**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br> 378 N Main Avenue <br> Tucson, AZ 85701, <br><br> DEFENDERS OF WILDLIFE, <br> 1130 17th Street NW <br> Washington, DC 20036, <br><br> THE HUMANE SOCIETY OF THE <br> UNITED STATES, <br> 1255 23rd Street NW <br> Suite 450 <br> Washington, DC  20037, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR ROSS, *in his official capacity as Secretary*, <br> U.S. Department of Commerce <br> 1401 Constitution Avenue, NW <br> Washington, DC 20230, <br><br> CHRIS OLIVER, *in his official capacity as Assistant Administrator*, <br> NOAA Fisheries <br> 1315 East-West Highway <br> Silver Spring, MD 20910, <br><br> NATIONAL MARINE FISHERIES SERVICE, <br> 1315 East-West Highway <br> Silver Spring, MD 20910, <br><br> Defendants. | Case No. <br><br><br> **COMPLAINT FOR DECLARATORY AND OTHER RELIEF** |

**INTRODUCTION**

1.  In this case, the Center for Biological Diversity, Defenders of Wildlife, and The Humane Society of the United States ("Plaintiffs") challenge the failure of the Secretary of Commerce and the National Marine Fisheries Service (collectively, "NMFS" or "Defendants") to

1

comply with the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361–1389, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, in authorizing and managing the American lobster fishery given the fishery's ongoing harmful impacts to critically imperiled North Atlantic right whales.

2.      The North Atlantic right whale is one of the most endangered marine mammals in the world. The population is in decline and consisted of only around 455 animals as of 2016. Sadly, at least 17 right whales died in 2017 alone, pushing the species even closer to the brink of extinction. Scientists now predict that, if current trends continue, the species could be functionally extinct by 2040.

3.      Entanglement in commercial fishing gear is one of the most significant threats to the right whale's survival and recovery, and the primary cause of right whale injuries and deaths in recent years. From 2010 to 2016, entanglements accounted for 85% of diagnosed right whale mortalities.

4.      When right whales become entangled in fishing gear, heavy fishing line – often still connected to even heavier traps – wraps around the whale's head, mouth, flippers, or tail, sometimes preventing the animal from resurfacing, resulting in drowning. If entangled animals do not immediately drown, the remaining entangling line often impedes basic movement, feeding, and reproduction, and causes chronic infection and damage to bone and muscle.

5.      The American lobster fishery is a U.S. fishery that frequently entangles right whales. NMFS authorizes and manages operation of the fishery. In 2014, NMFS issued a biological opinion purporting to analyze the ongoing effects of the fishery on ESA-listed species, including North Atlantic right whales ("Biological Opinion"). In the Biological Opinion, NMFS found that the fishery is likely to kill or seriously injure more than three North Atlantic right

whales every year. Nevertheless, NMFS concluded that the fishery is not likely to jeopardize the continued existence of North Atlantic right whales.

6.      NMFS's Biological Opinion is arbitrary, capricious, and violates the ESA and APA. 16 U.S.C. § 1536; 5 U.S.C. § 706(2). The Biological Opinion improperly truncates the scope of the agency action under review, employs a patently unlawful jeopardy analysis, does not include the required incidental take statement, and otherwise fails to establish a rational connection between the facts found and conclusions made.

7.      Because of these fatal flaws, NMFS cannot rely on the Biological Opinion to meet its substantive duties under Section 7 of the ESA. NMFS's authorization and management of the American lobster fishery without an adequate biological opinion violates its duty to ensure that its actions do not jeopardize the continued existence of critically endangered North Atlantic right whales. 16 U.S.C. § 1536(a)(2).

8.      Additionally, NMFS's authorization and management of the American lobster fishery is causing the unpermitted take of critically endangered North Atlantic right whales, in violation of Section 9 of the ESA. 16 U.S.C. § 1538(a)(1)(B), (g). Moreover, NMFS's authorization and management of a fishery that results in unpermitted, unsustainable levels of take of right whales without the implementation of additional measures to reduce the risk of further entanglements, is arbitrary, capricious, and violates the MMPA and APA. 16 U.S.C. § 1371(a); 5 U.S.C. § 706(2).

9.      Accordingly, Plaintiffs seek declaratory relief that NMFS is in violation of the ESA, MMPA, and APA. Plaintiffs also seek an order requiring NMFS to complete new ESA consultation by a date certain and implement mitigation measures to protect critically endangered

North Atlantic right whales from suffering further painful and deadly entanglements in lobster gear.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter under 28 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the ESA, MMPA, and APA. An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 701–706, and 16 U.S.C. § 1540(g).

11. Venue in this Court is proper under 28 U.S.C. § 1391. This action is brought against an agency of the United States and officers of the United States acting in their official capacity, Defendants maintain offices in the District of Columbia, and Plaintiffs Defenders of Wildlife and The Humane Society of the United States have their principle places of business in the District of Columbia.

12. Pursuant to 16 U.S.C. § 1540(g), Plaintiffs provided the Secretary of Commerce with notice of its ESA violations on October 2, 2017, more than 60 days prior to the commencement of this case.

## PARTIES

### Plaintiffs

13. Plaintiff Center for Biological Diversity ("the Center") is a non-profit, 501(c)(3) organization incorporated in the State of California and maintains offices across the country, including in Washington, D.C., California, Arizona, Florida, New York, Oregon, and Washington State, and in Baja California Sur, Mexico. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and

their habitats both in the United States and abroad. The Center has over 63,000 active members and around 1.6 million online activists. Through its Oceans Program, the Center has worked for years to protect marine mammals in the United States and abroad that are threatened by unsustainable or harmful fishing practices, including through advocacy, litigation, and participation as appointed members of five MMPA-mandated take reduction teams, including the Atlantic Large Whale Take Reduction Team. The Center has a long history of actively advocating for protection of the imperiled North Atlantic right whale, and brings this action on behalf of itself and its members.

14.     Center members and staff live in and regularly visit areas along the Atlantic Coast where North Atlantic right whales are known to occur in order to enjoy, study, photograph, recreate, observe, and attempt to observe the whales. For example, one Center member has a home near Duxbury, Massachusetts, on Cape Cod Bay. Her home is located on the top of a hill above the Bay and she can watch whales from her living room window. She has seen many whales from this vantage, and one particularly memorable spring, viewed a large number of right whales together in the Bay, spouting water. She has also seen a female and baby right whale in the waters near her home. She plans to continue looking for and viewing right whales from her window and near her home in the future. Her interests are harmed by Defendants' failure to sufficiently safeguard the right whale. Center members and staff have concrete plans to continue to live in, travel to, and recreate in areas where they can enjoy right whales and their coastal habitat. Moreover, the Center and its members and staff actively work on behalf of right whale conservation by reviewing scientific data and agency information, petitioning NMFS for increased protections, and monitoring and commenting on activities that have the potential to harm right whales.

15.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit, 501(c)(3) organization headquartered in Washington, D.C. with offices in Arizona, Alaska, California, Colorado, Florida, Idaho, Montana, New Mexico, North Carolina, and Washington. Founded in 1947, Defenders is a science-based conservation organization with more than 1.2 million members and supporters nationwide. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Defenders employs education, litigation, research, legislation, and advocacy to defend wildlife and their habitats. Defenders is one of the nation's leading advocates for endangered species and has been involved in issues of ESA and MMPA implementation for decades. Defenders is an appointed member of the Atlantic Large Whale Take Reduction Team and has devoted significant time to right whale conservation efforts on behalf of its members over many years.

16.     Defenders brings this action on behalf of itself and its members, many of whom enjoy observing, photographing, and appreciating North Atlantic right whales in the wild, and studying the species in its natural habitat. Defenders' members regularly engage in these activities in various locations along the Atlantic Coast and will continue to do so in the future. The interests of Defenders' members in viewing, studying, and enjoying North Atlantic right whales are harmed by Defendants' failure to adequately protect the right whale.

17.     Plaintiff The Humane Society of the United States ("HSUS") is a non-profit, 501(c)(3) organization headquartered in Washington, D.C. HSUS is the nation's largest animal protection organization, with members and supporters across the country and throughout the world, millions of whom reside in states along the Atlantic Coast. HSUS is committed to protecting and conserving the nation's wildlife, and fostering the humane treatment of all

animals. In furtherance of these goals and objectives, HSUS and its members have demonstrated a strong interest in the conservation and humane treatment of marine mammals, including the North Atlantic right whale. For example, HSUS is an appointed member of NMFS's Southeast Right Whale Recovery Plan Implementation Team and has served as a member of the Atlantic Large Whale Take Reduction Team since its inception in 1996, actively participating in efforts to protect the North Atlantic right whale and other large whales from entanglement in fishing gear.

18.     HSUS brings this action on behalf of itself and its members, who regularly engage in educational, recreational, and scientific activities involving the North Atlantic right whale. Many HSUS members live in close proximity to and frequently visit various portions of the Atlantic coast and regularly view or attempt to view right whales in their natural habitat. HSUS members regularly whale watch both from the shore and from boats, including commercial whale watching vessels. HSUS members plan to continue to observe this species in the future. One member, for example, is a long-time resident of Massachusetts, and lives within a mile of the coastline where right whales have been cited. She regularly walks along the shore or goes out on research or whale watching boats looking for right whales, and has taken others to see them as well. She also serves on NMFS's Southeast Right Whale Recovery Plan Implementation Team and the Atlantic Large Whale Take Reduction Team as a representative of HSUS. Viewing and hoping to view right whales is an ongoing and significant part of her professional and recreational life, and she is materially harmed by Defendants' failure to sufficiently protect the right whale. Further, HSUS and its members regularly review agency proposals affecting the North Atlantic right whale, review agency data and documentation provided to the public, and participate by commenting and advising the agency on its actions.

19.     Plaintiffs and their members derive scientific, educational, recreational, conservation, aesthetic, and other benefits from the existence of the right whale in the wild. These interests have been, are, and will be directly, adversely, and irreparably harmed by Defendants' violations of law. Plaintiffs' members will continue to be prejudiced by Defendants' unlawful actions unless and until this Court provides Plaintiffs' requested relief.

### Defendants

20.     Defendant Wilbur Ross is the Secretary of the U.S. Department of Commerce, and is sued in his official capacity. Secretary Ross directs all business of the Department of Commerce and is the official ultimately responsible under federal law for ensuring that the actions and decisions of the Department comply with all applicable laws and regulations, including the ESA and MMPA.

21.     Defendant Chris Oliver is the Assistant Administrator of the National Oceanic and Atmospheric Administration Fisheries ("NOAA Fisheries"), and has responsibility for implementing and fulfilling the agency's duties under the ESA and the MMPA. Mr. Oliver is sued in his official capacity.

22.     Defendant National Marine Fisheries Service is an agency within NOAA, and is sometimes referred to as NOAA Fisheries. NMFS is the agency to which the Secretary of Commerce has delegated the authority to conserve endangered and threatened marine species under the ESA and marine mammal species under the MMPA.

### LEGAL BACKGROUND

### The Endangered Species Act

23.     In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction" and that these

species are "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(2), (3).

24.    The ESA protects imperiled species by listing them as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretary of Commerce is charged with administering and enforcing the ESA for most marine species, including North Atlantic right whales, and has delegated this responsibility to NMFS. 50 C.F.R. § 402.01(b).

25.    The ESA seeks "to provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." 16 U.S.C. § 1531(b). The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). Accordingly, the ultimate goal of the ESA is not only to prevent listed species from going extinct, but also to recover these species to the point where they no longer require ESA protection.

26.    To accomplish these goals, Section 9 of the ESA generally makes it unlawful for "any person" to "take" an endangered species. *Id.* § 1538(a)(1). A "person" includes private parties as well as local, state, and federal agencies. *Id.* § 1532(13). "Take" is defined broadly under the ESA to include harassing, harming, wounding, killing, or capturing a protected species (or attempting to engage in such conduct), either directly or by degrading its habitat enough to impair essential behavior patterns. *Id.* § 1532(19); 50 C.F.R. § 222.102. The ESA prohibits the

acts of parties directly causing a take as well as the acts of third parties, such as governmental agencies, whose acts cause such taking to occur. 16 U.S.C. § 1538(g).

27.    Additionally, Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any" endangered or threatened species. *Id.* § 1536(a)(2).

28.    To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NMFS when their actions "may affect" a listed marine species. 16 U.S.C. § 1536(a)(2). NMFS and the action agency must utilize the "best scientific and commercial data available" during the consultation process. *Id.*; 50 C.F.R. § 402.14(a).

29.    Where, as here, NMFS is the action agency as well as the expert consulting agency, NMFS must undertake intra-agency consultation. At the completion of consultation, the consulting branch of NMFS issues a biological opinion that describes the expected impact of the agency action on listed species. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

30.    The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of "the current status of the listed species," the "effects of the action," and the "cumulative effects." 50 C.F.R. § 402.14(g)(2), (g)(3).

31.    "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline." *Id.* § 402.02. The "environmental baseline" includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* "Cumulative

effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.*

32.    Thus, in issuing a biological opinion, NMFS must consider not just the isolated share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but also the effects of that action when *added to* all other activities and influences that affect the status of that species.

33.    After NMFS has added the direct and indirect effects of the action to the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species." 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R. § 402.14(h). A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

34.    A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in take incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4).

35.    The incidental take statement must specify the amount or extent of incidental taking on such listed species, "reasonable and prudent measures" that NMFS considers necessary or appropriate to minimize such impact, and set forth "terms and conditions" that must be complied with by the action agency to implement the reasonable and prudent measures. *Id.*; 50 C.F.R. § 402.14(i). Additionally, when the listed species to be incidentally taken are marine mammals, the take must first be authorized by NMFS pursuant to the MMPA, and the incidental

take statement must include any additional measures necessary to comply with the MMPA take authorization. *Id*.

36.     The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

37.     If NMFS determines in its biological opinion that the action is likely to jeopardize the continued existence of a listed species, the biological opinion must include "reasonable and prudent alternatives" to the action that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

38.     Regardless of the conclusion reached in the biological opinion, the agency undertaking the federal action has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action does not satisfy its substantive duty to ensure against jeopardy.

39.     Moreover, the ESA's implementing regulations further require an agency to reinitiate Section 7 consultation when: (a) the amount of take specified in the incidental take statement is exceeded; (b) new information reveals that the action may have effects not previously considered; (c) the action is modified in a way that was not previously considered; or (d) a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16.

40.     The ESA specifies that Section 7 consultation must typically be completed within ninety days after initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e).

41.     The substantive duty to ensure against jeopardy of listed species remains in effect

regardless of the status of the consultation.

**The Marine Mammal Protection Act**

42.    Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the MMPA in 1972 to ensure that marine mammals are "protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). The central purpose of the MMPA is to prevent marine mammal stocks from falling below their "optimum sustainable population" levels, defined as the "number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element." *Id.* §§ 1361(2), 1362(9).

43.    To promote these objectives, the MMPA establishes a general moratorium on the "taking" of marine mammals, *id.* § 1371(a), expressly prohibits the unauthorized "take" of a marine mammal by any person, *id.* § 1372(a), and specifically requires NMFS to "prevent the depletion" of marine mammals from incidental take by commercial fisheries. *Id.* § 1387(f)(1). Prohibited takings include actions that kill or injure marine mammals or disrupt behavioral patterns, such as migration, breathing, breeding, or feeding. *Id.* § 1362(13), (18).

44.    In addition, the MMPA requires NMFS to prepare a "stock assessment" for each marine mammal population in U.S. waters, documenting the population's abundance and trend, describing the fisheries that interact with the stock, and estimating the level of "mortality and serious injury" caused by those fisheries each year. 16 U.S.C. § 1386(a). NMFS defines "serious injury" as "any injury that will likely result in mortality." 50 C.F.R. § 216.3.

45.    Based on the stock assessment, the agency must estimate the "potential biological removal" ("PBR") level for each stock, 16 U.S.C. § 1386(a), defined as the maximum number of

animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. *Id.* § 1362(20).

46.    The MMPA also requires that NMFS annually publish a list of commercial fisheries, classifying each fishery as a Category I, II, or III fishery. *Id.* § 1387(c)(1). Category I fisheries are those that cause "frequent incidental taking of marine mammals;" Category II fisheries are those that cause "occasional incidental mortality and serious injury of marine mammals;" and Category III fisheries are those that have "a remote likelihood of or no known incidental mortality or serious injury of marine mammals." *Id.*

47.    Sections 101 and 118 of the MMPA provide for limited exemptions for the incidental take of endangered or threatened marine mammals in the course of commercial fishing operations, but only if specifically authorized by NMFS after the agency makes certain findings. *Id.* § 1387(a)(2), (a)(5)(E).

48.    Specifically, under Section 101(a)(5), NMFS can authorize the incidental take of ESA-listed marine mammals by commercial fishing operations for a three-year period provided it first finds, after public notice and comment, that the taking will have a "negligible impact" on the species or stock, a recovery plan has been or is being developed under the ESA, and, if required by Section 118, a monitoring plan and a take reduction plan are in place. *Id.* § 1371(a)(5)(E)(i).

49.    A negligible impact is "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103.

50.     If the incidental take by a commercial fishery will have no more than a "negligible impact" on listed marine mammals and the other requirements of Section 101(a)(5)(E)(i) have been met, NMFS can authorize the take by the fishery and give permits to the vessels operating in the fishery to which the authorization applies. 16 U.S.C. § 1371(a)(5)(E)(ii).

51.     If, during the course of the commercial fishing season, NMFS determines that the level of incidental serious injury and mortality it authorized has resulted or is likely to result in an impact that is more than negligible on the listed species or stock, NMFS "shall use the emergency authority granted under [Section 118] to protect such species or stock, and may modify any permit granted . . . as necessary." *Id.* § 1371(a)(5)(E)(iii). In addition, NMFS can suspend or revoke a permit if it determines the permittee is not in compliance with the conditions or limitations of its permit. *Id.* § 1371(a)(5)(E)(iv).

52.     Section 118, in turn, requires NMFS to develop a "take reduction plan" for each "strategic stock" of marine mammals, including any ESA-listed species. *Id.* §§ 1387(f)(2), 1362(19)(c). Each take reduction plan must contain regulatory measures to reduce fishery-related mortality and serious injury to below PBR within six months of the plan's implementation. *Id.* § 1387(f)(4), (f)(5). The "long-term goal" of the plan must be to reduce bycatch levels to the "zero mortality and serious injury rate." *Id.* § 1387(f)(2).

53.     The MMPA requires NMFS to amend the take reduction plan as necessary to meet the requirements of the MMPA. 16 U.S.C. § 1387(f)(7)(F). The MMPA also explicitly mandates that NMFS "prescribe emergency regulations that, consistent with such plan to the maximum extent practicable, reduce incidental mortality and serious injury in the fishery" when

necessary to protect a marine mammal species from significant adverse impacts from entanglements in commercial fishing gear. *Id.* § 1387(g)(1)(A).

54.     In response to the high level of marine mammal mortality from commercial fishing, NMFS adopted the Atlantic Large Whale Take Reduction Plan in 1997, which has operated since that time with the goal of reducing commercial fishing impacts on right whales. *See* 50 C.F.R. § 229.32.

55.     The American lobster fishery is subject to the Atlantic Large Whale Take Reduction Plan because NMFS has determined that it is a Category I fishery for North Atlantic right whales (i.e., the fishery causes frequent mortalities or serious injuries of endangered North Atlantic right whales). *See id.*; *see also* 82 Fed. Reg. 3,655 (Mar. 21, 2017) (listing fisheries that must comply in 2017). Owners of vessels or gear must obtain authorization under the MMPA from NMFS to lawfully engage in the fishery. 16 U.S.C. § 1387(c)(2); 50 C.F.R. § 229.4.

56.     Despite the existence of the Atlantic Large Whale Take Reduction Plan and NMFS's continued authorization of the American lobster fishery, the agency has never made the requisite MMPA Section 101(a)(5) findings necessary to authorize the incidental take of right whales by the American lobster fishery.

57.     Moreover, notwithstanding the fact that NMFS's 2016 stock assessment report shows that serious injuries and mortalities of critically endangered right whales from entanglement in commercial fishing gear are *more than four times* the species' PBR, NMFS has not issued emergency regulations under Section 118 to protect the species from entanglements.

58.     Nor has NMFS proposed amendments to the Atlantic Large Whale Take Reduction Plan. NMFS last amended the Atlantic Large Whale Take Reduction Plan to reduce

the risk of whale entanglements in 2014. 79 Fed. Reg. 36,586 (June 27, 2014).[1]

## The Administrative Procedure Act

59.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

60.     Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id.* § 706(2)(A), (C), (D).

## FACTUAL BACKGROUND

### The Critically Endangered North Atlantic Right Whale

61.     The North Atlantic right whale is one of the world's most critically endangered large whales and one of the world's most endangered mammals.

62.     Right whales migrate annually from their summer feeding grounds off the Northeast coast of the United States to their winter breeding grounds off the Southeast coast. Females typically reach sexually majority at age nine or ten and give birth to a single calf. The gestation period lasts roughly one year. From 2005 to 2014, the average right whale calving interval (i.e., the amount of time between the birth of a right whale calf and a subsequent calf from the same mother) ranged from three to five years. The average right whale calving interval has increased every year since 2014, to a high of 10 years in 2017.

63.     Right whales have raised patches of roughened skin on their heads, known as callosities. These callosities are found only on right whales and, like human fingerprints, have distinctive patterns that enable scientists to individually identify right whales. The callosities are covered by barnacles and tiny crustaceans known as whale lice. The barnacles and whale lice

---

[1] NMFS amended the Atlantic Large Whale Take Reduction Plan in 2015, but did so to exempt certain waters from the requirements of the 2014 rule. 80 Fed. Reg. 30,367 (May 28, 2015).

make the callosities appear white or pale yellow and thus visible from boats or during aerial surveys. Scientists maintain an extensive catalogue that documents each of the North Atlantic right whales known to exist.

64.     Although the North Atlantic right whale has been protected under the ESA since 1973, the species has not recovered to a sustainable population level. Scientists estimate that the species consisted of only 458 individuals as of 2016.

65.     NMFS has previously stated that the species' survival is dependent on protecting every individual, concluding that the loss of even one whale may contribute to the extinction of the species.

66.     Entanglement in commercial fishing gear and ship strikes are the two primary threats to the North Atlantic right whale's recovery.

67.     To reduce the threat of ship strikes, NMFS issued regulations in 2008 and 2013 requiring ships 65 feet in length and longer to slow to ten knots or less in important right whale habitat areas at certain times of year. 73 Fed. Reg. 60,173 (Oct. 10, 2008); 78 Fed. Reg. 73,726 (Dec. 9, 2013). The rule has reduced right whale mortalities from ship strikes.

68.     Entanglement in fishing gear has been the primary cause of death and serious injuries of North Atlantic right whales in recent years.

69.     When right whales get tangled up in lobster gear, they can drown immediately. In a significant number of cases, however, the animals die over an extended time period as they become incapacitated by injuries or infections caused by the entanglement or starve. Gear often wraps around whales' flippers, mouths, and tails and, particularly in growing animals, cinches tighter over time. Such injury often results in major tissue and bone damage and systemic

infection. The animals often lose weight, causing them to sink when dead so that death from entanglement is often underreported.



Image: Florida Fish & Wildlife Commission

70.     From 2010 to 2014, there were 24 records of serious injuries and mortalities of right whales that involved entanglement or fishery interactions – an average of 4.65 whales per year. In 2015, there were at least 4 new confirmed entanglements of right whales in fishing gear; in 2016 there were at least 7 new confirmed right whale entanglements; and in 2017, there were at least 9 new confirmed right whale entanglements.

71.     From 2010 to 2016, entanglement related deaths accounted for 85% of diagnosed right whale mortalities.

72.     In its 2016 stock assessment report, NMFS established an annual right whale PBR of 1. In other words, NMFS has determined that only a single right whale may be killed as a result of human activity while still allowing the species to reach its optimum sustainable

population under the MMPA. 16 U.S.C. § 1362(20). Therefore, current documented serious injuries and mortalities are unsustainable and vastly exceed the standards of the MMPA.

73.     Many right whale entanglements and mortalities are undocumented. Documented serious injury and mortality rates may vastly underrepresent actual mortality. Scarring data may better reflect actual entanglement rates. For example, a study of scarification data estimated that between 1980 and 2009, nearly 83% of known right whales suffered entanglements and 59% of right whales have been entangled more than once. A recent follow-up study indicates that the pattern persisted through at least 2012, and there is no evidence to suggest this threat has been mitigated.

74.     In addition to causing serious injuries and mortalities, entanglement in fishing gear causes other significant harm to right whales.

75.     For example, research indicates that survivorship probability for individual North Atlantic right whales is reduced by at least 20% after an entanglement event.

76.     Chronic entanglement impairs foraging and locomotion. Impaired locomotion can contribute to starvation, while an entanglement of the mouth directly impedes foraging, causing starvation. One entangled North Atlantic right whale gradually starved to death over the course of 320 days.

77.     An entanglement can also increase stress hormone levels, which can contribute to the development of systematic infections. Severe wounding from an entanglement or repeated entanglements of right whales can increase their susceptibility to disease.

78.     Entanglements are reducing the reproductive success of right whales, inhibiting the species' ability to recover from the brink of extinction. Studies show that severe wounding and repeated entanglements of right whales can cause reduced reproduction. Studies have also

found that female right whales seen alive and carrying gear or with severe wounds from entanglement had a significantly lower chance of calving again. Females that experienced moderate or severe entanglement wounds between calving events had a significantly longer calving interval than females that experienced minor or no entanglement wounds.

79.     Other studies have found that significant energetic impacts also occur from entanglements, especially in reproductive females. The drag from fishing gear can delay right whale reproduction by months or years.

80.     The myriad negative impacts from entanglements are contributing to the dire status of the right whale population. Just since 2010, calving rates have dropped by nearly 40%, and the last four decades have seen increasing numbers of right whales killed, primarily by entanglement in fishing gear. The right whale population is now in decline.

81.     The declining population trend was evident even before the spring and summer of 2017, during which at least 17 right whales were found dead in the United States and Canada. Twelve whales were found dead in Canadian waters, and five were found dead in U.S. waters. The cause of death is still being investigated for many of these deaths, but necropsies show that at least two of the whales found dead in Canadian waters appear to have died from entanglement in fishing gear. Two of the whales found dead in U.S. waters show evidence of entanglement. Some of the whales were too decomposed to determine cause of death.

82.     These mortalities, *which amount to nearly 4% of the current right whale population*, will compound negative impacts to right whales, especially considering that at least four of the dead whales have been identified as females and only five calves were born in 2017.

83.     Indeed, scientists estimate that if current trends continue, the species could be functionally extinct in 23 years.

**The American Lobster Fishery and its Impact on Right Whales**

84.     The American lobster fishery is the most active trap/pot fishery in the northeastern United States.

85.     Although the fishery uses multiple gear types, trap/pot gear predominates, accounting for 98% of total landings between 1981 and 2007. Lobster trap/pot gear consists of the trap(s), buoy-surface lines, groundline, and buoys. The traps are baited and rest on the seafloor until retrieved. Buoy lines connect to the trap and rise vertically to the surface through the water column. Some traps are set singly, with each trap having its own buoy-surface line, while others are fished in trawls, consisting of two or more traps per trawl. Multiple traps are linked together by groundline.

86.     In 2016, lobster landings totaled more than 158.5 million pounds, valued at more than $666.5 million.

87.     Commercial lobster fishing occurs year-round, although the fishery peaks in summer and early fall months.

88.     North Atlantic right whales are in danger of entanglements from lobster gear because they feed and travel in many of the same cold water areas in which the fishery operates. The risk of entanglement occurs year-round, though the risk is greatest during the summer and fall when both whales and lobster gear are the most concentrated and co-occur in many areas.

89.     The fishery operates under a dual management system whereby the Atlantic States Marine Fisheries Commission manages the fishery in state waters (0 to 3 miles from shore) and NMFS manages the fishery in federal waters (3 to 200 miles from shore) from Maine through Cape Hatteras, North Carolina. The primary area of lobster harvest is in the Gulf of Maine in depths up to 40 meters.

90.     NMFS authorizes and manages the operation of the American lobster fishery through implementation of various fishery management measures, including granting annual permits to vessels operating in federal waters under the Atlantic Coastal Fisheries Cooperative Management Act, which regulates federal permit holders regardless of whether they fish in federal or state waters. 16 U.S.C. §§ 5101–5108; 50 C.F.R. § 697.4(a), (g). NMFS also manages and authorizes operation of the fishery through the MMPA. 16 U.S.C. § 1387(c); 50 C.F.R. §§ 229.4, 229.32.

91.     NMFS is required to consult under the ESA regarding the effects of the fishery on listed species and ensure that its authorization and management of the fishery is not likely to jeopardize any listed species, including North Atlantic right whales. *See* 16 U.S.C. § 1536(a)(2).

92.     Following a series of entanglements after implementation of the Atlantic Large Whale Take Reduction Plan in 1997, NMFS reinitiated ESA consultation to consider how the American lobster fishery affects endangered right whales. The consultation resulted in a biological opinion in 2001 that concluded the existing conservation measures were inadequate to avoid the likelihood of jeopardy to right whales by the fishery. Accordingly, the biological opinion included a series of reasonable and prudent alternatives that would avoid this result.

93.     Even with the reasonable and prudent alternatives, the 2001 biological opinion did not authorize any take of right whales because the population level was too low to sustain any take. Rather, the 2001 biological opinion made clear that, "[g]iven the current critical status of the right whale population and the aggregate effects of human-caused mortality that has led to the species current status, the right whale population cannot sustain incidental mortality caused by the [American] lobster fishery." NMFS, *Biological Opinion re: Reinitiation of Consultation on the Federal Lobster Management Plan* at 101 (June 14, 2001).

94.     NMFS further recognized that it could not authorize any take because the negligible impact finding required by the MMPA could not be made. *Id.* at 107. Because no take could be authorized, the biological opinion stated that reinitiation of consultation would be required if a single right whale was killed or seriously injured by the fishery.

95.     Despite nearly a decade of right whale entanglements and deaths following the 2001 biological opinion, and reinitiating consultation in 2003, NMFS did not complete a new consultation on operation of the American lobster fishery until October 29, 2010.

96.     Shortly thereafter, one of the key assumptions underlying the 2010 biological opinion – that the lobster fishery would only kill or seriously injure one right whale per year – proved erroneous. Two of the plaintiffs in this case filed a lawsuit challenging the deficient 2010 biological opinion. *Humane Society of the U.S. v. NMFS*, Case No. 1:11-cv-11927 (D. Mass., filed Oct. 31, 2011), ECF Doc. No 1. NMFS issued a new biological opinion in August 2012 while the lawsuit was pending.

97.     The plaintiffs amended their complaint to challenge the August 2012 biological opinion. *Id.*, ECF Doc. No 21. The challenge to the 2012 biological opinion was based on many of the same deficiencies alleged in the lawsuit challenging the 2010 biological opinion. The case settled when NMFS agreed to issue a new biological opinion and implement new regulations to reduce the risk of right whale entanglements by a date certain. *Id.*, ECF Doc. Nos. 45, 47. NMFS issued the new Biological Opinion and regulations amending the Atlantic Large Whale Take Reduction Plan in 2014. 79 Fed. Reg. at 36,586.

**The Current American Lobster Fishery Biological Opinion**

98.     The 2014 Biological Opinion purports to analyze the effects of the American lobster fishery on North Atlantic right whales.

24

99.     The Biological Opinion defines the agency action as the continued operation of the American lobster fishery in state and federal waters for the next 10 years as managed by NMFS, including management measures implemented as part of the Atlantic Large Whale Take Reduction Plan.

100.    The Biological Opinion defines the action area as the area in which the American lobster fishery operates, which includes all waters within the U.S. Exclusive Economic Zone from Maine through Cape Hatteras, North Carolina, and the adjoining state waters that are affected through the regulation of activities of federal American lobster permit holders fishing in those waters.

101.    According to the Biological Opinion, right whale recovery is negatively affected by anthropogenic mortality.

102.    The Biological Opinion states that, relative to their population abundance, from 2007 to 2011, right whales had the highest proportion of reported entanglements and ship strikes of any species of large whale. From 2007 to 2011, the annual average of right whale serious injuries and mortalities from entanglement in fishing gear was 3.25 whales per year.

103.    The Biological Opinion notes that even when entanglement does not cause direct mortality, it may weaken or compromise an individual such that subsequent injury or death is more likely. For example, some right whales who have been entangled were later involved in ship strikes, suggesting that the animal may have become debilitated by entanglement to such an extent that it was less able to avoid a ship. And even when a whale is disentangled, the animal may die of injuries sustained by fishing gear.

104.    The Biological Opinion reiterates the conclusion in the revised Right Whale Recovery Plan that one of the most significant needs for the species is to reduce right whale deaths and injuries from commercial fishing activities.

105.    The Biological Opinion also recognizes other threats to right whales in its analysis of the environmental baseline and cumulative effects, including reduced genetic diversity, noise, military vessel activities and operations, ingestion of plastic debris, pollution, global climate change, and catastrophic events such as oil spills.

106.    For example, the Biological Opinion notes that noise pollution is increasing in the ocean at a substantial rate. This noise pollution can interfere with the whales' ability to feed and communicate for mating. The Biological Opinion also states that climate change may negatively affect right whales by reducing their prey availability, and could emerge as a significant factor influencing the recovery of right whales.

107.    The Biological Opinion finds that entanglements of North Atlantic right whales in trap/pot gear have continued, and will continue to occur, despite the measures implemented by the Atlantic Large Whale Take Reduction Plan.

108.    The Biological Opinion concludes that the American lobster fishery, operating pursuant to the Atlantic Large Whale Take Reduction Plan, will kill or seriously injure up to 3.25 North Atlantic right whales per year, or a total of 32.5 whales for the 10-year period analyzed.

109.    The Biological Opinion concludes that the continued operation of the American lobster fishery for 10 years is not likely to jeopardize the continued existence of North Atlantic right whales. NMFS's jeopardy analysis is entirely conclusory.

110.    Further, NMFS's jeopardy analysis only considers the impacts from entanglements it finds will result in serious injuries or mortalities. NMFS's jeopardy analysis

does not consider the best available scientific data documenting the numerous other negative impacts to right whales from entanglements, such as increased susceptibility to disease and infection, increased stress, reproductive failure, and reduced chance of survival.

111.    NMFS's jeopardy analysis does not add the effects of the operation of the lobster fishery on right whales to the environmental baseline and cumulative effects, and instead compares the discrete risk posed by the fishery to the overall grim state of affairs for North Atlantic right whales.

112.    The Biological Opinion does not include an incidental take statement authorizing the take of right whales by the American lobster fishery that the Biological Opinion admits and assumes will occur.

113.    While the Biological Opinion does not include an incidental take statement, it does include a numeric trigger that, if reached, requires NMFS to reinitiate consultation. The Biological Opinion requires reinitiation of consultation when: (a) the annual average serious injury and mortality rate for right whales is greater than 3.25 whales at the conclusion of a five-year period; or (b) at any time during the five-year period, the number of right whale serious injuries and mortalities make it statistically impossible for the average to be less than 3.25 whales at the end of the five year period.

114.    The Biological Opinion contains many of the same inadequacies as those NMFS issued in 2010 and 2012.

115.    Following Plaintiffs' 60-day notice of intent to sue NMFS for violations of the ESA, the agency reinitiated consultation on the Biological Opinion based on new information indicating that the North Atlantic right whale population is in decline.

116.   NMFS has not completed new consultation on the American lobster fishery. The 2014 Biological Opinion remains in force. NMFS continues to rely on the Biological Opinion in authorizing and managing the American lobster fishery.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of the ESA and APA – Inadequate Biological Opinion

117.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in this Complaint.

118.   In completing a biological opinion and making its jeopardy determination pursuant to Section 7(a)(2) of the ESA, NMFS, in its capacity as the expert consulting agency, must consider whether the aggregate effects of the factors considered in the environmental baseline, effects of the action, and cumulative effects, when viewed against the status of the species, are likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g). A biological opinion must include an incidental take statement for any take that may occur from the action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (i).

119.   NMFS's Biological Opinion is a final agency action within the meaning of the APA.

120.   NMFS's Biological Opinion fails to consider the full effects of the action by improperly limiting the temporal scope of the action to 10 years.

121.   NMFS's Biological Opinion fails to employ the proper jeopardy analysis for at least the following reasons:

(a) improperly considering the impacts from entanglements deemed serious injuries or mortalities only and not also considering other negative effects from entanglements, such as reduced chances of survival and reproduction;

28

(b) improperly considering only the isolated share of responsibility for impacts to right whales from operation of the fishery, rather than *adding* the direct and indirect effects of operation of the fishery to all other activities and influences that affect the status of the species; and

(c) improperly analyzing the likelihood of jeopardy based on whether the proposed action will affect the species' trend toward recovery or the chance it will be reclassified as threatened, rather than on the species' actual likelihood of recovery.

122.   NMFS's determination in the Biological Opinion that the continued operation of the American lobster fishery will not jeopardize the continued existence of North Atlantic right whales, is improperly conclusory, has no factual and analytical basis in the Biological Opinion, is not rationally connected to the facts found in the Biological Opinion, and is not based on the best available scientific data.

123.   NMFS's Biological Opinion fails to include an incidental take statement that would account for, minimize, require the reporting of, and authorize take of right whales in accordance with both the ESA and the MMPA despite finding that these endangered whales will be entangled, killed, and seriously injured by operation of the American lobster fishery.

124.   NMFS's Biological Opinion includes a numeric trigger for reinitiation of consultation that allows more than three North Atlantic right whales to be killed or seriously injured before reinitiation is required. The trigger is an improper and unlawful substitute for an incidental take statement.

125.   NMFS's Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A).

## Second Claim for Relief
### Violation of the ESA – Failure to Ensure Against Jeopardy

126.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in this Complaint.

127.    NMFS has a substantive duty as the action agency authorizing, permitting, and managing the American lobster fishery to ensure that its actions are not likely to jeopardize the continued existence of North Atlantic right whales. 16 U.S.C. § 1536(a)(2).

128.    The Biological Opinion is unlawful and NMFS cannot rely on this legally invalid opinion to meet its substantive obligations under Section 7(a)(2) of the ESA, *id.*, in authorizing, permitting, and managing the American lobster fishery.

129.    NMFS is failing to ensure that its continued authorization, permitting, and management of the American lobster fishery does not jeopardize the continued existence of endangered North Atlantic right whales, in violation of Section 7(a)(2) of the ESA. *Id.*

## Third Claim for Relief
### Violation of the ESA – Unpermitted Take of North Atlantic Right Whales

130.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation of this Complaint.

131.    Section 9 of the ESA prohibits the "take" of endangered species, and prohibits federal agencies from authorizing activities that cause the take of endangered species. 16 U.S.C. § 1538(a)(1)(B), (g).

132.    The American lobster fishery entangles, injures, and kills (i.e., "takes") North Atlantic right whales. For example, NMFS's Biological Opinion concludes that the lobster fishery will kill or seriously injure up to 3.25 right whales each year. NMFS has also reported that at least one right whale was confirmed entangled in U.S. lobster gear in 2016.

133.   The Biological Opinion does not include an incidental take statement exempting takes of North Atlantic right whales by the American lobster fishery from the ESA's prohibition on take. Thus, every entanglement of a North Atlantic right whale in lobster gear is unlawful.

134.   NMFS, as the action agency authorizing, permitting, and managing the American lobster fishery, is "caus[ing]" the unpermitted take of endangered North Atlantic right whales, in violation of Section 9 of the ESA. 16 U.S.C. § 1538.

**Fourth Claim for Relief**
**Violation of the MMPA and APA – Unauthorized Take of North Atlantic Right Whales**

135.   Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation of this Complaint.

136.   The MMPA generally prohibits the take of marine mammals. 16 U.S.C. §§ 1371(a), 1372(a). Section 101(a)(5)(E) and Section 118 contain a limited exception to this otherwise broad prohibition whereby NMFS can authorize the incidental take of ESA-listed marine mammals by commercial fishing operations, provided it first finds that, *inter alia*, such take will have a "negligible impact" upon the species or stock of animals to be taken, and issues a permit with conditions. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2).

137.   NMFS has determined that the American lobster fishery causes frequent injury and mortality of North Atlantic right whales, even with the Atlantic Large Whale Take Reduction Plan in place. For example, NMFS's Biological Opinion finds that the fishery will kill or seriously injure up to 3.25 right whales per year. NMFS has reported that at least one right whale was confirmed entangled in U.S. lobster gear in 2016.

138.   However, NMFS has not made the requisite negligible impact determination nor authorized the incidental take of right whales by the American lobster fishery. Nevertheless, NMFS continues to authorize operation of the fishery.

139.   NMFS's continued authorization, permitting, and management of the American lobster fishery in absence of an MMPA take authorization is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the MMPA, in violation of the APA. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.   Declare that NMFS's Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in violation of the ESA and APA;

2.   Declare that NMFS is in violation of its duty under Section 7(a)(2) of the ESA to ensure that its actions do not jeopardize the continued existence of North Atlantic right whales;

3.   Declare that NMFS is in violation of Section 9 of the ESA by causing the unlawful take of North Atlantic right whales;

4.   Declare that NMFS's continued authorization of the lobster fishery without incidental take authorization under the MMPA is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the MMPA and APA;

5.   Order NMFS to complete Section 7 consultation regarding the impacts of the American lobster fishery on North Atlantic right whales, and issue a new, legally valid biological opinion within sixty (60) days;

6.   Order NMFS to implement additional mitigation measures to reduce the risk of entanglement of North Atlantic right whales;

7.   Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

8.   Grant such other relief as the Court deems just and proper.

Dated: January 18, 2018

Respectfully submitted,

/s/ Sarah Uhlemann
Sarah Uhlemann, DC Bar No. 501328
Center for Biological Diversity
2400 80th Street NW, #146
Seattle, WA 98117
Phone: (206) 327-2344
Email: suhlemann@biologicaldiversity.org

Kristen Monsell
*pro hac vice admission pending*
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

Jane P. Davenport, DC Bar No. 474585
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
Phone: (202) 772-3274
Email: jdavenport@defenders.org

Laura Friend, DDC Bar No. NY0217
The Humane Society of the United States
1255 23rd Street NW, Ste. 450
Washington, DC 20037
Phone: (202) 676-2331
Email: lfriend@humanesociety.org

*Attorneys for Plaintiffs*