UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR ROSS, *et al.*,<br><br>Defendants. | Civil Action Nos. 18-112 (JEB)<br>18-283 (JEB) |

MEMORANDUM OPINION

In these two consolidated cases, four environmental and conservation groups challenge a 2014 Biological Opinion issued by the National Marine Fisheries Service regarding the effects of the American lobster fishery on the North Atlantic right whale. Alleging that the BiOp violates several federal statutes, Plaintiffs have brought this suit against the Secretary of Commerce, NMFS, and the Assistant Administrator for Fisheries at the National Oceanic and Atmospheric Administration. Defendants now move to transfer this action to Massachusetts, where the BiOp was prepared. Because the Court finds that convenience and the interests of justice warrant keeping the matter in the District of Columbia, it will deny the Motion.

**I.      Background**

The North Atlantic right whale is one of the world's most endangered mammals, with only an estimated 458 creatures alive as of 2016. See No. 18-112 (Center for Biological Diversity, *et al.*), Compl., ¶¶ 61, 64. In recent years, the primary cause of death and serious injury for the species has been entanglement in fishing gear. Id., ¶ 68. When a right whale becomes entangled, it can die immediately by drowning or over an extended time period from

1

injury, infection, or starvation. Id., ¶ 69. From 2010-16, entanglements accounted for 85% of right-whale deaths. Id., ¶ 71. If these trends continue, scientists estimate that the leviathan could become functionally extinct in 23 years. Id., ¶ 83.

Right whales do not maintain a circumscribed habitat, but "migrate annually from their summer feeding grounds off the Northeast Coast of the United States to their winter breeding grounds off the Southeast Coast." Id., ¶ 62. Because of their migratory pattern, the government has designated the right whale's critical habitat to lie in waters stretching from Maine to Florida. See No. 18-283 (Conservation Law Foundation), Compl., ¶¶ 66-67. In the Northeast, the right whales swim in many areas where the American lobster fishery, an entity authorized and managed by NMFS, operates. See CBD Compl., ¶ 88. The fishery's lobster gear creates a significant risk of entanglement for the whale, particularly in the summer and early fall, when both the mammal's feeding and lobster fishing are at their peak in many of the same waters. Id., ¶¶ 87-88.

Two statutes — the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.* — seek to protect species like the right whale in danger of extinction. Both prohibit any entity from "tak[ing]" an endangered species. See 16 U.S.C. §§ 1538(a)(1), 1371(a), 1372(a). Taking encompasses a broad range of harms, including trapping, wounding, killing, or capturing a protected species. Id. § 1532(19). The Secretary of Commerce is responsible for administering and enforcing the statutes. For most marine species, including the right whale, the Secretary has delegated this responsibility to the National Marine Fisheries Service, a line office within the National Oceanic and Atmospheric Administration, which itself sits in the Department of Commerce. See 50 C.F.R. § 402.01(b). Pursuant to the ESA, the Secretary must ensure that "any action authorized, funded, or carried

2

out by [a federal] agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). NMFS does so by issuing a biological opinion. See 50 C.F.R. § 402.14(g)(4).

Because NMFS authorizes and manages the operation of the American lobster fishery, it must prepare biological opinions to determine the effects of the fishery on threatened and endangered species. See CBD Compl., ¶¶ 90-91. In 2014, the Agency issued a BiOp to analyze the effects on the North Atlantic right whale. Id., ¶ 98. Looking at the "waters from Maine through Cape Hatteras, NC," CLF Compl., ¶ 98, the opinion estimated that right-whale entanglements from the American lobster fishery would be unlikely to increase above 3.25 per year and concluded that the fishery does not threaten the survival of the whale. Id., ¶¶ 103-04. The BiOp was "prepared" and "drafted" in NMFS's Greater Atlantic Regional Fisheries Office, which is located in Gloucester, Massachusetts, and signed by GARFO's Regional Administrator. See Mot. to Transfer, Attach. 1 (Affidavit of Michael Pentony), ¶¶ 1, 5.

In January 2018, the Center for Biological Diversity, Defenders of Wildlife, and the Humane Society of the United States brought suit, alleging that the 2014 BiOp does not comply with the ESA, the MMPA, or the Administrative Procedure Act. See CBD Compl., ¶ 1. The following month, the Conservation Law Foundation filed a Complaint with substantially similar claims and requests for relief. See CLF Compl. After Defendants separately moved to transfer both cases to the District Court for the District of Massachusetts, this Court ordered all parties to submit a notice on their position regarding consolidation. See Minute Order of April 24, 2018. As the parties generally agreed that it would be proper, the Court consolidated the cases on May 2, 2018. See Minute Order. It will thus analyze the Motions to Transfer under the current

3

consolidated posture.

## II. Legal Standard

Even if a plaintiff has brought its case in a proper venue, a district court may, "for the convenience of parties and witnesses, in the interests of justice . . . transfer [it] . . . to any other district or division where [the case] might have been brought." 28 U.S.C. § 1404(a). The only textual limitation on the Court's power to transfer a case under § 1404(a), then, is the requirement that the case "might have been brought" in the forum to which the defendant is seeking transfer. Van Dusen v. Barrack, 376 U.S. 612, 623 (1964). In other words, the transfer statute requires that venue be proper in the new forum.

Once that threshold condition is met, district courts have "discretion . . . to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen, 376 U.S. at 622); see also Pres. Soc'y of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 53 (D.D.C. 2012). This analysis "calls on the district court to weigh in the balance a number of case-specific factors," which typically relate to the private interests of the parties and the public interests of justice. See Stewart Org., 487 U.S. at 29-30.

In evaluating motions to transfer venue, courts in this circuit are instructed to guard against "the danger that a plaintiff might manufacture venue in the District of Columbia . . . [b]y naming high government officials as defendants." Cameron v. Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993). Still, to prevail, the movant must show that "considerations of convenience and the interest of justice weigh in favor of transfer." Sierra Club v. Flowers, 276 F. Supp. 2d 62, 65 (D.D.C. 2003); Trout Unlimited v. U.S. Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996) (movant bears burden to show that transfer is proper).

4

**III. Analysis**

    A. <u>Propriety of New Venue</u>

Both parties agree that § 1404(a)'s threshold query — whether the case could have been brought in the proposed venue — is satisfied here. <u>See</u> CBD Opp. at 6 (conceding that case could have been brought in District of Massachusetts). Under the general venue statute, venue in a suit against the federal government will lie in any district in which a plaintiff resides. <u>See</u> 28 U.S.C. § 1391(e)(1)(C). At least one Plaintiff, Conservation Law Foundation, has its principal place of business in Boston. <u>See</u> CLF Compl., ¶ 15. Section 1404(a)'s threshold requirement is thus satisfied.

    B. <u>Private- and Public-Interest Factors</u>

Turning to the case-specific factors, Defendants have the burden to show that the "particular circumstances" of the case "render [this] forum inappropriate." <u>Starnes v. McGuire</u>, 512 F.2d 918, 925 (D.C. Cir. 1974). For this determination, the Court assesses a number of private- and public-interest factors. <u>See</u> <u>Trout Unlimited</u>, 944 F. Supp. at 16. The former include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof. <u>Id.</u> The latter are: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the local interest in having local controversies decided at home. <u>Id.</u>

        1. *Private–Interest Factors*

As with many cases that will be decided on an administrative record, the most relevant private-interest factors are the parties' choice of forum and where the claim arose. The Court addresses both below before briefly discussing those factors related to convenience.

5

a. Parties' Choice of Forum

When a plaintiff brings suit in its home forum, that choice is afforded "substantial deference." The Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 12 (D.D.C. 2000); Sierra Club v. Van Antwerp, 523 F. Supp. 2d 5, 11 (D.D.C. 2007). That is so even when all plaintiffs do not reside in the chosen forum. See Van Antwerp, 523 F. Supp. 2d at 11 (affording deference to all five plaintiffs based on residency of one); see also Greater Yellowstone Coal. v. Bosworth, 180 F. Supp. 2d 124, 129 (D.D.C. 2001) (denying transfer where "two of the five plaintiffs have offices in the District of Columbia"); Wilderness Soc'y, 104 F. Supp. 2d at 14 (denying transfer where "[f]our of the [eight] plaintiffs are headquartered in Washington, D.C. and two others have offices here"). As Defendants concede, at least one Plaintiff here is headquartered in the District. See Mot. at 15; see also CLF Compl., ¶¶ 15, 17. Indeed, both Defenders of Wildlife and The Humane Society have their homes here, and the Center for Biological Diversity also maintains an office in this city. As three of the four Plaintiffs have significant ties to the District, the Court accords Plaintiffs' choice to bring this claim here "substantial weight." Wilderness Soc'y, 104 F. Supp. 2d at 18.

In contrast, a defendant's forum preference "is not ordinarily entitled to deference." To show that transfer is appropriate, rather, a defendant "must establish that the added convenience and justice of litigating in [its] chosen forum overcomes the . . . deference given to" the plaintiff's. Tower Labs., Ltd. v. Lush Cosmetics Ltd., 2018 WL 534323, at *4 (D.D.C. Jan. 24, 2018). As discussed in more detail below, the convenience factors are irrelevant here, and the Government advances no argument that justice requires transfer. See Mot. at 15-16.

b. Where the Claim Arose

Despite the deference typically afforded a plaintiff's forum choice, it is diminished when

"the majority of operative facts took place outside the District of Columbia." Bergmann v. U.S. Dep't of Transp., 710 F. Supp. 2d 65, 72 (D.D.C. 2010). In APA cases, "courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). It is clear from Defendants' Motion (which Plaintiffs do not rebut) that the claim largely arose in Massachusetts. The 2014 BiOp at issue here was "prepared by biologists in GARFO," which is located in Gloucester. See Pentony Decl., ¶ 5. It was "drafted entirely in the regional office" by staff in that office. Id. Although GARFO staff "briefed officials at NOAA Fisheries headquarters in Silver Spring, Maryland[,] to make them aware of the work that was being done, . . . the officials in Silver Spring were not substantively involved in the development of the BiOp." Id. This factor thus clearly tips in favor of transfer.

      c. Convenience

  The final three private-interest factors — *viz.*, the convenience of the parties, the convenience of the witnesses, and ease of access to sources of proof — are neutral. Defendants do not argue that they will be inconvenienced by litigating here. Plaintiffs obviously find this forum preferable since they brought the case here. And, although they claim that they would have to incur some costs if the case were transferred, the Court disagrees since "it is unlikely [in this administrative-record case] that the parties or the lawyers for either side will have to appear in court often, and the minimal fees for *pro hac vice* admission are 'not substantial enough' to tip the balance in a transfer case.'" Oceana, Inc. v. Pritzker, 58 F. Supp. 3d 2, 7 (D.D.C. 2013) (quoting WildEarth Guardians v. U.S. Forest Serv., 2012 WL 1415378, at *4 (D. Colo. 2012)). For the same reasons, the convenience of witnesses and the ease of access to sources of proof are "not likely to be relevant here." Id. at 5 (citation omitted).

*   *   *

Determining which way the private-interest factors cumulatively tip thus comes down to whether the claims arising in Massachusetts overcomes the deference owed to Plaintiffs' forum choice. The Court finds that, at best for Defendants, the factors are in equipoise. See Wright & Miller, Fed. Practice & Procedure, § 3848 (4th ed. 2018) ("Without more, it is . . . not enough merely to show that the claim arose elsewhere."); Otay Mesa Prop. L.P. v. U.S. Dep't of Interior, 584 F. Supp. 2d 122, 124-25 (D.D.C. 2008) (denying transfer even though challenged agency action was developed in transferee district). The public-interest factors will thus be dispositive here.

2. *Public–Interest Factors*

a. Judicial Economy

Despite Defendants' contentions, the first two public-interest factors — the transferee court's familiarity with the governing law and the relative congestion of the courts' calendars — are neutral with respect to transfer. The Government's argument that "the District Court for the District of Massachusetts . . . ha[s] greater familiarity with the history of the management regimes applicable to the waters off of Massachusetts, the factual and legal history of that fishery, and the factual and legal issues implicated by this case," Mot. at 8, gains little traction. The relevant inquiry is not whether a certain court is familiar with the "factual and legal history" of a case, but whether it is more familiar with the "governing laws." Trout Unlimited, 944 F. Supp. 13 at 17 (emphasis added). Plaintiffs here challenge federal agency action and charge violations of federal statutes. Resolving this case will thus require statutory interpretation, a task any federal court is competent to undertake. See Greater Yellowstone Coal., 180 F. Supp. 2d at 129. Indeed, this very Court has issued opinions on New England-centered fisheries issues in the

past.  See Oceana, Inc. v. Pritzker, 26 F. Supp. 3d 33 (D.D.C. 2014); Conservation Law Foundation v. Pritzker, 37 F. Supp. 3d 254 (D.D.C. 2014).

The caseload disparity between the two courts, moreover, is not great enough to have an effect on the transfer analysis.  See Mot. at 14 (noting median time for cases to be resolved is 7.9 months in the District of Massachusetts versus 10.4 months in this district).  Absent a showing that either court's docket is "substantially more congested" than the other, this factor weighs neither for nor against transfer.  Nat'l Ass'n of Home Builders, 675 F. Supp. 2d at 178; see also Preservation Soc'y, 893 F. Supp. 2d at 57 (finding that when "relative congestion . . . appears comparable," judicial-economy factor not substantial enough to warrant transfer).

b.  Local Interest

The focus here, then, must be on the final public-interest factor: the local interest in having local controversies decided at home.  S. Utah Wilderness Alliance v. Norton, 845 F. Supp. 2d 231, 237 (D.D.C. 2002); Pres Soc'y, 893 F. Supp. 2d at 57.  Because the Court finds that this a case of national, rather than local, importance, this factor weighs heavily against transfer.

In trying to cast the dispute as a parochial one, Defendants highlight the connection of the lobstering industry to the Bay State, noting that it "provide[s] employment, recreation, and other opportunities to the people of Massachusetts."  Mot. at 10.  While this may be true, that does not make this case a local controversy.  First, those in Massachusetts are far from the only ones affected.  While "[t]he vast majority of American lobster is landed in states adjacent to the Gulf of Maine," that description includes Maine and New Hampshire, too.  See Pentony Decl., ¶ 11.  Other states along the East Coast, from Connecticut to Virginia, also land lobster, and NMFS's decision thus concerns them.  Id.  The facts here, consequently, present a very different scenario

9

from one in which <u>all</u> of the relevant events and actions occurred in the transferee district.

For example, in <u>Preservation Society</u>, 893 F. Supp. 2d 49, the challenged action depended on parallel state proceedings and would be "funded, overseen, and implemented by a . . . state agency on state-owned property." <u>Id.</u> at 57. This Court thus had little difficulty finding that transfer was appropriate, as the "fundamental issue" in the case was "a local controversy in the purest sense." <u>Id.</u>; <u>see also</u> <u>Trout Unlimited</u>, 944 F. Supp. at 19 (decision made by federal agency in Colorado that directly affects that state's forests, "water systems, [and] wildlife" was local controversy). Here, the <u>regional</u> NMFS office (which happens to be in Massachusetts) manages the American lobster fishery, an entity that spans the East Coast from Maine to Florida.

The effect on the lobster industry, moreover, is incidental to the thrust of Plaintiffs' grievances here, which focus on the right whale. <u>See, e.g.</u>, CLF Compl., ¶ 122. That whale is a migratory mammal, spending the summer months feeding off the coast of Maine and Massachusetts before heading south to Georgia and Florida for the winter. <u>Id.</u>, ¶ 66. Rather than a case where the disputed resources are "located entirely within" the proposed transferee district, <u>see</u> <u>Trout Unlimited</u>, 944 F. Supp. at 17, the wildlife at issue here swims far beyond the shores of Massachusetts. Even if the lobster industry has significant ties to that state, the controversy is far broader in scope.

In addition, as this Court has repeatedly noted, the central question is not "whether the people of Massachusetts have an interest — even a strong one — in the outcome of this case. Instead, the Court must determine whether this is a 'question[] of national policy or national significance.'" <u>Oceana</u>, 58 F. Supp. 3d at 9 (quoting <u>Oceana v. Bureau of Ocean Energy Mgmt.</u>, 962 F. Supp. 2d 70, 77 (D.D.C. Aug. 23, 2013)). Agency action that affects a far-ranging endangered species "is not just a Northeastern problem; it is a national one." <u>Id.</u> at 10. Whale

10

conservation, indeed, has attracted global attention over the last decades. Because neither the lobster industry nor the right whale is "local" to Massachusetts, the Court finds that this final public-interest factor weighs powerfully against transfer.

## IV. Conclusion

In the end, it is Defendants' burden to show that the totality of circumstances warrants transfer. Because they have not done so here, the Court will deny the Government's Motion to Transfer the case to the District Court for the District of Massachusetts. An Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: May 10, 2018