UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**WILBUR ROSS, in his official capacity as Secretary of Commerce**, *et al.*,<br><br>Defendants,<br><br>and<br><br>**MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.**, *et al.*,<br><br>Defendant-Intervenors. | Civil Action No. 18-112 (JEB) |

## MEMORANDUM OPINION

So named because for centuries they were easy to kill and strip for blubber, North Atlantic "right" whales have been hunted to the edge of extinction. One of the first animals to be protected under the Endangered Species Act, the population nonetheless hovers perilously around 400, fewer than 100 of which are breeding females. The largest modern threats to this species are ship strikes and fishing-gear entanglement, each of which also makes the whales more susceptible to the other.

In 2014, Defendant National Marine Fisheries Service produced a Biological Opinion finding that, despite its potential to harm the species in unsustainable numbers, the American lobster fishery would not jeopardize the continued existence of the North Atlantic right whale. In so finding, however, the Service failed to include an "incidental take statement" as required

1

under the Act. In response to this suit brought by four conservation groups, the Court now concludes that the agency's reasons for this signal omission are unavailing. It will thus hold the 2014 Biological Opinion to be illegal under the Endangered Species Act and will order briefing as to further remedies.

**I.     Background**

The Court begins by laying out the statutory framework of the ESA, the Marine Mammal Protection Act, and the Administrative Procedure Act before proceeding to the factual and procedural background. Plaintiffs' Complaint, as will be explained in more detail shortly, cites the ESA and APA for Count I, the ESA alone for Counts II and III, and the MMPA and APA for Count IV.

   A.  Statutory Framework

      1. *Endangered Species Act*

Congress enacted the ESA in 1973 "to halt and reverse the trend toward species extinction, whatever the cost." Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv., 786 F.3d 1050, 1052 (D.C. Cir. 2015) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978)). The Act "constitutes 'the most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" Ctr. for Biological Diversity v. EPA, 861 F.3d 174, 177 (D.C. Cir. 2017) (quoting Tenn. Valley Auth., 437 U.S. at 180). To enforce its various provisions, the ESA contains a citizen-suit provision "of remarkable breadth." Bennett v. Spear, 520 U.S. 154, 164 (1997). It authorizes "any person . . . to enjoin any person, including the United States and any other governmental instrumentality or agency[,] . . . who is alleged to be in violation of any provision of [the ESA] or regulation issued under the authority thereof." 16

U.S.C. § 1540(g)(1)(A). It is under this provision that Plaintiffs in this case bring their first three claims. See ECF No. 1 (Complaint), ¶¶ 117–34 (Counts I–III).

Of the various substantive provisions of the Act, the most relevant here is § 7(a)(2), which requires that "[e]ach Federal agency . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To achieve this end, the accompanying regulations specify that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species." 50 C.F.R. § 402.14(a). If this preliminary "may affect" threshold is met, the agency (called the "action agency") must engage in consultation with an "expert agency." Id.; Conservation Law Found. v. Ross, 2019 WL 5549814, at *2 (D.D.C. Oct. 28, 2019). In this case, the "action agency" was NMFS's Sustainable Fisheries Division (SFD), and the "expert agency" was its Protected Resources Division (PRD).

The ESA regulations have created a few escape hatches allowing agencies, in a limited number of circumstances, to bypass this consultation requirement and instead engage in "informal consultation." See 50 C.F.R. § 402.14(b). The parties in this case, however, do not dispute that SFD was required to engage in "formal consultation" — that is, the full consultation process contemplated by the Act.

Broadly speaking, the object of consultation under the statute is for the expert agency to determine whether the project will violate § 7(a)(2)'s prohibition on jeopardizing the continued existence of endangered and threatened species. The "formal consultation" process laid out by the accompanying regulations, see generally 50 C.F.R. § 402.14(g), ultimately results in a "biological opinion." Id. § 402.14(e). The BiOp can either find that the action does violate

3

§ 7(a)(2) — "a 'jeopardy' biological opinion" — or that it does not — "a 'no jeopardy' biological opinion." Id. § 402.14(h)(1). In the case of a "jeopardy" BiOp, if the expert agency "indicate[s] that to the best of its knowledge there are no reasonable and prudent alternatives" that would avoid jeopardizing the species, id. § 402.14(h)(2), the action stands in violation of § 7(a)(2) and cannot go forward. See 16 U.S.C. § 1536(a)(2); Tenn. Valley Auth., 437 U.S. at 172–74.

Where a "no jeopardy" BiOp issues — or where reasonable and prudent alternatives to the action exist — the Act then requires the project to meet several requirements regarding its potential to "take" the species. The Act defines "[t]he term 'take'" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); see also 50 C.F.R. § 222.102 (expanding that definition to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering"). The statutory requirements regarding "take" are as follows:

> If after consultation under subsection (a)(2), the Secretary concludes that —
> (A) the agency action will not violate such subsection [*i.e.*, through a no-jeopardy BiOp], or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection [*i.e.*, through a jeopardy BiOp finding such alternatives];
> (B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and
> (C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of [the MMPA, discussed below];
> the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that —
> (i) specifies the impact of such incidental taking on the species,

> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
> (iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of [the MMPA] with regard to such taking, and
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). Subsections (i) through (iv) thus lay out the substantive requirements for this "written statement," called an "incidental take statement" by the regulations. See 50 C.F.R. § 402.14(i). The content of an ITS is further dictated by regulation. See 50 C.F.R. § 402.14(i). Importantly, the regulations also make clear that an ITS must be produced whenever "[incidental] take is reasonably certain to occur." 50 C.F.R. § 402.14(g)(7).

Subsections (A) through (C), conversely, lay out the prerequisites the agency must satisfy before even being permitted to produce an ITS and proceed with the project: (1) the project must not threaten the continued existence of the listed species; (2) any incidental take from the project must not threaten the continued existence of the species; and (3) any incidental take from the project must not violate § 101(a)(5) of the Marine Mammal Protection Act, discussed below, which requires that there be no more than a negligible impact on the species. See 16 U.S.C. §§ 1536(b)(4)(A)–(C), 1371(a)(5); see also 50 C.F.R. § 402.14(i)(1) ("In those cases where the [expert agency] concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2) and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, [it] will provide with the biological opinion a statement concerning incidental take . . . .") (emphasis added).

5

In sum: if take is reasonably certain, there must be an incidental-take statement, and that ITS must confirm that any take complies with both the ESA and the MMPA. The absence of an ITS is at the crux of this case.

### 2. *Marine Mammal Protection Act*

Plaintiffs' fourth cause of action falls under the Marine Mammal Protection Act. See Compl., ¶¶ 135–39. Congress enacted the MMPA in 1972, see 86 Stat. 1027, in acknowledgment of the "great international significance" of marine mammals and its finding "that they should be protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(6). In order to counteract "man's activities" that placed marine mammals "in danger of extinction or depletion," id. § 1361(1), the Act's stated aim is to keep all marine mammal populations at or above their "optimum sustainable population." Id. § 1361(2). To achieve that goal, the MMPA "generally prohibits any individual from 'taking' a marine mammal." Winter v. NRDC, 555 U.S. 7, 15 (2008) (quoting 16 U.S.C. § 1372(a)). The MMPA defines "take" similarly to the ESA, stating that the term "means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13); see also 50 C.F.R. § 216.3 (elaborating that "[t]ake" includes "the restraint or detention of a marine mammal, no matter how temporary," as well as "the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal").

While the Act places a broad "moratorium on the taking and importation" of all marine mammals, see 16 U.S.C. § 1371(a), it also contains "several enumerated exceptions." In re Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litig., 720 F.3d 354, 357 (D.C. Cir. 2013). One of these allows incidental takings by certain commercial fishing operations should they be approved by NMFS in compliance with the MMPA and its regulations. See 16 U.S.C.

§ 1371(a)(1). If NMFS determines, "after notice and opportunity for public comment," that "the incidental mortality and serious injury from commercial fisheries will have a <u>negligible impact</u> on such species or stock" and that the species is subject to recovery and monitoring plans, it must allow incidental take by such fisheries. <u>Id.</u> § 1371(a)(5)(E)(i) (emphasis added). NMFS must post a list of the fisheries permitted under these requirements, and any fishery not on the list that does "take" the marine mammal is subject to penalties. <u>Id.</u> §§ 1371(a)(5)(E)(i), 1387(h). As noted above, compliance with this section of the MMPA is also required by the ESA. <u>Id.</u> § 1536(b)(4)(C).

### 3. *Administrative Procedure Act*

The Administrative Procedure Act, passed in 1946, "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513 (2009) (citing <u>Vermont Yankee Nuclear Power Corp. v. NRDC</u>, 435 U.S. 519, 545–49 (1978)). It subjects to judicial review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The statute also sets out the standard for such review, requiring courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

While Plaintiffs' first claim purports to "lie both under the ESA and the APA, . . . the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court.'" <u>Bennett</u>, 520 U.S. at 161–62 (quoting 5 U.S.C. § 704); <u>see also</u> <u>Conservation Force v. Salazar</u>, 715 F. Supp. 2d 99, 104 n.6 (D.D.C. 2010) ("[T]he APA permits courts to review 'final agency action <u>for which there is no other adequate remedy in a court</u>.'" Here, the ESA's citizen-suit provision provides an adequate remedy.") (citation omitted) (quoting 5 U.S.C. §

7

704).  The Court will thus treat this first count as arising under only the ESA.  Confusingly, however, while the APA does not provide a cause of action for ESA claims, it does provide the standard of review.  Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005); see also Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson, 685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the [APA].").  For all three ESA claims, consequently, "[w]hile the subject of review is whether NMFS has violated the ESA, the standard of review is thus found in APA precedent."  CLF, 2019 WL 5549814, at *10.  This standard will be laid out in a future section.  See infra Section II.

Plaintiffs' fourth claim, on the other hand, is properly pled as arising under the APA, since the MMPA, unlike the ESA, does not have a citizen-suit provision.  See 16 U.S.C. §§ 1371, 1387; accord NRDC v. Evans, 279 F. Supp. 2d 1129, 1142 (N.D. Cal. 2003) ("Citizens challenging actions done under the MMPA must sue under the APA."); Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332, 1338 (9th Cir. 1992) (noting "that the MMPA does not provide for citizen enforcement of the Act").  While all four claims must thus be reviewed under the APA standard of review, only the last of them properly derives its cause of action from that statute.

  B.  Factual History

Lest this Opinion get too dry, let us head back out to sea.  NMFS supervises multiple fisheries along the continental coastline. This case concerns the American lobster fishery, which consists of seven areas spanning the East Coast from Maine to North Carolina, American Lobster, NOAA Fisheries (last visited Apr. 8, 2020), https://www.fisheries.noaa.gov/species/american-lobster, and most abundantly between Maine and New Jersey.  See C1 26727.  It is "one of the most valuable fisheries along the Atlantic coast," raking in hundreds of millions of

dollars and lobsters every year.  American Lobster, Atlantic States Marine Fisheries Commission (last visited Apr. 8, 2020), http://www.asmfc.org/species/american-lobster.  The fishery is managed pursuant to a Fishery Management Plan (FMP) created by the New England Fishery Management Council, one of eight regional councils created by the Magnuson-Stevens Act and managed by NMFS.  Oceana, Inc. v. Pritzker, 26 F. Supp. 3d 33, 36–37 (D.D.C. 2014).

The North Atlantic right whale, which has "been listed as endangered under the [ESA] since its passage in 1973," C1 6807, "is one of the world's most endangered large whale species, with only about 400 whales remaining."  North Atlantic Right Whale, NOAA Fisheries (last visited Apr. 8, 2020), https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.  This highly migratory species feeds and mates in New England and Canadian waters but may travel as far south as Florida each year to calve.  Id.  The two largest factors preventing this whale population from recovering to a sustainable level are "vessel collisions and entanglement in fishing gear."  C1 6807.

Fishing gear with a vertical line poses an especially grave danger to the species, since such gear has ropes stretching from the surface to the ocean floor into which the whales may swim and become entangled.  See C1 26781.  Two types of vertical-line gear are lobster pot/trap gear and gillnets used to fish non-crustaceans.  This Court previously invalidated NMFS's opening of a large area to gillnet fishing.  CLF, 2019 WL 5549814, at *14–16.  In that litigation, the Service's own expert claimed that "[t]he risk of entanglement mortality to right whales is much higher in trap/pot gear, particularly lobster gear, because lobster fishing accounts for over 97% of the vertical lines on the east coast."  Conservation Law Found. v. Ross, No. 18-1087, ECF No. 40-4 (Declaration of Michael Asaro), ¶ 7; see CLF, 2019 WL 5549814, at *15 (quoting same).  "Pot/trap gear," the type used in the American lobster fishery, "is known to entangle

9

ESA-listed cetaceans" such as the North Atlantic right whale, "with some events resulting in injuries and death." C1 26726. It has "been identified as a gear type causing injuries and mortality of right, humpback, and fin whales." Id.

On July 31, 2014, NMFS issued its newest Biological Opinion for the American lobster fishery, see C1 26652–28422 (2014 BiOp), finding that the fishery "may adversely affect, but is not likely to jeopardize, the continued existence of North Atlantic right whales." C1 26811. As to incidental take, Defendants mince no words: "NMFS anticipated take would occur as the result of the action, but did not include an ITS in the 2014 BiOp." ECF No. 81 (Defs. Opp. and Cross-Motion for SJ) at 17. Specifically, the 2014 BiOp found that "the lobster fishery ha[d] the potential to seriously injure or kill an average of 3.25 right whales per year." C1 26787. The BiOp arrived at this number because 3.25 had been "the average reported mortality or serious injury to right whales due to fishery entanglement from U.S. gear" each year "[f]rom 2007 to 2011." C1 26786. The figure was well over the whale's "potential biological removal level" — that is, "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 50 C.F.R. § 229.2; see C1 26796 (2014 BiOp reciting same definition). The PBR for North Atlantic right whales, in fact, "is 0.9 whales." C1 26796; see C1 26686 (same).

Despite finding that the American lobster fishery had the potential to "take" North Atlantic right whales within the meaning of the ESA, the 2014 BiOp explained that it did "not includ[e] an incidental take authorization for right . . . whales in connection with this biological opinion because (1) an incidental take statement cannot be lawfully issued under the ESA for a marine mammal unless incidental take authorization exists for that marine mammal under the

10

MMPA and (2) the incidental take of ESA-listed whales by the American lobster fishery has not been authorized under section 101(a)(5) of the MMPA." C1 26812 (citation omitted) (citing 16 U.S.C. § 1536(b)(4)(C)). Because of this, "no incidental take by the American lobster fishery is authorized under the ESA." Id. Instead of an ITS, NMFS "included numerical 'triggers' for reinitation of ESA section 7 consultation." Id. For right whales, this number was an annual average of 3.25 incidents of serious injury or mortality within a five-year period. Id. "[I]f the average number of serious injuries or mortalities were to occur for the whale species at a number ≤ the species' trigger, it would not likely reduce appreciably the likelihood of both survival and recovery of the whale species." Id.

NMFS concluded by "recogniz[ing] that further efforts among stakeholders are necessary to reduce interactions between authorized federal fisheries and right, humpback, fin, and sei whales in order to achieve the MMPA's goal of insignificant levels of incidental mortality and serious injury of marine mammals . . . ." C1 28422. And "[a]lthough NMFS ha[d] concluded that the American lobster fishery is not likely to jeopardize the continued survival or recovery of right . . . whales for purposes of ESA Section 7, the need for further efforts among stakeholders to reduce whale/fishery interactions and achieve the zero mortality goal of the MMPA is not diminished by this no-jeopardy conclusion." Id.

C. Procedural History

In January 2018, Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and The Humane Society of the United States filed suit in this Court, challenging the 2014 BiOp and subsequent agency action on four grounds. See Compl., ¶¶ 117–39. First, they claimed that the 2014 BiOp was deficient under the ESA for a number of reasons, including for "fail[ing] to include an incidental take statement" and instead including the "numeric trigger," an "unlawful

11

substitute for an incidental take statement." Id., ¶¶ 123–24. Plaintiffs' second allegation is that NMFS violated the ESA by "rely[ing] on this legally invalid opinion to meet its substantive obligations under Section 7(a)(2) of the ESA." Id., ¶ 128. Their third claim asserted that the agency was running afoul of an altogether different provision of the ESA, Section 9, which makes it "unlawful for any person subject to the jurisdiction of the United States to . . . cause to be committed," 16 U.S.C. § 1538(g), the "take [of] any [listed] species within the United States or the territorial sea of the United States." Id. § 1538(a)(1)(B); see Compl., ¶¶ 131–34 (so alleging). And finally, Plaintiffs maintained that "NMFS's continued authorization, permitting, and management of the American lobster fishery in absence of an MMPA take authorization" was "not in accordance with the MMPA, in violation of the APA." Compl., ¶ 139 (citing 5 U.S.C. § 706(2)).

NMFS, for its part, answered the Complaint but moved to transfer the case to the District of Massachusetts. See ECF Nos. 10, 12. After consolidating the case with one alleging the same four claims and brought by Plaintiff Conservation Law Foundation, see ECF No. 19; see also Conservation Law Found. v. Ross, No. 18-283, ECF No. 1 (Complaint), ¶¶ 118–48, the Court denied the transfer motion, finding this "a case of national, rather than local, importance." Ctr. for Biological Diversity v. Ross (CBD I), 310 F. Supp. 3d 119, 127 (D.D.C. 2018). Shortly thereafter, both the Maine Lobstermen's Association and the Massachusetts Lobstermen's Association successfully moved to intervene as defendants. See ECF Nos. 24, 31 (motions to intervene); Minute Order of June 4, 2018 (granting Maine); Minute Order of Aug. 3, 2018 (granting Massachusetts). Plaintiffs had moved for discovery back in May, and Defendants had opposed. The Court "attempted to assist the parties in reaching a compromise on this issue, but apparently to no avail." Ctr. for Biological Diversity v. Ross (CBD II), 349 F. Supp. 3d 38, 40

(D.D.C. 2018).  In October 2018, "forced to address the merits of the discovery dispute," the Court granted discovery on two of Plaintiffs' four counts.  Id.  The Court then also granted the parties' joint request "that discovery and briefing should both be bifurcated, with the first phase to address liability and a second, future phase to address remedy, if necessary."  ECF No. 48 (Joint Mot. to Clarify), ¶ 2; see Minute Order of Nov. 13, 2018.

After discovery closed at the end of May 2019, see Minute Order of Apr. 22, 2019, Plaintiffs filed a motion for summary judgment, and NMFS responded by moving to stay the case.  Ctr. for Biological Diversity v. Ross (CBD III), 419 F. Supp. 3d 16, 19 (D.D.C. 2019). This request arose from the agency's "intent to issue, by July 31, 2020, both (1) a new BiOp for the American lobster fishery and (2) a regulation amending the Atlantic Large Whale Take Reduction Plan (TRP)."  Id.  A TRP is required by a different section of the MMPA not challenged by Plaintiffs in this case.  Id.  The Court denied the stay, finding the TRP process irrelevant to this case and the new BiOp not at all certain to moot Plaintiffs' claims, particularly in the interim before the BiOp is issued.  Id. at 22–23.

With the motion to stay resolved, Defendants filed their Oppositions to Plaintiffs' Motion for Summary Judgment and Cross-Motions for Summary Judgment.  Briefing is now complete, and the Court is ready to rule on the Motions.

## II. Legal Standard

Upon a party's motion, Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is material if it would change the outcome of the litigation, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006), and a dispute is genuine if the evidence

is such that a reasonable jury could return a verdict for the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006). "Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits its own affidavits[,] . . . declarations[,] or documentary evidence to the contrary." Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing Neal v. Kelly, 963 F.2d 453, 456 (D.C. Cir. 1992)).

As noted above, however, all four claims in this case are to be reviewed under the APA's judicial-review standard. See supra Section I.A.3. That standard, set out below, applies in place of the typical summary-judgment standard of Rule 56: "[W]hen a party seeks review of agency action under the APA, . . . the district judge sits as an appellate tribunal." Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). In other words, "[t]he entire case on review is a question of law." Id. (quoting Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

As noted above, the APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

14

"'The scope of review [in an APA case] is narrow and a court is not to substitute its judgment for that of the agency,' provided the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43). While the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (citation omitted) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); then citing Colo. Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)). It is only these "certain minimal standards of rationality" to which a reviewing court holds an agency. Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (*en banc*)).

### III. Analysis

Although the foregoing involved scene setting portends quite a lengthy unfolding of this drama, the reader may take heart: the analysis here is not taxing. Indeed, the Court need address only one part of Count I to find that the 2014 BiOp is invalid under the ESA. And even that analysis, set forth in more detail below, can be summarized quite neatly: The ESA and its regulations require an ITS when the taking of an endangered species is anticipated. Take was anticipated here, and NMFS did not produce an ITS. The 2014 BiOp therefore violates the ESA.

The slightly longer version is this. As noted above, ESA regulations require that NMFS "[f]ormulate a statement concerning incidental take, if such take is reasonably certain to occur." 50 C.F.R. § 402.14(g)(7). The agency concedes that although "NMFS anticipated take would

occur as the result of the action, [it] did not include an ITS in the 2014 BiOp." Def. MSJ at 17. For purposes of the ESA citizen-suit provision, a violation of an ESA regulation is equivalent to a violation of the statute itself. See 16 U.S.C. § 1540(g)(1)(A) ("[A]ny person may commence a civil suit . . . to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof . . . .") (emphasis added).

Defendants counter that this seemingly unassailable logic "misread[s] the ESA and MMPA." Def. MSJ at 26. Because the ESA would have required an ITS to find that any take would not violate § 101(a)(5) of the MMPA, see 16 U.S.C. §§ 1536(b)(4)(C), 1371(a)(5), and because NMFS had been "unable to [so] find," the agency concluded that it "was not permitted to include an ITS in that BiOp." Def. MSJ at 27. So, "[r]ather than decline to issue a BiOp entirely, NMFS reasonably sought to harmonize the MMPA and ESA under the unique circumstances presented here." Id. By including the "functional equivalent" of an ITS — its "numerical trigger for reinitiation" of consultation, id. at 29 — NMFS claims to have fulfilled its ESA duties. Defendants then cite legislative history from the 1994 amendments to the MMPA that they claim shows a congressional intent not "to force NMFS, in seeking to implement the ESA and MMPA, to close fisheries." Id. at 27. On the contrary, they argue, Congress included in the ESA the requirement to fulfill § 101(a)(5) of the MMPA "to merely lend urgency to the TRT process [under § 118 of the MMPA] in situations like the one presented by the right whale." (For context, a separate provision of the MMPA, § 118 — not raised by Plaintiffs in this case — requires NMFS to implement a Take Reduction Plan (TRP) with the advice of a Take Reduction Team (TRT) in order to reduce the harm to endangered species to a sustainable level. See generally 16 U.S.C. § 1387(f).) In sum, the agency argues that because the fishery would not

16

have been able to proceed had they complied with the ESA, NMFS was justified in abandoning the Act's directives altogether.

The Service and the statute pass each other like ships in the night. The agency does not appear to invoke Chevron deference for its novel interpretation of the law, but even if it did, the text of the ESA is crystal clear. As the D.C. Circuit has explained,

> At th[e] first step of the Chevron analysis we "employ[ ] traditional tools of statutory construction" to determine whether Congress has "unambiguously foreclosed the agency's statutory interpretation." Congress may have done so in one of two ways: either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that the agency has clearly exceeded. Because at Chevron step one we alone are tasked with determining Congress's unambiguous intent, we answer both inquiries without showing the agency any special deference. And if the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as Chevron puts it, "that is the end of the matter" — the agency's interpretation is unlawful.

Village of Barrington v. Surface Transp. Bd., 636 F.3d 650, 659–60 (D.C. Cir. 2011) (alteration in original) (citations omitted) (quoting Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 n.9 (1984); then quoting Catawba Cty. v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009); and then quoting Chevron, 467 U.S. at 842).

Here, the ESA and accompanying regulations plainly require an ITS, and they require that the ITS find that any take resulting from the proposed agency action will neither jeopardize the continued existence of the listed species nor run afoul of § 101(a)(5) of the MMPA. See 50 C.F.R. § 402.14(g)(7) (requiring ITS "if [incidental] take is reasonably certain to occur"); 16 U.S.C. § 1536(b)(4) (requiring, in order for NMFS to even create a BiOp, that it find that (1) the action does not jeopardize the continued existence of the species, (2) any incidental taking will not jeopardize the continued existence of the species, and (3) any incidental taking of a marine

mammal is authorized under § 101(a)(5) of the MMPA). The statutory text itself harmonizes the ESA and the MMPA quite clearly by requiring that both be satisfied in the case of marine mammals. See 16 U.S.C. § 1536(b)(4). NMFS's finding that the lobster fishery would have more than the "negligible impact" allowed by § 101(a)(5) of the MMPA meant that the fishery violated § 7(b)(4) of the ESA. This should have ended the agency's inquiry.

The fact that the alternative is to "decline to issue a BiOp entirely," Def. MSJ at 27, does not change the requirements of the ESA. In fact, that is precisely the purpose of the ESA: "The plain intent of Congress in enacting the [ESA] was to halt and reverse the trend toward species extinction, whatever the cost." Ctr. for Biological Diversity, 861 F.3d at 177 (quoting Tenn Valley Auth., 437 U.S. at 184). In the seminal case on the ESA, the Supreme Court enjoined operation of an already-constructed dam, which "requir[ed] the sacrifice of the anticipated benefits of the project and of many millions of dollars in public funds." Tenn. Valley Auth., 437 U.S. at 174. But this unfortunate outcome could not change the plain language of the Act, wrote the Court:

> One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to <u>insure</u> that actions <u>authorized</u>, <u>funded</u>, or <u>carried out</u> by them do not <u>jeopardize</u> the continued existence" of an endangered species or "<u>result</u> in the destruction or modification of habitat of such species . . . .

Id. at 173 (omission in original) (quoting 16 U.S.C. § 1536(a)(2)). Defendants cannot rewrite the statute just because they do not agree with its consequences.

Finally, the Service's inclusion of a "numerical trigger for reinitiation" of consultation, Def. MSJ at 29, does nothing to cure its violation of the Act. Setting a threshold of an acceptable take level for the fishery, see generally 50 C.F.R. § 402.14(i)(4), is only one of many mandatory

18

components of an ITS.  Id. § 402.14(i)(1)(i)–(v).  In any case, the Service does not deny that its "functional equivalent" was not, in fact, an ITS.  See Def. MSJ at 3, 18, 29.  As stated *ad nauseum* above, the ESA and its regulations require an ITS.  Any non-ITS substitute, even one that fulfills one of several functions of an ITS, will not do.

In short, the Service's failure to include an ITS in its 2014 BiOp after finding that the American lobster fishery had the potential to harm the North Atlantic right whale at more than three times the sustainable rate is about as straightforward a violation of the ESA as they come. The Court therefore declares the 2014 BiOp to be invalid under the Endangered Species Act and will order briefing from the parties on the issue of an injunctive remedy.

Having so found, the Court has no need to engage in Plaintiffs' other arguments as to why the 2014 BiOp violated the ESA.  But NMFS would do well to adhere to all of the Act's requirements in any future BiOps.  For example, Plaintiffs here also pointed out that the Service evaluated the fishery's impact on right whales using the MMPA's "serious injury and mortality" standard, see 16 U.S.C. § 1387, instead of the broader "effects of the action" standard required by the ESA, which includes "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." 50 C.F.R. § 402.02; see id. § 222.102 (defining "take" to include actions that injure a listed species "by significantly impairing essential behavioral patterns, including[] breeding, spawning, rearing, migrating, feeding or sheltering"); see also, e.g., C1 26787 (2014 BiOp considering lobster fishery's "potential to seriously injure or kill" right whales).  Put differently, just because the Court had no need to discuss other features of the 2014 BiOp does not mean that they complied with the ESA (or, for that matter, the MMPA) and should be repeated in future BiOps.

## IV.　Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Summary Judgment and deny Defendants' and Defendant-Intervenors' corresponding Cross-Motion for Summary Judgment. A contemporaneous Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 9, 2020