**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*<br><br>    *Plaintiffs*,<br><br>  v.<br><br>WILBUR ROSS, *et al*.,<br><br>    *Federal Defendants*, and<br><br>MAINE LOBSTERMEN'S ASSOCIATION, INC., and MASSACHUSETTS LOBSTERMEN'S ASSOCIATION,<br><br>    *Defendant-Intervenors.* | Civil Action Nos. 18-112 (JEB)<br>18-283 (JEB) |

**PLAINTIFFS' OPENING BRIEF ON REMEDY**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 5

    I.    Plaintiffs Are Entitled to Ordinary APA Remedies ................................. 6

        A.    The Court Should Vacate and Remand the 2014 BiOp as Applied
            to Right Whales and Stay Vacatur Until January 31, 2021 ........................ 6

            1.    Vacatur is the Presumptive Remedy ............................................... 6

            2.    The Legal Errors in the 2014 BiOp Are Serious Violations
               of Law ................................................................................................ 8

            3.    Vacatur Plus a Short Stay Will Provide Incentive for
               NMFS to Act While Limiting Potential Disruptive
               Consequences................................................................................... 10

        B.    In the Alternative, the Court Should Remand the 2014 BiOp and
            Order NMFS to Issue a New Biological Opinion and Final Rule
            by January 31, 2021 ....................................................................... 12

    II.    The Court Should Also Order Interim Injunctive Relief ...................... 15

        A.    Standard of Review for Injunctive Relief ................................................. 18

        B.    Irreparable Harm is Likely Absent an Interim Injunction ....................... 19

            1.    Entanglement of Right Whales Constitutes Irreparable Harm ..... 19

            2.    The Requested Relief Would Reduce the Likelihood of
                Irreparable Harm ........................................................................... 22

         C.    The Other Three Factors Favor the Interim Injunction............................ 25

D.      The Requested Injunction Appropriately Responds to NMFS's
        ESA Violations ........................................................................................ 27

E.      The Requested Relief Would Allow Experimental Ropeless Fishing ...... 28

CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................ 8, 10

*Am. Rivers v. Fed. Energy Reg. Comm'n*,
   895 F.3d 32 (D.C. Cir. 2018) ................................................................................. 8

*Amoco Prod. Co. v. Vill. of Gambell*,
   480 U.S. 531 (1987) ..................................................................................... 19, 26

*Anacostia Riverkeeper, Inc. v. Jackson*,
   713 F. Supp. 2d 50 (D.D.C. 2010) ...................................................................... 9, 11

*Anacostia Riverkeeper, Inc. v. Wheeler*,
   404 F. Supp. 3d 160 (D.D.C. 2019) ........................................................................ 11

*Bennett v. Spear*,
   520 U.S. 154 (1997) ........................................................................................... 6

*Brady Campaign to End Gun Violence v. Salazar*,
   612 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 19

*Cal ex. rel. Lockyer v. USDA*,
   575 F.3d 999 (9th Cir. 2009) ................................................................................. 9

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*,
   316 F. Supp. 3d 349 (D.D.C. 2018) .................................................................... 10, 12

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................................................... 7

*City of Tacoma v. Fed. Energy Reg. Comm'n*,
   460 F.3d 53 (D.C. Cir. 2000) ................................................................................. 4

*\*Conserv. Law Found. v. Ross*,
   422 F. Supp. 3d 12 (D.D.C. 2019) ............................................................ 20, 21, 24, 26

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) .............................................................................. 19

*Ctr. for Biol. Diversity v. Ross*,
   349 F. Supp. 3d 38 (D.D.C. 2018) ........................................................................... 7

*Ctr. for Biological Diversity v. NMFS*,
   977 F. Supp. 2d 55 (D.P.R. 2013) ........................................................................... 9

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012)........................................................................ 4, 7

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ........................................................................ 13

*Defenders of Wildlife v. U.S. Dep't of the Interior*,
  931 F.3d 339 (4th Cir. 2019)............................................................................ 8

*FCC v. Nextwave Personal Commc's*,
  537 U.S. 293 (2003) .......................................................................................... 7

*Friends of the Earth, Inc. v. U.S. EPA*,
  446 F.3d 140 (D.C. Cir. 2006) ........................................................................ 11

*Fund for Animals v. Turner*,
  No. 91-2201(MB), 1991 WL 206232 (D.D.C. Sept. 27, 1991) .............................. 20

*Hecht v. Bowles*,
  321 U.S. 321 (1944) .......................................................................................... 6

*In re American Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004) ........................................................................ 13

*In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.*,
  818 F. Supp. 2d 214 (D.D.C. 2011) .................................................................. 7

*Indep. U.S. Tanker Owners Comm. v. Dole*,
  809 F.2d 847 (D.C. Cir. 1987) ........................................................................ 11

*League of Wilderness Defenders v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014)..................................................................... 26, 27

*Marbled Murrelet v. Babbitt*,
  83 F.3d 1068 (9th Cir. 1996)........................................................................... 26

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................................ 18

*Nat. Res. Def. Council v. U.S. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007) (Randolph, J., concurring in part)....................... 12

*Nat. Res. Def. Council v. U.S. EPA*,
  489 F.3d 1364 (D.C. Cir. 2007) ...................................................................... 10

*Nat'l Wildlife Fed'n v. Burford*,
  835 F.2d 305 (D.C. Cir. 1987) ........................................................................ 19

*Nat'l Wildlife Fed'n v. NMFS,*
    422 F.3d 782 (9th Cir. 2005)..................................................................... 22

*Nat'l Wildlife Fed'n v. NMFS,*
    524 F.3d 917 (9th Cir. 2008)....................................................... 12, 13, 15

*\*Nat'l Wildlife Fed'n v. NMFS,*
    886 F.3d 803 (9th Cir. 2018)............................................... 18, 20, 21, 25

*S. Yuba River Citizens League v. NMFS,*
    804 F. Supp. 2d 1045 (E.D. Cal. 2011)...................................................... 27

*Strahan v. Coxe,*
    127 F.3d 155 (1st Cir. 1997) ...................................................................... 5

*Telecomm. Research & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ........................................................... 12, 15

*\*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978) ......................................................................... *passim*

*Thomas v. Peterson,*
    753 F.2d 754 (9th Cir. 1985)...................................................................... 9

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ................................................................................. 18

*W. Watersheds Proj. v. Zinke,*
    No. 1:18-cv-00187-REB, 2020 WL 959242 (D. Idaho Feb. 27, 2020) ...................... 8

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010)..................................................................... 16

*Winter v Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ..................................................................................... 18

*Zambrana v. Califano,*
    651 F.2d 842 (2nd Cir. 1981).................................................................... 13

**Statutes**

5 U.S.C. § 704.............................................................................................. 6

5 U.S.C. § 706(2) ......................................................................................... 7

5 U.S.C. § 706(2)(A)-(D).............................................................................. 7

16 U.S.C. § 1371(a)(5)(E)(i) ................................................................................ 3

16 U.S.C. § 1387(f)(7) ...................................................................................... 15

16 U.S.C. § 1387(f)(7)(C) ................................................................................ 13

16 U.S.C. § 1532(5) ......................................................................................... 23

16 U.S.C. § 1532(19) ......................................................................................... 4

16 U.S.C. § 1536(a)(2) ..................................................................................... 16

16 U.S.C. § 1536(b)(1) ..................................................................................... 15

16 U.S.C. § 1536(b)(4) ................................................................................... 3, 8

16 U.S.C. § 1538(a)(1) ....................................................................................... 4

16 U.S.C. § 1538(g) ........................................................................................... 4

## Regulations

50 C.F.R. § 229.32(c)(2)(iii) ............................................................................ 25

50 C.F.R. § 402.14(i) .......................................................................................... 9

50 C.F.R. § 424.12 ........................................................................................... 23

50 C.F.R. §§ 402.12–402.17 ............................................................................... 9

## Legislation

H.R.1568, 116th Cong. (2019) ......................................................................... 29

S. 2453, 116th Cong. (2019) ............................................................................ 29

## Federal Register Notices

59 Fed. Reg. 28,805 (June 3, 1994) ................................................................. 23

70 Fed. Reg. 35,894 (June 21, 2005) ............................................................... 13

72 Fed. Reg. 57,104 (Oct. 5, 2007) .................................................................. 13

73 Fed. Reg. 51,228 (Sept. 2, 2008) ................................................................ 28

79 Fed. Reg. 36,586 (June 27, 2014) ........................................................................... 28

81 Fed. Reg. 4,837 (Jan. 27, 2016) ............................................................................... 23

83 Fed. Reg. 49,046 (Sept. 28, 2018) ........................................................................... 29

84 Fed. Reg. 37,822 (Aug. 2, 2019) .............................................................................. 25

85 Fed. Reg. 21,079 (Apr. 16, 2020) .............................................................. 3, 23, 24

## INTRODUCTION

On April 9, 2020 this Court granted Plaintiffs' motion for summary judgment on their first claim, holding that the National Marine Fisheries Service's (NMFS) 2014 biological opinion on the American lobster fishery (2014 BiOp) violates the Endangered Species Act (ESA). The Court held that NMFS's "failure to include an [incidental take statement] in its 2014 BiOp after finding that the American lobster fishery had the potential to harm the North Atlantic right whale at more than three times the sustainable rate is about as straightforward a violation of the ESA as they come." Mem. Op. 19, ECF. No. 91. This serious violation of law has deprived endangered right whales of desperately needed protections to which they are legally entitled. NMFS's legal errors mean that it may no longer lawfully rely on the invalid 2014 BiOp in authorizing and managing the fishery. To comply with the Court's decision and fulfill its legal obligations under both the ESA and the Marine Mammal Protection Act (MMPA), NMFS must implement substantial changes to the regulations implementing the Atlantic Large Whale Take Reduction Plan (ALWTRP) to ensure that the fishery does not continue to entangle, injure, and kill right whales at unsustainable levels such that a new biological opinion may lawfully issue.

As NMFS has repeatedly assured the Court, the rulemaking to amend the ALWTRP is well underway. Most recently, NMFS stated that it expects to issue a proposed rule and new draft biological opinion by July 2020, with a final biological opinion, final rule, and implementation of the rule at some unspecified points thereafter. *See* Jt. Status Report 5, ECF No. 95.

The question here is what happens between now and the issuance of a new, lawful biological opinion and how quickly NMFS must come into compliance with the Court's decision (especially considering NMFS's history of delaying actions to protect right whales). As set forth below, Plaintiffs seek both the ordinary remedies provided by the Administrative Procedure Act

(APA) as well as an interim injunction to prevent irreparable harm pending NMFS's compliance with the Court's decision.

With respect to APA remedies, Plaintiffs respectfully request the Court vacate and remand the 2014 BiOp and stay vacatur until January 31, 2021. In the alternative, should the Court decline to grant the standard remedy of vacatur, Plaintiffs request that it remand the 2014 BiOp and order that NMFS issue a new biological opinion and associated final rule to amend the ALWTRP by January 31, 2021.

In addition, Plaintiffs respectfully request that the Court enjoin NMFS's authorization of the use of static vertical lines in the lobster fishery in an area south of Martha's Vineyard and Nantucket where right whales are especially at risk. Plaintiffs request that this injunction stay in place until the agency issues a biological opinion that includes an incidental take statement (ITS) for right whales and until any necessary mitigation measures are in effect on the water. Plaintiffs' requested interim injunctive relief is necessary to remedy the agency's serious legal errors and the irreparable harm that could befall right whales prior to these measures' implementation.

## BACKGROUND

The North Atlantic right whale faces a very real prospect of extinction. Entanglement in commercial trap/pot fishing gear is one of the primary threats to the survival and recovery of the species. Right whales become entangled by swimming into the rope, or vertical line, that runs from a trap set on the seafloor through the water column to a buoy at or near the surface (a "static" line). *See* Pls.' Summ. J. Mem. 4, ECF No. 66-1; *see, e.g.*, AR_8724.[1] Entanglements cause right whales to drown immediately or to die slowly of injuries, infections, or starvation. *Id.*

---

[1] As explained further below, "ropeless" gear—which involves traps on the seafloor being called to the surface remotely—eliminates the use of vertical lines except during active retrieval of traps and has significant potential to reduce the risk of right whale entanglements.

Entanglements also cause sublethal impacts, including impeding feeding ability and reducing reproduction. *Id.*

The American lobster fishery frequently seriously injures and kills right whales. *See, e.g.*, *id.* at 5; 85 Fed. Reg. 21,079–21,780, 21,096 (Apr. 16, 2020). As this Court has recognized, "[t]he risk of entanglement mortality to right whales is much higher in trap/pot gear, particularly lobster gear, because lobster fishing accounts for over 97% of the vertical lines on the east coast." Mem. Op. 9 (citing Decl. of Michael Asaro, *Conserv. Law Found. v. Ross*, No. 18-1087 (D.D.C. June 21, 2019), ECF No. 40-4).

The 2014 BiOp concluded that operation of the fishery would not jeopardize the species' survival or recovery, even though the death or serious injury of *just one* right whale per year is unsustainable. *See, e.g.*, C1_26796; Mem. Op. 10. Despite finding that the fishery could kill or seriously injure more than three right whales every year, the 2014 BiOp failed to include an ITS to authorize and mitigate this anticipated incidental take from operation of the fishery. *See* Pls.' Summ. J. Mem. 5; *see also* 16 U.S.C. § 1536(b)(4).

On April 9, 2020, this Court held that the 2014 BiOp violates the ESA. As it "summarized quite neatly, [t]he ESA and its regulations require an ITS when the taking of an endangered species is anticipated. Take was anticipated here, and NMFS did not produce an ITS. The 2014 BiOp therefore violates the ESA." Mem. Op. 15. The Court rejected NMFS's argument that, because it cannot authorize take of right whales under the MMPA, it reasonably chose to issue the 2014 BiOp without an ITS rather than shutting down the fishery.[2] The Court

---

[2] NMFS has never authorized the take of right whales by the lobster fishery under the MMPA because it has never made the negligible impact determination that statute requires. *See* 16 U.S.C. § 1371(a)(5)(E)(i) (requiring NMFS to find that the "incidental mortality and serious injury from commercial fisheries will have a negligible impact" on an ESA-listed marine mammal species to authorize take by fisheries).

explained that "the ESA and accompanying regulations plainly require an ITS, and they require that the ITS find that any take resulting from the proposed agency action will neither jeopardize the continued existence of the listed species nor run afoul of § 101(a)(5) of the MMPA." *Id.* at 17. Because NMFS was unable to make the necessary MMPA negligible impact determination, "[t]his should have ended the agency's inquiry," particularly in light of Congress's intent in enacting the ESA "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 18 (citations omitted).

The Court also noted that, while it did not rule on Plaintiffs' other arguments as to why the 2014 BiOp is unlawful, "NMFS would do well to adhere to <u>all</u> of the [ESA's] requirements in any future BiOps" and that "just because the Court had no need to discuss other features of the 2014 BiOp does not mean that they complied with the ESA (or, for that matter, the MMPA) and should be repeated in future BiOps." Mem. Op. 19.

Although the Court did not reach the merits of Plaintiffs' substantive ESA claims under sections 7(a)(2) and 9, *see* Pls.' Summ. J. Mem. 41–53, its decision means that NMFS cannot lawfully rely on the 2014 BiOp in authorizing and managing the American lobster fishery to fulfill its substantive duty to avoid jeopardy to the right whale. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127–28 (9th Cir. 2012) ("an agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed"); *City of Tacoma v. Fed. Energy Reg. Comm'n*, 460 F.3d 53, 75–76 (D.C. Cir. 2000) (similar). Likewise, in the absence of an ITS, every entanglement of a right whale is a violation of section 9 of the ESA. *See* 16 U.S.C. § 1532(19) (defining take); *id.* § 1538(a)(1) (take prohibition); *id.* § 1538(g) (prohibition on causing unlawful take to be committed). As the entity that authorizes

and manages the fishery, NMFS is responsible for such unauthorized take. *See Strahan v. Coxe*, 127 F.3d 155, 163–64 (1st Cir. 1997).

## ARGUMENT

The legal errors in the 2014 BiOp are significant. NMFS's legal failures leave critically endangered right whales vulnerable to increased risk of entanglement-related death and injury in lobster gear, fail to ensure that ongoing operation of the lobster fishery will not jeopardize the species' continued existence, and undermine congressional intent that federal agencies "afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). While the Court has declared the 2014 BiOp unlawful, further remedies are necessary to correct the agency's substantial errors and prevent the likelihood of irreparable harm. Plaintiffs request two forms of relief, described in detail below.

First, Plaintiffs request that the Court vacate and remand the 2014 BiOp as applied to right whales, thereby granting the presumptive remedy for an agency action held contrary to law under the APA, but additionally stay vacatur until January 31, 2021. In the alternative, if the Court declines to vacate the 2014 BiOp, it should remand the 2014 BiOp and order NMFS to issue a new biological opinion and final rule amending the ALWTRP by January 31, 2021.

Second, in addition to granting these ordinary APA remedies, given the significant threat that ongoing lobster fishing poses to right whales, Plaintiffs request that the Court enjoin NMFS from authorizing the use of static vertical lines in the lobster fishery in an important right whale habitat area in Southern New England until an ITS issues and until all the regulatory measures needed for NMFS to issue a lawful ITS are implemented on the water.

Plaintiffs' requested relief is meaningful yet narrowly tailored to correct the agency's substantial violations and provide critical protections to right whales over the coming months. Each form of Plaintiffs' requested relief is warranted and well within this Court's broad power to

cure federal agency wrongdoing. *See Hecht v. Bowles*, 321 U.S. 321, 328–30 (1944) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it."). The Court should therefore grant Plaintiffs' requested remedies.

## I.      Plaintiffs Are Entitled to Ordinary APA Remedies

### A.      The Court Should Vacate and Remand the 2014 BiOp as Applied to Right Whales and Stay Vacatur Until January 31, 2021

The Court should vacate the 2014 BiOp as applied to right whales and remand it to NMFS to issue a new biological opinion consistent with the Court's decision. Vacatur and remand is consistent with established principles of administrative law and appropriate to resolve the legal errors found by this Court. However, given the potential disruptive environmental consequences of vacating the 2014 BiOp, Plaintiffs ask the Court to stay vacatur until January 31, 2021 to give the agency time to address and correct its legal deficiencies by issuing a new biological opinion and whatever additional mitigation measures are required to comply with the ESA as a result, while incentivizing it to act within a certain timeframe. Without such incentive, it is likely the agency will continue its longstanding pattern of delay in implementing actions to protect right whales from entanglement in fishing gear.

### 1.      Vacatur is the Presumptive Remedy

Plaintiffs' challenge to the 2014 BiOp arises under the APA, which provides the exclusive judicial mechanism for challenging NMFS's "maladministration" of the ESA. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 171–74 (1997) (ESA citizen-suit review is not available for biological opinions); *id.* at 177–79 (judicial review of biological opinions is

available under the APA).[3] Under the plain language of the APA, a reviewing court "*shall . . .*

*hold unlawful and set aside* agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)

(emphases added).

Vacatur is the presumptive remedy for agency actions held contrary to law. *See Citizens*

*to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency

action *must be set aside* if the action was 'arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or

constitutional requirements." (quoting 5 U.S.C. § 706(2)(A)-(D)); *see also FCC v. Nextwave*

*Personal Commc's*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside

federal agency action that is 'not in accordance with law' . . . which means, of course, *any* law,

and not merely those laws that the agency itself is charged with administering." (citations

omitted)); *In re Polar Bear Endangered Species Act Listing and 4(d) Rule Litig.*, 818 F. Supp. 2d

214, 238 (D.D.C. 2011) ("Both the Supreme Court and the D.C. Circuit Court have held that

vacatur is the presumptive remedy" for a violation of the APA).

Consistent with this directive, courts regularly vacate biological opinions that fail to

comply with the ESA, as well as agency actions taken in violation of the ESA's no-jeopardy

obligations. *See, e.g.*, *Ctr. for Biological Diversity*, 698 F.3d at 1128 (vacating and remanding

biological opinion on gas pipeline and vacating underlying agency action); *Defenders of Wildlife*

---

[3] This Court has previously recognized the jurisdictional distinction between Plaintiffs' first and
fourth claims, arising under the APA, and their second and third claims, arising under the ESA
citizen-suit provision. *Ctr. for Biol. Diversity v. Ross*, 349 F. Supp. 3d 38, 41 (D.D.C. 2018).
Plaintiffs respectfully note that, while it did not affect the Court's decision as to why NMFS's
2014 BiOp is unlawful, the statements in the Court's decision as to the adequacy of the ESA
citizen-suit provision for remedying Plaintiffs' first claim are inconsistent with *Bennett v. Spear*
because that claim arises under the APA. *See* Mem. Op. 2–3, 7–8.

*v. U.S. Dep't of the Interior*, 931 F.3d 339, 366 (4th Cir. 2019) (vacating and remanding

biological opinion on gas pipeline); *Am. Rivers v. Fed. Energy Reg. Comm'n*, 895 F.3d 32, 55

(D.C. Cir. 2018) (vacating and remanding licensing decision for hydroelectric project because,

*inter alia*, decision relied on biological opinion that failed to comply with the ESA).

While the D.C. Circuit has recognized an exception to the default remedy of vacatur in

cases arising under the APA, *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146,

150–51 (D.C. Cir. 1993), such an exception is to be applied rarely and NMFS—not Plaintiffs—

carry the burden to show why vacatur is inappropriate. *See, e.g.*, *W. Watersheds Proj. v. Zinke*,

No. 1:18-cv-00187-REB, 2020 WL 959242, at *12 (D. Idaho Feb. 27, 2020) ("The burden is on

[the agency] to show that compelling equities demand anything less than vacatur"). Under

*Allied-Signal*, a court's decision whether to vacate "depends on 'the seriousness of the order's

deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive

consequences of an interim change that may itself be changed.'" 988 F.2d at 150–51 (citation

omitted). NMFS cannot meet that burden here: its violations are serious and unjustifiable and the

short stay of vacatur that Plaintiffs seek will mitigate potential disruptive consequences.

      2.      The Legal Errors in the 2014 BiOp Are Serious Violations of Law

Applying *Allied-Signal*, the Court must consider "the seriousness of the order's

deficiencies." *Id*. Here, NMFS's failure to include an ITS constitutes a fundamental flaw in the

agency's decision, with serious implications for NMFS's ongoing authorization and management

of the lobster fishery and its obligation to protect endangered right whales in accordance with the

ESA and MMPA. The agency has no option other than to correct this fundamental flaw in a new

biological opinion.

NMFS violated section 7 of the ESA in issuing the 2014 BiOp without an ITS. 16 U.S.C.

§ 1536(b)(4); Mem. Op. 15. The ESA's consultation requirement is how agencies carry out the

ESA's substantive mandate to protect endangered species from jeopardy. *See* 50 C.F.R. §§ 402.12–402.17; *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("[T]he strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions").

Section 7 is the very "heart" of the ESA for federal agencies, *Cal ex. rel. Lockyer v. USDA*, 575 F.3d 999, 1018 (9th Cir. 2009), and NMFS's violation cuts to the core of the statute. *See Tenn. Valley Auth.*, 437 U.S. at 184–85. The failure to include an ITS deprives the 2014 BiOp of "twin, vital purposes: Gauging conservation and monitoring take to ensure that the agency really does ensure against jeopardy and that any take that occurs is minimized." *Ctr. for Biological Diversity v. NMFS*, 977 F. Supp. 2d 55, 85 (D.P.R. 2013) (citing 50 C.F.R. § 402.14(i)).

On remand, the agency cannot possibly justify its plain legal error of failing to include an ITS to authorize and mitigate right whale take in the 2014 BiOp. The Court clearly stated that "[h]ere, the ESA and accompanying regulations plainly require an ITS, and they require that the ITS find that any take resulting from the proposed agency action will neither jeopardize the continued existence of the listed species nor run afoul of § 101(a)(5) of the MMPA." Mem. Op. 17. NMFS "must develop an entirely new [biological opinion] to correct its errors," rendering remand without vacatur inappropriate. *See Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 52 (D.D.C. 2010).

Remand without vacatur would be especially improper here given NMFS's decades-long history of: (1) authorizing the fishery without the requisite ITS; and (2) delaying issuance of regulations to protect right whales from entanglement in lobster gear despite recognizing that

9

such actions are necessary. *See Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 316 F. Supp. 3d 349, 415 (D.D.C. 2018) ("Given the length of time [an] invalid regulation has persisted, particularly in the face of internal acknowledgement by OGC of potential shortfalls, inaction by the FEC to address its flaws is inevitably a significant concern with a remand-only remedy"); *infra* pp. 13–14 (discussing NMFS's history of delaying action to protect right whales from entanglements in fishing gear); Pls.' Opp. to Defs.' Mot. to Stay 6–9, ECF No. 71 (same). The Court should therefore vacate and remand the 2014 BiOp.

### 3. Vacatur Plus a Short Stay Will Provide Incentive for NMFS to Act While Limiting Potential Disruptive Consequences

Under *Allied-Signal*, the Court should also consider the "disruptive consequences of an interim change" in considering vacatur. 988 F.2d at 150–51. Under this test, "[v]acatur would be disruptive if it set[s] back achievement of the environmental protection required" by statute. *Nat. Res. Def. Council v. U.S. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007).

Plaintiffs request vacatur of the 2014 BiOp but also request a brief stay of vacatur until January 31, 2021 to provide NMFS time to finalize its biological opinion and final rule amending the ALWTRP. This stay provides NMFS the necessary incentive to act within a certain timeframe, while limiting the potentially disruptive environmental consequences of vacatur that might result from vacating a biological opinion on NMFS's ongoing authorization and management of the lobster fishery under the ALWTRP regulations and the federal lobster permitting system. Additionally, while the 2014 BiOp fails to adequately protect right whales, it does contain several conservation recommendations, including that NMFS continue to undertake and support aerial surveys, passive acoustic monitoring, and disentanglement activities. C1_26816–17. While these recommendations are limited, having them in place is better than nothing at all.

Numerous courts in this Circuit have taken a comparable approach in similar circumstances. *See Anacostia Riverkeeper, Inc. v. Wheeler*, 404 F. Supp. 3d 160, 189 (D.D.C. 2019) (vacating unlawful pollution limits ruled not protective enough under the Clean Water Act, but staying vacatur for one year because "better these [limits] than no limits at all"); *Anacostia Riverkeeper v. Jackson*, 713 F. Supp. 2d at 52 (similar); *see also Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987) ("In this case, we vacate the rule because the Secretary's omissions are quite serious . . . Yet we exercise our power to withhold issuance of our mandate [for six months]"); *Friends of the Earth, Inc. v. U.S. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006) (vacating EPA's unlawful approval of a water pollution control limit and recognizing the district court's authority to stay the order of vacatur until EPA issues a new limit).

Accordingly, Plaintiffs ask the Court to stay vacatur until January 31, 2021. This timeframe is roughly six months from the date NMFS has stated it intends to issue the proposed amendments to the ALWTRP and draft biological opinion analyzing those amendments. *See* Jt. Status Report 5. Six months is generally consistent with the timeframe NMFS previously represented to the Court that it needed to finalize the rulemaking following the proposed rule. *See* Anderson Decl. ¶ 16, ECF 68-2 (NMFS declaration stating it intended to issue a proposed rule in January or February 2020 and final rule in July 2020). This stay of vacatur will provide NMFS time to enact needed amendments to the ALWTRP to reduce serious injury and mortality of right whales in lobster gear and issue a new biological opinion, while also providing right whales with the continued protections of the existing management regime analyzed in the 2014 BiOp during the stay.

Staying vacatur until January 31, 2021 will also provide the agency with the incentive to act within this timeframe. *See Nat. Res. Def. Council v. U.S. EPA*, 489 F.3d 1250, 1264 (D.C.

Cir. 2007) (Randolph, J., concurring in part) ("The existence of a stay with time limits, rather than an open-ended remand without vacating, will give the agency an incentive to act in a reasonable time, given the other constraints on its resources. When we simply remand the agency has no such incentive."). This incentive is particularly important here, where the agency has a long-established history of delaying actions to protect right whales and of authorizing the fishery without adequate measures to reduce the risk of entanglements. *See infra* pp. 13–14 (discussing delays); *Citizens for Responsibility & Ethics in Wash.*, 316 F. Supp. 3d at 414–15 (vacating rule but staying vacatur for 45 days to motivate agency to act to amend unlawful regulation).

Given the agency's history of not meeting its own deadlines, Plaintiffs also request that the Court retain jurisdiction and require NMFS to submit monthly progress reports to the Court regarding the status of the agency's new biological opinion and final rule. *See, e.g.*, *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 937 (9th Cir. 2008) (finding reasonable the district court's requiring status reports every 90 days during remand on unlawful biological opinion, noting that requiring such reports is "clearly permissible") (hereinafter, *Nat'l Wildlife Fed'n I*); *Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 81 (D.C. Cir. 1984) (requiring status reports every 60 days).

### B.      In the Alternative, the Court Should Remand the 2014 BiOp and Order NMFS to Issue a New Biological Opinion and Final Rule by January 31, 2021

Vacatur of the 2014 BiOp plus a stay of vacatur both gives NMFS time to come into compliance with the ESA and avoids potentially disruptive environmental consequences while also ensuring NMFS acts within a certain timeframe. If, however, the Court declines to vacate the 2014 BiOp, it should remand the 2014 BiOp and order NMFS to issue a new biological opinion and final rule to reduce serious injury and mortality of right whales in lobster gear by January 31, 2021.

Notably, in ordering such relief, the Court will not be commanding *how* NMFS must act, only that it must act by a date certain. This is well within this Court's power. *See, e.g.*, *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering agency action within 45 days); *Cutler v. Hayes*, 818 F.2d 879, 895 n.137 (D.C. Cir. 1987) (listing cases where courts "intervened to compel an agency unreasonably delaying to speed up its activities" and imposed 30 and 60 day deadlines); *Zambrana v. Califano*, 651 F.2d 842, 844 (2nd Cir. 1981) (noting that "[t]he remanding court is vested with equity powers" and that "[i]t may when appropriate set a time limit for action by the administrative tribunal, and this is often done").

Absent vacatur, a court-ordered deadline for a final, revised biological opinion and final rule is necessary due to the agency's long and consistent history of delaying actions to protect right whales from entanglements and "the urgency of the listed species' situation." *See Nat'l Wildlife Fed'n I*, 524 F.3d at 937 (holding a court has discretionary authority to impose deadlines on remand proceedings and district court properly did so especially considering agency's history of issuing flawed biological opinions and the highly endangered status of the species at issue).

Over the past two decades, NMFS has made only slow progress in issuing and revising rules and biological opinions and even that progress has often been the result of litigation. *See* Pls.' Opp. to Defs.' Mot. to Stay 6–9 (describing NMFS's history of delay). For example, in 2003, NMFS concluded that then-existing measures were not sufficiently protective of right whales yet did not issue a proposed rule to amend the ALWTRP until June 2005. *See, e.g.*, 70 Fed. Reg. 35,894 (June 21, 2005); C1_ 026657. And it did not finalize that rule until October 2007—nearly two and a half years after the proposed rule, five years after NMFS acknowledged the ALWTRP should be amended, and well beyond the timelines established by the MMPA. *See* 72 Fed. Reg. 57,104 (Oct. 5, 2007); 16 U.S.C. § 1387(f)(7)(C) (requiring NMFS to publish final

rule within 60 days of close of comment period on proposed rule). Moreover, NMFS only issued the final rule because Plaintiff the Humane Society of the United States challenged the agency's unlawful delay and it was under a court order to act. *See* Order, *Humane Society of the U.S. v. Gutierrez*, No. 07-00333-ESH (D.D.C. July 11, 2007), ECF No. 23 (adopting Stipulated Settlement and Agreement, filed at ECF No. 21).

NMFS has also delayed issuing legally-required biological opinions under the ESA. For example, despite reinitiating consultation on the lobster fishery in July 2003, NMFS did not issue a biological opinion until October 2010—more than seven years later. *See* C1_26657. Here, without a date certain for a new biological opinion and final rule, it is reasonable to assume that urgently-needed regulatory protections for right whales will continue to languish.

The history of this litigation also demonstrates why a court-ordered deadline for final action by NMFS is necessary. In moving to stay this lawsuit in August 2019, the agency stated that it "expects to issue a new set of regulations under the [MMPA] and a new, superseding biological opinion under the [ESA] on the operation of the lobster fishery by July 31, 2020." Defs.' Mot. to Stay 2, ECF No. 68. Its supporting declaration stated that the agency intended to issue a proposed rule "by the end of January or February 2020" and, although noting the possibility of additional delays, had an "ultimate goal of a final rule in July 2020." Anderson Decl. ¶ 16. Less than one month later, NMFS submitted another declaration indicating that issuance of the final rule (and accompanying biological opinion) may be delayed due to review of the rule by the Office of Management and Budget, but the agency still hoped to finalize the rule by July 2020. Second Anderson Decl. ¶¶ 3–5, ECF No. 74-1. Then, at the summary judgment stage of this case, NMFS submitted a third declaration indicating that it now expects to issue a draft biological opinion and proposed rule in July 2020. Third Anderson Decl. ¶ 9, ECF

No. 87-1.

Given the agency's long history of delaying actions to protect right whales from entanglements in lobster gear—and often only acting once forced to do so by a court—there is no basis for confidence in any of NMFS's promises. A court-ordered deadline of a final rule and biological opinion by January 31, 2021 would provide the necessary certainty. While this date is already beyond the statutory deadlines for amending a take reduction plan under the MMPA, *see* 16 U.S.C. § 1387(f)(7), and beyond the 90-day default for completing section 7 consultation under the ESA, *see id*. § 1536(b)(1), this timeline will provide NMFS with ample opportunity to finalize its forthcoming regulation to implement additional measures to protect right whales from entanglement in lobster gear and to issue a new biological opinion that complies with the Court's decision. Again, because of the agency's history of delay, Plaintiffs also request that the Court retain jurisdiction during the pendency of the remand and require NMFS to submit monthly progress reports. *See Nat'l Wildlife Fed'n I*, 524 F.3d at 937; *Telecomm. Research & Action Ctr.*, 750 F.2d at 81.

## II.     The Court Should Also Order Interim Injunctive Relief

Vacatur of an agency's biological opinion would typically provide the relief necessary to remedy a plaintiff's harms because the underlying agency action analyzed in the biological opinion could not go forward. However, to narrow the relief requested, provide the agency time to correct its legal errors, and limit potential environmentally disruptive consequences of vacatur, Plaintiffs instead ask the Court to stay vacatur; or, alternatively, to remand the 2014 BiOp with a date certain for a new biological opinion and final rule. Thus, additional relief is necessary to prevent irreparable harm to right whales (and to Plaintiffs' protected interests in right whale conservation) in the interim.

So long as NMFS continues to authorize and manage the lobster fishery under the current regulatory regime analyzed in the 2014 BiOp, right whales are at ongoing risk of unlawful entanglements. The Court should therefore issue injunctive relief until NMFS issues a new, final biological opinion that complies with the Court's decision by including an ITS authorizing any take from operation of the lobster fishery and until the measures necessary to do so are effective on the water. This interim injunctive relief will help remedy the irreparable harm that could befall right whales absent such relief. It will also help avoid unauthorized incidental take of right whales in violation of section 9 of the ESA and help ensure that ongoing lobster fishing does not jeopardize the continued existence of this critically endangered species. *See* 16 U.S.C. § 1536(a)(2); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (holding an agency's biological opinion unlawful and remanding the case to the district court to "grant injunctive relief until the Service complies with its obligations under the ESA.").

Specifically, Plaintiffs seek an interim injunction enjoining NMFS from authorizing the lobster fishery's use of static vertical lines in an area of high, year-round right whale use. This area south of Martha's Vineyard and Nantucket off Massachusetts (hereinafter referred to as "Southern New England") has increasingly become important right whale foraging and socializing habitat in recent years. This area is depicted in the map below as the proposed Southern New England Restricted Area.



Plaintiffs' requested injunctive relief properly responds to NMFS's legal errors. The requested injunction is narrowly tailored to protect right whales from entanglement risk in an important habitat area and will lift once NMFS issues a new biological opinion that contains an ITS for take of right whales by the lobster fishery and any measures necessary to authorize such take are effective. The requested relief may also facilitate experimental lobster fishing in the area using various prototypes of "ropeless" gear, which NMFS has acknowledged has great promise for solving the entanglement crisis.[4]

---

[4] To be clear, Plaintiffs do not request that the Court order NMFS to conduct or permit ropeless experimental fishing in the proposed Southern New England Restricted Area, only that NMFS's authorization of the use of static vertical lines in this area be enjoined.

A.      **Standard of Review for Injunctive Relief**

In an ordinary case, a plaintiff seeking a permanent injunction must demonstrate: "(1)

that it has suffered an irreparable injury" (or will, absent injunctive relief); "(2) that remedies

available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010) (citation omitted).

However, that test is modified where, as here, a plaintiff seeks interim injunctive relief for an

agency's established violation of the ESA. *See Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817

(9th Cir. 2018) (hereinafter, *Nat'l Wildlife Fed'n II*). Regarding irreparable harm, "because the

injunction may be lifted after federal defendants issue a new BiOp and comply with [the

ESA] . . . the first prong of the injunction test should be modified to match the analogous prong

in the preliminary injunction test: plaintiffs must show that they are 'likely to suffer irreparable

harm in the absence of preliminary relief.'" *Id*. (quoting *Winter v Nat. Res. Def. Council*, 555

U.S. 7, 20 (2008) (additional citations omitted)).

Moreover, as the Supreme Court has made plain, because Congress intended that

endangered species conservation be given paramount importance, courts cannot use equities to

strike a different balance. *Tenn. Valley Auth.*, 437 U.S. at 194; *United States v. Oakland

Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Thus, "[w]hen considering an injunction

under the ESA, [the Court] presume[s] that remedies at law are inadequate, that the balance of

interests weighs in favor of protecting endangered species, and that the public interest would not

be disserved by an injunction." *Nat'l Wildlife Fed'n II*, 886 F.3d at 817. In short, injunctive relief

should issue upon a demonstration by the plaintiff "that irreparable injury 'is *likely* in the

absence of an injunction.'" *Id*. at 818 (quoting *Winter*, 555 U.S. at 22).

18

**B.     Irreparable Harm is Likely Absent an Interim Injunction**

Although injunctions have been characterized as extraordinary remedies, courts have

consistently recognized that they are appropriate in environmental cases. As the Supreme Court

has explained:

> Environmental injury, by its nature, can seldom be adequately remedied by money
> damages and is often permanent or at least of long duration, i.e., irreparable. If such
> injury is sufficiently likely, therefore, the balance of harms will usually favor the
> issuance of an injunction to protect the environment.

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see also Nat'l Wildlife Fed'n v.*

*Burford*, 835 F.2d 305, 323–25 (D.C. Cir. 1987) ("destroying wildlife habitat, air and water

quality, natural beauty, and other environmental and aesthetic values and interests" constitutes

irreparable harm); *Brady Campaign to End Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25

(D.D.C. 2009) ("These environmental and aesthetic injuries are irreparable"). That is particularly

true for violations of the ESA. Where a case involves harm to endangered species, "establishing

irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Envtl. Law Ctr. v.*

*U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).

This case is no exception. Entanglement of right whales constitutes irreparable harm and

the requested relief is likely to prevent that harm from occurring during the pendency of the

requested interim injunction.

1.     Entanglement of Right Whales Constitutes Irreparable Harm

There is no question that entanglement of endangered right whales in lobster gear

constitutes irreparable harm. NMFS succinctly stated, "[b]ecoming entangled in fishing gear can

severely stress and injure a right whale. Being entangled slows down the whale, decreases its

overall fitness, and can lead to a long and painful death." NMFS, *North Atlantic Right Whales*

*and the Dangers of Vessel Strikes and Entanglement*, https://www.fisheries.noaa.gov/feature-

story/north-atlantic-right-whales-and-dangers-vessel-strikes-and-entanglement (Feb. 19, 2020).

"Biologists also believe that injuries and stress caused by long-term entanglements is one of the

reasons that females are calving less often." *Id.*

According to NMFS, entanglement in commercial fishing gear is responsible for the

majority of known right whale deaths in recent years. *See, e.g.*, AR_8724. The sublethal impacts

of entanglement—and the impacts that entanglement can have on a whale's ability to reproduce

in particular—"may be equally harmful to the whale population." *Conserv. Law Found. v. Ross*,

422 F. Supp. 3d 12, 32 (D.D.C. 2019). A 2012 study indicates that 83 percent of right whales had

been scarred at least once by fishing gear between 1980 and 2009 and nearly half the population

had been entangled more than once. Pls.' Summ. J. Mem. 22. A 2016 study confirms these

findings. AR_2494.

These harms to individual right whales from entanglements are irreparable. *See Nat'l*

*Wildlife Fed'n II*, 886 F.3d at 818–19 (extinction-level threat is not required to demonstrate

irreparable harm). This is "because '[o]nce a member of an endangered species has been injured,

the task of preserving that species becomes all the more difficult.'" *Id.* (quoting *Forest Conserv.*

*Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995)); *see also Fund for Animals v.*

*Turner*, No. 91-2201(MB), 1991 WL 206232, at *8 (D.D.C. Sept. 27, 1991) ("the loss even of

the relatively few grizzly bears that are likely to be taken . . . is a significant, and undoubtedly

irreparable, harm").

And while harm to an individual member of an endangered species in general is

significant and irreparable, harm to a right whale is especially so. Despite being protected as

endangered for more than 40 years, right whales have not recovered. To the contrary, the species

has been steadily declining since 2010, calving rates have significantly decreased, and at least 30

right whales have died since 2017. NMFS, *North Atlantic Right Whale*,

https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last visited May 14, 2020).

NMFS recently assigned the right whale "a recovery priority #1," meaning its "extinction is

almost certain in the immediate future" absent intervention. NMFS, *Species in the Spotlight*,

https://www.fisheries.noaa.gov/topic/endangered-species-conservation#species-in-the-spotlight

(last visited May 14, 2020).

This Court recently recognized that an entanglement of right whale constitutes irreparable

harm, stating that "[b]oth lethal and sublethal effects of entanglement bring the species ever

closer to extinction, from which there is, of course, no return." *Conserv. Law Found.*, 422 F.

Supp. 3d at 34; *see also id.* at 32 ("[w]hen the global population of a species is as low as 400 . . .

'every mortality is of huge significance to the potential for the species to avoid extinction'"

(citing Decl. of Dr. Michael Moore)). NMFS has conceded as much, stating that "protecting

every individual is a top priority." Pls. Opp. to Mot. to Stay, Ex. 1 at 2, ECF No. 71-2; *see also*

C1_26686 (NMFS's determination that the right whale population cannot sustain *any* deaths or

serious injuries if the population is to recover); NMFS, *10 Things You Should Know About North*

*Atlantic Right Whales*, https://www.fisheries.noaa.gov/feature-story/10-things-you-should-know-

about-north-atlantic-right-whales (Oct. 17, 2019) ("Survival of this species depends on no more

than one whale death per year").

Because of their documented interests in the conservation of the North Atlantic right

whale, Plaintiffs face "irreparable harm to their own interests stemming from the irreparable

harm to the listed species." *See Nat'l Wildlife Fed'n II*, 886 F.3d at 822; *see also* Bartlett Decl.

¶¶ 4–12, ECF No. 66-4 (describing one of Plaintiffs' member's aesthetic and other interests in

right whales and concerns that continued entanglements mean fewer opportunities to observe the

whales and that the whales will be pushed closer to extinction); Milton Decl. ¶¶ 10–14, ECF No. 66-5 (same); Young Decl. ¶¶ 5–8, 21–25, ECF No. 66-6 (same); Hillgarth Decl. ¶¶ 9–12, ECF No. 66-7 (same); Patek Decl. ¶¶ 7–14, ECF No. 66-8 (same); Peach Decl. ¶¶ 11–15, ECF No. 66-9 (same); Shelley Decl. ¶¶ 8–13, ECF No. 66-10 (same).

2.     The Requested Relief Would Reduce the Likelihood of Irreparable Harm

Plaintiffs' request that the Court enjoin NMFS from allowing the lobster fishery to fish using static vertical lines in the proposed Southern New England Restricted Area would reduce the likelihood of irreparable harm to right whales, and thus to Plaintiffs' members, in an area with demonstrably high year-round aggregations of right whales. When a court "ha[s] rejected [a] biological opinion . . . and it ha[s] concluded that continuation of the status quo could result in irreparable harm to a threatened species[,] [t]hose are precisely the circumstances in which . . . the issuance of an injunction is appropriate." *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 796 (9th Cir. 2005). Thus, the relevant question is whether Plaintiffs' requested relief will likely reduce the risk of harm to right whales as compared to the status quo. *See id.* at 797 (upholding district court's issuance of injunctive relief based on evidence that the "plaintiffs' request . . . would pose less risk for migrating fish than the proposed operations").[5]

Plaintiffs' requested relief will do just that. The status quo means that right whales will continue to experience entanglements in lobster gear. NMFS has concluded that right whales are at risk of entanglement anywhere they overlap with vertical lines in the water column. AR_8732;

_____

[5] Although the Court has not explicitly ruled on Plaintiffs' ESA citizen-suit claims against NMFS in its capacity as the action agency that authorizes and manages the fishery, the agency unequivocally violated the ESA by relying on the invalid 2014 BiOp. The basis for Plaintiffs' second claim against NMFS for violating the substantive no-jeopardy obligation of section 7(a)(2) of the ESA—the invalidity of the 2014 BiOp—has been decided, and the agency has no independent basis to support an assertion that its actions nonetheless comply with the ESA. Likewise, the agency has no basis to claim that it is in compliance with section 9.

*see also* 85 Fed. Reg. at 21,086 (NMFS's recent statement that "lobster gear poses a potential

risk to right whales in any area where right whale and lobster fishery distributions overlap").

NMFS has also stated that existing mitigation measures under the ALWTRP are insufficient to

protect right whales from harmful entanglements. *See* P_16674 (April 2019 email from NMFS);

*see also* AR_8732 (NMFS's statement that "there is no place within the fished area along the

East Coast of North America for which entanglement risk is zero"). Indeed, NMFS recently

determined that 26 percent of the right whale population is entangled each year and the risk of an

entanglement is increasing at a rate of 6.3 percent per year. AR_8724, AR_8732.

Plaintiffs' requested interim injunctive relief will reduce the risk of entanglement by

enjoining NMFS from authorizing the use of static vertical lines in a hotspot for right whales.

The proposed Southern New England Restricted Area is adjacent to designated right whale

critical habitat in Cape Cod Bay and the Great South Channel, which the agency has recognized

as important feeding areas. *See* 59 Fed. Reg. 28,805 (June 3, 1994); 81 Fed. Reg. 4,837 (Jan. 27,

2016); *see generally* 16 U.S.C. § 1532(5) (defining critical habitat); 50 C.F.R. § 424.12 (criteria

for designating critical habitat). In recent years, however, Southern New England has also

become an important new habitat for right whales. Decl. of Michael Moore, PhD (Moore Decl.)

¶¶ 21–26. Scientists have determined that climate-driven changes have altered foraging patterns,

and this area has become an important new feeding and socializing area for right whales. *Id*.

¶¶ 20, 23. The data show the whales use these waters in the greatest numbers during the winter

and spring months, but also that they are present in Southern New England waters year-round.

*Id*. ¶¶ 21–23, 25–26.

NMFS's own data show increasing abundance and consistent aggregations of right

whales in the area, particularly in the last five years. *See id*. ¶¶ 21, 22, 25; NMFS, *Interactive*

*North Atlantic Right Whale Sightings Map* https://fish.nefsc.noaa.gov/psb/surveys/ MapperiframeWithText.html (last visited May 14, 2020). Right whale aggregations are so common in this area that NMFS has repeatedly established voluntary speed restrictions and asked vessels to change their routes and lower their speeds to reduce ship strikes. Moore Decl. ¶ 25. More than 100 whales—one quarter of the entire population—were recently observed in the area south of Martha's Vineyard and Nantucket at one time. *Id.* ¶ 26. Moreover, seven right whales have been found dead in Southern New England over the last three years, and entangled whales have recently been sighted in the area. *Id.* ¶¶ 27–30. For example, in December 2019, a 15-year-old male right whale was seen 20 miles south of Nantucket with three lines running out of his mouth; and in February 2020, a 19-year-old female right whale was seen with a fishing buoy stuck in her mouth. *Id.* ¶¶ 29–30. While these events do not necessarily mean the whales were killed or entangled in Southern New England, they demonstrate the whale's increasing presence in the area. *See id.* ¶ 27.

This Court also recognized the importance of these waters to right whales in restoring the prohibition on gillnet fishing in the areas that overlap within the waters at issue here. *Conserv. Law Found.*, 422 F. Supp. 3d at 32–34. While the gillnet fishery cannot operate in certain portions of Southern New England, the lobster fishery can and does operate throughout Southern New England.

Any vertical line in this habitat area creates a risk of entanglement. *See*, *e.g.*, 85 Fed. Reg. at 21,086; AR_8732; Moore Decl. ¶ 35. The right whale's increasing use of this area increases the likelihood that one or more whales will encounter and become entangled in vertical line used in the lobster fishery operating in that area. Moore Decl. ¶¶ 23, 50. The behavior of foraging right whales also increases the likelihood of entanglement in the area. *Id*. ¶ 23. The majority of

right whales seen in the area were feeding, moving slowly through the water column with their mouths wide open. *Id.* Such behavior significantly increases the risk of entanglement. *Id.*

Moreover, while any entanglement constitutes irreparable harm to right whales, the gear used in the offshore portions of the proposed Southern New England Restricted Area (i.e., waters greater than 12 nautical miles from shore) is heavy gear. Existing regulations require a minimum of 20 traps on each fishing trawl, and fishermen use thicker and longer lines to account for increased depth and currents. *See* 50 C.F.R. § 229.32(c)(2)(iii); Moore Decl. ¶ 39. This gear configuration increases the chances that an entanglement will cause a serious injury or mortality. Moore Decl. ¶¶ 39–40. Enjoining NMFS from authorizing the lobster fishery's use of static vertical lines in the proposed Southern New England Restricted Area will eliminate the risk of entanglement in lobster gear in this foraging hotspot and reduce the risk of irreparable harm to individuals of this highly imperiled species. *Id.* ¶ 50–51.

Area and gear closures have a proven track record of success and play a paramount role in right whale conservation. NMFS has stated that targeted closures, such as the existing seasonal closure of Cape Cod Bay, "can have minimal impact to fishing while providing great benefit to whales." AR_8732. NMFS believes the existing closure in Cape Cod Bay has been so successful at reducing the risk of entanglements in the area that the agency recently applied a 24 percent credit toward its goal of reducing the risk of entanglement-related serious injury and mortality off Massachusetts by 60 percent. *See* 84 Fed. Reg. 37,822, 37,823 (Aug. 2, 2019).

### C.    The Other Three Factors Favor the Interim Injunction

Because Plaintiffs have demonstrated the requested relief is likely to prevent irreparable harm to right whales and Plaintiffs' members, that should end the Court's inquiry and the interim injunction should issue. *See Nat'l Wildlife Fed'n II*, 886 F.3d at 817, 822. To the extent the Court

considers the other factors for injunctive relief, the result is the same as the remaining factors all tip sharply in favor of the interim injunction.

To begin, it is well established that monetary damages would be insufficient to remedy any irreparable harm to right whales that might occur from entanglements in lobster gear in the proposed Southern New England Restricted Area. *See Amoco Prod. Co.*, 480 U.S. at 545. Indeed, as this Court has recognized, "[i]t hardly merits recitation that the harm inflicted upon the whales by entanglement, and the resulting harms to the professional, aesthetic, and recreational interests of [plaintiffs'] members, are noncompensable by legal remedies." *Conserv. Law Found.*, 422 F. Supp. 3d at 34. The insufficiency of legal remedies favors Plaintiffs' requested injunction.

Moreover, the balance of the hardships and the public interest both tip sharply in favor of an injunction. Under clear and consistent caselaw, these factors *always* sharply favor an injunction in cases brought under the ESA. *See, e.g.*, *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996). "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Tenn. Valley Auth.*, 437 U.S. at 194; *see also Conserv. Law Found.*, 422 F. Supp. 3d at 34 (noting that "the public interest in preventing the extinction of the whale, which has been listed as endangered since the passage of the ESA, is beyond dispute").

That is especially true here, where any economic injury caused by the requested injunctive relief is only temporary as it will expire upon NMFS's issuance of a biological opinion that includes an ITS for any take in the lobster fishery and upon the measures necessary to authorize such take going into effect on the water. *See League of Wilderness Defenders v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (holding that "irreparable environmental

injuries outweigh the temporary delay intervenors face in receiving a part of the economic

benefits of the project"). Any alleged financial harm stemming from Plaintiffs' requested relief

simply cannot override Congress's directive in the ESA that listed species be protected

"whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184.

### D.     The Requested Injunction Appropriately Responds to NMFS's ESA Violations

In addition to preventing irreparable harm, Plaintiffs' request to enjoin NMFS from

authorizing the use of static vertical lines in the lobster fishery in the proposed Southern New

England Restricted Area appropriately responds to NMFS's legal errors. *See S. Yuba River*

*Citizens League v. NMFS*, 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011) (holding that requested

interim injunctive measures "must bear some relation to the deficiencies in the BiOp for which

the court held that the defendants were liable for violation of the ESA" and issuing injunctive

relief during pendency of remand on legally deficient biological opinion).

In fact, because the Court found the 2014 BiOp violates the ESA, Plaintiffs could seek to

enjoin NMFS's authorization of the entire fishery. *See id.* at 1055 (noting that "[i]n cases where a

BiOp relating to a new project has been found to be inadequate, a court could enjoin the new

project entirely"). That is particularly true here where NMFS's ongoing authorization of the

lobster fishery does not have a valid ITS and ongoing entanglements in lobster gear may very

well be jeopardizing the right whale's continued existence. *See id.*; *see also* C1_3744 (2010

BiOp not including ITS); C1_28422 (2012 BiOp not including ITS); C1_26812 (2014 BiOp not

including ITS). Instead, Plaintiffs seek narrowly-tailored interim injunctive relief that will

protect right whales from the risk of entanglement in an important new habitat area while NMFS

develops a new biological opinion on the forthcoming rule to reduce the lobster fishery's impacts

to the right whale to legally acceptable levels and thereby enable the agency to issue an ITS.

Plaintiffs request that the interim injunctive relief remain in place until any measures necessary to reduce and mitigate take and issue a lawful ITS take effect on the water because of the history of significant lag time between NMFS's issuance of final rules amending the ALWTRP and when fishermen have had to comply with those rules. *See, e.g.*, 73 Fed. Reg. 51,228 (Sept. 2, 2008) (extending effective date of final rule by an additional six months to give fishermen a total of 1.5 years to come into compliance with gear modifications required under amendments to ALWTRP); 79 Fed. Reg. 36,586, 36,587 (June 27, 2014) (giving fishermen in the northeast one year to comply with amended ALWTRP). In other words, status quo lobster fishing—which NMFS admits will entangle, injure, and kill right whales, *see, e.g.*, P_16674; AR_8724; AR_8732—will continue until new mitigation measures take effect, which will not necessarily coincide with when NMFS issues a new rule and a new biological opinion.

### E.     The Requested Relief Would Allow Experimental Ropeless Fishing

While Plaintiffs do not seek an order requiring ropeless fishing, the requested relief would allow NMFS to permit experimental fishing using ropeless gear, also known as "pop-up" or "buoyless" gear, in the proposed Southern New England Restricted Area. This gear allows traps on the seafloor to be remotely called to the surface and eliminates the static vertical lines in the water column that entangle whales. Moore Decl. ¶ 46–48. Specifically, the ropeless system (either a stowed rope and buoy or a lift bag) sits on the seafloor attached to the first trap in a trawl and contains an acoustic modem and GPS that records its location. *Id.* ¶ 47. When fishermen return to that location, a signal from a second paired modem on their boat using high-frequency sound waves triggers the buoy or a lift bag to come to the surface. *Id.* The traps can then be hauled up using traditional fishing practices. *Id.*

Some fishermen are already testing types of ropeless gear to fish lobster off the eastern

seaboard. *Id*. ¶ 48. Various prototypes are being tested and refined in trap/pot fisheries off both the U.S. Atlantic and Pacific coasts and in Canada. *Id*. In the FY20 Commerce, Justice, and Science Appropriations Bill, Congress allocated $3 million to NMFS for right whale research and conservation efforts, $1 million of which is directed to be expended on ropeless fishing pilot projects. The SAVE Right Whales Act has been introduced in both Houses of Congress to authorize appropriations of $5 million annually for ten years to develop and test technological solutions to the twin crises of fishing gear entanglements and vessel strikes. *See* S. 2453, 116th Cong. (2019); H.R.1568, 116th Cong. (2019). NMFS itself has said that ropeless gear "is an emerging option that could alleviate a lot of th[e] risk" of entanglement and that "[t]he ability to use gear retrieval devices that do not require the use of stationary buoy lines in the water column would be a truly game changing development for right whales." NMFS, *Dangers of Vessel Strikes and Entanglement*.

In 2018, NMFS issued an advanced notice of proposed rulemaking to allow the use of ropeless gear in areas currently closed to trap/pot fishing because doing so "could incentivize cooperative research that may lead to further technological developments from buoy-lineless fishing." 83 Fed. Reg. 49,046, 49,047 (Sept. 28, 2018). While this proposal has apparently stalled, enjoining NMFS's authorization of the use of static vertical lines by the lobster fishery in the proposed Southern New England Restricted Area would provide the same incentive and promote the development of gear that will create a safer ocean for right whales and help solve the entanglement crisis for good.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) vacate and remand the 2014 BiOp as it pertains to right whales, with vacatur stayed until January 31, 2021 (or, in the alternative, remand the 2014 BiOp and order NMFS to issue a new biological opinion

and final rule by January 31, 2021); and (2) enjoin NMFS's authorization of the lobster fishery

using static vertical lines in the proposed Southern New England Restricted Area.

Respectfully submitted this 15th day of May, 2020,

/s/ *Kristen Monsell*
Kristen Monsell, *admitted pro hac vice*
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org

Sarah Uhlemann, DC Bar No. 501328
Center for Biological Diversity
2400 80th Street NW, #146
Seattle, WA 98117
(206) 327-2344
suhlemann@biologicaldiversity.org

Jane P. Davenport, DC Bar No. 474585
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036
(202) 722-3274
jdavenport@defenders.org

Laura Friend Smythe, DC Bar No. NY0217
The Humane Society of the United States
1255 23rd Street, NW Suite 450
Washington, DC 20037
(202) 676-2331
lsmythe@humanesociety.org

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, The Humane Society of the United States*

/s/ *Erica A. Fuller*
Erica A. Fuller, DC Bar No. MA0001
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

Emily K. Green, DC Bar No. ME0002
Sean Mahoney (*pro hac vice*)
(Maine Bar No. 8661)
Conservation Law Foundation
53 Exchange St., Suite 200
Portland, ME 04101
(207) 210-6439
egreen@clf.org
smahoney@clf.org

*Attorneys for Plaintiff Conservation Law Foundation*