UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY, *et al.*,

     Plaintiffs,

     v.

WILBUR ROSS, in his official capacity as
Secretary of Commerce, *et al.*,

     Defendants,

     and

MASSACHUSETTS LOBSTERMEN'S
ASSOCIATION, INC., *et al.*,

     Defendant-Intervenors.

Civil Action No. 18-112 (JEB)

## MEMORANDUM OPINION

North Atlantic right whales frequently become entangled in fishing gear used by commercial lobster fishermen. Entanglement can seriously injure or kill a right whale, and these unfortunate events are one of the main reasons why the species is endangered, with approximately 400 left on earth. This Court previously invalidated the National Marine Fisheries Service's 2014 Biological Opinion regarding the agency's management of the American lobster fishery for failing to sufficiently take these perilous circumstances into account. Without a valid BiOp, the agency cannot lawfully authorize the fishery under the Endangered Species Act. The Court thus ordered further briefing on the question of remedy; in other words, what should happen to the fishery while NMFS promulgates a new BiOp?

Given that an NMFS rulemaking process that will result in new right-whale conservation measures and the issuance of a superseding BiOp has been underway for some time, even the conservation-group Plaintiffs agree that the agency should have until at least early 2021 to complete such new BiOp. Beyond that, though, the parties diverge on three key remedial questions. First, should the Court vacate the 2014 BiOp or remand it to the agency without vacatur? Second, should the agency be required to complete the new rule and accompanying BiOp by January 31, 2021 (as Plaintiffs propose), or should it be given until May 31, 2021 (as Defendants ask)? Finally, should the Court grant Plaintiffs' request for an interim injunction ordering the immediate cessation of lobstering in a substantial area south of Nantucket Island off the Massachusetts coast until the new rule is implemented?

On the BiOp issues, the Court renders a split decision: vacatur of the 2014 BiOp is appropriate, but that relief shall be stayed until May 31, not January 31, 2021, to give Defendants time to complete the new rule and BiOp. The Court does not believe, moreover, that Plaintiffs' immediate cessation injunction is warranted.

## I.    Background

The Court here provides a somewhat truncated summary of the relevant statutory and procedural background to this litigation. For a fuller discussion, readers are referred to the Court's prior two Opinions. See ECF No. 91 (SJ Op.); ECF No. 76 (Stay Op.).

### A.    The 2014 BiOp

Before NMFS may authorize the continued operation of the American lobster fishery, the Endangered Species Act requires it to produce a Biological Opinion assessing the fishery's impact on the right whale. See 16 U.S.C. § 1536(a)(2), (b); SJ Op. at 8–10; ECF No. 81-1 (Defs. Opp. & Cross-Motion for SJ) at 3, 17. When developing a BiOp, if the agency concludes that

"incidental take" (essentially, harm) to an endangered species is "reasonably certain to occur" from the agency action being assessed, the agency must produce an "incidental take statement" or ITS.  See 50 C.F.R. § 402.14(g)(7); see also 16 U.S.C. § 1536(b)(4).  An ITS, among other things, functions as kind of permit allowing incidental taking, which is otherwise unlawful under section 9 of the ESA.  See 16 U.S.C. §§ 1532(13); 1536(o)(2); 1538(a)(1)(B), (g); see also Oceana, Inc. v. Pritzker, 75 F. Supp. 3d 469, 493 (D.D.C. 2014).

In the 2014 BiOp, NMFS concluded that the American lobster fishery would cause some incidental take of the right whale.  See Defs. Opp. & Cross-Motion for SJ at 17.  Yet the agency nevertheless did not include an ITS with that BiOp.  The reason was simple: the agency could not lawfully issue an ITS vis-à-vis the right whale because it had not found — as required by the ESA before incidental take may be authorized — that "continued operation of the lobster industry w[ould] have [no more than] a 'negligible impact'" on the species.  Id. at 27 (citing 16 U.S.C. § 1536(b)(4)(C); id. § 1371(a)(5)).  NMFS was aware of this prohibition, but it nonetheless chose to "issu[e] [the] BiOp without an ITS," rather than "issu[e] no BiOp (and therefore clos[e] the lobster fishery."  Id. at 3.  The agency argued that its choice was lawful under the ESA.  Id.

This Court disagreed, rejecting the agency's argument that "because the fishery would not have been able to proceed had [NMFS] complied with the ESA, NMFS was justified in abandoning the Act's directives altogether."  SJ Op. at 16–17.  The Court accordingly held that the 2014 BiOp was unlawful and granted summary judgment to Plaintiffs.  It then "order[ed] briefing from the parties on the issue of an injunctive remedy."  Id.

B.  <u>The Atlantic Large Whale Take Reduction Team</u>

The good news is that all stakeholders in the lobster fishery, including conservation groups, are not starting from square one.  NMFS, in fact, has been engaged for some time now in developing new regulations aimed at decreasing the risk of entanglement of right whales in lobster-fishing gear.  Those regulations will be the culmination of the latest efforts of the Atlantic Large Whale Take Reduction Team (TRT), a group convened by NMFS with the central purpose (as the name suggests) of decreasing the very takes Plaintiffs are concerned with.  The new regulations will require a new BiOp, which will supersede the 2014 BiOp as the latest document covering NMFS's authorization of the lobster fishery.

The TRT was established pursuant to section 118(f) of the Marine Mammal Protection Act, which requires NMFS to "develop and implement a take reduction plan designed to assist in the recovery or prevent depletion of each . . . stock [of certain marine mammals, including right whales] which interacts with [certain] commercial fisher[ies]," including the lobster fishery.  <u>See</u> 16 U.S.C. § 1387(f)(1).  The first goal of any take-reduction plan is to "reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock."  <u>Id.</u> § 1387(f)(2).  The "potential biological removal level" is defined as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  50 C.F.R. § 229.2.  The right whale's PBR, according to NMFS, is 0.9 right whales, meaning the species is threatened by the non-natural death of even one cetacean per year.  <u>See</u> SJ Op. at 10.

Section 118(f) contemplates that the take-reduction plans ultimately adopted by NMFS will be developed with the assistance of a "take reduction team." See 16 U.S.C. § 1387(f)(6). The TRT must include as members certain federal agencies, each coastal state with relevant fisheries, Regional Fishery Management Councils, interstate fisheries commissions, academic and scientific organizations, environmental groups, affected Native organizations, and industry. Id. § 1387(f)(6)(C).  TRTs develop "draft take reduction plan[s]" by "consensus" and then submit them to NMFS, which must "take the draft take reduction plan into consideration" and eventually publish both the plan as submitted and any changes proposed by the agency, along with "proposed regulations to implement such plan."  Id. § 1387(f)(7)(A), (B).  Section 118 further requires NMFS to meet with the TRT every so often to monitor implementation of the take-reduction plan, and it obligates the agency to "amend the take reduction plan and implementing regulations as necessary to meet the requirements of this section."  Id. § 1387(f)(7)(E)–(F).

NMFS established the TRT in 1996, and the process culminated in the adoption of the first Atlantic Large Whale Take Reduction Plan in 1997.  The Plan has been amended several times since then.  See, e.g., 79 Fed. Reg. 36,586 (June 27, 2014); 72 Fed. Reg. 57,104 (Oct. 5, 2007); 72 Fed. Reg. 34,632 (June 25, 2007).

Following an unusually deadly year for right whales in 2017, NMFS reconvened the TRT with an eye toward amending the Plan to further reduce entanglement of right whales in fishing gear.  See Atlantic Large Whale Take Reduction Plan Modifications to Reduce Serious Injury and Mortality of Large Whales in Commercial Trap/Pot Fisheries Along the U.S. East Coast, 84 Fed. Reg. 37,822, 37,823 (Aug. 2, 2019).  Three of the four Plaintiffs, in fact, were participants. See Stay Op. at 6.  The April 2019 TRT meeting ended with near consensus on a suite of

measures, including new federal and state rules governing lobster fishing. <u>See</u> 84 Fed. Reg. at 37,823. In August 2019, citing the measures largely agreed to at the April meeting, NMFS declared its intent to propose regulations amending the Plan. <u>Id.</u> The agency also moved for a stay of this lawsuit, which the Court denied, in part because the TRT timetable was aspirational, rather than concrete; indeed, NMFS's briefing there asserted that completion of the Plan amendments by July 31, 2020, was realistic. <u>See</u> Stay Op. at 3, 5–6.

Time has proven, however, that such goal was not attainable, and Plan amendments remain a ways off. According to the agency, it decided to wait to draft the rule until after TRT-participating states had submitted final written proposals. Those "measures took more time to be developed than NMFS expected, and some of the state measures changed between the April 2019 TRT meeting and when the states submitted them to NMFS." ECF No. 111 (Def. Remedy Opp.) at 9. In fact, NMFS did not receive proposals from all relevant states until March 2020. <u>See</u> ECF No. 111-1 (Fourth Declaration of Jennifer Anderson), ¶ 4. Only then, with final state proposals in hand, did NFMS feel sufficiently able to analyze what federal rules would be needed to achieve sufficient reduction in incidental take of right whales. <u>Id.</u>, ¶ 5. NMFS has now completed a draft of its proposed rule, and it is currently under review by the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget.

Given the time needed for OIRA to complete its review, for public comment on the eventual proposed rule, and for both NMFS and OIRA to make possible revisions in response to such comments, NMFS currently estimates that it will publish a final amended Take Reduction Plan and implementing regulations by May 31, 2021. <u>See</u> Fourth Anderson Decl., ¶¶ 11–13. The agency intends to issue a new BiOp (presumably including an ITS this time, if required) for the lobster fishery simultaneously with publishing the final amended Plan, as the required

"analysis of the effects of the fisheries [on the right whale] . . . necessitates knowing what measures will be in the final rule." Defs. Remedy Opp. at 10–11. The new rule and BiOp will moot — and should redress — Plaintiffs' claims in this action, including those on which judgment has not yet been entered, all of which pertain to NFMS's "authoriz[ation] and manage[ment of] the lobster fishery under the current regulatory regime analyzed in the 2014 BiOp." ECF No. 105 (Pl. Remedy Br.) at 16.

　　　C.　The Parties' Remedy Positions

　　　In the now-completed remedy briefing, Plaintiffs seek two different kinds of equitable relief.

　　　They first ask the Court to vacate the 2014 BiOp and remand the matter to the agency pending the issuance of the new BiOp. Plaintiffs also request a stay of that order, so that they may retain the benefit of "several conservation recommendations" currently in effect under the 2014 BiOp until a new Take Reduction Plan is promulgated and implemented. See Pl. Remedy Br. at 10 ("Having [the 2014 BiOp] in place is better than nothing at all" in the interim.). Pointing to NMFS's delay to this point, Plaintiffs contend that January 31, 2021, is an appropriate deadline for the new Plan and corresponding BiOp. Id. If the stay expires before the new Plan and BiOp go into effect, the lobster fishery would presumably have to cease operating on February 1, 2021.

　　　Second, Plaintiffs ask the Court to order one type of immediate injunctive relief that would remain in effect until NMFS has implemented the new rules. Specifically, they request an order enjoining NMFS from authorizing the use of fishing gear with vertical lines in a large area south of Martha's Vineyard and Nantucket Islands off Cape Cod in Massachusetts. Id. at 16. Vertical lines are what lobster fishermen use, so Plaintiffs' proposed injunction would effectively

direct NMFS to institute a year-round closure of this so-called Southern New England Restricted

Area (SNERA), which is roughly the size of Connecticut.  If a picture is worth a thousand words,

it must save at least a page of legal description; as a result, reproduced below is a map of the

SNERA submitted by Plaintiffs.



Id. at 17.  Pointing to right-whale sightings indicated on the map, Plaintiffs argue that the

SNERA has become an important new habitat "hotspot" for right whales.  Id. at 23, 25.

Removing vertical lines from that area, they contend, is therefore necessary to reduce a

substantial and imminent risk of right-whale entanglement in NFMS-controlled waters.

        The agency unsurprisingly opposes these requests.  While it understands that a remand

must flow from the Court's merits Opinion, it believes that vacatur of the 2014 BiOp is not

necessary.  In addition, it strenuously maintains that Plaintiffs' January 2021 deadline is

unworkable and insists that May 31, 2021, is a far more appropriate deadline.  See Def. Remedy Opp. at 20.  Finally, NMFS opposes Plaintiffs' proposed interim injunction regarding the closure of the SNERA to vertical lines.  Id. at 22.

## II.   Analysis

The Court first examines whether remand with or without vacatur is appropriate here.  It next considers how long a stay is warranted for the implementation of the new Plan and BiOp and concludes with a look at the proposed SNERA closure.

### A.  Vacatur

"The ordinary practice is to vacate unlawful agency action."  United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)).  That rule holds when the law rendering the agency action "unlawful" is the Endangered Species Act.  See, e.g., Humane Soc'y of U.S. v. Jewell, 76 F. Supp. 3d 69, 136 (D.D.C. 2014), aff'd sub nom. Humane Soc'y of U.S. v. Zinke, 865 F.3d 585 (D.C. Cir. 2017); Humane Soc'y of U.S. v. Kempthorne, 579 F. Supp. 2d 7, 21 (D.D.C. 2008).  Yet while vacatur may be the presumptively appropriate remedy, it is not the only option.  Instead, as equity requires, the reviewing court has discretion to leave the agency action in place.  See, e.g., Nat'l Parks Conservation Ass'n v. Semonite, 422 F. Supp. 3d 92, 98–99  (D.D.C. 2019); Pub. Emps. for Envtl. Responsibility v. Beaudreau, 25 F. Supp. 3d 67, 115 (D.D.C. 2014).

In Allied-Signal v. United States Nuclear Regulatory Commission, 988 F.2d 146 (D.C. Cir. 1993), our Circuit laid out the operative test for whether to vacate a deficient agency action during remand.  First, a court must consider "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly)."  Id. at 150 (citation omitted). Second, it analyzes "the disruptive consequences of an interim change that may itself be

changed." Id. at 150–51. "Because vacatur is the default remedy, . . . defendants bear the burden to prove that vacatur is unnecessary." Semonite, 422 F. Supp. 3d at 99. Here, neither Allied-Signal factor provides a reason to depart from the standard vacatur remedy.

1. *Seriousness of Error*

To begin, there is little "doubt whether the agency chose correctly" in promulgating the 2014 BiOp without an ITS: it did not. See Allied-Signal, 988 F.3d at 150. As the Court stated in its previous Opinion, the legal analysis here is "not taxing": "[T]he ESA and accompanying regulations plainly require an ITS," yet NMFS did not provide one. See SJ Op. at 15, 17. That "straightforward . . . violation of the ESA," id. at 19, is not the sort of "deficienc[y] . . . [that] can be redressed on remand," Black Oak Energy, LLC v. FERC, 725 F.3d 230, 244 (D.C. Cir. 2013), because "the defects in the challenged [BiOp] go far beyond a mere failure in explanation." Humane Soc'y, 76 F. Supp. 3d at 137. The agency has already explained why it did not include an ITS with the BiOp: although the text of the ESA and MMPA prohibited such exclusion, the agency believed it was preferable to issue the BiOp anyway rather than close the lobster fishery. See SJ Op. at 16–18. The Court rejected that argument, see id., and it is therefore "certain that the agency" cannot cure its errors on remand "because the actions taken were not statutorily authorized." Humane Soc'y, 76 F. Supp. 3d at 137. "In such circumstances — where there is no question that the agency has violated the law and absolutely no possibility of the [agency action's] survival on remand — the D.C. Circuit has suggested that the rule ought to be vacated." Conservation Law Found. v. Pritzker, 37 F. Supp. 3d 254, 271 (D.D.C. 2014) (citing Nat. Res. Def. Council v. EPA, 489 F.3d 1250, 1261 (D.C. Cir. 2007)).

In addition to being obvious, NMFS's legal error was also "serious[]" in the context of the larger ESA scheme. See Allied Signal, 988 F.3d at 150–51. Because the agency anticipated

incidental take of right whales as a result of the action covered by the BiOp, the ESA required it

to issue an ITS that did four things: "specifie[d] the impact of such incidental taking on the

species"; included "reasonable and prudent measures . . . necessary or appropriate to minimize

such impact"; provided "measures that are necessary to" keep that impact at a "negligible" level

under the MMPA, and "set[] forth the terms and conditions . . . that must be complied with by

the Federal agency . . . to implement th[ose] measures."  16 U.S.C. § 1536(b)(4)(i)–(iv); see also

id. § 1371(a)(5).  NMFS, though, undisputedly failed to provide any measures aimed at

minimizing the impact of take.  See Defs. Remedy Br. at 16 (agency did not even adopt

"functional equivalent" of such measures, leaving that to still-not-completed TRP process); see

also SJ Op. at 18–19.  Despite NMFS's finding that the lobster fishery could kill or injure over

three right whales a year, see C1 26787, the agency thus flouted its "responsibility to delineate

terms and conditions to minimize th[at] potential."  Ctr. for Biological Diversity v. Bureau of

Land Mgmt., 422 F. Supp. 2d 1115, 1141 (N.D. Cal. 2006).  Such "terms . . . . are integral parts

of the statutory scheme" that were ignored here.  Arizona Cattle Growers' Ass'n v. U.S. Fish &

Wildlife, 273 F.3d 1229, 1251 (9th Cir. 2001).

     In an effort to stave off vacatur, the agency cites two cases in which courts declined to

vacate a BiOp for ITS-related shortcomings, but neither is persuasive.  For one thing, neither

decision explains why the court chose to remand without vacatur rather than to vacate.  See

Beaudreau, 25 F. Supp. 3d at 115; Ctr. for Biological Diversity v. Bureau of Land Mgmt., No.

03-2509, 2006 WL 2788252, at *2 (N.D. Cal. Sept. 26, 2006).  At any rate, the decisions are

both distinguishable on several grounds.  In Beaudreau, the court concluded that an ITS was

required on fairly technical grounds: take was concededly unlikely, but the agency had not

affirmatively "state[d] that incidental take would not occur."  25 F. Supp. 3d at 114.  Here, by

11

contrast, the BiOp forecasted a considerable level of right-whale take.  In <u>Beaudreau</u>, moreover, the agency had suggested that given the unlikelihood of any take, the acceptable level of incidental take might well be zero.  <u>Id.</u> at 115.  In that context, there was little practical difference between having an ITS and not.  As for <u>Center for Biological Diversity</u>, the agency there had issued an ITS with at least three reasonable and prudent measures (RPMs) for minimizing impact on the desert tortoise, but had not included terms and conditions to implement an important aspect of one of those RPMs.  <u>See</u> 422 F. Supp. 2d at 1141.  The Court's remand-without-vacatur order recognized the protection offered by the other terms and conditions, allowing the agency action to continue pending remand of the ITS only insofar as those conditions were complied with.  <u>See</u> 2006 WL 2788252, at *2.  NMFS, of course, offered no RPMs or terms and conditions aimed at minimizing the impact of right-whale take in the 2014 BiOp.

### 2.  *Disruptive Consequences*

Comparatively little needs to be said about the disruptive-consequences factor.  The consequences to be considered are those that might be caused by "an interim change that," after the agency acts on remand, "may itself be changed."  <u>Allied Signal</u>, 958 F.2d at 150–51.  Yet here, for the reasons described below, there should be no interim change caused by the Court's Order.  Since, as requested by the Government, the Court will stay vacatur until May 31, 2021 — the date by which NMFS promises the new superseding BiOp will be promulgated — there will be no period in which a BiOp is not in operation.  Put another way, there should be no interim closure of the fishery.

Vacatur plus a nine-month stay is also appropriate, in the Court's equitable discretion, because it gives NMFS an incentive to complete the Plan amendments within the timeframe the

agency has provided.  See Nat. Res. Def. Council, 489 F.3d at 1264 (Randolph, J., concurring)

("The existence of a stay with time limits, rather than an open-ended remand without vacating,

will give the agency an incentive to act in a reasonable time . . . ."); see also Anacostia

Riverkeeper, Inc. v. Pruitt, No. 09-98, 2017 WL 6209176, at *1 (D.D.C. Sept. 15, 2017) (noting

"advantages to be gained by setting a deadline" by which stay of vacatur will expire).

     B.  Timetable for Take Reduction Plan Amendments

     Having announced that it will follow NMFS's proposed May 2021 deadline, the Court

here explains why it is giving the agency four more months than Plaintiffs contend is appropriate

to complete the new rule and BiOp.

     NMFS has provided a detailed accounting of the requested time period through a

declaration by agency official Jennifer Anderson.  See Fourth Anderson Decl.  The agency has

already completed a draft rule, which it provided to OIRA for mandatory review, as required by

Executive Order 12,866, on July 8.  Under that Order, OIRA review can take up to 90 days.  Id.,

¶ 6.  Once that is complete, the agency will submit the proposed rule for publication in the

Federal Register.  Id., ¶ 7.  According to the Government at oral argument, the COVID-19

pandemic has caused some delay in processing at the Federal Register, and it may take up to 30

days for the proposed rule to be published.  That pushes a published proposed rule to early

November.  NFMS then intends to provide up to 75 days for public comment, in part to allow an

opportunity for the appropriate Regional Fishery Management Councils (members of which

serve, as required by law, on the Take Reduction Team) to review and discuss the proposed rule

during one of their meetings.  Id., ¶ 9; see also 16 U.S.C. §§ 1387(f)(2) (take-reduction plans

must "tak[e] into account . . . existing State or regional fishery management plans").  That

comment period would close by mid-January 2021.  NMFS's proposed date of May 31 would

then leave a little over four months to complete the final rule.  That process will require another round of OIRA review under Executive Order 12,866, revisions to the proposed rule in response to comments, related changes to the required Environmental Impact Statement under the National Environmental Policy Act, and similar possible revisions to the new BiOp.  <u>See</u> Fourth Anderson Decl., ¶¶ 10–11.

The Court finds this proposed schedule reasonable.  Measured against prior amendments to the Atlantic Large Whale Take Reduction Plan, a period of roughly six months between issuance of a proposed rule and a final rule (November 2020 to May 2021) is relatively quite brief.  One previous amendment, known as the "Sinking Groundline Rule," took 27 months from proposed to final rule.  <u>Compare</u> Taking of Marine Mammals Incidental to Commercial Fishing Operations, 70 Fed. Reg. 35,894 (June 21, 2005) (proposed rule), <u>with</u> Taking of Marine Mammals Incidental to Commercial Fishing Operations, 72 Fed. Reg. 57,104 (Oct. 5, 2007) (final rule).  Another amendment called the "Trawling Up" Rule, which Anderson explains was "relatively similar in complexity" to the current rulemaking, took nearly a year between proposed and final rules.  <u>See</u> Fourth Anderson Decl., ¶ 13; <u>compare</u> Taking of Marine Mammals Incidental to Commercial Fishing Operations, 78 Fed. Reg. 42,654 (July 16, 2013) (proposed rule), <u>with</u> Taking of Marine Mammals Incidental to Commercial Fishing Operations, 79 Fed. Reg. 36,586 (June 27, 2014) (final rule).  Taking half that time, especially during the COVID-19 crisis, hardly constitutes dilatoriness on the agency's part.

The Court is also mindful that it owes some deference to NMFS's expert judgment that the situation for right whales, while precarious, does not require immediate action.  <u>See</u> <u>Illinois Commercial Fishing Ass'n v. Salazar</u>, 867 F. Supp. 2d 108, 113–14 (D.D.C. 2012) ("[T]he Court 'must look at the [agency's] decision not as the chemist, biologist, or statistician that [it is]

qualified neither by training nor experience to be," but instead must limit itself to "holding agencies to certain minimal standards of rationality.") (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*)) (internal quotation marks omitted).  The agency, it should be noted, has previously used its emergency authority under section 118(g) of the MMPA to immediately implement interim right-whale protective measures despite a new TRP rule being only a few months away.  See 16 U.S.C. § 1387(g); North Atlantic Right Whale Protection; Emergency Regulations, 62 Fed. Reg. 16,108 (Apr. 4, 1997).  Here, though, NMFS has declined to use that power, concluding that the risk of entanglement of right whales in NMFS-controlled waters between January and May 2021 is not pronounced enough to warrant "emergency . . . action in an expedited timeframe with limited public involvement," largely because lobster fishing decreases during those cold months.  See Fourth Anderson Decl., ¶¶ 16, 20.  In light of the agency's apparent willingness to act urgently where urgent measures are called for, its scientific assessment that such steps are not necessary here is noteworthy.  The Court therefore sees no pressing need to preempt completion of the full TRP rulemaking process, which, by Congressional design, should involve attempts to reach "consensus" with stakeholders and a robust opportunity "for public review and comment."  16 U.S.C. § 1387(f)(8)(A)(ii), (B)(i).

Plaintiffs vigorously disagree, understandably maintaining that every day counts for ensuring survival of the right whale.  But their actions up until this point do not suggest that the difference between a five-month stay and a nine-month stay is critical.  Plaintiffs, for example, have not moved for preliminary relief at any point during this two-year-plus litigation.  Cf. Fund for Animals v. Frizzell, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one.").  Despite repeated delays by the Government, Plaintiffs have not sought to "compel" new TRT rules on the ground

15

that they have been "unlawfully withheld or unreasonably delayed." See 5 U.S.C. § 706(1); cf.

Complaint, Humane Society of the U.S. v. Gutierrez, No. 07-333 (D.D.C. Feb. 12, 2007)

(bringing that kind of action against NMFS).  Nor have they petitioned NMFS to use its section

1387(g) authority to bypass the TRT process and issue emergency rules, even as other

environmental groups have filed such petitions.  See Petition for Interim and Permanent

Rulemaking Implementing Closures to Vertical Line Trap/Pot Gear Fishing Necessary to Protect

North Atlantic Right Whales, https://www.pewtrusts.org/-/media/assets/2020/06/pewright

whaleemergencyactionpetition.pdf.  In pointing this out, the Court does not in any way fault

Plaintiffs' tactical or litigation choices; it simply notes that such choices are consistent with

NMFS's expert determination that four additional months under the current Take Reduction Plan

will not lead to calamity.

      Plaintiffs also argue that the agency's proposed timeline is out of compliance with the

statutory deadlines established by the MMPA, which require NMFS to publish proposed TRP

rules within 60 days of receiving the Take Reduction Team's proposed plan.  See ECF No. 119

(Pl. Remedy Reply) at 17–18, 18 n.5 (citing 16 U.S.C. § 1387(f)(7)).  That argument holds no

water.  As an initial matter, it is not obvious to the Court that Plaintiffs' cited statutory deadlines

apply to amendments to existing take-reduction plans; it is possible to read them as applying

only to the initial plan developed by a Team after it is constituted.  Compare 16 U.S.C.

§ 1387(f)(7)(A)(i) ("Not later than 6 months after the date of establishment of a take reduction

team for the stock, the team shall submit a draft take reduction plan for such stock to the

Secretary . . . ."), with id. § 1387(f)(7)(B)(i) ("The Secretary shall take the draft take reduction

plan into consideration and, not later than 60 days after the submission of the draft plan . . .

shall" publish proposed rules) (emphases added); but see id. § 1387(f)(7)(F) ("The Secretary

shall amend the take reduction plan . . . in accordance with the procedures in this section for the issuance of such plans and regulations.").

At any rate, the existence of these deadlines does not alter the Court's analysis. For one thing, this is not an unreasonable-delay action regarding the MMPA TRP deadlines, so there is some question as to the Court's power to order compliance with those deadlines. See Defs. Remedy Opp. at 20 n.5 (arguing the Court lacks such power). More importantly, the January 31 date urged by Plaintiffs is still fourteen months later than the deadline by which they assert NMFS should have completed the TRP rulemaking (November 2019). See Pl. Remedy Reply at 18 n.5. It is unclear why the Court should be overly concerned with preventing an eighteen-month delay when Plaintiffs acknowledge that a fourteen-month one is appropriate. Indeed, on closer inspection, the nub of Plaintiffs' argument is backward looking: that NMFS unnecessarily and unlawfully wasted over a year waiting for final proposals from stakeholder states. See Pl. Remedy Reply at 16. But even if NMFS's prior delay was unwarranted, "the purpose of this [Court's] order is to protect the public [and Plaintiffs'] interest[s] and not to punish [NMFS]" for past errors. Sierra Club v. Thomas, 658 F. Supp. 165, 175 (N.D. Cal. 1987). The agency has now completed a draft rule; the Court cannot turn back the clock and compel it to have done so more expeditiously.

And, as things now stand, NMFS's forward-looking timetable for completing the rulemaking process is reasonably consistent with the MMPA's deadlines. All told, the Act gives the agency 150 days to get from publication of a proposed rule to publication of the final rule. See 16 U.S.C. § 1387(f)(7)(B)(ii) (90 days allotted for comment period); id. § 1387(f)(C) (60 days allotted for revisions after comment period closes). By a back-of-the-envelope calculation, NMFS's proposed schedule gives it about 200 days. While technically over the limit, a delay of

a few weeks past a statutory deadline is reasonable here, as it rests on "a good faith effort [by the agency] to manage [its] . . . obligations" under the MMPA.  See Sierra Club v. Pruitt, 280 F. Supp. 3d 1, 3 (D.D.C. 2017); see also Nat. Res. Def. Council, Inc. v. Train, 510 F.2d 692, 713 (D.C. Cir. 1974) (the district court's task is to "separate justifications grounded in the purposes of the [a]ct from the footdragging efforts of a delinquent agency").  The Court would be remiss, moreover, to ignore the difficulties almost certainly posed by completing this complex rule during a global pandemic.

Although the Court therefore finds the May 31, 2021, deadline acceptable, it will look with considerable disfavor on any future requests by NMFS for even more time to complete the new rule and BiOp.  Delay, it seems, has been a primary strategy for many TRP stakeholders, and NMFS effectively tolerated such tactics despite previously representing to the Court that it expected to have a proposed rule and draft BiOp complete more than a year ago.  Given this history, the following words of the Circuit, while taken from a different case, are on point:

> The agency is now in the concluding phase of the rulemaking; it predicts final issuance of a rule in [nine] months from now. . . .  Yet [there is some] cause for concern [that] . . . some new impediment will be pleaded [nine] months hence. [NMFS's] asserted justifications for the delay [will] become less persuasive the longer the delay continues.  There is a point when the court must "let the agency know, in no uncertain terms, that enough is enough," Public Citizen Health Research Grp. v. Brock, 823 F.2d 626, 627 (D.C. Cir. 1987) . . . .  We accept [the agency's] estimate of the additional time it needs to complete the final stages of the rulemaking, but we insist that there be no postponement beyond the . . . target date.

In re Int'l Chem. Workers Union, 958 F.2d 1144, 1150 (D.C. Cir. 1992).  For the agency here, forewarned is forearmed.

C.  Southern New England Restricted Area (SNERA) Injunction

Although Plaintiffs acquiesce in a limited stay of vacatur until a new BiOp is produced, they believe prompter equitable relief is necessary elsewhere — namely, via an immediate effective closure of a sizeable swath of the lobster fishery south of Nantucket Island.  Given that such a request seeks more than mere vacatur, the Court must look to the standards for a permanent injunction.

Those are familiar ones, requiring a plaintiff to demonstrate that: (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  See Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  While the first element is recited in the past tense, the Supreme Court has recognized that it may include future harm.  See Monsanto, 561 U.S. at 162, (finding respondents did not adequately show "that they will suffer irreparable injury" if the agency were "allowed to proceed").

Where an injunction is being considered as a remedy for a violation of Section 7 of the ESA, "the third and fourth factors . . . are generally considered to tip in favor of the species." Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 31 (D.D.C. 2019); accord Strahan v. Pritchard, 473 F. Supp. 2d 230, 240–41 (D. Mass. 2007) ("The presumption in cases arising under the ESA is that the balancing of harms and effect on the public interest tips in favor of protecting the endangered animals.").  According to the Supreme Court's analysis in a seminal ESA case, while courts are by no means "mechanically obligated to grant an injunction," the Act nonetheless makes clear that "the balance [of equities] has been struck in favor of affording

endangered species the highest of priorities."  Tennessee Valley Authority v. Hill, 437 U.S. 153,

193–94 (1978).

      To assist the Court, Plaintiffs provide a map of the proposed closure area, see *supra,*

along with "coordinates for the area going clockwise from the northeastern most point . . . 41°

21.5'N, 69° 16'W; 40° 37.02'N, 69° 16'W'; 40° 37.02'N, 70° 18.9'W; 40° 37.02'N, 71°

20.6'W; 41° 15.3'N, 71° 20.6'W; 41° 15.3'N, 70° 18.9'W; 41° 15.3'N, 70° 10.6'W; 41° 15.3'N,

69° 57.9'W."  ECF No. 105-2 (Declaration of Dr. Michael Moore), ¶ 42.  Although figurative

line-drawing questions are common fare for judges, Plaintiffs have offered no precedent in which

a court literally created its own lines on a map or in the sea.  The closest example they could

offer was this Court's own decision in Ross, 422 F. Supp. 3d 12, in which it entered an

injunction after finding that NMFS had failed to properly consult prior to allowing gillnet fishing

in two previously closed areas.  Id. at 28, 31.  Yet there, the Court's injunction simply re-closed

the two areas at issue.  Far from wielding an inventive pen, the Court merely adhered to

boundaries already established by the agency and returned matters "to the status quo that [had]

existed for 20 years prior."  Id. at 31.  Plaintiffs here would disrupt the status quo by fashioning a

new closure area from whole cloth, relying in part on shipping lanes for boundaries.  See ECF

No. 119-1 (Supplemental Declaration of Dr. Michael Moore), ¶¶ 23–24.  At over 5,000 square

miles, the SNERA would also be larger than any previously established closure area of which the

Court is aware.  See ECF No. 115-4 (Declaration of David Borden), ¶ 6.

      Plaintiffs' novel requested remedy puts them decidedly behind the eight ball as the Court

turns to the permanent-injunction factors.  Whether to enter a requested "injunction is a matter of

equitable discretion," Winter v. Nat Res. Def. Council, 555 U.S. 7, 32 (2008), and thus "a court

must determine that an injunction should issue," not merely apply the four-factor test in a rote

fashion. <u>Monsanto</u>, 561 U.S. at 158; <u>see also</u> <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (citing <u>Hill</u>, 437 U.S. at 193). The Court is disinclined to boldly go where no court seems to have gone before, and scrutinizing the requested SNERA injunction under the <u>Monsanto</u> factors confirms that such extraordinary action is not warranted.

For ease of analysis, the Court starts with the first two factors relating to harm to the whales, then moves to the public interest, and winds up with a balancing of the equities.

### 1. *Irreparable Harm*

Although the Court believes that Plaintiffs eke out the necessary showing of irreparable harm, their case is hardly overwhelming. At the outset, there is some dispute as to the proper standard to be applied in the injury analysis. Plaintiffs claim that "the relevant question is whether [the SNERA] will likely reduce the risk of harm to right whales compared to the status quo." Pl. Remedy Br. at 22. The Ninth Circuit case they cite, however, relied on a finding that "the status quo <u>could</u> result in irreparable harm to a threatened species." <u>Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.</u>, 422 F.3d 782, 796 (9th Cir. 2005). Yet the Supreme Court later declared that "'possibility' [of irreparable harm] standard too lenient." <u>Winter</u>, 555 U.S. at 22. Plaintiffs must show more than a reduction in <u>risk</u> to right whales to establish that irreparable harm is likely in the absence of an injunction.

At the other end of the spectrum, NMFS suggests that the standard is whether Plaintiffs "<u>will be</u> irreparably harmed," not merely whether such harm is likely to occur. <u>See</u> Defs. Remedy Opp. at 25 (emphasis added). In cases of future harm such as this one, no less an

authority than the Supreme Court has been unclear on that question.  <u>Compare</u> <u>Monsanto</u>, 561

U.S. at 162 ("[R]espondents cannot show that they <u>will suffer</u> irreparable injury if [agency

action] is allowed to proceed. . . ."), <u>with</u> <u>id.</u> ("[A] permanent injunction is not now needed to

guard against any present or imminent risk of <u>likely</u> irreparable harm."), <u>and</u> <u>id.</u> at 163 ("It is

hard to see how . . . [the action] would cause [respondents] <u>likely</u> irreparable injury.") (emphases

added).  To give Plaintiffs the benefit of the doubt here, the Court will use a less demanding

standard requiring only a likelihood, not a certainty, of future irreparable harm.

Plaintiffs' injury in this case, as is typical in ESA cases, is to their ability to "observe . . .

the species in the wild."  Pl. Remedy Reply at 28.  The relevant inquiry, then, is whether that

ability is likely to be irreparably diminished in the absence of a SNERA closure lasting until June

2021.  Plaintiffs' argument in the affirmative is straightforward: according to NMFS itself,

lobster gear poses a risk of entanglement in any area where right whales and gear overlap, and

right whales are often present in the SNERA.  <u>See</u> Pl. Remedy Br. at 22–25 (citing List of

Fisheries for 2020, 85 Fed. Reg. 21,079, 21,086 (Apr. 16, 2020)).  Plaintiffs also note that seven

right whales have been found dead, and several more actively entangled, near the SNERA over

the last three years.  <u>See</u> Moore Decl., ¶¶ 27–30.  These events, Plaintiffs candidly add, do not

demonstrate precisely where any of these whales were entangled; indeed, whales can apparently

drag fishing gear for months (and thus presumably many miles) before succumbing.  <u>Id.</u>, ¶ 30.

This essentially probabilistic reasoning is not a slam dunk.  In the 2014 BiOp, NMFS

concluded that "the lobster fishery ha[d] the potential to seriously injure or kill an average of

3.25 right whales per year."  C1 26787.  That rough projection, though, is applicable to the <u>entire</u>

lobster fishery, and the SNERA, though no party provides exact figures, cannot be more than

10% of the fishery's total square mileage.  <u>See</u> ECF No. 111-5 at 8.  According to Plaintiffs'

expert, moreover, relatively few right whales are present in the SNERA in the summer and fall months. <u>See</u> Moore Decl., ¶¶ 21–23. And in the winter and spring months, when right-whale presence is higher, many lobstermen remove their gear from the water because lobsters have migrated to deeper offshore waters. <u>See</u> Fourth Anderson Decl., ¶ 16. All told, then, it is a close question whether even one serious entanglement or death in the SNERA is <u>likely</u> to occur in the next nine months. Indeed, the SNERA "is not an area where [NMFS] [is] aware of persistent entanglements." Fourth Anderson Decl., ¶ 20.

The above analysis, though, does not account for the effects of <u>sublethal</u> entanglement of right whales, which "may be equally harmful to the whale population." <u>Ross</u>, 422 F. Supp. 3d at 32. Such entanglements may impede feeding ability and reduce reproduction even if they do not cause serious injury or death, and they occur at a greater clip than serious or deadly entanglements. <u>Id.</u>; Moore Decl., ¶ 11; ECF No. 66-1 (Pl. SJ Mot.) at 4, 22–24; C1 26786. They are thus likely to make "the task of preserving [the] species . . . more difficult," potentially causing irreparable harm to Plaintiffs. <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>, 886 F.3d 803, 818 (9th Cir. 2018); <u>cf.</u> <u>Am. Rivers v. U.S. Army Corps of Engineers</u>, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003) (rejecting argument that irreparable harm can only include injury sufficient to cause jeopardy). That additional prospect of harm to right whales appears enough to get Plaintiffs over the hump. <u>Cf.</u> <u>Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.</u>, 789 F.3d 1075, 1091 (9th Cir. 2015) ("In light of the stated purposes of the ESA in conserving endangered and threatened species[,] . . . establishing irreparable injury should not be an onerous task for plaintiffs.").

Intervenors (who represent the lobster industry) contend that implementing the SNERA will not prevent irreparable harm; on the contrary, they believe that it will make entanglement

more likely.  Following the law of unintended consequences, they contend that a closure such as the SNERA "may in fact increase gear density" in areas right outside its boundaries, as fishermen move their traps to where they are permitted, "creating a gauntlet [*sic*] that marine mammals have to traverse."  ECF No. 114 (Little Bay Lobster Opp.) at 9–10; see also ECF No. 115 (Lobstermen Ass'ns Opp.) at 18.  The key point, according to Executive Director of the Atlantic Offshore Lobstermen's Association David Borden, is that the SNERA would be a year-round closure, not a typical seasonal closure.  Although seasonal closures allow "the coastal lobster fleet [to] remove[] gear from the water and [not] fish for three months," a year-long closure would leave fishermen "only two options: fish somewhere else or go out of business."  Borden Decl., ¶ 13.

Plaintiffs unsurprisingly disagree, but their counterarguments do not put the Court entirely at ease.  They first point out that closures are a standard conservation tool.  That argument, though, does not address the distinction between seasonal and year-long closures, a distinction that is central to Borden's analysis.  Next, Plaintiffs submit that fishermen cannot just move their gear to the SNERA boundaries, as no new permits are being granted and existing permits are only valid in one Lobster Management Area.  But, as noted above, the SNERA overlaps three different LMAs, and from looking at the map, the Court sees no obvious reason why most fishermen could not reposition their gear while remaining in their permitted area.  See ECF No. 111-6.  It is true, as Plaintiffs argue, that the SNERA is bounded on several sides by shipping lanes, where, according to Dr. Moore, fishermen do not tend to place gear.  See Suppl. Moore Decl., ¶ 23.  Yet it is also true that Moore is a biologist and a veterinarian, not an expert in lobster fishery management.  Cf. ECF No. 115-2 (Declaration of Elizabeth Casoni), ¶ 15 (Executive Director of Massachusetts Lobstermen's Association) ("I am very concerned that a

24

year-round closure . . . would increase the risk to right whales as fishermen move their gear . . . .").  In fact, Moore himself candidly stated that "actual fishery response is difficult to predict." Suppl. Moore Decl., ¶ 20.  Given that admitted difficulty, the Court cannot entirely write off the gear-shift problem raised by Intervenors.  While not enough to vitiate Plaintiffs' irreparable-harm showing, that concern does somewhat weaken their position.

2.  <em>Public Interest</em>

The gear-shift dispute illustrates perfectly the reasons for the Court's decision not to order the creation of the SNERA even in the face of likely irreparable harm.  Such a decree would substitute the Court's judgment for NMFS's, even though the agency is the expert best positioned to judge whether a measure such as the SNERA closure would help <u>at all</u>, let alone be appropriate as a management tool.  Under the MMPA, it is NMFS, not this Court, that Congress has tasked with making such judgments after engaging in the deliberate and deliberative Take Reduction Plan process.  With that process close to fruition, it would not be in the public interest for the Court to unilaterally invent significant right-whale protective measures.

Where an ongoing "regulatory process offers an alternative means of ensuring statutory compliance without the burden of an injunction," "the public interest favors a less intrusive . . . role" for a court considering injunctive relief.  <u>Garnett v. Zeilinger</u>, 313 F. Supp. 3d 147, 161 (D.D.C. 2018); <u>see also</u> <u>Allina Health Servs. v. Sebelius</u>, 756 F. Supp. 2d 61, 70–71  (D.D.C. 2010) (public interest weighed against "disruptive" injunction that would "burden" HHS by forcing it to act before an "impending and controlling" appeal, "which w[ould] provide an opportunity for the Secretary . . . to alter the [regulatory] scheme consistently and uniformly"); <u>Emily's List v. Fed. Election Comm'n</u>, 362 F. Supp. 2d 43, 58–59 (D.D.C. 2005), <u>aff'd</u>, 170 F. App'x 719 (D.C. Cir. 2005) (finding public-interest factor "weigh[ed] heavily against the

25

issuance of an injunction" that "would throw the present system of regulations into disarray");
Ctr. for Auto Safety v. Dole, 582 F. Supp. 1444, 1450 (D.D.C. 1984) ("In light of the expectation
that final rules will soon issue, the public interest . . . favors denying injunctive relief" that would
"disturb[] the *status quo*."); Atl. Richfield Co. v. Dep't of Energy, No. 82-3269, 1983 WL 1111,
at *7 (D.D.C. Jan. 7, 1983), aff'd sub nom. Atl. Richfield Co. v. U.S. Dep't of Energy, 769 F.2d
771 (D.C. Cir. 1984) ("[T]he public interest is strongly in favor of the completion of the
regulatory machinery . . . without interruption by this Court.").

 Other courts have recently applied these principles in denying requests for closure
injunctions aimed at protecting right whales.  See Man Against Xtinction v. Comm'r of Maine
Dep't Of Marine Resources, No. 19-406, 2020 WL 4588530, at *4 (D. Me. Aug. 10, 2020)
(denying injunction "suspending the existing fishery" off Maine as it would "effectively deprive"
[state and federal agencies] of their role as duly-appointed executive agents with regulatory
oversight of lobster fisheries and marine policy, considerations that militate strongly against
mandatory . . . injunctive relief"); Strahan v. Sec'y, Massachusetts Exec. Office of Energy &
Envtl. Affairs, No. 19-10639, 2020 WL 2079302, at *13–14 (D. Mass. Apr. 30, 2020)
("Allowing the [regulatory] process to take place ensures Congress's objectives for the
[Endangered Species] Act are achieved" and avoids "inequit[y] to Massachusetts fishermen" by
"provid[ing] some time to allow the [regulatory] process to play out.").

 Drawing an arbitrary box in the ocean and ordering NMFS to immediately close its
contents to fishing would be the very sort of "intrusive" and "disruptive" undertaking the Court
should avoid in light of the ongoing TRP process.  See Garnett, 313 F. Supp. 3d at 161; Allina
Health Servs., 756 F. Supp. 2d at 71.  According to NMFS, indeed, the agency is currently
considering Massachusetts' proposed seasonal closure of an area about one-third the size of the

SNERA at its easternmost end.  See Fourth Anderson Decl., ¶ 17; ECF No. 111-3 at 9.  The public interest is not served by having a federal court, rather than NMFS, decide whether a geographically comparable closure is appropriate.  The agency is vastly more qualified, will have the benefit of public and stakeholder comment, and can assess the closure as it considers other proposals, rather than in isolation.

Plaintiffs counter that the Court's entry of a SNERA injunction would not affect NMFS's consideration of any conservation measure because the TRP rulemaking would remain ongoing despite the injunction.  The Court is not so sanguine.  NMFS spent years consulting with all stakeholders and soliciting state proposals as part of the TRP process.  See ECF No. 68-2 (First Anderson Decl.), ¶¶ 4.  At last, "four long days and nights of discussions [and] negotiations" at the April 2019 meeting achieved near consensus on a suite of necessary steps.  Id., ¶ 10.  Those negotiations took place against the backdrop of the existing regulatory regime — a status quo that would be significantly altered by an immediate and indefinite closure of an area the size of Connecticut.  Previously acceptable compromises could be rendered unacceptable, unraveling the "consensus" aimed for by Congress and rendering the last few years a waste.  See 16 U.S.C. § 1387(f)(7)(A)(ii).  While NMFS could in theory forge ahead, there is no guarantee of what the states might do, and state buy-in is crucial if right-whale entanglement is to be appreciably reduced.  See First Anderson Decl., ¶ 11.  Recall that states have already shown hesitation to abide by the 2019 recommendations; for example, while Maine initially concurred, its final submission to NMFS shifted on the grounds that it had been disproportionately targeted.  See Fourth Anderson Decl., ¶ 4; ECF No. 111-2 (Maine Proposal) at 3.  In sum, were the Court to grant Plaintiffs their injunction, it could trip up NMFS's adoption of effective Plan amendments inches from the finish line.  That outcome would serve no one's interest, including the whales'.

27

3. *Balance of Harms*

The foregoing harms to the public interest, combined with the lack of any precedent for Plaintiffs' requested injunction, are enough to convince the Court that such relief should not issue. In addition, the negative effects the injunction would have on "the livelihood[s] of fishermen and . . . the survival of their communities" also counsel against awarding Plaintiffs the "extraordinarily broad relief" they seek. Pritchard, 473 F. Supp. 2d at 240 (declining to "require all persons currently using fixed gear to immediately remove such gear from coastal waters" to protect right whales).

In the usual case, a court sitting in equity must weigh "the balance of hardships between the plaintiff and defendant," including intervenors, when considering whether to grant a permanent injunction. See Monsanto, 561 U.S. at 157; League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton, 752 F.3d 755, 766 (9th Cir. 2014) (noting that "intervenors' interests in [a] case make it appropriate to consider" harms to them). The water is murkier, though, in the context of the Endangered Species Act and the Supreme Court's statement in Hill that "the balance has been struck [by Congress] in favor of affording endangered species the highest of priorities." 437 U.S. at 194. Plaintiffs, citing Ninth Circuit caselaw, contend that Hill leaves this Court no power to consider the balance of equities. Instead, they argue that the Court must simply treat the balance as favoring whatever injunctive relief is necessary to prevent irreparable species harm. See, e.g., Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc., 23 F.3d 1508, 1511 (9th Cir. 1994) ("In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests.")

The D.C. Circuit, however, has never "definitively ruled on" the correctness of the Ninth Circuit's approach.  Am. Rivers, 271 F. Supp. 2d at 248–49.  Courts outside the West Coast, in fact, have largely rejected its uncompromising test.  See Animal Welfare Inst. v. Martin, 623 F.3d 19, 26 (1st Cir. 2010) (rejecting Ninth Circuit's "circumvent[ion] of the traditional injunction inquiry" as "wrong"); Am. Rivers, 271 F. Supp. 2d at 261 (granting injunction after "balancing the benefit to the Plaintiffs and the endangered species they represent from granting an injunction against the harms to the Defendants"); Pritchard, 473 F. Supp. 2d at 240 (denying closure injunction in part because of "obvious detrimental impact that such an order would have on the Massachusetts fishing industry"); Hamilton v. City of Austin, 8 F. Supp. 2d 886, 894 & n.14, 897 (W.D. Tex. 1998) ("The merits of the case, the lack of irreparable harm, and the equities of the case all indicate that the plaintiffs' motions for preliminary injunctions should be denied."); see also Man Against Xtinction, 2020 WL 4588530, at *4 (denying order effectively "suspending the existing fishery altogether" because it would "overwhelmingly impose hardship on third-party fishermen and women"); Strahan, 2020 WL 2079302, at *14 ("Congress has already determined that the balance of hardships . . . tips heavily in favor of protected species," yet "[a]t the same time, Massachusetts fishermen will be harmed if they are enjoined from being able to fish.").

The Court agrees with the approach taken in these cases.  As the First Circuit held in Martin, where the species injury to be avoided is less "dire" than immediate extinction, as was certain to occur in Hill, the ESA does not require courts to grant the most species-protective injunction possible.  See 623 F.3d at 26–27.  Rather, courts retain their discretion to weigh the competing interests, taking into consideration harm to the defendants while nonetheless "affording protection of endangered species the highest of priorities" in their balancing.

In this case, a decree ordering the immediate cessation of lobster fishing in a large area would disrupt fishermen's current operations and their near-term plans. But the harm may well be more severe. The COVID-19 pandemic has gutted the market for lobster, cutting the price in half and pushing fishermen, most of whom are self-employed, to the economic brink. See Casoni Decl., ¶¶ 12–13; ECF No. 115-3 (Declaration of Patrice F. McCarron), ¶¶ 5, 8. For the many dozens of fishermen with pots currently in the SNERA, see Borden Decl., ¶ 14, an indefinite closure starting now, at the height of the fishing season, would make matters worse. See Casoni Decl., ¶¶ 14, 16 ("Most of the small businesses and individuals who operate or work on lobster fishing vessels in Massachusetts have limited financial resources," and SNERA could "shut down" affected lobstermen "for good"); see also McCarron Decl., ¶ 8 (pandemic alone puts "many [Maine] lobster businesses at risk of failing this season"). Both the affected fishermen and their communities, "many of which are highly dependent upon lobstering," could suffer greatly. See McCarron Decl., ¶ 4; see also id., ¶ 6 ("[S]horeside . . . lobster supply chain" supports thousands of jobs in Maine); Casoni Decl., ¶ 12 (same for Massachusetts). The Court does not believe that the SNERA's short-lived and uncertain reduction in entanglement risk can justify the permanent economic and social damage that could accompany the closure.

## III.   Conclusion

For the foregoing reasons, the Court will vacate the portion of NMFS's 2014 BiOp pertaining to right whales, but will stay that order until May 31, 2021. The Court will also deny

Plaintiffs' request for an interim injunction prohibiting the use of vertical lines in the SNERA.  A

contemporaneous Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  August 19, 2020