IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
*et al.*,

        Plaintiffs,

        v.

GINA RAIMONDO, in her official capacity as
Secretary of the U.S. Department of
Commerce, *et al.*,

        Defendants,

        and

MASSACHUSETTS LOBSTERMEN'S
ASSOCIATION, INC., *et al.*,

        Defendant-Intervenors.

Case No.:  1:18-cv-112-JEB

## MAINE LOBSTERMEN'S ASSOCIATION'S COMBINED BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF FACTS ............................................................................... 6

     A.     The Biology and Status of the North Atlantic Right Whale ................................ 6

     B.     Take Reduction Planning and Conservation Actions by U.S. Fisheries................ 8

     C.     The 2021 Biological Opinion and Related Lawsuits ........................................... 13

III.    ARGUMENT .................................................................................................. 15

     A.     NMFS Correctly Considered State-Authorized Lobster Fisheries as
            Cumulative Effects ................................................................................... 15

           1.     The state-authorized fisheries are cumulative effects............................... 15

           2.     The state-authorized fisheries are not part of the "agency action" .......... 17

     B.     Plaintiffs' Claims Challenging the Incidental Take Statement Should be
            Denied ................................................................................................... 23

     C.     Plaintiffs' Effort to Narrow the Temporal Scope of the "Action" Is
            Misguided .............................................................................................. 26

     D.     Plaintiffs' MMPA Claims Should be Denied ..................................................... 29

           1.     Plaintiffs' "unreasonable delay" claim should be denied because
               NMFS has taken action ........................................................................ 30

           2.     Plaintiffs' claim that the Take Reduction Rule "violates the
               MMPA" should be denied because it presupposes "mandatory"
               obligations that do not exist ................................................................ 31

                    a.     Section 118 of the MMPA ........................................................ 32

                    b.     Plaintiffs' argument is contrary to Section 118 .......................... 34

     E.     Should the Court Find Any Error, the Correct Remedy Is to Remand
            Without Vacatur ..................................................................................... 38

IV.    CONCLUSION ............................................................................................... 43

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allied-Signal v. U.S. Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........................................................................38

*\*Am. Corn Growers Ass'n v. E.P.A.*,
291 F.3d 1 (D.C. Cir. 2002) ...........................................................................35

*\*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................................3

*CBD v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ........................................................................39

*CBD v. Ross*,
No. 18-112 (JEB), 2020 WL 1809465 (D.D.C. Apr. 9, 2020) ..............................23, 24, 25, 26

*\*CBD v. U.S. Fish & Wildlife Service*,
807 F.3d 1031 (9th Cir. 2015) ........................................................................19

*Cooling Water Intake Structure Coalition v. EPA*,
905 F.3d 49 (2d Cir. 2018)..............................................................................22, 26

*CropLife Am. v. E.P.A.*,
329 F.3d 876 (D.C. Cir. 2003) ........................................................................41

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
288 F. Supp. 2d 7 (D.D.C. 2003) ....................................................................39

*\*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
593 F.3d 923 (9th Cir. 2010) ..........................................................................31, 36

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*,
839 F.2d 795 (D.C. Cir. 1988) ........................................................................32

*Loving v. I.R.S.*,
742 F.3d 1013 (D.C. Cir. 2014) ......................................................................35

*Maine Lobstermen's Ass'n v. NMFS*,
No. 21-cv-2509 (D.D.C., filed Sept. 27, 2001).................................................1

*\*Nat'l Wildlife Fed'n v. Gorsuch*,
693 F.2d 156 (D.C. Cir. 1982) ........................................................................35, 41

ii

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# TABLE OF AUTHORITIES
(continued)

Page

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   184 F. Supp. 3d 861 (D. Or. 2016) ......................................................................39

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   839 F. Supp. 2d 1117 (D. Or. 2011) ....................................................................40

*North Carolina v. EPA*,
   550 F.3d 1176 (D.C. Cir. 2008).............................................................................39

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004)..................................................................................................30

*Oceana, Inc. v. Ross*,
   No. CV 15-0555 (PLF), 2020 WL 5995125 (D.D.C. Oct. 9, 2020) .......................40

*Or. Nat. Desert Ass'n v. Tidwell*,
   716 F. Supp. 2d 982 (D. Or. 2010) ..................................................................42, 43

*Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*,
   533 F.3d 810 (D.C. Cir. 2008)...............................................................................18

*Sierra Club v. Bureau of Land Mgmt.*,
   786 F.3d 1219 (9th Cir. 2015) ...............................................................................19

*Strahan v. Pritchard*,
   473 F. Supp. 2d 230 (D. Mass. 2007) ...................................................................18

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978)........................................................................................2, 3, 27

*Whale & Dolphin Conservation v. Nat'l Marine Fisheries Serv.*,
   No. 21-CV-112 (APM), 2021 WL 5231938 (D.D.C. Nov. 10, 2021)....................30

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010) .................................................................................29

*WildEarth Guardians v. Chao*,
   454 F. Supp. 3d 944 (D. Mont. 2020)...................................................................30

## Statutes

5 U.S.C. § 701(b)(1) ....................................................................................................22

5 U.S.C. § 706(2)(A)....................................................................................................36

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# TABLE OF AUTHORITIES
(continued)

**Page**

16 U.S.C. § 1361, *et seq.*...................................................................................32

16 U.S.C § 1371..................................................................................................32

16 U.S.C. § 1371(a)(2).......................................................................................20

16 U.S.C. § 1371(a)(5)(E)..............................................................................20, 38

16 U.S.C. § 1373.................................................................................................20

16 U.S.C. § 1374(a)............................................................................................20

16 U.S.C. § 1383a..............................................................................................20

16 U.S.C. § 1386.............................................................................................9, 25

16 U.S.C. § 1387........................................................................................20, 25, 33

16 U.S.C. § 1387(a)(5)(E)(i)(I).........................................................................25

16 U.S.C. § 1387(b)(1)......................................................................................37

16 U.S.C. § 1387(c)......................................................................................21, 38

16 U.S.C. § 1387(c)(1)(A)...................................................................................9

16 U.S.C. § 1387(c)(2)(C)..................................................................................21

16 U.S.C. § 1387(f)..............................................................................................9

16 U.S.C. § 1387(f)(1)................................................................................9, 31, 34

16 U.S.C. § 1387(f)(2)........................................................................................34

16 U.S.C. § 1387(f)(4)........................................................................................34

16 U.S.C. § 1387(f)(5)-(7)....................................................................................9

16 U.S.C. § 1387(f)(5)(A)..................................................................................35

16 U.S.C. § 1387(f)(6)....................................................................................9, 33

16 U.S.C. § 1387(f)(6)(C)....................................................................................9

16 U.S.C. § 1387(f)(7)........................................................................................36

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

# TABLE OF AUTHORITIES
### (continued)

**Page**

16 U.S.C. § 1387(f)(7)(F) .................................................................................31, 36

16 U.S.C. § 1387(f)(9) ...........................................................................................37

16 U.S.C. § 1533(f) ................................................................................................27

16 U.S.C. § 1536(a)(2) .................................................................................... passim

16 U.S.C. § 1536(b) ................................................................................................15

16 U.S.C. § 1536(b)(3)(A) ..........................................................................23, 24, 25

16 U.S.C. § 1536(b)(4) ...........................................................................................24

16 U.S.C. § 1536(d) ................................................................................................41

16 U.S.C. § 1536(o) ................................................................................................24

16 U.S.C. § 5103(b) ................................................................................................16

Me. Rev. Stat. tit. 12, ch. 619 ................................................................................18

13-188-25 Me. Code. R. .........................................................................................18

13-188-75 Me. Code R. § 2.A.1 .............................................................................12

13-188-75 Me. Code R. § 2.A.2 .............................................................................12

13-188-75 Me. Code R. § 25.93 .............................................................................12

Pub. L. No. 92-522, 86 Stat. 1029 (1972) ..............................................................32

Pub. L. No. 95-632, 92 Stat. 3751 (1978) ..........................................................3, 27

Pub. L. No. 100–711, 102 Stat. 4755 (1988) .........................................................32

Pub. L. No. 103–86, 107 Stat. 930 (1993) .............................................................32

**Rules and Regulations**

50 C.F.R. § 216.3 ...................................................................................................25

50 C.F.R. § 229.32(b) .............................................................................................12

50 C.F.R. § 402.02 ...............................................................................16, 19, 20, 28

v

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# TABLE OF AUTHORITIES
(continued)

**Page**

50 C.F.R. § 402.13 ..................................................................................................17

50 C.F.R. § 402.14(i) .............................................................................................24

50 C.F.R. § 402.14(b)(1) ........................................................................................17

50 C.F.R. § 402.14(g) .............................................................................................16

50 C.F.R. § 402.14(h)(1) ........................................................................................24

Mass. Code Regs. § 6.02(7)(b) ..............................................................................12

Mass. Code Regs. § 7.08 ........................................................................................12

Mass. Code Regs. § 12.04(2) .................................................................................12

61 Fed. Reg. 40,819 (Aug. 6, 1996) .........................................................................9

62 Fed. Reg. 16,108 (Apr. 4, 1997) ........................................................................10

62 Fed. Reg. 39,157 (July 22, 1997) ................................................................ passim

64 Fed. Reg. 7529 (Feb. 16, 1999) ...................................................................10, 11

65 Fed. Reg. 80,368 (Dec. 21, 2000) ................................................................11, 12

67 Fed. Reg. 1300 (Jan. 10, 2002) .........................................................................11

72 Fed. Reg. 57,104 (Oct. 5, 2007) .............................................................11, 12, 19

73 Fed. Reg. 51,228 (Sept. 2, 2008) ......................................................................11

79 Fed. Reg. 36,586 (June 27, 2014) .....................................................................11

80 Fed. Reg. 30,367 (May 28, 2015) ................................................................11, 12

80 Fed. Reg. 48,171 (Aug. 11, 2015) .....................................................................32

85 Fed. Reg. 86,878 (Dec. 31, 2020) .................................................................2, 13

86 Fed. Reg. 48,953 (Sept. 1, 2021) ........................................................................3

86 Fed. Reg. 51,970 (Sept. 17, 2021) ...............................................................13, 36

*Center for Biological Diversity, et al. v. Raimondo, et al.*

## TABLE OF AUTHORITIES
(continued)

Page

**Legislative History**

139 Cong. Rec. S15321-01 (Nov. 8, 1993)....................................................................33

140 Cong. Rec. H2714 (Apr. 26, 1994).......................................................................33

140 Cong. Rec. S3288-01 (Mar. 21, 1994)...................................................................33

140 Cong. Rec. S4923, S4934 (Apr. 26, 1994) ............................................................33

H.R. Rep. 95-1625, 95th Cong., at 19 (2d Sess. 1978).................................................27

H.R. Rep. 97-567 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807 ...............................24

H.R. Rep. 103-439, 103rd Cong. at 38 (2d Sess. 1994)................................................21

S. Rep. 103-220 (1994), *reprinted in* 1994 U.S.C.C.A.N. 518......................................32

Staff of S. Comm. on Environment and Public Works, 97th Cong., a Legislative
History of the Endangered Species Act of 1973, as Amended in 1976, 1977,
1978, 1979 and 1980 (Comm. Print 1982) (reprint of House Consideration and
Passage of H.R. 14104, with Amendments..................................................................3

**Other Authorities**

Erin L. Meyer-Gutbrod *et al.*, Ocean Regime Shift is Driving Collapse of the
North Atlantic Right Whale Population, Oceanography, Vol. 34, No. 3 (2021),
https://tos.org/oceanography/article/ocean-regime-shift-is-driving-collapse-of-
the-north-atlantic-right-whale-population..................................................................7

U.S. Dep't of the Interior, Fish and Wildlife Service, Programmatic Biological
Opinion on the U.S. Environmental Protection Agency's Issuance and
Implementation of the Final Regulations, Section 316(b) of the Clean Water
Act, at 5 (May 19, 2014), https://www.epa.gov/sites/default/files/2015-
04/documents/final_316b_bo_and_appendices_5_19_2014.pdf............................22

*Center for Biological Diversity, et al. v. Raimondo, et al.*

# I.  INTRODUCTION

The National Marine Fisheries Service ("NMFS") has produced a biological opinion (the "BiOp") under the Endangered Species Act ("ESA") that disregards the best scientific and commercial data available to exaggerate the impact of the American Lobster Fishery on the North Atlantic right whale ("right whale") by using unsupported "worst case" assumptions. NMFS then uses that hypothetical impact to mandate a new *98%* "risk reduction" on top of two decades' worth of improvements to mitigation measures that have already proven to be effective. But the real function of this mandate is to offset known, unabated harms caused by *others*, namely, Canadian fisheries and shipping vessels. The Maine Lobstermen's Association ("MLA") has separately filed a lawsuit challenging the BiOp on these grounds (the "MLA Case"). *See Maine Lobstermen's Ass'n v. NMFS*, No. 21-cv-2509 (D.D.C., filed Sept. 27, 2001).[1]

Relying on NMFS's inflated impact estimates, Plaintiffs erroneously claim that the lobster fisheries are "actively driving [the right whale] toward extinction" and seek more reductions. ECF No. 188-1 ("Pls.' Br.") at 1. Even though the lobster fisheries, working through the Atlantic Large Whale Take Reduction Team (the "Take Reduction Team" or "Team"), have implemented measures that NMFS itself concedes have been effective in reducing risk to the right whale, Plaintiffs want restrictions that would eventually shut these fisheries down. BiOp_1012 ("We recognize that the fishing industry has implemented all the required mitigation measures since 1997 and that these measures have reduced impacts to right whales from the fisheries."). Plaintiffs are unmoved by the 60-70% risk reduction NMFS projects from the most

---

[1] The Maine lobster fishery is one of several lobster fisheries that comprise the American Lobster Fishery. The American Lobster Fishery is sometimes referred to as the "lobster fisheries" or the "lobster fishery" in this brief.

*Center for Biological Diversity, et al. v. Raimondo, et al.*

recent regulatory amendments to the Atlantic Large Whale Take Reduction Plan ("Take Reduction Plan" or "Plan"), even though Plaintiffs themselves are *members* of the Take Reduction Team and *supported* the Team's recent recommendations. *See* 85 Fed. Reg. 86,878, 86,880 (Dec. 31, 2020); Rule_4037; Rule_29039, 29050.[2] And although NMFS adopted those recommendations (and then added a seasonal Maine closure), Plaintiffs accuse NMFS of "inaction" and ask the Court to compel NMFS to immediately achieve the "goals" of the Marine Mammal Protection Act ("MMPA"). In short, Plaintiffs seek to "halt and reverse" the right whale's decline "whatever the cost." Pls.' Br. at 7 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("*TVA v. Hill*")).

Plaintiffs ignore the very human cost of their misguided crusade. The Maine lobster fishery is vital to Maine's culture, heritage, and economy, and has, for more than 175 years, supported communities and generations of families in Maine. The fishery directly supports more than 10,000 captains, crew, and students who live along 3,500 miles of coastline in 120 rural Maine communities. Although MLA has grave concerns about the BiOp, it is forced to defend the BiOp in this case against Plaintiffs' assault in order to preserve commercial lobster fishing in Maine as a viable way of life, while challenging the BiOp in the MLA Case on other grounds.

Plaintiffs point to the "whatever the cost" language in *TVA v. Hill* as a marching order, but it is actually a cautionary tale. In *TVA v. Hill*, the Court enjoined construction of a dam because it was told that the snail darter was facing imminent extinction as it "apparently lives only in that portion of the Little Tennessee River which would be completely inundated by the

---

[2] The attorneys for Plaintiffs Center for Biological Diversity ("CBD"), Defenders of Wildlife ("Defenders"), and Conservation Law Foundation ("CLF") are members of the Team. CBD's and Defenders' Team members supported the recent Team recommendations (CLF's member was not appointed to the Team at that time).

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

reservoir created as a consequence of the Tellico Dam's completion" and that "'impoundment of water behind the proposed Tellico Dam would result in total destruction of the snail darter's habitat.'" 437 U.S. at 161–62 (citation omitted). But that information was proved wrong. Snail darters were found living in *many* locations, not just the Little Tennessee River, are "widely dispersed," and can and do live in reservoirs. 86 Fed. Reg. 48,953, 48,956 (Sept. 1, 2021). Tellico Dam was eventually built, and the snail darter did not go extinct. In fact, it has fully recovered. 86 Fed. Reg. at 48,955–56.

Congress thought *TVA v. Hill* was "very bad public policy."[3] So, within a few months of the Court's decision, members of Congress prepared amendments to the ESA, providing for a comprehensive revision to the ESA in 1978. Pub. L. No. 95-632, 92 Stat. 3751 (1978). Among those changes were substantial revisions to Section 7, including a new requirement that agencies must consider the "best scientific and commercial data available" when implementing the ESA. *Id*. The objective of this requirement, a unanimous Supreme Court later explained, "is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett v. Spear*, 520 U.S. 154, 176–77 (1997).

Here, the best scientific and commercial data available show that the American Lobster Fishery is not "actively driving [the right whale] to extinction" as Plaintiffs would have the Court believe. *There has not been a single documented entanglement in Maine lobster gear in the last 18 years*. Rule_29078. Instead, the recent decline of the right whale is caused by a scientifically demonstrated, climate-driven change in the oceanic environment over the past decade that has

---

[3] Staff of S. Comm. on Environment and Public Works, 97th Cong., a Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979 and 1980 (Comm. Print 1982) ("ESA Legislative History") at 822 (reprint of House Consideration and Passage of H.R. 14104, with Amendments).

*Center for Biological Diversity, et al. v. Raimondo, et al.*

depleted the right whale's primary food source and consequently pushed the right whale's migration path out of the Western Gulf of Maine and squarely into heavily used—and poorly regulated—waters in Canada. In those Canadian waters, right whales are entangled in heavy snow crab gear and struck by vessels. This is what led to the Unusual Mortality Event NMFS declared in 2017. Neither the BiOp nor the recent Take Reduction Plan regulatory amendments will alleviate these demonstrated, continuing harms to the species because they do not apply to Canadian waters. *See* BiOp_2177 ("[T]he [right whale] population is likely to decline if human-caused mortalities in Canada continue at current rates, regardless of efforts in the United States.").

Likewise, the best scientific and commercial data available show that the conservation measures implemented under the Plan are working. From 1990 to 2011 (before ocean conditions changed), right whale abundance increased from an estimated 270 animals to 481 animals. BiOp_1758. During that time, 10 observed non-serious injuries, and one observed mortality (in 2002) were associated with gear from the American Lobster Fishery. But in the second half of that timeframe, the fishery had implemented numerous protective measures under the Plan. Consequently, from 2011 to 2019, there was only **one** observed non-serious injury (in 2016) and **zero** observed serious injuries or mortalities attributed to the American Lobster Fishery. Rule_29078.

In contrast, from 2011 to 2019, there were **21** observed entanglements in Canadian fishing gear and eight lethal vessel strikes in Canadian waters resulting in **18** observed right whale mortalities and serious injuries. *Id*. Also during that time, there were 14 observed U.S. vessel strikes resulting in seven mortalities and serious injuries. *Id*. In 2019 alone, there were **10** observed right whale mortalities and one serious injury attributed to Canada. *Id*. Along with the

4

unprecedented shift in ocean conditions and the alarming spike in right whale deaths caused by Canadian threats, the right whale population count declined from an estimated 481 animals in 2011 to 368 animals in 2019. BiOp_1758.

MLA acknowledges that the cause of right whale deaths is often unknown. Indeed, right whales die from many natural and anthropogenic causes, in U.S. waters and in foreign waters. But the problem will not be solved by NMFS's (i) application of arbitrary "worst case" scenarios that disproportionately exaggerate the risk of the American Lobster Fishery and (ii) adoption of draconian mandates to address those inflated risks while ignoring other, far more rampant, sources of mortality. Nevertheless, the Maine lobster fishery remains ready and willing to undertake *reasonable*, *scientifically supported* actions to further reduce potential risks, just as it has done under the guidance of the Take Reduction Plan since 1997.

MLA cannot, however, stand idly by to watch the ultimate "worst case scenario" unfold: the regulatory decimation of the Maine lobster fishery *and* the unchecked decline of the right whale. That is why MLA is both defending against Plaintiffs' effort to spur NMFS to double-down on its misguided approach *and* challenging the BiOp in an attempt to require NMFS to make regulatory decisions grounded in rational assumptions and lawful standards. The solution to the right whale's decline will only occur after there has been a *reasonable and objective* evaluation of the species' status and *all* of the threats, based upon the best scientific and commercial data available.

For these reasons, and those set forth in more detail below, the Court should deny Plaintiffs' claims. From an MMPA perspective, the right path is for the Team-driven process to continue and to ultimately succeed by using the best available data. From an ESA perspective, the right path is to leave the BiOp in place and, in response to the claims set forth in the MLA

*Center for Biological Diversity, et al. v. Raimondo, et al.*

Case, remand the BiOp to NMFS to perform an amended evaluation based upon a realistic scenario consistent with the best scientific and commercial data available.

The common thread in these cases is that *everyone* wants the right whale to recover and thrive. But that goal will not be achieved by the misguided paths charted by Plaintiffs or by NMFS's BiOp. The lives and livelihoods of the hard-working people and families that will indisputably suffer if Plaintiffs have their way are also an inextricable part of the ESA's equation. *See* ESA Legislative History at 837 ("[T]here are human considerations to be dealt with and people are an important factor in [the ESA] equation.").

## II.  STATEMENT OF FACTS

### A.    The Biology and Status of the North Atlantic Right Whale.

The right whale lives primarily in the North Atlantic Ocean. BiOp_1755–56. Pre-whaling, the North Atlantic Ocean is estimated to have supported between 9,000 and 21,000 right whales. BiOp_1757. Commercial whaling drove the western population to 100 animals or less by 1935, when international protections for right whales were implemented. *Id*. In 1990, right whale abundance was estimated to be 270 whales. BiOp_1758. From 1990 to 2011, estimated right whale abundance increased by approximately 2.8% per year on average, and peaked in 2011 at 481 whales. Since 2011, the modeled population has declined and, as of 2019, is estimated to number 368 whales. BiOp_1758.

In the fall, pregnant right whales migrate south, through the mid-Atlantic region of the United States, to their calving grounds off Georgia and Florida, where they overwinter and give birth in shallow, coastal waters. BiOp_1757, 1863. During that time, the rest of the population likely remains in high latitude foraging grounds or disperses along the eastern seaboard, although some also migrate south at variable times over the winter. BiOp_1863. During spring, the

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

reproducing females and new calves migrate north to foraging grounds where they feed on large concentrations of copepods. BiOp_1757. Mating may occur on the foraging grounds, although the locations of right whale mating are generally not known. *Id*.

The distribution of right whales is strongly linked to the distribution of their copepod prey. BiOp_1863. In 2010, the Gulf of Maine and Scotian Shelf regions of the Northwest Atlantic experienced an unprecedented change in oceanic conditions that caused a substantial decline in copepod abundance in the Gulf of Maine, which has remained anomalously low. BiOp_61537; BiOp_2170. As a result of this change in ocean conditions, right whales have abandoned some of their traditional foraging grounds, such as those in the western Gulf of Maine, in favor of new habitat in Canada's Gulf of St. Lawrence where copepod aggregations now occur. BiOp_60661; BiOp_18920; BiOp_18939. Scientists observed a significant increase in the presence of right whales in the Gulf of St. Lawrence in 2015, which has continued to the present. *See* BiOp_18920; BiOp_18939.

Coinciding with these oceanic and migratory changes, the right whale population has exhibited an unusually high mortality rate since 2017, losing an unprecedented number of adult whales to vessel strikes and Canadian fishing gear entanglement. BiOp_60661; BiOp_18920; BiOp_33597; BiOp_61537; BiOp_25243. The population has also experienced a reduction in its calving rate since 2010, which is thought to be linked to the oceanic shift. BiOp_60661. With an elevated mortality rate, lower levels of prey availability, greater distances traveled to locate prey, and a depressed calving rate, the right whale population has declined by an estimated 26% since the oceanic shift occurred. BiOp_60661; BiOp_33564, BiOp_33597. These scientific studies and related information were most recently reviewed and summarized in Erin L. Meyer-Gutbrod *et al*., Ocean Regime Shift is Driving Collapse of the North Atlantic Right Whale Population,

7

Oceanography, Vol. 34, No. 3 (2021), https://tos.org/oceanography/article/ocean-regime-shift-is-driving-collapse-of-the-north-atlantic-right-whale-population.

Numerous scientists have linked the post-2010 decline in right whale abundance to a spike in right whale serious injuries and mortalities caused by Canadian snow crab gear and vessels in Canada's Gulf of St. Lawrence. BiOp_60661; BiOp_18920; BiOp_33597; BiOp_61537; BiOp_25243. In 2017 alone, **13** observed right whale serious injuries and mortalities were attributed to Canadian fishing gear and vessel strikes in Canadian waters. Rule_29078. In response to this Unusual Mortality Event, the Canadian government implemented a crisis plan to protect right whales. BiOp_18920–22. This appeared to have some initial success, with only two observed serious injuries and mortalities attributed to Canadian fishing gear and vessel strikes in 2018. Rule_29078. However, in 2019, another spike occurred, with **11** observed right whale serious injuries and mortalities attributed to Canadian fishing gear and vessel strikes, prompting Canada to implement more measures in 2020 and 2021. Rule_29078; BiOp_2005.

From 2010 to 2019, only one observed right whale entanglement (a non-serious injury) has been attributed to the American Lobster Fishery (non-Maine gear). Between 2000 and 2009, one mortality and five non-serious injuries were attributed to the American Lobster Fishery. There has not been a single right whale entanglement associated with Maine lobster gear since 2004. Rule_29078. From 2000 to 2019, 18 serious injuries and mortalities have been attributed to vessel strikes in U.S. waters. *Id*.

**B.     Take Reduction Planning and Conservation Actions by U.S. Fisheries.**

Sections 117 and 118 of the MMPA establish the mechanisms by which NMFS regulates the interactions of commercial fisheries with marine mammals. Section 117 requires NMFS to,

*inter alia*, estimate annual levels of "human-caused mortality and serious injury" of marine mammal stocks and to report those estimates in annual stock assessment reports. 16 U.S.C. § 1386. Under Section 118, those estimates are used as the basis for the authorization and regulation of incidental take, including the development of take reduction plans. *Id*. § 1387(c)(1)(A), (f)(1), (f)(5)–(7). NMFS's implementation of the MMPA's take reduction planning provisions is based upon the most recent five-year average of serious injury and mortality by commercial fisheries compared to a marine mammal stock's "potential biological removal" level ("PBR"). *See id.* § 1387(f). Thus, take reduction plans typically include measures intended to avoid take *and* to reduce the severity of marine mammal interactions such that they result in non-serious injuries. The MMPA's take reduction goals can therefore be achieved by both minimizing marine mammal interactions and ensuring that any interactions that do occur result in non-serious injuries.

In 1996, NMFS established the Take Reduction Team pursuant to Section 118(f) of the MMPA. 16 U.S.C. § 1387(f)(6); 61 Fed. Reg. 40,819 (Aug. 6, 1996). The Section 118(f) take reduction planning process involves all stakeholders in developing a solution. Members of take reduction teams must have expertise in conservation, biology, or fishing practices. 16 U.S.C. § 1387(f)(6)(C). They must include "representatives of Federal agencies, each coastal State which has fisheries which interact with the species or stock, appropriate Regional Fishery Management Councils, interstate fisheries commissions, academic and scientific organizations, environmental groups, [and] all commercial and recreational fisheries groups and gear types which incidentally take the species or stock." *Id*. The Take Reduction Team includes representatives from all of these stakeholder groups, including from intervenor-defendants MLA, the State of Maine, and the Massachusetts Lobstermen's Association; from NMFS; and from

9

three of the plaintiffs (CBD, Defenders, and CLF). *See supra* note 2. The MMPA charged the

Team, upon formation, with producing a draft take reduction plan.

The Take Reduction Team produced the draft Take Reduction Plan to NMFS in February

1997, and NMFS finalized and published the Plan, along with promulgating interim

implementing regulations, in July 1997. 62 Fed. Reg. 16,108, 16,109 (Apr. 4, 1997); 62 Fed.

Reg. 39,157 (July 22, 1997). NMFS issued final regulations implementing the Plan in 1999. 64

Fed. Reg. 7529 (Feb. 16, 1999). When NMFS published the 1999 final rule, it noted that it was

not aware of any right whale entanglements in U.S. fishing gear within the first six months of the

Plan. *Id*. at 7531. NMFS stated that it was impossible to determine whether the goals of the

MMPA had been achieved because observed right whale entanglements are relatively rare. *Id*.

NMFS nevertheless included measures in addition to those required in the interim implementing

regulations that were designed to further reduce incidental take from commercial fisheries. *Id*. at

7531–34.

Under the guidance of the Take Reduction Team, and implementation of the Take

Reduction Plan, the right whale population growth trajectory was favorable for many years.

Collaborative work by lobster harvesters, researchers, fishery managers, agencies,

environmental advocates, and other stakeholders led to the development of innovative fishing

practices and gear deployment strategies to reduce the frequency and severity of interactions

between whales and fishing gear. Rule_4726–27. Since 1997, the Team has regularly engaged

in meetings, consulted with NMFS, and refined and amended the Plan.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

Between 1999 and 2015, NMFS completed five substantial rulemakings to amend the Take Reduction Plan through implementing regulations.[4] Each of these Plan amendments was based on consensus, or near-consensus, recommendations by the Take Reduction Team. *Id.*; *see generally* Rule_3676–77 (discussing previous Team recommendations). Each of these amendments included measures that the Team and NMFS believed would meet the incidental take reductions goals of the MMPA. *See, e.g.*, 64 Fed. Reg. 7529; 72 Fed. Reg. 57,104 (Oct. 5, 2007); 79 Fed. Reg. 36,586 (June 27, 2014). The measures implemented under the Take Reduction Plan over the past two decades have significantly reduced the amount of rope associated with lobster and other trap/pot gear in the water as well as the risk of a severe outcome if a whale is entangled. BiOp_1012 ("We recognize that the fishing industry has implemented all the required mitigation measures since 1997 and that these measures have reduced impacts to right whales from the fisheries."). The principal elements of these protective measures are summarized as follows:

- Sinking groundline requirement. The 2007 Plan amendments preclude the use of "floating groundlines" connecting lobster traps and, instead, require the use of "sinking groundlines." 72 Fed. Reg. 57,104; 73 Fed. Reg. 51,228, 51,241 (Sept. 2, 2008). This eliminates the potential for whale entanglement in floating lines near the ocean bottom. This amendment removed over 27,000 miles of floating groundlines from New England waters. Rule_4817.

- Vertical line reduction. The 2014 Plan amendments established minimum traps per trawl based on geographic area and distance from shore, resulting in the removal of approximately 2,740 miles of vertical rope from the water. 79 Fed. Reg. 36,586, 36,587 (June 27, 2014). This requirement was expanded in the most recent rulemaking.

---

[4] 65 Fed. Reg. 80,368 (Dec. 21, 2000); 67 Fed. Reg. 1300 (Jan. 10, 2002); 72 Fed. Reg. 57,104 (Oct. 5, 2007); 79 Fed. Reg. 36,586 (June 27, 2014); 80 Fed. Reg. 30,367 (May 28, 2015). The Take Reduction Plan has had numerous additional minor amendments since 1999.

*Center for Biological Diversity, et al. v. Raimondo, et al.*

- <u>Massachusetts Restricted Area</u>. In 2015, Plan amendments established a 3,000 square-mile area spanning Cape Cod Bay, Massachusetts Bay, and outer Cape Cod, which has been closed to lobster gear from February 1 to April 30 annually, eliminating entanglement risk for up to three-quarters of the right whale population during these months. 80 Fed. Reg. 30,367 (May 28, 2015). The state waters portion of this closure is managed by the Massachusetts Division of Fisheries, which has extended applicability to recreational fishermen and moved the closure date beyond April 30 as appropriate. 322 Mass. Code Regs. §§ 6.02(7)(b), 12.04(2). Massachusetts expanded this closure to encompass all state waters in 2021.

- <u>Gear Marking</u>. Fixed-gear fishermen regulated under the Plan are required to mark vertical lines to aid in identifying the source of gear involved in an entanglement. *See* 65 Fed. Reg. 80,368 (Dec. 21, 2000); 50 C.F.R. § 229.32(b). In 2020, Maine implemented new regulations to require unique and expanded gear markings in Maine's exempt and regulated waters. 13-188-75 Me. Code R. § 2.A.2, .3, .4 (2021). This requirement was expanded in the most recent rulemaking.

- <u>Weak Links</u>. The Plan requires the incorporation of 600-lb. weak links (1,100 lbs. in Lobster Management Area 3) in the top of a buoy line and to any attachments along the buoy line. *See* 80 Fed. Reg. 30,378. This requirement was replaced by a more expansive weak insert requirement in the most recent rulemaking.

- <u>Universal Gear Requirements</u>. The Plan regulations establish a suite of gear modifications to reduce entanglement risk to right whales, such as prohibiting the use of floating line at the surface and wet storage of gear for more than 30 days, which Maine adopted by rulemaking to apply to gear fished in exempt waters. 72 Fed. Reg. 57,106; 13-188-75 Me. Code R. § 2.A.1.[5]

No similar measures were used in any Canadian fisheries during the time these regulations were implemented in the United States.

---

[5] The state of Maine requires lobster gear fished in Maine's exempt waters where NMFS has determined there is minimal risk to the right whale to implement multiple whale protective measures, including sinking rope and weak link requirements. *See* 13-188-75 Me. Code R. § 2.A.2. Additionally, the states have separately reduced effort since the inception of the Take Reduction Plan. Area 3 has implemented mandatory annual trap allocation limits of 5% per year, Massachusetts has a long-standing moratorium on lobster licenses, and Maine has established a limited-entry and apprentice program, all of which have resulted in a significant reduction in the risk of entanglement to right whales. Rule_4728; *see* 322 Mass. Code Regs. § 7.08; 13-188-75 Me. Code R. § 25.93; *see also* ECF No. 115-4 (Decl. of David Borden, Exhibit B).

*Center for Biological Diversity, et al. v. Raimondo, et al.*

In September 2021, NMFS issued the most recent regulatory amendment to the Plan (the "Take Reduction Rule," or "Rule," challenged in this lawsuit). 86 Fed. Reg. 51,970 (Sept. 17, 2021). The Take Reduction Rule amends the Plan by increasing the minimum number of traps per trawl (to further reduce vertical lines), modifying existing restricted areas to allow ropeless fishing, expanding the Massachusetts Restricted Area, establishing two new restricted areas (including a large seasonal closure in offshore Maine waters (the "LMA 1 Closure")), implementing new requirements for the configuration and spacing of "weak inserts" in vertical lines, and significantly expanding requirements for gear marking. *Id.* at 51,971. NMFS estimates that this extensive suite of new measures, which builds upon two decades of Take Reduction Plan actions, will reduce any risk posed by the American Lobster Fishery by an additional 60–70%. With the exception of the LMA 1 Closure, which NMFS added at the proposed rule stage, this amendment was based on a "near consensus" recommendation from the Take Reduction Team. *Id.* The Team representatives for both CBD and Defenders agreed with the recommendations. 85 Fed. Reg. 86,878, 86,880 (Dec. 31, 2020); Rule_4037; Rule_29039, 29050; *see supra* note 2. The Team did not discuss or recommend the LMA 1 Closure. 85 Fed. Reg. at 86,882.

## C.     The 2021 Biological Opinion and Related Lawsuits.

On May 27, 2021, NMFS issued the BiOp. The BiOp estimates right whale serious injury and mortality from U.S. trap/pot fisheries (which include the American Lobster Fishery) in state and federal waters to be 7.6 whales per year, which is 76 times greater than the number of observed right whale entanglements attributed to the trap/pot fisheries from 2010 to 2019 (an average of 0.1 whales per year). *See* BiOp_1899; Rule_29078. NMFS's estimate derives from its allocation of unattributed entanglement events to the U.S. trap/pot fisheries, which is based on

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

numerous assumptions, such as that (i) right whale entanglements unattributed to a country should be split evenly between the U.S. and Canada, (ii) right whale entanglements unattributed to fishing gear type should all be allocated to trap/pot gear, and (iii) no right whales ever die of natural causes. BiOp_1890–99.

To assess whether the effects of the fisheries are likely to jeopardize the right whale, the BiOp relies on a "population projection model" to characterize the effects over a 50-year time period. BiOp_2000. The modeling assessment "utilized metrics representing the worst case scenario" and, therefore, the "model outputs very likely overestimate" the effects of the evaluated actions. BiOp_2004. Some of those "metrics" included assumptions that: (i) the unfavorable oceanographic conditions in the 2010s (including the spike in Canadian water mortalities) will continue for all 50 years; (ii) mitigation measures implemented by Canada from 2017 to 2021 will have no beneficial effect for all 50 years; (iii) measures imposed on U.S. fisheries to reduce "sublethal effects" on right whales will have no beneficial effect for all 50 years; and (iv) measures to reduce vessel strikes in both Canada and the U.S. will have no beneficial effect for all 50 years. BiOp_2004–06. NMFS concluded that the continued authorization of the evaluated fisheries is not likely to jeopardize the continued existence of the right whale. BiOp_2017.

The BiOp includes a four-phase "Conservation Framework." NMFS included the Conservation Framework because, based on its "worst case" scenario of effects, it perceived "a need to implement measures to further reduce entanglements" of right whales "to meet the mandates of the ESA." BiOp_1647. In the Conservation Framework, NMFS concludes that it must further reduce risk by more than 98%, which requires the fisheries to reduce serious injury and mortality levels to 0.136 right whales per year by 2030. BiOp_1649-50.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

Plaintiffs filed their supplemental complaint challenging the BiOp and the Rule on September 10, 2021. MLA filed a separate lawsuit challenging the BiOp and the Rule (based upon its BiOp claims) on September 27, 2021. Plaintiffs ask the Court to vacate the BiOp and remand the Rule without vacatur. MLA asks the Court to remand both the BiOp and Rule without vacatur.

### III.  ARGUMENT

**A.      NMFS Correctly Considered State-Authorized Lobster Fisheries as Cumulative Effects.**

**1.      The state-authorized fisheries are cumulative effects.**

Section 7(a)(2) of the ESA provides that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered . . . or threatened species. . . ." 16 U.S.C. § 1536(a)(2). The question posed by Section 7(a)(2)—whether the action is "likely" to jeopardize species or destroy critical habitat—is answered with an "opinion" by NMFS under Section 7(b). 16 U.S.C. § 1536(b). This *prohibitory* obligation—to avoid authorizing, funding, or carrying out actions that jeopardize listed species or destroy their critical habitat—is distinct from NMFS's separate obligations to develop programs to benefit species (Section 7(a)(1)) or to plan for the recovery of the species (Section 4(g)).

Under the ESA implementing regulations, NMFS must, when evaluating the effects of the "agency action," (i) "[e]valuate the current status and environmental baseline of the listed species or critical habitat"; (ii) "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat"; and (iii) "[a]dd the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat,

*Center for Biological Diversity, et al. v. Raimondo, et al.*

formulate the Service's opinion . . . ." 50 C.F.R. § 402.14(g). "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, . . .  and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id*.

As applied here, NMFS's Sustainable Fisheries Division authorizes the American Lobster Fishery *in federal waters* pursuant to the Atlantic Coastal Fisheries Cooperative Management Act ("Atlantic Coastal Act"). *See* 16 U.S.C. § 5103(b). That federal authorization is an "action" evaluated in the BiOp, along with the federal authorizations of other fisheries. The BiOp evaluates the effects of those actions against the environmental baseline (which includes past and present commercial lobster fishing in state and federal waters) and the cumulative effects (which include reasonably foreseeable future lobster fishing authorized by state law). BiOp_1811 (Environmental Baseline), 1884 (describing evaluation of gear used in state fisheries in environmental baseline and cumulative effects), 1996 (Cumulative Effects), 1998 (Integration and Synthesis of Effects). *See* BiOp_1998. This approach to state fisheries is correct—state-authorized lobster fisheries are "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." 50 C.F.R. § 402.02.

Separately, NMFS's Protected Resources Division issued the Take Reduction Rule pursuant to Section 118 of the MMPA ("Taking of Marine Mammals Incidental to Commercial Fishing Operations"). This, too, is a federal "action" for purposes of ESA Section 7. NMFS's Protected Resources Division consulted on the effects of that "action." *See* Rule_6502–6519.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

NMFS determined that the Take Reduction Rule "will have wholly beneficial effects to ESA-listed species or their critical habitat" and, thus, "is not likely to adversely affect ESA-listed species or designated critical habitat…." Rule_6515. Actions that are "not likely to adversely affect any listed species" may undergo "informal" Section 7 consultation. 50 C.F.R. §§ 402.13, 402.14(b)(1). Informal consultations result in a memorandum (rather than a biological opinion) documenting the consulting agency's concurrence in the "not likely to adversely affect" conclusion, which is what NMFS did here.[6] *See* Rule_6502–6519. Plaintiffs have not challenged NMFS's "not likely to adversely affect" determination.

### 2.      The state-authorized fisheries are not part of the "agency action."

Plaintiffs argue that state-authorized fishing activities should have been analyzed in the BiOp as part of the "effects of the action" rather than as a "cumulative effect." Aside from being wrong on the law, Plaintiffs do not explain why this distinction matters. NMFS's jeopardy analysis *included* state fishing activities in the baseline and cumulative effects, and those impacts were added to the "effects of the action" as required by the ESA implementing regulations. NMFS concluded that "the nature and magnitude of the proposed action's effects, *when considered together with the species status and <u>all other threats acting on it</u>*, would have inconsequential impacts on the species overall reproduction, numbers and distribution in the wild." BiOp_2017 (emphasis added). NMFS substantively considered *all* effects, including cumulative effects from state-authorized fisheries, when formulating its opinion. Plaintiffs fail to address this aspect of the BiOp, much less challenge it.

---

[6] NMFS also included the Take Reduction Rule, the measures of which are part of the Conservation Framework, in the "proposed action" evaluated in the BiOp. BiOp_1683–85.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

In any event, NMFS does not "authorize" the state fisheries, and state fisheries are not an "effect" of NMFS's authorization of federal fisheries or its issuance of the Take Reduction Rule. Fishermen operating in state waters require state authorizations. *See Strahan v. Pritchard*, 473 F. Supp. 2d 230, 236 (D. Mass. 2007) ("Commercial fishermen must obtain separate licenses for fishing in the waters of different jurisdictions. Federal waters . . . are regulated by [NMFS]. [States other than Massachusetts] have agencies equivalent to the [Mass. Division of Marine Fisheries] to license commercial fishing in their own waters."); *see also, e.g.,* Me. Rev. Stat. tit. 12, ch. 619; *id.* § 6421 ("A person may not engage in the activities authorized under this section without a current [lobster and crab fishing license]."); *see also* 13-188-25 Me. Code. R. Plaintiffs' argument that NMFS unlawfully excluded state-authorized fisheries from the "federal action" evaluated in the BiOp should therefore be rejected for the simple reason that state fisheries are not "authorized, funded, or carried out" by NMFS. 16 U.S.C. § 1536(a)(2).

Plaintiffs nevertheless contend that because the state fisheries are "regulated" by NMFS under Section 118 of the MMPA, the carrying out of those fisheries must be "federal" and therefore part of the "action." But this argument confuses actions that are *authorized* with actions that are *regulated*. Congress expressly made "Federal Agency Actions" the trigger for consultation, not state-authorized actions that happen to be subject to some type of federal regulation. To "regulate" is different than to "authorize, fund, or carry out." If Congress had intended Section 7 to have the expansive interpretation argued by Plaintiffs, it would have applied the consultation requirement to actions "authorized, funded, carried out, *or regulated*" by federal agencies. *See Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 816–17 (D.C. Cir. 2008) (declining to "add[] words that are not in the statute that the legislature enacted").

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

NMFS's regulations explain that the "effects of the action" are limited by basic principles of causation. "Effects of the action are all consequences to listed species or critical habitat that are caused by the proposed action," and "[a] consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02. State fisheries operate under state permits issued under state laws and regulations. The Take Reduction Rule is not the "but for" *cause* of state-water fishing. *See, e.g.*, *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1223–25 (9th Cir. 2015) (although federal right-of-way required consultation, development of windfarm required no federal authorization and was not "agency action" requiring Section 7 consultation). Indeed, the Plan regulations do not even apply to lobster fishing in most of Maine's waters because "NMFS believes large whales rarely occur inside many of Maine's bays, harbors, or inlets . . . ." 72 Fed. Reg. 57,104, 57,165 (Oct. 5, 2007).

The Ninth Circuit case of *CBD v. U.S. Fish & Wildlife Service* is instructive. 807 F.3d 1031, 1046–47 (9th Cir. 2015). There, the U.S. Fish and Wildlife Service ("FWS") entered into a Memorandum of Agreement ("MOA") with various water users and a tribe in an effort to mitigate the effects of groundwater pumping to the Moapa dace. The groundwater pumping was carried out according to state laws. FWS prepared a BiOp evaluating the MOA as the "action," but did not consider groundwater pumping as part of the action. CBD argued, as it does here, that FWS should have included the state-authorized groundwater pumping as part of the "action." The Court rejected CBD's argument because the groundwater pumping was "'not authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States.'" *Id.* at 1046–47 (quoting 50 C.F.R. § 402.02). It further explained that "[b]ecause the groundwater pumping is not an 'action,' as defined by the ESA, its negative effects on the Moapa dace are not considered 'effects of the action' because they are not 'direct [or] indirect effects *of an action* on

19

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

the species.'" *Id*. (emphasis in original) (quoting 50 C.F.R. § 402.02). Just as the MOA action did not "federalize" the state-authorized groundwater pumping, the Rule does not "federalize" state-authorized fisheries.

To be sure, NMFS's MMPA actions to authorize the incidental take of marine mammals *are* federal actions triggering ESA Section 7 consultation, which is why NMFS properly consulted upon its issuance of the Rule and reasonably concluded that the Rule is "not likely to adversely affect" ESA-listed species. The "action" of issuing Section 118 regulations is consistent with NMFS's jurisdiction under the MMPA, which extends *only* to marine mammal *take* prohibition and authorization. *See, e.g.*, 16 U.S.C. §§ 1371(a)(2) ("[m]arine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued therefor"), 1371(a)(5)(E) (incidental take authorizations for commercial fisheries), 1373 (authorization to prescribe "regulations with respect to the taking and importing of animals" as "necessary and appropriate"), 1374(a) ("The Secretary may issue permits which authorize the taking or importation of any marine mammal."), 1383a (interim exemption from take prohibition for commercial fisheries), 1387 (governing the "Taking of marine mammals incidental to commercial fishing operations"). The MMPA does not confer jurisdiction on NMFS to authorize the activity of *fishing* in state waters. Plaintiffs' argument fails to recognize this critical distinction between the authorization of *fishing* and the authorization of *incidental take of marine mammals*.

This flaw is readily apparent in Plaintiffs' interchangeable use of the legally distinct "regulation" and "authorization" concepts. Sometimes Plaintiffs correctly describe the roles of the agencies. *See, e.g.*, ECF No. 66-1 (Pls.' Mem. of Pts. and Authorities in Support of its [First] Mot. for Summary Judgment) at 44 (referring to "NMFS' decisions to authorize the American

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

Lobster Fishery's *incidental take* of non-listed marine mammals under the MMAP and *to authorize the fishery itself* under the Atlantic Fisheries Act" (emphases added)), Pls.' Br. at 18–19 (Congress "delegated NMFS the authority to authorize and regulate the *take* of marine mammal resources by commercial fisheries in both state and federal waters"). At other times, Plaintiffs incorrectly state that NMFS "authorizes" lobster fishing. *See id*. at 17 (referring to NMFS's "*authorization* and management *of the lobster fishery* in state waters under the Plan"), 8 (stating that the "Large Whale Plan *authorizes* and regulates the *lobster fishery*") (emphases added). But Plaintiffs do not—and cannot—identify a single provision in the MMPA providing NMFS with the ability to "authorize" the operation of a commercial fishery.[7]

Plaintiffs' other attempts to justify their flawed reading of the ESA are without merit. First, the Marine Mammal Authorization Program ("MMAP") is a component of Section 118, which comprehensively governs the "[t]aking of marine mammals incidental to commercial fishing operations." *See* 16 U.S.C. § 1387(c). The MMAP is a mechanism for *authorizing incidental take* and creating registration requirements applicable to such authorizations. *See id*. § 1387(c)(2)(C) ("[A]n authorization granted under this section shall *allow the incidental taking* of all species and stocks of marine mammals to which this Act applies." (emphasis added)). The MMAP does not authorize *commercial fishing*. Second, the fact that the MMPA creates mechanisms to enforce the terms of Section 118, and the conditions of any *incidental take* authorizations granted pursuant to that section, does not create jurisdiction to *authorize fisheries*. It just means that NMFS has the ability to take enforcement actions against vessels that are not

---

[7] When enacting MMPA Section 118, Congress explained, "nothing in this subsection gives the Secretary any new authority to modify fishery management plans established under the Magnuson Fishery Conservation and Management Act or to regulate fisheries in State waters." H.R. Rep. 103-439, 103rd Cong. at 38 (2d Sess. 1994) (emphasis added).

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

compliant with the terms of its incidental take authorizations. Finally, the Second Circuit

decision in *Cooling Water Intake Structure Coalition v. EPA* actually supports NMFS, not

Plaintiffs. 905 F.3d 49 (2d Cir. 2018). The biological opinion at issue in that case only evaluated

the federal regulation being promulgated by the EPA as the "agency action" and excluded the

operation of the regulated facilities from the "action."[8]

      Ultimately, Plaintiffs' argument has nothing to do with NMFS's substantive

consideration of incidental take by state fisheries. Instead, Plaintiffs want to bootstrap the states'

authorizations of their fisheries onto Plaintiffs' Section 7 claims against NMFS, with the hope

that any remedy they obtain, such as vacatur of the BiOp, will also bind the states and prevent or

impede them from continuing to authorize and manage their fisheries as state law requires them

to do. But state actions are not subject to ESA Section 7, nor are they subject to suits under the

Administrative Procedure Act ("APA"). *See* 16 U.S.C. § 1536(a)(2) (applicable only to "Federal

Agency Actions"); 5 U.S.C. §§ 701(b)(1) ("'agency' means each authority of the Government of

the United States"), 702. Congress did not intend for ESA Section 7 and the APA to be used as

tools to halt state actions.

      For all of these reasons, the Court should deny Plaintiffs' state-action claim. The state-

authorized fisheries are not authorized, funded, or carried out by NMFS. The fact that NMFS

---

[8] *See* U.S. Dep't of the Interior, Fish and Wildlife Service, Programmatic Biological Opinion on the U.S. Environmental Protection Agency's Issuance and Implementation of the Final Regulations, Section 316(b) of the Clean Water Act, at 5 (May 19, 2014) ("For the purposes of this biological opinion (Opinion), we focus on requirements of the rule because we must evaluate the Federal action (not the discretionary decisions of owners, operators, or Directors)."), https://www.epa.gov/sites/default/files/2015-04/documents/final_316b_bo_and_appendices_5_19_2014.pdf; *see also Cooling Water Intake Structure Coal.*, 905 F.3d at 75 ("Section 7 tasks the Services with analyzing the effects of the <u>EPA's</u> proposed action." (emphasis in original)).

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

may regulate the marine mammal incidental take of those fisheries under MMPA Section 118
does not supplant the jurisdiction of the states to authorize their fisheries in accordance with state
law.

**B.      Plaintiffs' Claims Challenging the Incidental Take Statement Should be Denied.**

This Court has held that NMFS cannot issue a biological opinion for the federal fisheries
without an incidental take statement ("ITS"). *CBD v. Ross*, No. 18-112 (JEB), 2020 WL
1809465 (D.D.C. Apr. 9, 2020) ("*CBD v. Ross*"). Plaintiffs argue that NMFS cannot issue an ITS
until NMFS issues an incidental take authorization under MMPA Section 101(a)(5)(E). NMFS,
however, has so far been unable to satisfy a prerequisite for issuing such an authorization—a
"negligible impact determination"—because it has overestimated the impact of the American
Lobster Fishery on the right whale.

Had NMFS *objectively* evaluated the amount of take potentially caused by the American
Lobster Fishery, rather than generate hypothetical "worst case scenario" estimates of take, it may
very well have been able to issue an incidental take authorization under MMPA Section
101(a)(5)(E). In its case, MLA seeks remand of the BiOp to require an accurate assessment of
the impacts of the American Lobster Fishery. Setting aside MLA's claims and assuming the
overestimated impact for the sake of argument, NMFS's approach to the ITS reasonably balances
its obligations to comply with both this Court's order and the statute.

Upon completing the ESA Section 7(a)(2) consultation, NMFS must provide its
biological opinion as to whether the effects of the agency action at issue are likely to jeopardize
the continued existence of an ESA-listed species or destroy or adversely modify its critical
habitat. 16 U.S.C. §§ 1536(a)(2), 1536(b)(3)(A). This obligation is triggered by Section
7(b)(3)(A), which requires that, upon conclusion of consultation under Section 7(a)(2), the

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

consulting agency "*shall* provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion…." *Id*. § 1536(b)(3)(A) (emphasis added). This statutory duty is contingent only on the "conclusion of consultation" and it must be performed "[p]romptly." *Id*.

Separately, ESA Section 7(b)(4) triggers an obligation for the consulting agency to produce an ITS *if* all three conditions specified in Section 7(b)(4) are satisfied. *Id*. § 1536(b)(4). Issuance of a lawful ITS exempts any incidental taking carried out in compliance with the ITS from the ESA's Section 9 take prohibition. *Id*. § 1536(o). Prior to 1982, the ESA did not require consulting agencies to include an ITS with the biological opinion. But in the 1982 ESA amendments, Congress added the ITS provisions so that an "applicant who consults with the Secretary under the Section 7 process [would receive] a written statement on what permissible . . . taking may occur." H.R. Rep. 97-567, at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2807, 2815. The ITS is not part of the biological opinion; it is a separate statement provided "with" the opinion. *Compare* 50 C.F.R. § 402.14(h)(1) (enumerating what a biological opinion "shall include" (ITS not listed)), *with id*. § 402.14(i) ("the Service will provide *with* the biological opinion [an ITS]" (emphasis added)).

Here, NMFS's statutory obligation to produce an ITS with the BiOp for the right whale was not triggered because NMFS has not issued a take authorization under MMPA Section 101(a)(5)(E), which is one of the three conditions precedent stated in ESA Section 7(b)(4). 16 U.S.C. § 1536(b)(4). But NMFS is obligated to comply with this Court's prior decision in *CBD v. Ross*, and so it properly included an ITS for right whale in the BiOp. This was a reasonable approach. Had NMFS not issued the BiOp at all, it would have violated its mandatory duty to provide a "written statement setting forth the Secretary's opinion" promptly upon the

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

"conclusion of consultation." 16 U.S.C. § 1536(b)(3)(A). Had NMFS left out the ITS for the

right whale, it would have violated the Court's ruling in *CBD v. Ross*.

NMFS's approach also reasonably harmonized the ITS with the MMPA. When issuing

incidental take authorizations under Section 101(a)(5)(E) of the MMPA, NMFS must perform a

"negligible impact" evaluation based *only* upon the "serious injury and mortality" caused by the

commercial fishery at issue. 16 U.S.C. § 1387(a)(5)(E)(i)(I). NMFS defines "serious injury" as

"any injury that will likely result in mortality." 50 C.F.R. § 216.3. For purposes of the

"negligible impact determination," NMFS therefore treats "serious injuries" as lethal takes.

Additionally, under the MMPA's stock assessment reporting provisions in Section 117, NMFS

only considers takes by serious injury and mortality for purposes of determining whether a stock

is "strategic" and whether PBR is exceeded. *See* 16 U.S.C. § 1386. Under Section 118, NMFS

categorizes fisheries based only on serious injury and mortality and, of course, take reduction

planning goals only refer to serious injury and mortality. *See* 16 U.S.C. § 1387.

NMFS claims it cannot issue a Section 101(a)(5)(E) authorization because the "serious

injury and mortality" NMFS has attributed to the American Lobster Fishery is not "negligible."[9]

NMFS therefore included an ITS in the BiOp to comply with *CBD v. Ross*, but did not exempt

lethal right whale take from the ESA's take prohibition because any such take has not been

authorized under the MMPA. In contrast, non-lethal take of marine mammals (that does not

render them "likely" to die) is not considered in the negligible impact analysis performed under

Section 101(a)(5)(E) (or in any of the other MMPA processes described above). Accordingly,

---

[9] MLA maintains that the amount of serious injury and mortality NMFS attributes to the American Lobster Fishery is arbitrary and contrary to the best scientific and commercial data available. MLA has challenged this aspect of the BiOp in its separate lawsuit.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

NMFS reasonably enumerated non-lethal take in the ITS because such take is not legally relevant to any of the MMPA provisions governing the incidental take of marine mammals by commercial fisheries, all of which pertain to "serious injury and mortality."

Finally, Plaintiffs' claim that the reasonable and prudent measures ("RPMs") will not minimize take is baseless. The fact that some of those measures may be required through a different statute is not unusual or unlawful. RPMs often restate measures that are carried out under other authorities. *See Cooling Water Intake Structure Coal.*, 905 F.3d at 77 (approving RPM requiring EPA to use its authority under the Clean Water Act to implement protective measures).

NMFS's approach satisfies its obligations under both Section 7(b)(3) (to produce a BiOp) and *CBD v. Ross* (to produce an ITS), and its decision to grant a take exemption for non-lethal take, but not for lethal take, reasonably reconciled its obligations under the ESA and MMPA. Plaintiffs' ITS claims should therefore be denied.

## C.    Plaintiffs' Effort to Narrow the Temporal Scope of the "Action" Is Misguided.

The question posed by Section 7(a)(2)—whether the action is "likely" to jeopardize species or destroy critical habitat—should have been relatively straightforward in this case. 16 U.S.C. § 1536(a)(2). The American Lobster Fishery, operating pursuant to federal authorization under the Atlantic Coastal Act and in compliance with the stringent requirements of the Take Reduction Plan, is not likely to jeopardize the continued existence of the right whale. Although the right whale does face serious threats from Canadian fisheries and vessel strikes, risks posed by the American Lobster Fishery are now quite small, heavily mitigated, and unlikely to jeopardize the continued existence of the species. Unfortunately, the BiOp presents an erroneous "worst case" analysis that attributes impacts to the fishery that are not caused by the fishery and

*Center for Biological Diversity, et al. v. Raimondo, et al.*

introduces a "Conservation Framework" to address those impacts in a way that neither the environmental community nor the fishing industry agrees with.

Plaintiffs contend that the 10-year Conservation Framework and NMFS's 50-year jeopardy analysis are too long in duration. But recovery is a long-term prospect, and one that is achieved *outside* the Section 7(a)(2) consultation process. 16 U.S.C. § 1533(f). When Congress amended the ESA in the wake of the *TVA v. Hill* decision, it recognized that the prohibition against jeopardy was not going to recover imperiled species. So, in 1978, it added a separate requirement in Section 4 of the ESA for NMFS and the U.S. Fish and Wildlife Service to engage in "recovery planning." Section 4(g) now requires the Secretary to "develop and implement plans . . . for the conservation and survival of" listed species and authorized the Secretary to "procure the services of appropriate public and private . . . institutions, and other qualified persons." Pub. L. No. 95-632. As members of Congress explained, "[s]uch plans would be designed to ensure the conservation or survival of each listed species." H.R. Rep. 95-1625, 95th Cong., at 19 (2d Sess. 1978), *reprinted in* ESA Legislative History at 743. These plans "shall be as long and as detailed as is necessary and consonant with their purpose of providing a framework for actions directed at conserving or, at least, insuring the survival of the subject species." *Id*.

NMFS published its most recent recovery plan for the right whale in 2005. NMFS recognized that this was a very long-term project and set criteria to first move the whale from "endangered" to "threatened." BiOp_45698–99. Among other criteria to support a "threatened" status, NMFS states that there must be evidence that "[t]he population has increased for a period of 35 years at an average rate of increase equal to or greater than 2% per year." BiOp_45699. As to full recovery, NMFS determined that "conditions related to delisting are now too distant and hypothetical to realistically develop specific criteria." *Id*. The Recovery Plan states that "[t]he

*Center for Biological Diversity, et al. v. Raimondo, et al.*

most significant need for North Atlantic right whale recovery is to reduce or eliminate deaths and injuries from anthropogenic activities, namely shipping and commercial fishing operations." BiOp_45698. It also explains that recovery must be achieved with cooperation from Canada. *See* BiOp_45693–95; BiOp_45748.

As described in Sections I and II *supra*, the path to right whale recovery seemed possible until 2017, as NMFS had continued to work with stakeholders through the take reduction planning process to reduce the impacts from commercial fishing. But NMFS had done nothing about vessel strikes since 2009, and the path to recovery has been stalled by an unprecedented change in ocean conditions subjecting the species to new, different, and serious threats. It is further complicated by the fact that the primary threat now occurs in waters over which the U.S. government has no jurisdiction.

Although a "Conservation Framework" based on adaptive management may be needed to address the threats now facing the right whale, it is neither adaptive nor wise to solve this problem by targeting domestic fisheries that are not responsible for new threats to the species from a shift in oceanic conditions. A 10-year plan that eviscerates U.S. fisheries will not address impacts occurring in Canadian waters or impacts from vessel strikes. *See* BiOp_2177 ("[T]he [right whale] population is likely to decline if human-caused mortalities in Canada continue at current rates, regardless of efforts in the United States."). That is why MLA has separately challenged the BiOp and its Conservation Framework. For adaptive management to work, there must be an *objective* assessment of the "reasonably certain" effects of U.S. fisheries, and those effects must be addressed in proportion to the risk they actually present. *See* 50 C.F.R. § 402.02 ("effects of the action" evaluated in a biological opinion must be "reasonably certain to occur").

28

Plaintiffs' solution is even further from the mark. They want to *accelerate* NMFS's plan by narrowing, or eliminating, the timeframe on which federal fisheries would be subject to the Conservation Framework's 98% "risk reduction" mandate. And they want to *expand* the Section 7 "action" to include state fisheries and subject them to that mandate too. Plaintiffs' request for the Court to both narrow and broaden the "action" to achieve Plaintiffs' desired result—elimination of all perceived threats at the cost of decimating the American Lobster Fishery—should be rejected.

Finally, Plaintiffs incorrectly argue that NMFS may not evaluate a *continuing* action over a time period stretching many years into the future. But NMFS is required to do just that. *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010) (agency decision to restrict Section 7 evaluation of a continuing action to a five-year period was arbitrary and capricious). Plaintiffs overlook the fact that the federal fisheries actions addressed in the BiOp are *continuing* actions that operate under open-ended federal authorizations. NMFS correctly chose to evaluate the effects of those actions over an extended period, just as it does for many other continuing federal fisheries actions. Plaintiffs' claim should therefore be denied.

**D.      Plaintiffs' MMPA Claims Should be Denied.**

Plaintiffs claim that NMFS has violated the MMPA in two ways. First, they argue that NMFS unlawfully withheld or unreasonably delayed compliance with a "mandatory duty to amend" the Take Reduction Plan. Pls.' Br. at 34–41. This claim fails for the simple reason that NMFS *has* acted. Plaintiffs just do not like the *content* of NMFS's action. Second, Plaintiffs bite at the other side of the apple and argue that NMFS's action (the Rule) "violates the MMPA." Pls.' Br. at 29–33. This claim also fails because it presupposes "mandatory" requirements not contained in the statute.

29

*Center for Biological Diversity, et al. v. Raimondo, et al.*

1.      **Plaintiffs' "unreasonable delay" claim should be denied because NMFS *has* taken action.**

As an initial matter, it is noteworthy that Plaintiffs complain that "NMFS has a long history of failing to meet the strict mandates of the MMPA, perpetually kicking the can down the road on adequately addressing entanglements" and that "NMFS has repeatedly chosen not to enact more protective measures." Pls.' Br. at 32. Plaintiffs *themselves* helped develop, and ultimately agreed upon, the very Plan amendments that have been recommended and implemented by NMFS over the years through the take reduction planning process, including the Take Reduction Rule. *See supra* note 2; *contrast* Pls.' Br. at 33–34 (denigrating the Team's recommendations and its role as an "advisory body only"). That is a good thing, as the measures have been effective and the Team has largely functioned and worked through strong disagreements among its stakeholder members as Congress intended. But it is disingenuous for Plaintiffs to now challenge the very measures they have supported throughout the decades-long take reduction planning process, and to characterize those actions as a failure to act. In any event, Plaintiffs' "unreasonable delay" claim is easily disposed of on the merits.

Section 706(1) of the APA grants federal courts the power to "compel agency action unlawfully withheld or unreasonably delayed." However, where, as here, the agency has acted, there is no claim under Section 706(1). *See WildEarth Guardians v. Chao*, 454 F. Supp. 3d 944, 953 (D. Mont. 2020) (dismissing Section 706(1) claim where the agency had "taken some steps, limited as they may be, to address its statutory obligation…."); *Whale & Dolphin Conservation v. Nat'l Marine Fisheries Serv.*, No. 21-CV-112 (APM), 2021 WL 5231938, at *3 (D.D.C. Nov. 10, 2021) (rejecting argument that NMFS should be compelled to initiate rulemaking, under § 706(1), where it acted to deny petition for rulemaking); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (action under § 706(1) may only proceed where "an agency failed to take a

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

*discrete* agency action that it is required to take"). Instead, a plaintiff must challenge the agency

action with which it disagrees under APA Section 706(2). *See Hells Canyon Pres. Council v.*

*U.S. Forest Serv.*, 593 F.3d 923, 932–34 (9th Cir. 2010) (rejecting Section 706(1) claim as a

disguised Section 706(2) claim because although "plaintiffs may not approve of the way it has

done so, the Forest Service has been carrying out this statutory responsibility since at least

1981").

The MMPA requires the Secretary to "develop and implement a take reduction plan." 16

U.S.C. § 1387(f)(1). That is exactly what NMFS did in 1997. 62 Fed. Reg. 39,160. It then

proceeded to take *six* subsequent substantive rulemaking actions (and more minor actions) to

amend the Take Reduction Plan and implement it through regulations, including the Rule. *See* 16

U.S.C. § 1387(f)(7)(F); *see supra* note 4. Although Plaintiffs may now disagree with the Take

Reduction Team's recommendations, and NMFS's implementation of those recommendations,

they cannot claim NMFS has not acted. NMFS has been acting on its Section 118(f) obligations

for more than two decades based on recommendations from the Team (including Plaintiffs).

Plaintiffs' "unreasonable delay" claim should therefore be denied.

## 2. Plaintiffs' claim that the Take Reduction Rule "violates the MMPA" should be denied because it presupposes "mandatory" obligations that do not exist.

Plaintiffs argue that Congress "required NMFS to enact measures to reduce mortality and

serious injury to below certain levels within particular timeframes." Pls.' Br. at 30. Plaintiffs

ignore the plain language of the MMPA and misconstrue Congress's purpose in enacting Section

118. Below, MLA briefly outlines the history of Section 118 and then addresses the flaws in

Plaintiffs' argument.

31

*Center for Biological Diversity, et al. v. Raimondo, et al.*

a.      **Section 118 of the MMPA.**

The MMPA was passed in 1972. Pub. L. No. 92-522, 86 Stat. 1029 (1972) (codified at 16

U.S.C. § 1361, *et seq.*). As originally enacted, the MMPA permitted take of marine mammals

incidental to commercial fishing and authorized the Secretary of Commerce to regulate such

incidental take. *Id*. § 101 (codified at 16 U.S.C § 1371). The Act further stated that "[i]n any

event it shall be the immediate goal that the incidental kill or incidental serious injury of marine

mammals permitted in the course of commercial fishing operations be reduced to insignificant

levels approaching a zero mortality and serious injury rate." *Id.*

In 1988, the D.C. Circuit Court of Appeals held that a marine mammal incidental take

permit issued to Japanese salmon fishermen violated the MMPA. *Kokechik Fishermen's Ass'n v.*

*Sec'y of Com.* ("*Kokechik*"), 839 F.2d 795, 801 (D.C. Cir. 1988). The effect of *Kokechik* was to

prevent NMFS from issuing *any* incidental take permits to any commercial fisheries for marine

mammal stocks that were below their optimum sustainable population size. *See* 80 Fed. Reg.

48,171, 48,173 (Aug. 11, 2015) (discussing effect of *Kokechik*); S. Rep. 103-220, at 3 (1994),

*reprinted in* 1994 U.S.C.C.A.N. 518, 520 (same). Consequently, Congress acted swiftly to enact

a five-year interim exemption for commercial fisheries from the MMPA moratorium on

incidental take of marine mammals to allow time for a permanent solution to be developed. Pub.

L. No. 100–711, 102 Stat. 4755 (1988). Congress then extended the exemption for an additional

six months to complete the MMPA Amendments of 1994. Pub. L. No. 103–86, 107 Stat. 930

(1993); *see also* S. Rep. 103-220, at 3 (1994), *reprinted in* U.S.C.C.A.N. 518, 520 (discussing

history and details of moratorium).

The legislative history of the 1994 amendments is replete with concern about the effect of

the *Kokechik* decision and the need to find a solution that allowed commercial fisheries to

*Center for Biological Diversity, et al. v. Raimondo, et al.*

113559116.7 0074237-00002

continue operating, while still recognizing the goal of the MMPA to reduce incidental take of marine mammals. *See, e.g.,* 140 Cong. Rec. S3288-01, S3293 (Mar. 21, 1994); 139 Cong. Rec. S15321-01, S15326 (Nov. 8, 1993). The sponsors of the 1994 amendments noted that the amendments restated the zero-mortality rate goal of the MMPA, while allowing "our fishermen to keep fishing." Statement of Mr. Stubbs, 140 Cong. Rec. H2714, H2724 (Apr. 26, 1994). As explained by Senator Hollings,

> [T]he MMPA Amendments of 1994 will strengthen and extend the protection afforded to marine mammals under the MMPA without damaging our important commercial fisheries. The legislation is consistent with the original goals and intent of the MMPA and will facilitate our attempts to meet these goals.

140 Cong. Rec. S4923, S4934 (Apr. 26, 1994) (Mr. Hollings).

Section 118 is the product of these congressional deliberations. Generally, and as its title states, Section 118 establishes a comprehensive statutory framework for the "Taking of marine mammals incidental to commercial fishing operations." 16 U.S.C. § 1387. It includes goals for the reduction of marine mammal incidental take, mandatory procedural requirements, a system for fishing vessel registration and the reporting of marine mammal incidental take, authorization for placement of observers on fishing vessels, and mechanisms for NMFS to enforce the failure to comply with the terms of the incidental take authorizations. *See generally id.* Importantly, and as relevant here, a primary feature of Section 118 is the creation of a unique statutory process through which qualifying stakeholders, assembled as a formally appointed "team," develop plans for reducing marine mammal incidental take in commercial fisheries, which are then implemented by NMFS. *Id.* § 1387(f)(6) (addressing "take reduction teams").

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

b.     **Plaintiffs' argument is contrary to Section 118.**

Section 118(f)(1) of the MMPA provides that "[t]he Secretary shall develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each strategic stock which interacts with a commercial fishery. . . ." *Id*. § 1387(f)(1). Although most of Section 118(f) sets forth procedural requirements for the development and implementation of take reduction plans, it does specify, in Section 1387(f)(4), certain items that a plan "shall include." *Id*. § 1387(f)(4) (enumerating four items plans must include). In addition, Section 118(f)(2) specifies certain "goals" applicable to take reduction plans:

> The *immediate goal of a take reduction plan for a strategic stock shall be* to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock under section 117. The *long-term goal of the plan shall be* to reduce, within 5 years of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing State or regional fishery management plans.

*Id*. § 1387(f)(2) (emphases added). The requirement—as indicated by use of the words "shall be"—in this provision is for NMFS to *establish* the "goals" of the take reduction plan. A plan that does not have these goals is noncompliant with this section; a plan that does have these goals is compliant. There is no requirement that the goals be satisfied (otherwise they would be mandates, not goals).

The Take Reduction Plan establishes the goals of Section 118(f)(2). As NMFS explained long ago, the Plan was established in the preamble to the 1997 rule issued by NMFS when it first promulgated regulations implementing the Plan. *See* 62 Fed. Reg. at 39,158 ("Through this

34

document, NMFS publishes an Atlantic Large Whale Take Reduction Plan (ALWTRP) and an interim final rule implementing that plan."). The Plan properly stated the short-term and long-term goals set forth in Section 118(f)(2), set those goals for the Plan, and stated that the Plan "is intended to meet" those goals. *Id*. at 39,157-60. That is all Section 118(f)(2) required in terms of its stated "goals."

The Take Reduction Plan was also required to include "measures the Secretary *expects* will reduce, within 6 months of the plan's implementation, such mortality and serious injury to a level below the potential biological removal level." 16 U.S.C. § 1387(f)(5)(A) (emphasis added). Here too, the Plan was compliant. It specifically includes numerous measures that were "expected to achieve the necessary take reductions within 6 months." 62 Fed. Reg. at 39,159.

Plaintiffs are therefore wrong that Section 118(f) establishes a "requirement" or "mandate" for NMFS to *meet* the "goals." Pls.' Br. at 30. As the D.C. Circuit has recognized, a "goal is not a mandate, it is a *goal*." *Am. Corn Growers Ass'n v. E.P.A.*, 291 F.3d 1, 10 (D.C. Cir. 2002) (emphasis in original); *see also Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 178 (D.C. Cir. 1982) ("[A]s any student of the legislative process soon learns, it is one thing for Congress to announce a grand goal, and quite another for it to mandate full implementation of that goal."). Although the Court need look no further than Section 118(f)(2)'s plain language to determine that NMFS complied with the statute's stated requirements, the legislative history confirms the error in Plaintiffs' argument. Were Plaintiffs correct that NMFS was *mandated* to reduce fisheries mortalities and serious injuries to below PBR within six months, then numerous fisheries would have been shut down (and still would be shut down). As set forth in the preceding subsection, that is precisely what Congress intended to avoid when establishing Section 118. *See Loving v. I.R.S.*, 742 F.3d 1013, 1016 (D.C. Cir. 2014) (in determining whether

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

agency action is permissible under a statute, courts "employ all the tools of statutory interpretation, including text, structure, purpose, and legislative history" (citations and internal quotation marks omitted)).

In any event, it is too late for Plaintiffs to challenge the Take Reduction Plan. The Plan was established in 1997. 62 Fed. Reg. 39,157. The limitations period for claims under the APA's judicial review provision applicable to agency actions, 5 U.S.C. § 706(2)(A), is six years. *See Hells Canyon Preservation Council*, 593 F.3d at 933–34. Plaintiffs have exceeded the limitations period by almost 20 years.

In addition, Plaintiffs' claim operates under the mistaken belief that the Take Reduction Rule is the Plan itself. As explained above, the Plan was established in 1997. The Rule is the sixth major *amendment to* the Plan. *See* 86 Fed. Reg. at 51,970 ("NMFS is amending the regulations implementing the Atlantic Large Whale Take Reduction Plan."); BiOp_1852 ("Revisions are made to the Plan by implementing regulations as new information and technology becomes available."); *see also* 16 U.S.C. § 1387(f)(7)(F). Amendments to take reduction plans and regulations implementing those amendments are performed pursuant to MMPA Section 118(f)(7)(F), which provides: "The Secretary shall amend the take reduction plan and implementing regulations as necessary to meet the requirements of this section, *in accordance with the <u>procedures in this section</u> for the issuance of such plans and regulations*." 16 U.S.C. § 1387(f)(7)(F) (emphasis added).

Plaintiffs fail to identify any Section 118(f)(7) procedural requirements that NMFS allegedly violated. *See* 16 U.S.C. § 1387(f)(7) ("[T]he following procedures shall apply in the development of the take reduction plan."). Instead, they merely complain about substantive "mandates" they believe NMFS has not satisfied. Furthermore, Section 118(f)(9) makes the

*Center for Biological Diversity, et al. v. Raimondo, et al.*

*content* of any regulations amending plans discretionary. 16 U.S.C. § 1387(f)(9) (when "implementing a take reduction plan" the Secretary "*may* . . . promulgate regulations which include, but are not limited to, [various enumerated measures]" (emphasis added)).

Finally, Plaintiffs mistakenly suggest that the Take Reduction Rule "violates" MMPA Section 118(b)(1). Pls.' Br. at 32 (citing 16 U.S.C. § 1387(b)(1)). But that section applies to commercial fisheries generally, not to take reduction plans created for specific fisheries and marine mammal stocks under Section 118(f). And, in any case, Section 118(b)(1) simply states a "goal." If Congress had intended take reduction plans to strictly comply with Section 118(b)(1)'s goal, it would have said so in Section 118(f). Moreover, Congress expressly chose not to include a provision in the MMPA to allow citizens to enforce the statute's generally stated goals through litigation, which is what Plaintiffs are attempting to do here.

Ultimately, Plaintiffs' MMPA claims boil down to Plaintiffs' desire to unilaterally control a marine mammal take reduction planning process that Congress expressly intended to be *collaborative* among *all* stakeholders. The fact that Congress did not intend for certain stakeholders to usurp this process through litigation is evidenced by Congress's decision to both include no citizen suit provision in the MMPA and give NMFS discretion in its administration of Section 118. Plaintiffs may not use the APA to thwart Congressional intent and graft so-called "mandatory" agency duties onto the MMPA that do not exist.

In sum, Plaintiffs' MMPA claims are meritless. They presume that Section 118 mandates certain outcomes when, in fact, it prescribes a process. Plaintiffs have identified no procedural

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

flaw in NMFS's promulgation of the Take Reduction Rule. Accordingly, their MMPA claims should be dismissed.[10]

## E.   Should the Court Find Any Error, the Correct Remedy Is to Remand Without Vacatur.

Plaintiffs' brief confusingly asks for multiple forms of relief on a claim-by-claim basis, including seeking declaratory relief on Claims 3 and 4 that are not part of the present motion for summary judgment. *See* ECF No. 88 at 1 (moving for summary judgment only on Claims 5 through 8). Among other things, Plaintiffs ask the Court to remand and immediately vacate the BiOp, but also ask the Court to remand the Take Reduction Rule *without* vacatur. Plaintiffs are silent on the disruptive impact that vacatur would have on the American Lobster Fishery in federal waters. Plaintiffs muddy the consequences of potential vacatur even further with their (incorrect) argument that the BiOp should have included state fisheries in the "action." Pls.' Br. at 17–21.

It is premature to attempt to navigate such dire straits without first having a ruling from this Court as to whether any of Plaintiffs' claims have merit. The appropriateness of vacatur turns on "'the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly).'" *Allied-Signal v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (citation omitted). And even where the error is found to be serious, the court

_____

[10] This includes Plaintiffs' Fourth Claim. Among many deficiencies, that claim fails on the basis that NMFS does not "authorize" fishing with issuance of an MMAP—it authorizes incidental take (and *must* do so if certain conditions are met). *See supra* § III.A.2; 16 U.S.C. § 1387(c). It also fails because MMPA Section 101(a)(5)(E) is not stated as a mandate applicable to the operation of fisheries. Rather, it is a mandate to be followed when the criteria for issuing an incidental take authorization under that provision are satisfied. 16 U.S.C. § 1371(a)(5)(E) ("the Secretary shall allow the *incidental, but not the intentional, taking*" if certain criteria are met) (emphasis added). MLA hereby incorporates by reference NMFS's arguments in response and reply to Plaintiffs' Fourth Claim. ECF No. 82 at 37; ECF No. 86 at 21.

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

retains equitable discretion to stay the order of vacatur to "relieve[] the parties from the onerous results of the court's holding until the agency can redo its analysis." *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7, 11 (D.D.C. 2003) (staying vacatur of biological opinion and fishery regulations to allow for preparation of new biological opinion). If the Court grants summary judgment to Plaintiffs on any specific claim, the parties can most effectively address these standards in light of the nature of the claim and the nature of any violation identified by the Court. This was the process efficiently utilized by the Court in addressing claims filed under the original complaint, and MLA respectfully asks the Court to follow this same procedure here. *See* ECF No. 125. But to the extent the Court will not invite more tailored briefing on the remedy, MLA provisionally addresses the remedy below.

If the Court finds any error, the most efficient and equitable result is to remand the BiOp and the Rule without vacatur or, alternatively, to stay vacatur of the BiOp for a reasonable period of time to allow NMFS to address the error. Courts in this circuit have "remanded without vacatur . . . if vacating 'would at least temporarily defeat ... the enhanced protection of the environmental values covered by'" the agency rule at issue. *CBD v. EPA*, 861 F.3d 174, 188–89 (D.C. Cir. 2017) (quoting *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008)). Other courts have declined to vacate biological opinions despite NMFS's *repeated* failure to issue compliant biological opinions following multiple remands because the "BiOp provides some protection for the listed species" and the "vacatur could result in the cessation of [hydropower] operations." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 949 (D. Or. 2016); *id.* at 880–82 (discussing history of repeated decisions to remand without vacating the 2000, 2008, and 2010 biological opinions due to the "serious disruption" that vacatur could cause).

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

Remand of the BiOp without vacatur is appropriate because the BiOp provides significant protections for the right whale. Namely, the BiOp includes RPMs and "terms and conditions" intended to benefit the whale. These include affirmative obligations (not included in the Take Reduction Rule) requiring NMFS to conduct gear research to find ways to reduce impacts, to share research with Canadian partners to reduce whale entanglements, to conduct ecological studies, to ensure that entangled whales are handled properly to increase survivorship, to monitor vessel strike and gear entanglements, and to monitor and evaluate the impact of right whale cryptic mortality. BiOp_2068–72. Vacatur of the BiOp means vacatur of these obligations. One court in this district recently remanded a biological opinion without vacatur to avoid this same result. *See Oceana, Inc. v. Ross*, No. CV 15-0555 (PLF), 2020 WL 5995125, at *24 (D.D.C. Oct. 9, 2020) (remanding without vacatur because "[i]f the Court were to vacate the 2014 Shrimp BiOp, these RPMs and terms and conditions that protect sea turtles would be eliminated until the agency completed its remand or issued a new superseding BiOp"); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1128–29 (D. Or. 2011) (the court can "keep an invalid biological opinion in place during any remand if it provides protection for listed species within the meaning of the ESA").

Vacatur of the BiOp would also cause serious disruption to the American Lobster Fishery, as well as all of the other *nine* commercial fisheries addressed in the BiOp. The lobster fishery is a vital part of Maine's economy and cultural heritage. Declaration of Patrice F. McCarron (2022) ("McCarron Decl.") ¶¶ 2–8, 25. The lobster fishery in Maine has *already* been hit hard by complying with the requirements of the BiOp and Rule and had to expend tremendous effort and resources to make gear changes intended to reduce risk to the right whale.

*Center for Biological Diversity, et al. v. Raimondo, et al.*

113559116.7 0074237-00002

*Id*. ¶¶ 19–22. Moreover, the Rule and BiOp *already* impose a partial fishery closure in the LMA 1, which has caused significant financial hardship to fishermen and communities. *Id*. ¶ 19.

Vacatur of the BiOp without a stay could result in an interim closure of the federal portion of the lobster fishery, causing serious injury to Maine's economy, and the rural communities in Maine that depend on the fishery. *Id*. ¶¶ 23–24. This is the disruption the Court avoided in its prior remedy order by staying vacatur for a reasonable period of time, and in denying Plaintiffs' request for an injunction covering portions of the lobster fishery. ECF No. 125 at 12 (granting a stay to avoid disruption, and explaining that "there will be no period in which a BiOp is not in operation" and thus "there should be no interim closure of the fishery"); *id*. at 30 (noting "permanent economic and social damage that could accompany the closure."). A similar outcome is warranted here. Remand without vacatur will ensure the fishery can continue to operate while maintaining the protections of the BiOp and the Take Reduction Rule, should the Court find an error.

If the BiOp were vacated, NMFS may have some ability to continue to authorize the American Lobster Fishery in federal waters pursuant to ESA Section 7(d), or alternatively, by reverting to the last valid biological opinion issued in 2012. *See* 16 U.S.C. § 1536(d); *CropLife Am. v. E.P.A.*, 329 F.3d 876, 884–85 (D.C. Cir. 2003) (consequence of vacatur "is that the agency's previous practice . . . is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation"); *Nat'l Wildlife Fed'n*, 839 F. Supp. 2d at 1128–29 (applying reinstatement rule to a biological opinion). But even those options, if viable, would have disruptive consequences for the fishery. The ESA Section 7(d) process, if applied, would interject substantial new uncertainty as to interim management measures. The Maine lobster fishery is struggling to adapt to the newest regulatory changes. More uncertainty over the rules

41

will impose burdens lobstermen can ill afford to bear. McCarron Decl. ¶¶ 23–24. And temporary reversion to the 2012 BiOp is not desirable or practical as that BiOp requires now-outdated fishing practices, gear requirements, and mitigation measures from the 2010 version of the Take Reduction Plan. BiOp_1679; McCarron Decl. ¶ 24. This outcome is unnecessary and unwarranted, and can be avoided by remanding the 2021 BiOp without vacatur.

Moreover, the disruption to the Maine lobster fishery that could occur as a result of vacatur is particularly unwarranted given the low probability of impacts of that fishery on the right whale. McCarron Decl. ¶¶ 17–18. Right whales seldom migrate to, and even more rarely aggregate or feed in, Maine's commercial lobster fishing areas. BiOp_18920; BiOp_18939; BiOp_61537. All commercial fishing areas nonetheless engage in substantial measures to reduce impacts, including the seasonal LMA 1 Closure. McCarron Decl. ¶¶ 13–16, 19–22; *see supra* § II.B. There has not been a single observed right whale entanglement with Maine lobster gear in almost two decades. McCarron Decl. ¶ 17. Moreover, there has *never* been an observed right whale serious injury or mortality interaction associated with Maine lobster gear. *Id*. In short, the Maine lobster fishery would not jeopardize the right whale during any remand period. Because of these disruptive consequences, vacatur is unwarranted.

Finally, Plaintiffs have requested additional briefing regarding their request for injunctive relief under Claim 3. However, that claim can be dismissed for the reasons stated in Federal Defendants' briefing in opposition to that claim. ECF No. 82 (Fed. Defs.' Opp.) at 31. Moreover, in order to establish a Section 9 claim under the ESA, a plaintiff must demonstrate a continuing violation of ESA Section 9 under the present regulatory status of the action. *See Or. Nat. Desert Ass'n v. Tidwell*, 716 F. Supp. 2d 982, 1005 (D. Or. 2010). Plaintiffs have not presented *any*

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002

evidence of take by the fisheries under the newly promulgated Take Reduction Rule (much less under the previous status quo). This failure is fatal to their Claim 3. *Id.*

Under all of these circumstances, and assuming the Court finds a legal error, the most equitable remedy here is remand of the BiOp and Final Rule *without* vacatur (or with a reasonable stay of the vacatur) to ensure that the BiOp's conservation measures for the right whale are maintained, and that serious and unwarranted disruption to the Maine lobster fishery is avoided.

## IV.  CONCLUSION

For the reasons set forth above, MLA respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment on their Claims 3, 4, 5, 6, 7 and 8, and grant MLA's Cross-Motion for Summary Judgment on all of those claims. Claim 1 is no longer at issue in this case and, as Plaintiffs have recognized, Claim 2 is moot. Pls.' Br. at 5. Should the Court find in Plaintiffs' favor on any of their claims, MLA requests the opportunity for tailored remedy briefing to address any specific error or, alternatively, that the Court remand without vacatur.

Dated: February 17, 2022.

STOEL RIVES, LLP

*/s/ Ryan Steen*
Ryan Steen, D.C. Bar No. 1615260
Jason Morgan, D.C. Bar No. 1615129
James Feldman (*pro hac vice*)
600 University Street, Suite 3600
Seattle, Washington 98101
Phone: (206) 624-0900
Fax: (206) 386-7500
Email: ryan.steen@stoel.com
        jason.morgan@stoel.com
        james.feldman@stoel.com

Jane C. Luxton, D.C. Bar No. 243964
LEWIS BRISBOIS BISGAARD & SMITH LLP
2112 Pennsylvania Ave., NW, Ste. 500

43

*Center for Biological Diversity, et al. v. Raimondo, et al.*

Washington, D.C. 20037
Phone: (202) 558-0659
Email: Jane.Luxton@lewisbrisbois.com

Mary Anne Mason, D.C. Bar No. 375825
MAINE LOBSTERMEN'S ASSOCIATION, INC.
2 Storer Street, Suite 203
Kennebunk, ME 04043
Phone: (202) 262-2424
Email: Maryanne@mainelobstermen.org

*Attorneys for Maine Lobstermen's Association, Inc.*

*Center for Biological Diversity, et al. v. Raimondo, et al.*
113559116.7 0074237-00002