**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

       *Plaintiffs*,

       v.

GINA RAIMONDO, *et al.*,

       *Federal Defendants*,

       and

MAINE LOBSTERMEN'S ASSOCIATION, INC., *et al.*,

       *Defendant-Intervenors*.

C.A. No. 18-112 (JEB)

**DEFENDANT-INTERVENOR MASSACHUSETTS LOBSTERMEN'S ASSOCIATION'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.    INTRODUCTION ....................................................................................................1

II.   BACKGROUND ......................................................................................................2

    a.    Statutory Framework...................................................................................2

        i.    The Endangered Species Act. ..........................................................2
        ii.   The Marine Mammal Protection Act.................................................4
        iii.  The Administrative Procedure Act....................................................5

    b.    The North Atlantic Right Whale and Its History.........................................5

        i.    The North Atlantic Right Whale: Habitat, Food, Migration Patterns .........5

    c.    The American Lobster Fishery and Fishing in Massachusetts ....................9

        i.    The Importance of Lobster and Jonah crab to Massachusetts
             Coastal Communities........................................................................9
        ii.   The Growing Significance of Jonah Crab in Southeastern
             Massachusetts.................................................................................11

    d.    Conservation Efforts to Date ....................................................................11

        i.    The 2021 Final Rule. ......................................................................11
             1.    Reduction of Vertical Lines...............................................12
             2.    Gear Modification Requirements........................................12
             3.    Gear Marking Requirements. .............................................12
             4.    Additional and Expanded Seasonal Closures. ...................13
        ii.   Massachusetts Conservation Regulations. ......................................14

    e.    There is No Current Alternative to Lobster Pot Fishing since "Ropeless"
        Fishing is Not Viable ................................................................................14

III.  PROCEDURAL HISTORY......................................................................................16

IV.   ARGUMENT ........................................................................................................16

    a.    Standard of Review....................................................................................16

    b.    States, Not NMFS, Authorize Fishing in State Waters ..............................16

    c.    Plaintiff's MMPA Claims Rely On A Faulty Reading of Section 1387..............21

    d.    Even if the Court Rules for Plaintiffs on Liability, It Should Not Vacate
        the 2021 BiOp............................................................................................25

        i.    The Impact of Vacatur is Uncertain. ..............................................25
        ii.   Closure of the Federal Lobster Fishery Would Cripple the Coastal
             Economies and Societies of Massachusetts and the Rest of New
             England..........................................................................................26
             1.    The Economic Impact of a Closure. ..................................26
             2.    The Social Impact of a Closure. ........................................30

       iii.     Closure of the Fishery Would Not Comply With Congressional Intent. ................................................................................................... 31

       iv.     Reversion to the 2012 BiOp and 2015 TRP Rule Also Would Have Devasting Results. .................................................................................. 32

       v.     The Equities Strongly Support Remand Without Vacatur. ...................... 33

   e.     Ropeless Fishing is Not a Cure-All. ................................................................... 33

V.    CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995) ............................................................................. 33

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
  429 F.3d 1136 (D.C. Cir. 2005) ........................................................................... 25

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................. 25

*Chamber of Commerce of the U.S. v SEC,*
  443 F.3d 890 (D.C. Cir. 2006) ............................................................................. 33

*Envtl. Def. v. Leavitt,*
  329 F. Supp. 2d 55 (D.D.C. 2004) ....................................................................... 26

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .............................................................................................. 5

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ............................................................................................ 25

*Humane Soc'y of U.S. v. Kempthorne,*
  579 F. Supp. 2d 7 (D.D.C. 2008) ................................................................... 26, 32

*Indep. U.S. Tanker Owners Comm. v. Dole,*
  809 F.2d 847 (D.C. Cir. 1987) ............................................................................. 26

*INS. v. Ventura,*
  537 U.S. 12 (2002) .............................................................................................. 25

*Maine Lobstermen's Association et al. v. Ross et al.,*
  C.A. No. 1:21-cv-02509-JEB (D.D.C.) .................................................................. 2

*Man Against Xtinction, as Citizen Attorney General v. Mass. Port Authority,*
  C.A. No. 1:21-cv-10185, ECF No. 1 (Feb. 3, 2021) ........................................... 32

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747 (D.C. Cir. 2002) ....................................................................... 25, 33

*Nat'l Ass'n of Home Builders v. Norton,*
  415 F.3d 8 (D.C. Cir. 2005) ................................................................................. 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    839 F.Supp.2d 1117 (D. Or. 2011) .................................................................. 32

*NRDC v. Evans*,
    279 F.Supp.2d 1129 (N.D. Cal. 2003) ................................................................ 5

*Oceana, Inc. v. Pritzker*,
    24 F.Supp.3d 49 (D.D.C. 2014) ........................................................................ 21

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ............................................................................ 26

*Public Emps for Envtl. Responsibility v. Boudreau*,
    25 F. Supp. 3d. 67 (D.D.C. 2014) ..................................................................... 25

*Strahan v. Coxe*,
    127 F.3d 155 (1st Cir. 1997) ........................................................................ 5, 21

*Strahan v. Pritchard*,
    473 F. Supp. 2d 230 (D. Mass. 2007) .............................................................. 19

*Strahan v. Secretary, Massachusetts Executive Office of Energy & Environmental Affairs*,
    519 F.Supp.3d 65 (D. Mass. 2021) ............................................................... 3, 10

*Strahan v. Secretary, Massachusetts Executive Office of Energy & Environmental Affairs*,
    C.A. No. 1:19-cv-10639 (D. Mass.) ............................................................. 20, 32

*Strahan v. Secretary, Massachusetts Executive Office of Energy and Environmental Affairs, et al.*,
    C.A. No. 1:19-cv-10638, ECF No. 614 (Nov. 11, 2021) ..................... 9, 10, 15, 30, 34

*Sugar Cane Growers Cooperative of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ............................................................................ 33

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978) .......................................................................................... 3

**Statutes**

5 U.S.C. § 706(1) ............................................................................................... 21

16 U.S.C. § 706(2)(A) ......................................................................................... 16

16 U.S.C. § 1361(6) .............................................................................................. 4

16 U.S.C. § 1371(a) .............................................................................................. 4

iv

16 U.S.C. § 1371(a)(1) ................................................................................................4

16 U.S.C. § 1371(a)(5)(E)(i) .........................................................................................4

16 U.S.C. § 1387 ........................................................................................ 1, 21, 22, 24

16 U.S.C. § 1387(a) ....................................................................................................31

16 U.S.C. § 1387(f) ........................................................................................ 1, 22, 23

16 U.S.C. § 1387(f)(2) ................................................................................................22

16 U.S.C. § 1387(f)(5)(A) ...........................................................................................22

16 U.S.C. § 1387(f)(7)(f) .............................................................................................22

16 U.S.C. § 1387(g) ....................................................................................................24

16 U.S.C.§ 1536(a)(2) ..................................................................................................2

16 U.S.C. § 1536(b)(4) .................................................................................................4

16 U.S.C. §§ 1536(b)(4)(A)-(C), 1371(a)(5) ................................................................3

16 U.S.C. § 1536(b)(4)(C) ............................................................................................4

16 U.S.C. § 1539 ...........................................................................................................3

86 Stat. 1027 .................................................................................................................4

**Other Authorities**

50 C.F.R. § 216.103 ......................................................................................................5

50 C.F.R. § 402.14(i)(1) ...............................................................................................3

50 C.F.R. § 402.14(a) ...............................................................................................2, 3

50 C.F.R. § 402.14(g) ...................................................................................................3

50 C.F.R. § 402.14(g)(7) ..............................................................................................4

50 C.F.R. § 402.14(h)(1) ..............................................................................................3

50 C.F.R. § 697.4 ...................................................................................................17, 19

Fed. R. Civ. P. 56 .........................................................................................................1

Fed. R. Evid. 201 ........................................................................................................10

Local Rule 7(h) .................................................................................................................... 1

322 C.M.R. 12.06(3)(a) ....................................................................................................... 14

322 C.M.R. 12.06(2)(a) ....................................................................................................... 14

322 C.M.R. 12.06(2)(b) ....................................................................................................... 14

322 C.M.R. 12.06(2)(e) ....................................................................................................... 14

322 C.M.R. 12.04(2) ........................................................................................................... 14

322 C.M.R. 12.05 ................................................................................................................ 14

322 C.M.R. 7.01(2)(a) .................................................................................................. 17, 18

322 C.M.R. 12.01 ................................................................................................................ 19

## I.    **INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), the Massachusetts Lobstermen's Association ("MALA"), by its undersigned counsel, respectfully submits this memorandum of law in opposition to plaintiffs' motion for summary judgment.

Briefs already filed by the National Marine Fisheries Service ("NMFS"), the State of Maine, the Maine Lobstermen's Association, and the Maine Lobstermen's Union provide ample reasons for this Court to deny the Plaintiffs' motion for summary judgment.  In the interest of judicial economy and efficiency,  MALA has sought in this brief to avoid repeating arguments made by other parties.  To that end, this brief makes two principal liability arguments.  *First*, NMFS regulates, but does not authorize, fishing in state waters.  That is important because Plaintiffs' challenge in this case focuses on what NMFS' actions allow to take place.  Plaintiffs have pointed to nothing that would prevent NMFS from doing what is has done: authorizing (and issuing an Incidental Take Statement) on behalf of the federal fishery, and instructing the states to apply for their own Incidental Take Permits under the Endangered Species Act ("ESA").  *Second*, Plaintiffs have misread 16 U.S.C. § 1387, which they rely upon heavily to support their argument that NMFS has failed to comply with the Marine Mammal Protection Act ("MMPA"). Preliminarily, it is unclear whether any "mandates" even exist under the MMPA.  But even if they do, the event that triggers NMFS' obligations (if any) under 16 U.S.C. § 1387(f) is full *implementation*, not *enactment* of the Final Atlantic Large Whale Take Reduction Plan Rule (the "Final Rule").  Because implementation of the Final Rule is not expected to finish until 2031, Plaintiffs' MMPA claims (however packaged) are not ripe for adjudication.

Plaintiffs' unstated goal in this litigation is clear: they seek to end lobster fishing in its current form and force widespread adoption of "ropeless" fishing, a technology that is not viable today and won't be for years to come, if ever. To that end, plaintiffs request that the Court vacate

the 2021 Biological Opinion ("2021 BiOp"), a result that likely will lead to the closure of the federal fishery.  Any such result would have a devastating impact on the men and women who work in the American lobster fishery, their families, and their communities.[1]  Plaintiffs would like to avoid discussion of these people altogether, content to explore the twists and turns of complex statutory and regulatory frameworks.  But this Court wields tremendous power, with the potential to cause catastrophic harm to those who live within the facts of this case every day.  Many of the parties have requested additional briefing on the issue of remedy in the event that the Court grants the Plaintiffs summary judgment on liability.  MALA joins that request, but also provides this Court with preliminary briefing on the topic.

## II.   BACKGROUND

### a.   Statutory Framework

#### i.   The Endangered Species Act.

The Endangered Species Act (the "ESA") requires that "[e]ach Federal agency . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species."  16 U.S.C.§ 1536(a)(2).  Parallel regulations require that "[e]ach Federal agency . . . review its actions at the earliest possible time to determine whether any action may affect listed species."  *See* 50 C.F.R. § 402.14(a).  Where such agency action is deemed likely to affect a listed species, the agency must engage in consultation with an

---

[1] Maine Lobstermen's Association, in a parallel proceeding in which MALA has intervened as an intervenor-plaintiff, has raised significant concerns regarding the process NMFS employed to promulgate the 2021 BiOp and the conclusions NMFS has reached in that document.  *See Maine Lobstermen's Association et al. v. Ross et al.*, C.A. No. 1:21-cv-02509-JEB (D.D.C.).  MALA's brief in this matter opposing plaintiffs' motion for summary judgment should not be read to reflect an endorsement of NMFS' process or specific findings.  Plaintiffs' challenges, however, are flawed and should be rejected.

"expert agency." *Id.*  In this case, both the action agency and the expert agency are housed within the National Marine Fisheries Services ("NMFS").  *See* ECF No. 91 at 3.

As initially drafted, the ESA contained limited relief for an agency or actor whose actions were deemed to create a risk of incidental take of a listed species.  *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 171 (1978).  Following the Supreme Court's decision in *TVA*, however, Congress amended the ESA in several ways "so that it may be more flexible in application."  *See Strahan v. Secretary, Massachusetts Executive Office of Energy & Environmental Affairs*, 519 F.Supp.3d 65, 68 (D. Mass. 2021); *see also* Endangered Species Amendments of 1982, Pub. L. No. 97-304, § 6, 96 Stat 1411 (1982); Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 3, 92 Stat. 3751 (1978).  These amendments created the modern incidental take permit provisions (16 U.S.C. § 1539).

During consultation, the expert agency analyzes whether the proposed agency action will violate Section 1632(a)(2)'s prohibition on jeopardizing the continued existence of endangered and threatened species. This consultation results in a biological opinion.  *See* 50 C.F.R. § 402.14(g).  Where the expert agency concludes in its biological opinion that the proposed action will jeopardize the continued existence of the species, it issues a "jeopardy" decision.  *See* 50 C.F.R. § 402.14(h)(1).  Where such action is not deemed such a threat, a "no jeopardy" finding is appropriate.  *Id.*  A "no jeopardy" finding may issue only if  the expert agency determines: (1) the project does not threaten the continued existence of the listed species; (2) any incidental take from the project does not threaten the continued existence of the species; and (3) any incidental take from the project does not violate § 101(a)(5) of the Marine Mammal Protection Act . . . which requires that there be no more than a negligible impact on the species. ECF No. 91, at 5 (citing 16 U.S.C. §§ 1536(b)(4)(A)-(C), 1371(a)(5); 50 C.F.R. § 402.14(i)(1)).

Where the expert agency makes a "no jeopardy" finding, it may issue an Incidental Take Statement ("ITS"), provided that such statement: "(i) specifies the impact of such incidental taking on the species; (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact; (iii) in the case of marine mammals, specifies those measure that are necessary to comply with section 1371(a)(5) [of the Marine Mammal Protection Act] with regard to such taking; and (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii)." *See* 16 U.S.C. § 1536(b)(4). An ITS must be produced whenever the expert agency concludes that incidental takes are reasonably certain to occur. *See* 50 C.F.R. § 402.14(g)(7).

ii.    <u>The Marine Mammal Protection Act.</u>

The MMPA was enacted in 1972 for the protection of marine mammals. *See* 16 U.S.C. § 1361(6); 86 Stat. 1027. As a general rule, the MMPA bars "the taking and importation" of all marine mammals. 16 U.S.C. § 1371(a). Compliance with Section 1371(a)(5) of the MMPA is required by the ESA where an activity is likely to impact marine mammals. *See* 16 U.S.C. § 1536(b)(4)(C).

The MMPA contains exemptions to its strict requirements. Commercial fishing operations, for example, are allowed incidental takes where such takings are approved by NMFS in compliance with the ESA, the MMPA, and each statute's accompanying regulations. *See* 16 U.S.C. § 1371(a)(1). Where NFMS determines that "the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock" (amongst other things), it must allow incidental takes by such fisheries. *See* 16 U.S.C. § 1371(a)(5)(E)(i). A negligible impact is "an impact resulting from specified activity that cannot be reasonably expected

4

to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." *See* 50 C.F.R. § 216.103.

Unlike the ESA, the MMPA does not have a citizen's suit provision – private plaintiffs therefore cannot bring a cause of action under the MMPA. *See Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997).

### iii.   The Administrative Procedure Act.

The Administrative Procedure Act ("APA") provides an avenue for review of executive agency action by an Article III court. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Because the MMPA does not contain a citizens' suit provision, Plaintiffs may only challenge alleged MMPA violations through the APA. *See NRDC v. Evans*, 279 F.Supp.2d 1129, 1142 (N.D. Cal. 2003).

### b.   The North Atlantic Right Whale and Its History

### i.   The North Atlantic Right Whale: Habitat, Food, Migration Patterns

The North Atlantic Right Whale ("NARW") is a large, highly migratory species of baleen whale. Rule_12178-9. NARWs range from the coastal waters off of Jacksonville, Florida to the Gulf of St. Lawrence and beyond. BiOp_1153-54. NARWs historically have followed a fairly predictable annual migratory pattern. BiOp_1161. NARWs are known to spend the early winter months in warm waters off the coast of Florida, migrating north to Cape Cod Bay and surrounding waters in late January or early February of each year. BiOp_33368; 33372. In April or May of each year, NARWs traditionally have migrated north, to the Bay of Fundy. Rule_12179. In recent years, likely as a result of climate change, NARWs have migrated further north, to the Gulf of St. Lawrence. BiOp_1153; Rule_12179; BiOp_1161. In late fall, NARWs have traditionally migrated south again, back to coastal waters off of Florida, to reproduce. BiOp_1161.

NARWs primarily eat copepods.  BiOp_1153. NARWs' migration pattern is largely correlated with prevalence of copepods in the spring, summer, and fall months.  Rule_12179. The recent changes in NARW migratory behavior, resulting in migration to the northern Gulf of St. Lawrence, rather than the Bay of Fundy, is correlated with the rapid warming of the Gulf of Maine and the corresponding decline in copepod population in the western Gulf of Maine.  BiOp_1153 (noting changes in *C. finmarchicus* distributions since 2010, with increased presence on the continental shelf south of New England and the Gulf of St. Lawrence); *see also* BiOp_5697-5708 ("Projecting the effects of climate change on *Calanus finmarchicus* distribution within the U.S. Northeast Continental Shelf").

Estimates of the NARW population prior to human intervention range from around 1,000 to over 21,000 members of the species.  BiOp_54032.  In the early 1900s, NARWs were almost driven to extinction; current estimates indicate that the NARW population in 1935 was approximately 100.  BiOp_24884; BiOp_71545.  In 1992, the NARW population was estimated at 295 members.  BiOp_69964.  In the 1990s and 2000s, the NARW population rebounded, reaching a minimum estimated population of around 455 whales in 2010.  BiOp_71545.  The population peaked in 2011 at an estimated 481 animals.  BiOp_1162. Around that time, however, despite increased conservation measures in the United States at both the state and federal levels, the NARW population began to decline.



*Figure 2. (A) Abundance estimates for North Atlantic right whales. Estimates are the median values of a posterior distribution from modeled capture histories. Also shown are minimum number alive (diamonds) of cataloged individuals known to be alive in any given year, which includes all whales known to be alive prior to that year and seen in that year or subsequently plus all whales newly cataloged that year. Cataloged whales may include some but not all calves produced each year. (B) Crude annual growth rates from the abundance values.*

Rule_12181; BiOp_24885; BiOp_26012.   This decline coincided with increased evidence of NARW presence in the Gulf of St. Lawrence where NARWs were not previously known to aggregate in large numbers.   BiOp_26012 (noting that "there seems to have been a considerable change in right whale habitat use patterns in areas where most of the population has been observed in previously years exposing the population to additional anthropogenic threats").   In 2017, tragedy struck:  between June 6, 2017 and September 15, 2017, twelve NARWs were spotted dead in the Gulf of St. Lawrence.  BIOP_18652.  An additional five NARWs were found alive but entangled in snow crab fishing gear from July 5 to August 28, 2017.  BIOP_18655.  Hindcast analyses (a complex computer analysis which attempts to pinpoint the location at which an object began its drift) (BiOp_18713) have demonstrated that these dead NARWs almost certainly became entangled and died in or near the Gulf of St. Lawrence:



*Figure 4. Locations of incidents involving dead and live, entangled North Atlantic right whales in the GSL between June 6th and Sept 15th, 2017. Whales labelled #1 – 13 are per Table 1.*

BiOp_18653.  Following these tragic deaths, NMFS declared an unusual mortality event ("UME") in 2017, which remains ongoing as of the date this brief was filed.  BiOp_26017.

When a NARW is found entangled in gear NMFS attempts to do an analysis of the origin of the gear, assigning, where possible, a country and fishery.  *See e.g.* Rule_29053-29077.  From 2014 to 2021, NMFS was able to ascertain the country of origin for 24 entangled NARWs.  *See* Rule_29071.  Of these 24 NARWs, 20 were entangled in gear confirmed to have originated in Canada.  *Id.*  And of the four entanglements from suspected U.S. fishing gear, only one resulted in serious injury or mortality, compared to 11 instances of serious injury or mortality out of 20 recorded instances of entanglement in Canadian-set gear.  *Id.*

Commercial fishing gear represents only one of many threats to NARWs.  BiOp_26017.  NARWs are also known to be  killed or seriously injured in ship strikes. *Id*. (noting that from 2014 through 2017, average reported mortality and serious injury to right whales due to vessel strikes was 1.3 whales per year).

###### c.       The American Lobster Fishery and Fishing in Massachusetts

NMFS estimates approximately 3,970 vessels currently fish traps or pots in the Northeast American Lobster Fishery.  Rule_3896.  It is difficult to overstate the economic significance of lobster and Jonah crab fishing for New England communities.  Collectively, New England fishers land at least $628 million per annum in ex-vessel (dock-side) revenue attributed to trap/pot lobster and Jonah crab landings.  Rule_3898.  Indeed, some fishing communities rely almost exclusively on target species governed by the Atlantic Large Whale Take Reduction Plan ("ALWTRP") like lobster and Jonah crab. For instance, Norfolk County, MA (99%), York County, ME (93%), Knox County, ME (92%), and Rockingham County, NH (91%) all harvest at least 90% of their collective catch from ALWTRP-effected species.   Rule_3903.   NMFS' Final Environmental Impact Statement ("EIS") makes clear that these counties represent a sizable number of fishers. NMFS estimates, for instance, that Essex County, in Massachusetts, employs between 579 and 856 fishers on ALWTRP fishing vessels alone, with the annual Essex County ALWTRP catch estimated at $30,202,297 in ex-vessel (dock-side) revenue.  *Id.*  The same EIS confirms that  many coastal counties in New England are "vulnerable to adverse social impacts form ALWTRP regulations" and are thus at significant risk from a closure of the American Lobster Fishery.  Rule_3900.

###### i.      The Importance of Lobster and Jonah crab to Massachusetts Coastal Communities

Lobster and Jonah Crab fishing play a central role in the economic and social life of Massachusetts coastal communities.  NMFS estimates that Essex, Barnstable, and Bristol counties each land more than $15 million per annum from ALWTRP trap/pot gear. Rule_3901.  In total, Massachusetts fishers land between $80-100 million in lobster alone each year.  *See* "Indicative Ruling as to Liability and Remedies," *Strahan v. Secretary, Massachusetts Executive Office of Energy and Environmental Affairs, et al.*, C.A. No. 1:19-cv-10638, ECF No. 614, at 32 (Nov. 11,

2021) [hereinafter "Indicative Ruling"].[2]   In 2020, Massachusetts fishers landed 15,763,212 pounds of live American lobster, worth $78,604,366.  *See* Casoni Decl. at ¶ 13.  Fishers landed 8,649,738 pounds of Jonah crab in 2020, worth $7,059,428.  *Id.*  In 2020, Lobster was the second most valuable target species landed in Massachusetts ports; Jonah crab was sixth.  *See id.*  What's more, for many coastal communities in Massachusetts, fishing is a multi-generational way of life.  *See* Lorentzen Decl. at ¶ 6; Browne Decl. at ¶ 12.  The overwhelming majority of Massachusetts lobster and Jonah crab fishers are small businessmen and women.  The fishery as a whole is characterized by owner-operated two and three-person vessels.  Lorentzen Decl. at ¶ 5; Casoni Decl. at ¶ 13.  Many fishers have never done anything other than fish.  *See e.g.* Lorentzen Decl. at ¶ 4.  A closure of federal waters to lobster fishing would be devastating to many Massachusetts fishermen who rely on those waters for revenue during a substantial portion of the calendar year.  *See e.g.* Lorentzen Decl. at ¶ 15; Browne Decl. at ¶¶ 14, 15.

The significance of the lobster fishery to Massachusetts coastal communities does not end at the shoreline.  Many coastal  businesses work closely with lobster fishers.  *See e.g.* Browne Decl. at ¶¶ 3-9.  Entire families can and often are involved in various aspects of this coastal economy.  Browne Decl. at ¶ 10. Indeed, in communities like Gloucester, MA, lobster fishing forms the core of a vibrant coastal economy, with wholesalers, distributors, vessel repair shops, and gear shops relying on the continued operation and economic vitality of the lobstering industry.  Indicative Ruling at 33; Browne Decl. at ¶ 10.  NMFS, in its Final EIS noted that for Essex,

---

[2] The Indicative Ruling, referenced above, contains findings of fact by the U.S. District Court for the District of Massachusetts in the *Strahan* litigation in 2021.  This Court is permitted to take judicial notice of that decision in weighing the equities of a potential order vacating the 2021 BiOp. Fed. R. Evid. 201.

Barnstable, and Bristol counties of Massachusetts, the exposure to "adverse [social] impacts may be substantial." Rule_3901.

> ii.    The Growing Significance of Jonah Crab in Southeastern Massachusetts

Although lobster remains the primary target species for much of Massachusetts' trap/pot fishers, Jonah Crab is an increasingly important species, particularly for fishers fishing waters south of the Cape Cod peninsula.  *See* Casoni Decl. at ¶ 8.  Lobsters and Jonah Crab are highly dependent on water conditions. As waters off the coast of Massachusetts have warmed, lobsters have migrated north and further into federal waters, and Jonah Crab have increased in abundance in their place.  BiOp_1101.  Indeed, according to NMFS' 2021 Biological Opinion, Johan Crab landings have "increased dramatically since 1990."  *Id.*; *see also* BiOp_1102.  "The trend of increasing Jonah crab landings in the late 1990s coincides with the collapse of the Southern New England lobster stock and a decrease in lobster landings, suggesting harvesters turned to Jonah crab to supplement their income." BiOp_1101.  Thus, in recent years, Jonah crab fishing has become an important source of revenue  for many southeastern Massachusetts fishers.  *See* Casoni Decl. at ¶ 8.

> **d.    Conservation Efforts to Date[3]**

> i.    The 2021 Final Rule.

Following this Court's decision in April of 2020 and the issuance of the 2021 BiOp, on September 17, 2021, NMFS released the Final Rule.  The Final Rule contains a host of additional conservation measures which NMFS believes will have a positive impact on conservation of NARW.  Rule_6448.  Such measures include:

---

[3] MALA respectfully refers this Court to its Opening Brief on Remedy (ECF No. 115), at 6-9 for a fuller discussion of pre-2021 conservation measures.

1.      Reduction of Vertical Lines.

The Final Rule requires that certain fishers "trawl up," or increase the number of traps per trawl.  This has the effect of decreasing the number of vertical end lines (sometimes referred to as "buoy lines") in the water column.  Rule_6449.

2.      Gear Modification Requirements.

Prior to the Final Rule, fishers were not limited in the strength of the rope they used to fish in federal waters.[4]  Fishers often used thick, strong rope with high breaking strength.  BiOp_1089. Following academic research into entanglement events, however, the TRP adopted a new rule requiring the use of "weak" rope or rope inserts, which would break at 1,700 pounds breaking force – lower than the breaking force strength of gear deemed to cause serious injury and mortality to NARWs.  *Id.*  The purpose of this new requirement was to limit the impact of an entangling event on a NARW. BiOp_1090.  Following issuance of the Final Rule, lobster fishers must now use entirely weak rope or insert weak rope inserts at specified intervals in their end lines. Rule_6450-6451.

3.      Gear Marking Requirements.

In addition to new weak inserts, NMFS' Final Rule mandated adoption of a new gear marking regime.  A historical problem with analyzing entanglement data is a lack of identifying information on much of the gear found on entangled NARWs.  BiOp_1296.  The new gear marking requirements will allow investigators to identify the specific location from which the entangling rope came.  Rule_6451.

---

[4] This was not true in Massachusetts, which had adopted weak rope regulations earlier in 2021.

####     4.     Additional and Expanded Seasonal Closures.

Two seasonal closure areas already existed prior to the 2021 Final Rule in state and federal waters around Massachusetts: the Massachusetts Bay Restricted Area and the Great South Channel Restricted Area. Rule_6449. The Final Rule modifies these two existing seasonal closure areas and creates two additional seasonal closure areas. *Id.* The Final Rule also creates two additional restricted time-space closures: the LMA 1 Restricted Area (which is in effect from October through January of each year) and the South Island Restricted Area, which is closed from February through April of each year. *Id.*



**Figure 1. New (light gray) and existing (dark gray) seasonal restricted areas.**

Rule_6450. Taken together, the 2021 Final Rule dramatically increases the (i) scope of environmental regulations aimed at protecting the North Atlantic Right Whale, and (ii) burden placed upon Massachusetts lobster fishers.

13

      ii.     <u>Massachusetts Conservation Regulations.</u>

Massachusetts lobster fishing regulations are particularly conservation-friendly. For instance, Massachusetts requires the use of sinking ground lines year-round, 322 C.M.R. 12.06(3)(a), and a 600 lb. break-away link at the base of surface buoys. 322 C.M.R. 12.06(2)(a) ("Weak Link Requirement"). In 2021, Massachusetts became the first jurisdiction in the nation to mandate the use of weak rope or weak contrivances (breaking at 1,700 lbs. or less). 322 C.M.R. 12.06(2)(b) ("Buoy Line Breaking Contrivance"). Massachusetts fishermen also are limited in the buoy-line rope diameter they can use: all such lines must be 3/8" or less. 322 C.M.R. 12.06(2)(e) ("Restrictions on Buoy Line Diameters"). The Commonwealth also extended the seasonal closure of state waters to the New Hampshire border, closing waters off the coast of the North Shore for the first time from February until at least April, and in some cases until May 15 of each year. 322 C.M.R. 12.04(2) ("Trap Haul-Out Period"). In addition, speed limits and the seasonal three-month closure of the Massachusetts Bay Restricted Area dramatically reduce risk to NARWs. *Id.*; *see also* 322 C.M.R. 12.05 ("Speed Restrictions to Protect North Atlantic Right Whales").

**e.**     **There is No Current Alternative to Lobster Pot Fishing since "Ropeless" Fishing is Not Viable**

The evidentiary record unequivocally demonstrates that ropeless fishing[5] is not currently viable. Indeed, NMFS, which has advocated for the development of ropeless fishing technology, acknowledges in the Final Rule that Ropeless is not ready for general use.

> Given the high cost of ropeless retrieval technology, for the foreseeable future, industry participants are likely to depend on loans of gear purchased by the Northeast Fisheries Science Center for ropeless research collaborations. By 2025, we anticipate this would allow up to 33 fishermen to fish with up to 10 trawls each

---

[5] "Ropeless" fishing is somewhat of a misnomer; ropeless fishing gear may better be described as "on demand" gear, because the gear includes a remote-triggered release function which releases a rapidly-inflating buoy to the surface with line attached. The technology nevertheless represents a method for reducing permanent rope in the water column, as the gear does not have rope in the water column when it is not being actively hauled. BiOp_1308.

in the Northeast Region, including the restricted areas. Because they would be fishing under Federal exempted fishing permits (EFP) or equivalent state authorization, conditions to minimize impacts on the natural and human environment will likely include some area restrictions, reporting and monitoring requirements, gear marking of any stored buoy line, and evidence of communication and collaboration with adjacent fixed and mobile gear fishermen to minimize gear conflicts.

Rule_6449. There are two primary reasons why ropeless gear has not been widely adopted: cost and gear conflict. The typical Massachusetts lobsterman fishes 800 traps, in trawls of 20 or fewer traps. *See* Casoni Decl. at ¶ 19; Lorentzen Decl. at ¶ 9. Thus, a typical Massachusetts lobsterman fishes approximately 40 trawls, with a buoy attached to each end to show the fisher where the trawl is set. Each ropeless device is expensive: as of the summer of 2021, the cost was estimated at approximately $4,000 per unit. Indicative Ruling at 31. Thus, assuming that each fisher was required to outfit each end of his or her trawl with a ropeless buoy, the total cost to outfit a *single* lobsterman would be approximately $160,000 – *more than 1% of the entire ex-vessel revenue derived from the Massachusetts lobster fishery each year.* Indicative Ruling at 31.

Gear conflict presents additional concerns. A secondary (but important) benefit of visible buoys on the surface of the ocean is that other fishers operating mobile fishing platforms (sea scallopers, for instance) can see where trap/pot trawls are set, and thus avoid running over them. Lorentzen Decl. at ¶ 9, 11-13. This is important, because if a scalloper catches a trawl, it will drag the trawl – making it almost impossible to find again without surface buoys. Lorentzen Decl. at ¶ 11-13. Such gear conflict can also prove dangerous – a dragger whose line has become overweighted runs a serious risk of capsizing. Casoni Decl. at ¶ 20. These risks are not hypothetical. In recent years, a vessel capsized and a crew member died as a result of gear conflict. *Id*. In the Indicative Ruling, the Federal Court for the District of Massachusetts expressly recognized that ropeless technology was not ready for mass adoption. Indicative Ruling at 31.

### III.   PROCEDURAL HISTORY

On May 27, 2021, NMFS issued a new biological opinion.  ECF No. 125.  On September 9, 2021, the plaintiffs moved to amend their complaint, adding new claims arising from the 2021 Biological Opinion.  ECF No. 167.  On September 10, 2021, this Court granted the plaintiffs' unopposed motion to file their amended complaint.  On September 17, 2021, NMFS issued its new Final Rule.  Rule_6447.  On December 20, 2021, the plaintiffs filed their motion for summary judgment.  ECF No. 188.  On January 14, 2022, NMFS filed its administrative record with this Court.  ECF No. 193. On February 7, 2022, this Court granted MALA's request for a one week extension to file its cross-motion for summary judgment.  On February 14, 2022, the defendants and defendant-intervenors (aside from MALA) filed their oppositions and/or cross-motions for summary judgment. ECF Nos. 197-203.

### IV.   ARGUMENT

#### a.    Standard of Review

Agency actions under the ESA and the APA are reviewed under an "arbitrary and capricious" standard.  *See* 16 U.S.C. § 706(2)(A) (APA standard); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005) (ESA claims reviewed under APA "arbitrary and capricious" standard); *see also* ECF No. 188-1 at 11.[6]

#### b.    States, Not NMFS, Authorize Fishing in State Waters

Defendants and the other Intervenor-Defendants have raised many strong arguments supporting the denial of Plaintiffs' motion for summary judgment. MALA emphasizes here  an

---

[6] Addressed at length in others of the defendants' and intervenor-defendants' briefs are the standards relating to "unlawfully withheld or unreasonably delayed" claims.  Because MALA does not specifically address this component of Plaintiffs' claims in this brief, it respectfully refers the Court to other parties' briefing on the proper standard of review for such cases.

additional point which it believes should be  important to this Court's analysis:  NMFS' mandate to the states regarding continued operation of state fisheries.

Plaintiffs contend that NMFS has improperly cut state waters out of the 2021 BiOp.  *See* ECF No. 188-1, at 16-21 ("NMFS improperly defined the action area and improperly reclassified the impacts of lobster fishing in state waters as cumulative effects rather than effects of the action, rendering its effects analysis and no-jeopardy determination unlawful").  Plaintiffs' argument reflects a fundamental misunderstanding of the relationship between state and federal regulatory regimes, however.  States, not the federal government, regulate the right to fish in state waters. *Compare* 322 C.M.R. 7.01(2)(a) *with* 50 C.F.R. § 697.4.  For example, if a lobstermen wishes to fish in state waters off the coast of Gloucester, Boston, Hull, or New Bedford (all fishing ports in Massachusetts), he or she would need to procure a fishing permit from the Massachusetts Division of Marine Fisheries, not NMFS.  If that same fisher were interested in venturing outside of the three-mile state-line threshold that typically demarcates state and federal waters, he or she would need a federal fishing permit issued by NMFS:

17



*See* Casoni Decl. at ¶ 14.  In the diagram above, for instance, statistical reporting areas 1-15 are

primarily state waters, while statistical reporting areas 16-25 are primarily federal waters.  *See id.*

Lobstermen fishing in state waters must apply for and receive a state fishing permit from the

Division of Marine Fisheries.  *See* 322 C.M.R. 7.01(2)(a).  Federal waters lobstermen must have

18

federal permits issued by NMFS. 50 C.F.R. § 697.4.  For this reason, many lobstermen are "dually permitted," simultaneously holding permits for both the state and federal fisheries.[7]

Lobstermen often argue that their industry is overregulated, and with good reason.  Those fishing in state waters must adhere to the regulatory regime put into place by the state at issue.  In Massachusetts, for instance, state conservation regulations aimed at protecting NARWs have historically been more conservation friendly than federal regulations.  *See* 322 C.M.R. 12.01 *et seq.*  Lobstermen fishing state waters must also comply with the new TRP rules.  *See e.g.* Rule_6451.  This goes to the heart of Plaintiffs' misunderstanding:  NMFS does not *authorize* the activities of lobstermen fishing state waters; all it does is require that *if* a state has granted a lobsterman the right to fish in state waters, *then* the fisher must comply with federal TRP rules (gear markings, weak rope, sinking ground line, and the like) for their activity in those waters.  *See e.g. id.*  In other words, NMFS is not the "authorizing" or "action" agency for any fishing conduct that occurs in state waters; all NMFS does is impose additional conservation-minded regulatory requirements on any fisher who has authorization to fish in state waters.  *See e.g.* ECF No. 202-2 at 14-15 (NMFS brief noting, amongst other things, that "NMFS does not authorize, fund, or carry out fishing activities in state waters"); *see also Strahan v. Pritchard*, 473 F. Supp. 2d 230, 236 (D. Mass. 2007) ("Commercial fishermen must obtain separate licenses for fishing in the waters of different jurisdictions").

That NMFS has no plans to authorize fishing in state waters is clear from the 2021 BiOp.  BiOp_1560.  The result of NMFS' decision is that individual states bear the burden to demonstrate

---

[7] MALA notes that for historical reasons, Jonah crabbers use the same state and federal permits as lobster fishers, and use essentially identical gear (with slight modifications).  For purposes of understanding the state versus federal divide, however, Jonah crabbers are functionally identical to lobstermen and women.

that their regulatory regimes comply with the ESA's mandates.  Last summer, for instance, the U.S. District Court for the District of Massachusetts held a trial on an environmental challenge to the state's regulatory regime which was brought under the ESA citizen's suit provision.  *See Strahan v. Secretary, Massachusetts Executive Office of Energy & Environmental Affairs*, C.A. No. 1:19-cv-10639 (D. Mass.).

Massachusetts state waters are, as of August 2021, not included within the Category I fishery that is comprised of the rest of the American Lobster Fishery.  *See* Federal Register Vol. 86, No. 150 (Aug. 9, 2021); BiOp_1560.  This means that going forward, Massachusetts state waters will be treated differently than other state and federal waters, reflecting the reality of Massachusetts' rigorous regulatory scheme.  Massachusetts is applying for its own incidental take permit so that it can continue authorizing lobster fishing in state waters. BiOp_1561.  Other states with fishing that presents a risk to NARWs may follow Massachusetts' lead.  NMFS clearly expects other states to take this approach, explicitly calling for these states to apply for incidental take permits.  In the 2021 BiOp, NMFS stated that:

> Additionally, to obtain authorization for incidentally taking ESA-listed marine mammals, such as right whales, **states must apply for an ESA section 10(a)(1)(B) incidental take permit for state fisheries**.  Those applications must include conservation plans that specify the anticipated impact of the state fisheries on the species and its habitat, measures to monitor, minimize, and mitigate such impacts, as well as other information.  The Commonwealth of Massachusetts has indicated they are preparing an application, and other New England states have expressed interest or reached out for information on this process.

BiOp_1560-1.  Plaintiffs may not like the approach NMFS has taken: it almost certainly makes Plaintiffs' ultimate goal, complete elimination of end lines in American waters, more difficult.  But that frustration does not somehow create agency action in state waters.  Because NMFS regulates, but does not authorize fishing in state waters, the Plaintiffs' challenge to the 2021 BiOp's scope of agency action fails.

**c.      Plaintiff's MMPA Claims Rely On A Faulty Reading of Section 1387.**

Plaintiffs' argument -- that the Final Rule violates the MMPA by failing to include measure to reduce right whale mortality and serious injury below PBR within six months – simply misreads the clear text of the MMPA, and should be rejected on that basis.  As an initial matter, unlike the ESA, the MMPA does not contain a citizen's suit provision – Plaintiffs therefore do not have a direct right to challenge agency action for failing to comply with the MMPA.  *See Coxe*, 127 F.3d at 161.  In Count VII of the Amended Complaint, Plaintiffs have chosen to challenge NMFS' alleged MMPA violation under the APA.  This Court should not disturb NMFS' decision, therefore, unless such action is deemed arbitrary or capricious.  *Oceana, Inc. v. Pritzker*, 24 F.Supp.3d 49, 58-59 (D.D.C. 2014).

At its heart, Plaintiffs' MMPA claim is fairly simple:  plaintiffs contend that 16 U.S.C. § 1387 requires that NMFS take steps to ensure that (i) within six months of a TRP Rule enactment, right whale mortality and serious injury in commercial fisheries must be below PBR, and (ii) within five years of enactment, serious injury and mortality must be reduced to insignificant levels approaching zero.  *See* ECF No. 188-1 at 29-30, 36.  Plaintiffs contend that NMFS' conduct is arbitrary and capricious  because its 2021 TRP Amendments do not fulfill these alleged Congressional mandates.  Plaintiffs also challenge  NMFS' regulatory action as "unlawfully withheld or unreasonably delayed" pursuant to 5 U.S.C. § 706(1).

In support of their argument, Plaintiffs rely principally on three sub-sections of § 1387: (f)(2), (5)(A), and 7(F).  Those sections read:

| Statute | Text |
|---------|------|
| 16 U.S.C. § 1387(f)(2) | The immediate goal of a take reduction plan for a strategic stock shall be to reduce, within 6 months of its *implementation*, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock under section 1386 of this title. The long-term goal of the plan shall be to reduce, within 5 years of its *implementation*, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing State or regional fishery management plans. |
| 16 U.S.C. § 1387(f)(5)(A) | For any stock in which incidental mortality and serious injury from commercial fisheries exceeds the potential biological removal level established under section 1386 of this title, the plan shall include measures the Secretary expects will reduce, within 6 months of the plan's *implementation*, such mortality and serious injury to a level below the potential biological removal level. |
| 16 U.S.C. § 1387(f)(7)(f) | The Secretary shall amend the take reduction plan and *implementing* [sic] regulations as necessary to meet the requirements of this section, in accordance with the procedures in this section for the issuance of such plans and regulations. |

From this text, Plaintiffs derive a supposed Congressional mandate: NMFS must bring NARW serious injury and mortality to below PBR within six months of its *promulgation*. *See* ECF No. 188-1 at 31. Plaintiffs argue that because NMFS has, in effect, conceded that the Final Rule will not bring serious injury and mortality to levels below PBR within six months of the amendments' enactment in September 2021, the Final Rule violates the MMPA.

This reading misreads the text of § 1387(f), however.[8] As an initial matter, and as made clear in the Maine Lobstermen's Association's submission, there remains a serious question regarding whether the MMPA even contains ongoing mandates. *See* ECF No. 200-1, at 32-38. Yet even to the extent that this Court concludes that the MMPA does contain mandates, the text

---

[8] Others of the intervenor-defendants and defendants have made other valid points regarding the Plaintiffs' misreading of § 1387, and incorporates those arguments here by reference.

above makes clear that § 1387(f)'s sub-sections are not triggered by promulgation of a TRP Rule or its amendments; rather, the six-month and five-year triggers in § 1387(f) are triggered by full *implementation* of the Final Rule.  NMFS amended the TRP in September of 2021, but the implementation of those amendments is, by the terms of the 2021 BiOp and the Final Rule, not anticipated to conclude for at least ten years.  BiOp_1088.  NMFS' obligations under § 1387(f), therefore, do not begin to run until implementation of the TRP amendments are complete.  Indeed, Plaintiffs effectively concede as much in their briefing.  *See* ECF No. 188-1 at 31 ("Thus, the plain language and stated purpose of the MMPA requires NMFS to promulgate measures to reduce right whale mortality and serious injury to below PBR within six months of implementing Large Whale Plan amendments").

A close reading of the MMPA's text concerning commercial fishing and marine mammals indicates that Congress intended a very different balancing act than that which Plaintiffs seek to read into the statutory framework.  NMFS, the expert regulatory agency, was tasked with balancing important commercial interests against important conservation efforts.  *See* Section IV(d)(iii), *infra*.  To do so, Congress ordered NMFS to create and then *implement* plans that would promote these dual goals.  The end goal, *post-implementation*, was clear: limited or no serious injury or mortality (and by extension, no impact on the recovery of endangered or threatened marine mammal species).  Yet Congress did not expect or  intend such solutions to pop into existence overnight.  Rather, Congress recognized that implementation might take years – even decades – and gave NMFS the infrastructure to do so.  Section 1387(f)(7)(E), for instance, mandates that "[t]he secretary and the take reduction team shall meet every 6 months, or at such other intervals as the Secretary determines are necessary, *to monitor the implementation of the final take reduction plan* until such time as the Secretary determines that the objectives of such plan have been met."

23

Plaintiffs are well aware of the time, effort, and energy that is involved in first drafting and then implementing a TRP: several of Plaintiffs' representatives sit on the ALWTRP, and were heavily involved in the promulgation of the 2021 Final Rule.

Plaintiffs may argue that Congress cannot have intended for the triggering date to occur post-implementation, especially of amendments, because NMFS could effectively eliminate its obligations by continuing to amend the TRP with 10-year additions. Plaintiffs' fears are misplaced for at least two reasons. First, the Administrative Procedures Act creates a right of action to challenge agency action (or inaction) unlawfully withheld or unreasonably delayed. Perhaps more importantly, however, the MMPA statutory scheme demonstrates that Congress has in fact provided a safety valve outside of the TRP framework for NMFS to use when an implementation scheme is not producing sufficiently rapid results or new, unforeseen threats emerged. Specifically, 16 U.S.C. § 1387(g) creates an emergency regulations framework which allows the Secretary of Commerce and NMFS to promulgate emergency regulations where previous agency action is insufficient to address an "immediate and significant adverse impact on a stock or species." 16 U.S.C. § 1387(g). Congress left the exercise of the emergency function outlined in Section 1387(g) in the hands of the expert agency (NMFS). There is no citizen suit provision allowing parties such as Plaintiffs to invoke Section 1387(g). Plaintiffs may wish that the executive branch should take more aggressive action to protect the NARW. Congress, however, did not leave the question of emergency action in the hands of Article III courts. Instead, it left it to the executive branch to decide if and when to invoke such emergency powers. This Court should reject Plaintiffs' invitation to disrupt the balance of power that the legislature has fashioned.

For the reasons set forth above, Plaintiffs' claims under § 1387 (to the extent any such claim is even proper) are not ripe. NMFS' obligations will not trigger until at least 2031, and until

that time, any judicial analysis of NMFS' actions would be premature.  For this reason alone, the Court should dismiss Count VII.

> ### d.    Even if the Court Rules for Plaintiffs on Liability, It Should Not Vacate the 2021 BiOp.

In this Circuit, precedent counsels that the Court should remand without vacatur when equity so requires.  *See Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,* 429 F.3d 1136, 1151 (D.C. Cir. 2005); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002).  Indeed, where there is a violation of the APA, courts often remand to the agency so that the agency can address the violation.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *INS. v. Ventura*, 537 U.S. 12, 17 (2002) (a reviewing court "seriously disregard[s] the agency's legally mandated role" if it denies an agency the "opportunity to address the matter in the first instance in light of its own expertise"). *See also Public Emps for Envtl. Responsibility v. Boudreau,* 25 F. Supp. 3d. 67 (D.D.C. 2014) (allowing agency action under ESA, including incidental take statement, to remain in place during remand).

Ultimately, the decision whether to vacate rather than remand without vacatur depends on the weighing of two factors: "[1] the seriousness of the order's deficiencies. . . and [2] the disruptive consequences of an interim change that may itself be changed."  *Milk Train*, 310 F.3d at 755-56 (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  Here, even if the Court finds that NMFS has violated the ESA or the MMPA (via the APA), the disruptive consequences of a vacatur would be severe and the evidence demonstrates that vacatur is unnecessary.

> ### i.    The Impact of Vacatur is Uncertain.

As a preliminary matter, there appears to be significant disagreement amongst the parties as to what the practical effect of vacatur of the 2021 BiOp would be.  NMFS argues that "Plaintiffs'

request for vacatur of the 2021 BiOp . . . would be tantamount to an injunction closing the entire federal lobster fishery, and potentially all other fisheries analyzed in the BiOp." See ECF No. 202-2, at 45.  The State of Maine, by contrast, argues that the proper effect would be that the 2012 Biological Opinion would come back into effect, along with the (less restrictive) 2015 TRP Rule. See ECF No. 198-1 at 36 (citing *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005)).[9]

Given that the Plaintiffs seek to reduce risk to NARWs (and argue that lines in the water increase risk) it would appear Plaintiffs support NMFS' reading of the law.  See ECF No. 188-1, at 42-43.  For the reasons discussed below, however, both vacatur outcomes (closure of the fishery or reversion to the 2012 BiOp and 2015 TRP Rule) would cause significant harm and should be avoided at all costs.

ii.    <u>Closure of the Federal Lobster Fishery Would Cripple the Coastal Economies and Societies of Massachusetts and the Rest of New England.</u>

The economic and social impact to coastal communities arising from a closure of the federal Lobster fishery would be severe and irreversible.  The Final Rule already imposes millions (and perhaps tens of millions) of dollars in compliance costs and lost revenue on these commercial fisheries, Rule_3911-3912. Even a temporary closure of the federal fishery would likely result in a complete elimination of these fisheries for the foreseeable future.

1.    <u>The Economic Impact of a Closure.</u>

NMFS, in its Final Environmental Impact Statement, estimated the economic role ALWTRP-affected species played in a variety of coastal counties in New England, as demonstrated in Table 6.26 of that document:

---

[9] *See, e.g., Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) (*"When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect.") See* (citing *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987)); *see also Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008) (reinstating prior regulatory regime).

| State | County | Top Species Landed by Value | 2018 ALWTRP Harvest Value ($) | ALWTRP Harvest Value as% of Total Harvest Value | Estimated Number of Vessels Fishing with ALWTRP Gear | Total Estimated Employment on ALWTRP Vessels_Lower | Total Estimated Employment on ALWTRP Vessels_upper |
|---|---|---|---|---|---|---|---|
| ME | Washington | Lobster, softshell clam, sea scallop | 81,003,814 | 81% | 838 | 1,601 | 2,514 |
| ME | Hancock | Lobster, American eel, softshell clam | 156,154,329 | 89% | 1158 | 2,221 | 3,472 |
| ME | Waldo | Lobster, American eel, sea scallop | 3,041,380 | 72% | 113 | 196 | 322 |
| ME | Knox | Lobster, softshell clam, Atlantic herring | 136,413,697 | 92% | 945 | 1,834 | 2,872 |
| ME | Lincoln | Lobster, oysters, softshell clam | 29,770,294 | 69% | 465 | 859 | 1,374 |
| ME | Sagadahoc | Lobster, worms, quahog | 5,808,239 | 75% | 210 | 375 | 621 |
| ME | Cumberland | Lobster, pollock, cod | 60,664,397 | 69% | 646 | 1,204 | 1,950 |
| ME | York | Lobster, bluefin tuna, cod | 21,354,828 | 93% | 261 | 479 | 770 |
| NH | Rockingham | Lobster, cod, pollock | 35,026,477 | 91% | 179 | 396 | 574 |
| MA | Essex | Lobster, cod, pollock | 30,202,297 | 39% | 277 | 579 | 856 |
| MA | Suffolk | Cod, lobster, pollock | 2,631,553 | 16% | 28 | 18 | 25 |
| MA | Norfolk | Lobster, softshell clam, bluefin tuna | 1,916,586 | 99% | 24 | 47 | 70 |
| MA | Plymouth | Lobster, oysters, cod | 13,502,085 | 49% | 192 | 421 | 613 |
| MA | Barnstable | Lobster, sea scallops, bluefin tuna | 17,499,519 | 24% | 173 | 346 | 519 |
| MA | Bristol | Sea scallop, cod, lobster | 26,829,026 | 6% | 97 | 670 | 865 |
| RI | Newport | Lobster, sea scallop, monkfish | 7,313,508 | 60% | 63 | 152 | 215 |
| RI | Washington | Loligo squid, lobster, illex squid | 5,923,447 | 81% | 128 | 349 | 480 |

Table 6.26: Socioeconomic Profile of Substantively Affected Counties – Harvest Parameters

Rule_3903.   In 2020 alone, Massachusetts fishers landed $78,604,366 of live lobster and $7,059,428 of Jonah crab.  *See* Casoni Decl. at ¶ 13.

A closure would have wide-ranging economic impacts, effecting not just fishers but also land-based businesses that rely on the lobster and Jonah crab fisheries.  Cities and towns like Gloucester, MA, where lobster fishing forms the key component of the local economy, face significant hardship in the event of a closure.  *See* Browne Decl. at ¶¶ 14, 15.  Industry-adjacent businesses would be heavily impacted by a federal closure, and the overall economic impact to these communities would be significant.  *See* Browne Decl. at ¶¶ 14, 15.  The impacts would be particularly great on families for which more than one member participates in the fishing economy. *See e.g.* Browne Decl. at ¶¶ 10, 14, 15.

Ms. Browne, whose declaration is submitted alongside this memorandum, provides a useful example of the impact a federal closure might have on coastal communities' economies. Browne operates a wholesale lobster operation in Gloucester, MA and is married to a Gloucester commercial lobsterman.  *See* Browne Decl. at ¶¶ 3, 4, 5, 10.  She employs dozens of employees, and does business with commercial fishers across the North Shore of Massachusetts.  *See* Browne

Decl. at ¶¶ 7, 9.  Closure of the federal fishery would devastate Ms. Browne's business.  *See* Browne Decl. at ¶ 14.  Such a closure would also negatively impact Ms. Browne's husband's commercial fishing operation, dealing a one-two punch to her family's economic security.  *See* Browne Decl. at ¶ 15.  Although tragic, Ms. Browne's story is not uncommon – many families in coastal communities across New England face a similar fate if the federal fishery is closed.  *See* Browne Decl. at ¶¶ 10, 15.  Perhaps unsurprisingly, a closure of federal waters to fishing year-round is also likely to force many Massachusetts-based fishers out of business.  *See e.g.* Lorentzen Decl. at ¶ 15; Browne Decl. at ¶ 15.

The Jonah crab fishery provides another poignant example of the precarious position Massachusetts fishers currently face.  As discussed above, the Southern New England lobster fishery collapsed in the 1990s as a result of rapidly warming waters south of Cape Cod. BiOp_1101. Fishers who had fished for lobster for their entire careers faced the prospect of unemployment and business failure.  Thankfully for these fishers, however, warming waters came with a silver lining:  the Jonah crab, which had previously been a bycatch of lobster fishing, increased in number. Commercial landings of Jonah crab, particularly in Southern New England, increased commensurate with this change in the environment.  BiOp_1101-1102.  In 2020, the Massachusetts Division of Marine Fisheries reported that Massachusetts fishers landed 8,649,738 pounds of Jonah crab in Massachusetts ports, worth $7,059,428, making Jonah crab the sixth most valuable target species landed in Massachusetts ports.  *See* Casoni Decl. at ¶ 13.

These fishers have continued to face hardship because of this litigation.  The 2021 Final TRP Rule, likely enacted in part as a result of this litigation, now creates a new closure area south of Martha's Vineyard and Nantucket, called the "South Island Restricted Area."



**Figure 3.4:** The trap/pot buoy line closure areas proposed in Alternative 2 (Preferred) shaded in light gray. LMAs are delineated by the grey lines. The new South Island Restricted Area is proposed as closed to trap/pot buoy lines from February through April and the LMA 1 Restricted area is proposed from October through January. An expansion of the MRA into Massachusetts State waters to the New Hampshire border (MRA North) and extended in state waters in LMA 1 and the Outer Cape through at least May 15th, with a potential opening if whales are no longer present, is also included. In dark gray are existing seasonal restricted areas that would become areas with restrictions to fishing with buoy lines, with the exception of the Outer Cape LMA.

Rule_3702.  As Figure 3.4 in NMFS' Final Environmental Impact Statement makes clear, the new South Island Restricted Area is closed to trap/pot fishers (including Jonah crab fishers) from February to April of each year, mirroring the Massachusetts Bay Restricted Area time-space closure.

NMFS has noted that the new closure area "capture[s] important winter fishing grounds for Jonah crab, which has become an important target species in winter months and a major contributor to revenue for Southern New England fishermen.  While a seasonal closure would likely increase lobster catch rates once an area opens, making up for lost landings during the closure, Jonah crab landings are limited only by trap and vessel capacity.  Catch cannot be made up during the open fishing season."  Rule_3885.  Having survived the trials and tribulations of

environmental warming and collapse of the SNE lobster population, Jonah crab fishers now face an unenviable fate:  death by regulation.  Should the federal fishery close year-round, Jonah crab fishermen will lose complete access to the vital fishing grounds that have allowed them to survive blow after blow to date.

2.    <u>The Social Impact of a Closure.</u>

The impact of a year-round closure of federal waters to trap/pot fishing would not solely be economic: a deep social toll would be exacted as well.  Rule_3900.  Given that these communities were seriously impacted by the Final Rule, which required gear modifications, it stands to reason that many would be devastated by a year-round closure of the federal fishery. NMFS itself has concluded  that  "ALWTRP gear accounts for ex-vessel revenues of more than $15 million per year in Essex (Massachusetts), Barnstable (Massachusetts), and Bristol (Massachusetts) counties, **suggesting that adverse [social] impacts in these counties may be substantial**." Rule_3901 (emphasis added).

In many Massachusetts coastal communities, fishing for lobster and Jonah crab represents a multi-generational way of life.  *See* Indicative Ruling at 31-3; Lorentzen Decl. at ¶ 6; Browne Decl. at ¶ 12.  Most lobstering and Jonah crabbing vessels in Massachusetts are owner operated, with a crew of one to two in addition to the owner/captain of the vessel.  Indicative Ruling at 33. Fishers support families.  Lorentzen Decl. at ¶ 3; Browne Decl. at ¶¶ 8, 12.  Closure of the federal fishery runs a serious risk of destroying these communities, and of breaking down the social and communal networks that have formed over the course of hundreds of years.  The men and women who populate the Massachusetts lobster and Jonah crab fisheries, and their accompanying land-based enterprises, are a hardy bunch.  They have survived a great deal from forces outside of their control, and continue to try to find a way forward for themselves, their business, their families, and their communities.  A vacatur resulting in the closure of the federal Lobster and Jonah crab

fishery would wreak catastrophic hardship on these men and women.  Equity cannot favor such a result.

           iii.      <u>Closure of the Fishery Would Not Comply With Congressional Intent.</u>

       The MMPA recognizes that NMFS wears two hats when it comes to the intersection of marine mammal protection and commercial fisheries management.  Recognizing the potential conflict between the strict terms of the MMPA and the continued operation of commercial fisheries, Congress specifically provided for "incidental takings" of marine mammals in the course of commercial fishing operations.  *See* 16 U.S.C. § 1387(a).  When amending the MMPA in 1994, Congressional sponsors explicitly noted that their goal was to keep "our fishermen . . . fishing." Statement of Mr. Stubbs, 140 Cong. Rec. H2724 (Apr. 26, 1994); *see also* Statement of Mr. Hollings, 140 Cong. Rec. S4923, S4934 (Apr. 26, 1994) (noting that amendments would strengthen MMPA "without damaging our important commercial fisheries").  Congress has articulated a clearly defined, albeit difficult, path for NMFS:  it must promote and conserve marine mammals, but also promote and support commercial fisheries. A vacatur that effectively closes the federal fishery would not  comply with Congress's dual mandate to NMFS under the MMPA.  As described in fuller detail in Section IV(d)(ii), above, a federal waters closure would do extraordinary and irreparable harm to commercial fishers, likely ending the American lobster

fishery in its current form.[10]  Such a remedy does not keep "our fishermen . . . fishing," and would instead damage "our important commercial fisheries."

   iv. Reversion to the 2012 BiOp and 2015 TRP Rule Also Would Have Devasting Results.

  The consequences of a vacatur are no better or equitable if this Court concludes that vacatur revives the regulatory regime in place before the 2021 BiOp and Final Rule.  Since the 2014 BiOp was invalidated by this Court in 2020, a vacatur of the 2021 BiOp would plunge the lobster industry into a confused regulatory environment likely governed by the 2012 Biological Opinion and 2015 TRP Rule.  Yet such reversion makes no sense here, especially where the result of the reversion would mean *fewer* rather than *more* protections for the North Atlantic Right Whale. *See e.g. Humane Soc'y of U.S.*, 579 F. Supp. at 21 (vacatur may not be appropriate where reinstatement of prior regulation would cause "confusion or inefficiency"); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F.Supp.2d 1117, 1128-29 (D. Or. 2011).

  Moreover, re-orienting an industry to the regulatory framework that existed ten years ago will be difficult, if not impossible, especially given the same industry's recent efforts to adopt the

---

[10] The impact of Plaintiffs' legal argument may not be limited to the American Lobster industry: taken to its logical conclusion, Plaintiffs' challenge under the ESA and the MMPA would counsel enjoining all economic activity in coastal waters off of the eastern seaboard of the United States that creates *any* risk of serious injury or mortality to NARWs.  Entanglements are clearly not the only risk to NARWs. In U.S. waters,  gillnets, vessel strikes, and other risks await NARWs even if all trap/pot fishery gear was removed from state and federal waters tomorrow.  BiOp_1560-62. Enterprising environmental litigants have already sought to enjoin shipping activity in major U.S. ports and the construction of offshore wind farms with similar legal theories.  *See e.g.* Complaint, *Man Against Xtinction, as Citizen Attorney General v. Mass. Port Authority*, C.A. No. 1:21-cv-10185, ECF No. 1 (Feb. 3, 2021) (suing Massachusetts Port Authority for alleged violations of the Endangered Species Act arising from vessel strikes of NARWs); Amended Complaint, *Strahan v. Secretary, Executive Office of Energy & Environmental Affairs*, C.A. No. 1:19-cv-10639, ECF No. 48 (June 4, 2019) (suing, *inter alia*, Vineyard Wind LLC and Baystate Wind, LLC, two off-shore wind farms, for alleged violations of the ESA).  Indeed, commercial fisheries like the Lobster fishery are entitled to additional protections under the MMPA that may not exist for other economic activity, like shipping and renewable resource development.

2021 Final Rule.  Absent regulatory clarity, lobstermen will not know where or how to fish and many will not be prepared to accept the risk of fishing in such an environment. The result will be a severe disruption to the fishing communities.

Finally,  Plaintiffs' requested relief will do little or nothing to remedy many of the most significant threats to the NARW species:  climate change, vessel strikes, and Canadian snow crab gear.  Accordingly, if the Court grants Plaintiffs summary judgment on liability, it should remand *without* vacatur.

v.      The Equities Strongly Support Remand Without Vacatur.

For the reasons articulated in Section IV(d)(ii), above, the economic and social impact of a closure of federal waters would be devastating to New England communities.  No facts of similar weight support vacatur.  Thus, under this Court's precedent, any remand of the 2021 BiOp should be made without vacatur. *See, e.g., Chamber of Commerce of the U.S. v SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006) (noting that vacatur not appropriate where it would cause serious disruption to affected industry and delaying mandate to allow regulatory agency additional time to address concerns); *Milk Train, Inc.*, 310 F.3d at 756 (granting remand without vacatur after considering economic harm to dairy farmers); *Sugar Cane Growers Cooperative of Fla. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (considering economic harm to sugar cane growers, processors, and refiners); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (considering economic harm to producer of an animal drug).

e.      **Ropeless Fishing is Not a Cure-All.**

In response to the chaos and destruction that a closure would cause, Plaintiffs will likely provide this Court with a seemingly perfect solution:  fishers, Plaintiffs will likely claim, can simply switch to "ropeless" fishing, obviating the need for static lines in the water column and virtually eliminating the risk to NARWs caused by trap/pot fisheries.  Vacatur may even be

required, Plaintiffs might argue, to force the industry into widespread adoption of this novel technology. While an enticing thought, "ropeless" technology simply is not ready for wide-spread adoption, and reliance on ropeless fishing gear as a solution to entanglement risk (and as an equitable factor weighing in favor of vacatur) ignores the economic realities of the fishing industry.

As noted above, NMFS estimates that by 2025, only 33 vessels *total* will be fishing with ropeless gear in federal waters – less than 1% of the total fleet fishing in the Northeast Fishery. Rule_6449 -- and 30 of these 33 vessels – 90% -- will be fishing in collaboration with NMFS, meaning that NMFS anticipates that only *three* fishers will have paid to adopt ropeless technology in the next three years. *Id*. For practical purposes, then, NMFS acknowledges that ropeless fishing is still years away from being commercially viable – and the numbers bear that conclusion out. As NMFS acknowledges, outfitting  a single vessel with ropeless technology would cost between $55,000 and $240,000 per vessel. BIOP_3308. The District of Massachusetts found last summer that the total cost could approach  $160,000 per vessel, and that such technology was commercially impracticable for widespread adoption at this time. *See* Indicative Ruling at 31. And even if the clear economic barriers to widespread adoption were somehow overcome, ropeless fishing presents additional gear conflict concerns with other fisheries that have not been fully resolved at this time. *See* Casoni Decl. at ¶ 20. Simply put: ropeless fishing is not ready for widespread use, and should not factor into this Court's equitable analysis when considering vacatur of the 2021 BiOp.

## V.  CONCLUSION

For the reasons stated herein, MALA respectfully requests that this Court enter the order accompanying this memorandum, denying plaintiffs' request for summary judgment. Furthermore, to the extent that this Court finds in favor of Plaintiffs, MALA respectfully requests that any remand instruction be given without vacatur of the 2021 Biological Opinion.

Respectfully submitted,

MASSACHUSETTS LOBSTERMEN'S
ASSOCIATION, INC.

By its attorneys,

*/s/ Nicholas J. Nesgos*
Nicholas J. Nesgos (*pro hac vice*)
ARENT FOX LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199
Telephone: 617-973-6168
Email: Nicholas.nesgos@arentfox.com

Karen Ellis Carr (DC Bar No. 975480)
ARENT FOX LLP
1717 K Street, NW
Washington D.C. 20006
Karen.Carr@arentfox.com
T: 202-715-8531
F: 202-857-6395

Dated: February 22, 2022

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of February, 2022, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF filing system, which sent notification of such filing to all counsel of record and pro se individuals with CM/ECF privileges.

*/s/ Nicholas J. Nesgos*

Nicholas J. Nesgos