## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr>
<td>

**CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,

      **Plaintiffs**,

      **v.**

**GINA RAIMONDO, in her official capacity as Secretary of Commerce**, *et al.*,

      **Defendants**,

      **and**

**MAINE LOBSTERMEN'S ASSOCIATION**, *et al.*,

      **Defendant-Intervenors**.

</td>
<td>

**Civil Action No. 18-112 (JEB)**

</td>
</tr>
</table>

## MEMORANDUM OPINION

The lives of our vast oceans may appear timeless.  Indeed, at the end of <u>Moby-Dick</u>, "the great shroud of the sea rolled on as it rolled five thousand years ago."  Not so, however, for many creatures who live there, including its greatest leviathans.  For example, just around 370 North Atlantic right whales remain in existence.  For centuries, these whales were imperiled by excessive hunting, but today the greatest human-caused threat comes from entanglement in fishing gear.

Much of that gear is dropped into the ocean by crews fishing for lobster.  Since the gear harms right whales, the Endangered Species Act requires that before Defendant National Marine Fisheries Service authorizes the fisheries under its management, it must issue a Biological Opinion finding that the fishery operations will not jeopardize the continued existence of the

right whale.  As part of such a "no-jeopardy" BiOp, NMFS must issue an "incidental take statement" (ITS) authorizing the number, if any, of anticipated future killings or injuries of right whales.

This Court has already once found a previous version of NMFS's BiOp invalid for lack of an ITS and sent the agency back to the drawing board.  In 2021, the Service released a new BiOp addressing how lobster and crab fishing off the Atlantic coast would affect the dwindling right-whale population.  In this most recent BiOp, NMFS concluded that the fisheries under review would not jeopardize the continued existence of the whale despite acknowledging the expected potential harm to the species.  In reaching this determination, the Service included an ITS in which it authorized no lethal taking of the whales, even though it projected that, at least in the near future, nearly three whales could be killed annually.  NMFS, in consultation with a variety of stakeholders, and as mandated by the Marine Mammal Protection Act, also released a Final Rule that amended the specific rules that constituted the Atlantic Large Whale Take Reduction Plan.

Three conservation groups have renewed their suit against the Department of Commerce, of which NMFS is a part.  They argue that the new BiOp still does not satisfy the ESA and MMPA's requirements, just as the Final Rule flunks the MMPA's.  Although the Court will not reach every shortcoming that Plaintiffs allege, it concurs that NMFS violated the ESA by failing to satisfy the MMPA's "negligible impact" requirement before setting the authorized level of lethal take in its ITS.  NMFS also breached the time requirements mandated by the MMPA in the 2021 Final Rule.  The Court will thus hold the 2021 Biological Opinion and the 2021 Final Rule to be invalid.

Cognizant of the potential effects of this ruling on the lobster industry — and on the economies of Maine and Massachusetts — and given the highly complex statutory and regulatory environment that this case involves, the Court orders no remedy here.  Instead, it will offer the parties the opportunity for further briefing to articulate alternatives the Court may select.

## I.    Background

The Court starts by laying out the framework of the two statutes most relevant to this case — the Marine Mammal Protection Act and the Endangered Species Act — before describing the factual and procedural background.  As will be explained in more depth below, Plaintiffs' Complaints rely on the ESA, the MMPA, and the Administrative Procedure Act for different counts.

Within this statutory scheme, NMFS plays an important role, as it is the agency within the Department of Commerce that "is responsible for the stewardship of the nation's ocean resources and their habitat."  NOAA FISHERIES, About Us, https://bit.ly/3Nd7HP1 (last accessed June 22, 2022).  This work includes implementing fishery-management plans and working to protect endangered marine species.  See Oceana, Inc. v. Raimondo, 35 F.4th 904, 906 (D.C. Cir. 2022).  The American lobster and Jonah Crab fisheries fall under NMFS's auspices as the Service adopts and implements "regulations compatible with the interstate fishery management plans" required by statute.  See ECF No. 216-3 (Joint Appendix Vol. 3 "JA3") at ECF p. 80. This implementation process includes "a federal permitting process for fishermen harvesting lobster in federal waters," which are waters over three nautical miles from the shore extending to around two hundred nautical miles.  See ECF No. 198-1 (State of Maine Cross-MSJ) at 4; see also 16 U.S.C. § 5103 (requirements for state-federal cooperation in managing Atlantic coastal

fisheries).  State waters, conversely, lie in the three nautical miles closest to shore.  See ECF No. 188-1 (Pls. MSJ) at 13.  NMFS also issues and implements regulations under plans designed to reduce the killing and injury of certain marine mammals, including right whales.  See 16 U.S.C. § 1387(f).

    A.  Statutory Framework

        1.  *Marine Mammal Protection Act*

The MMPA was passed in 1972 in acknowledgment of the fact that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities" and "should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management."  16 U.S.C. § 1361(1) & (6).  To that end, the Act "generally prohibits any individual from 'taking' a marine mammal."  Winter v. NRDC, 555 U.S. 7, 15 (2008).  The MMPA defines to "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."  16 U.S.C. § 1362(13); see also 50 C.F.R. § 216.3 (explaining that "[t]ak[ing]" also includes "the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal").

Although the MMPA places "a moratorium on the taking and importation of marine mammals," 16 U.S.C. § 1371(a), there are "several enumerated exceptions."  *In re* Polar Bear Endangered Species Act Listing and Section 4(d) Rule Litig., 720 F.3d 354, 357 (D.C. Cir. 2013).  Two in particular govern the incidental taking of marine mammals "in the course of commercial fishing operations" under the MMPA.  See 16 U.S.C. § 1371(a)(2); see also 140 Cong. Rec. 8609, 8761 (April 26, 1994) (statement of Senator Stevens that "in the case of threatened or endangered marine mammals, both section 101(a)(5)(E) and section 118 apply").

Section 101(a)(5)(E)(i) permits the taking incidental to commercial fishing operations "of marine mammals from a species or stock designated as depleted because of its listing as an endangered species or threatened species" under the ESA if certain elements are satisfied.  See 16 U.S.C. § 1371(a)(5)(E)(i).  Such taking may be allowed for a period of three years only if "after notice and opportunity for public comment," NMFS finds that "the incidental mortality and serious injury from commercial fisheries will have a negligible impact on such species or stock."  Id. § 1371(a)(5)(E)(i)(I) (emphasis added).  Negligible impact, in this context, is "an impact resulting from [a] specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. § 216.103.  This negligible impact will be one significant issue here.  Section 101(a)(5)(E) also requires that a species-recovery plan be developed or be in process and that any monitoring program, vessel registration, or take-reduction plan required under section 118 of the MMPA be in place.  See 16 U.S.C. § 1371(a)(5)(E)(i)(II)–(III).

Section 118, meanwhile, imposes additional requirements governing the taking of marine mammals incidental to commercial fishing.  For example, the Secretary must "develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each strategic stock which interacts with [the relevant] commercial fisher[ies]."  Id. § 1387(f)(1).

These take-reduction plans are developed by take-reduction teams and must include information on the number of animals being killed or seriously injured annually, recommended measures to reduce M/SI (mortality and serious injury) takings, and dates for achieving these goals.  Id. §§ 1387(f)(4)–(f)(6).  In this case, the plan is entitled the Atlantic Large Whale Take Reduction Plan (ALWTRP) and seeks to lower the incidental entanglement of several types of large whales, including right whales, in fishing gear.  The MMPA requires that "[t]he immediate

goal of a take reduction plan . . . be to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level" for that marine mammal stock.  Id. § 1387(f)(2).  The potential biological removal (PBR) level is "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  50 C.F.R. § 229.2.  The six-month deadline is another focus of the controversy here.  Additionally, the "long-term goal" of a take-reduction plan is "to reduce, within 5 years of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing State or regional fishery management plans."  16 U.S.C. § 1387(f)(2).  A take-reduction plan must be amended "as necessary to meet the requirements of" the MMPA.  Id. § 13887(f)(7)(F).

### 2. *Endangered Species Act*

The ESA was passed in 1973 "to halt and reverse the trend toward species extinction, whatever the cost."  Nat'l Ass'n of Home Builders v. U.S. Fish and Wildlife Serv., 786 F.3d 1050, 1052 (D.C. Cir. 2015) (quoting Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978)). The most salient of the Act's provisions for this case are those ensuring that proposed federal actions will not threaten endangered species and that appropriate consultations occur to address such risks.  Section 7(a)(2) of the ESA, for instance, states that "[e]ach Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species."  16 U.S.C. § 1536(a)(2).  To

carry out this task, the accompanying regulations state that "[e]ach Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species." 50 C.F.R. § 402.14(a). If that is the case, the relevant agency (known as the "action agency" because it is the one proposing the action) must consult with a "consulting agency," which conducts the expert analysis on how the proposed action will affect the survival of the relevant endangered species and the effects on its habitat. Id.; Conservation Law Found. v. Ross, 422 F. Supp. 3d 12, 16–17 (D.D.C. Oct. 28, 2019). This consulting agency is either the U.S. Fish and Wildlife Service or the National Marine Fisheries Service. United States Fish & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct. 777, 784 (2021). Here, both the "action agency" and the "consulting agency" were divisions of NMFS, with the former being NMFS's Sustainable Fisheries Division, and the latter its Protected Resources Division. See JA3 at ECF p. 8; id. at ECF p. 80 (when NMFS itself is "proposing an action[,] . . . the agency must conduct intra-service consultation").

The aim of this process is for the consulting agency to assess whether the action will violate section 7(a)(2)'s prohibition on jeopardizing the continued existence of endangered and threatened species. The process culminates in a "biological opinion" to be issued by the "consulting agency," not the agency proposing the action. See 50 C.F.R. § 402.14(e). "In formulating a Biological Opinion, FWS and NMFS must 'use the best scientific and commercial data available.'" Oceana, Inc. v. Pritzker, 75 F. Supp. 3d 469, 475 (D.D.C. 2014) (citing 16 U.S.C. § 1536(a)(2)). The BiOp issued can either be "a 'jeopardy' biological opinion" or "a 'no jeopardy' biological opinion" depending on whether the action under review is "likely to jeopardize the continued existence of a listed species" or harm a "critical habitat." 16 U.S.C. § 402.14(h)(1)(iv). "[I]f a 'jeopardy' biological opinion is issued, the agency must either

implement the reasonable and prudent alternatives [proposed by the consulting agency], terminate the action altogether, or seek an exemption" for their project.   United States Fish & Wildlife Serv., 141 S. Ct. at 784; see also 50 C.F.R. § 402.15.

In this case, the 2021 BiOp issued by the Protected Resources Division was a "no jeopardy" biological opinion.  See JA3 at ECF p. 162.  When a "no jeopardy" BiOp issues — or when there are reasonable and prudent alternatives to the proposed action — a project may proceed, but the BiOp must include what is known as an "incidental take statement" addressing certain elements of the project's potential to "take" a species.  See 50 C.F.R. § 402.14(i).  Much like the MMPA, the ESA defines to "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19); see also 50 C.F.R. § 222.102 (definition also includes "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering").

The information that an agency must produce regarding "take" is laid out below:

> If after consultation under subsection (a)(2), the Secretary concludes that —
> > (A) the agency action will not violate such subsection [*i.e.*, through a no-jeopardy BiOp], or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;
> > (B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and
> > (C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of [the MMPA, discussed below];
> the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that —
> > (i) specifies the impact of such incidental taking on the species,

8

> (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,
> (iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of [the MMPA] with regard to such taking, and
> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4).

This section creates two sets of requirements for the written incidental-take statement. First, there are antecedent conditions laid out in subsections (A) through (C) that must be satisfied before an agency can even issue an ITS. Second, there are certain elements that the ITS must include, which are articulated in 16 U.S.C. § 1536(b)(4)(i)–(iv). See also 50 C.F.R. § 402.14(i). Of the most relevance here is the third antecedent condition to issuing an ITS: that an agency cannot do so unless the amount of projected incidental take from the project is authorized under section 101(a)(5) of the Marine Mammal Protection Act, which, as earlier discussed, requires that the taking have no more than a negligible impact on the species. See 16 U.S.C. §§ 1536(b)(4)(C), 1371(a)(5); see also 50 C.F.R. § 402.14(i)(1) (requiring an ITS "[i]n those cases where the [expert agency] concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2) and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972").

Overall, ITSs serve several functions. Since the ESA makes it unlawful to "take" a species except in certain circumstances, an ITS "constitutes a permit authorizing the action agency to 'take' the endangered or threatened species" up to the level specified in the ITS "so long as [the action agency] respects the" terms and conditions with which the ITS states it must

comply.  Bennett v. Spear, 520 U.S. 154, 170 (1997).  Additionally, "[i]f the amount or extent of

taking specified in the incidental take statement is exceeded," then an agency must reinitiate

Section 7 consultations, another long-standing issue at play in this case.  See 50 C.F.R.

§ 402.16(a)(1).

     B.  Factual and Procedural History

     Well before the elaborate scheme of environmental protections just described was

enacted, the North Atlantic right whale was so named because it was the right whale to hunt.

The species has thus long been in peril.  Indeed, it has been listed as endangered since 1970,

predating even the passage of the ESA.  See JA3 at ECF p. 101.  Although the right-whale

population has fluctuated over time, new scientific evidence in 2017 showed that its numbers had

been declining for nearly a decade.  See ECF 202-2 (Fed. Dfts. Cross-MSJ) at 9.  As of January

2019, the population was estimated at 368, a considerable drop from 481 just eight years prior.

See JA3 at ECF p. 103.  There are likely even fewer today.  See Pls. MSJ at 3 (citing New

England Aquarium, North Atlantic Right Whale Consortium Report Card, https://bit.ly/3t6FbqS

(last visited June 3, 2022)).  Given these limited numbers, "even one additional death a year

increases the odds that the right whale will go extinct."  District 4 Lodge of the Int'l Ass'n of

Machinists and Aerospace Workers Local Lodge 207 v. Raimondo, 18 F.4th 38, 41 (1st Cir.

2021).

     Although a variety of factors have precipitated this decline, "the two major known human

causes of mortality are vessel strikes and entanglement in fishing gear."  JA3 at ECF p. 104.

Between 2010 and 2018, there were 107 entanglements of the North Atlantic right whale, nearly

half of which resulted in mortality or serious injury.  Id. at ECF p. 119.  Vertical-line fishing gear

poses a particular threat to the whales, as they can become trapped in ropes stretching down from

the water's surface to the ocean floor. Among the types of vertical-line fishing gear are trap/pot

gear, used for catching lobsters and Jonah crabs, and gillnets, which are used to catch various

types of fish. Ctr. for Biological Diversity v. Ross, No. 18-112, 2020 WL 1809465, at *5

(D.D.C. Apr. 9, 2020) (CBD I). Of the two, entanglement in trap/pot gear is far deadlier for right

whales. See JA3 at ECF p. 122.

      1. *Case Background*

As will be explained below, this case has washed up on this Court's shores several times.

Plaintiffs — the Center for Biological Diversity, Defenders of Wildlife, and Conservation Law

Foundation — first sued in January 2018 challenging the 2014 BiOp and subsequent agency

action. See ECF No. 1 (Compl.). Although four claims were initially raised, the case was

resolved on only one of them — namely, the fact that the 2014 BiOp did not include an ITS and

included instead only a numerical trigger for how many right whales would need to be killed

before ESA section 7 consultations would be reinitiated. In April 2020, this Court found that

"the Service's failure to include an ITS in its 2014 BiOp," despite the relatively high rate of

lethal take anticipated, was "about as straightforward a violation of the ESA as they come."

CBD I, 2020 WL 1809465, at *10. It thus "declare[d] the 2014 BiOp to be invalid under the

Endangered Species Act." Id. In a subsequent Opinion in August 2020, the Court addressed the

appropriate remedy. Because NFMS was already in the process of amending the Atlantic Large

Whale Take Reduction Plan and crafting a new Biological Opinion, this Court vacated the 2014

BiOp, but held that relief should be stayed until May 31, 2021, to allow for completion of those

two documents. Ctr. for Biological Diversity v. Ross, 480 F. Supp. 3d 236, 240 (D.D.C. 2020)

(CBD II). Amendments to the ALWTRP are issued through the notice-and-comment rulemaking

11

process, while the BiOp analyzes the effect that the consulting agency projects that particular actions will have on threatened species.

### 2.   *2021 BiOp and Incidental Take Statement*

On May 27, 2021, NMFS issued its new Biological Opinion.  See JA3 at ECF p. 75.  This 2021 BiOp authorized fishing in an "action area" encompassing federal waters in which "ten fisheries operate" between Maine and Key West, Florida.  See JA3 at ECF p. 93; id. at ECF p. 85 (proposed action is authorization of ten fisheries).  This area spans the American portion of the North Atlantic right whales' habitat; true to their name, these whales "are primarily found in the western North Atlantic, from their calving grounds in lower latitudes off the coast of the southeastern United States to their feeding grounds in higher latitudes off the coast of New England and Nova Scotia."  Id. at ECF p. 102.  Given climate change, however, the whales' habitat has shifted northward as of late following the movement of their main food sources — zooplankton and copepods — to cooler waters.  Id. at ECF p. 119; see also Fed. Dfts. Cross-MSJ at 8–9.

Within the scope of the 2021 BiOp's analysis — in addition to the authorization of fisheries — was a proposal developed to reduce the lethal taking of North Atlantic right whales to near zero by 2030 under a four-part scheme.  See Fed. Dfts. Cross-MSJ at 18.  This proposal is known as the North Atlantic Right Whale Conservation Framework for Federal Fisheries in the Greater Atlantic Region (the Framework).  See JA3 at ECF p. 86.

Even accounting for the effects of this Framework, however, NMFS still projects in the 2021 BiOp that the population of right whales will continue to decline during the coming decade. In particular, it estimates that even after implementation of the modifications in the Final Rule proposed to the ALWTRP, several right whales will be killed or severely injured annually in

trap/pot fisheries and gillnets.  An estimated 2.69 entanglements per year leading to mortality or serious injury (M/SI incidents) for right whales are expected to occur in federal fisheries in 2022, although this rate will gradually decline to 2.61 in 2023–2025 and to 0.136 per year by 2030. See JA3 at ECF p. 146.  Of these entanglements, 2.56 would occur from the trap/pot fisheries associated with lobstering and crabbing until 2025.  Id.  Although these rates of M/SI entanglement are still below the average of 4.7 per year between 2010 and 2018 (4.57 of which were in trap/pot gear), id., they nonetheless remain well above the right whale's potential biological removal level (PBR) at least for the next few years.  Currently for right whales that level is just 0.8 M/SI per year.  See 86 Fed. Reg. 51,970, 51,971 (Sept. 17, 2021).

Despite these findings, the 2021 BiOp nonetheless "conclude[s] that right whale entanglements due to the operation of the federal fisheries will not result in an appreciable reduction in the likelihood of survival and recovery of North Atlantic right whales compared to the no federal fishery scenario."  JA3 at ECF p. 162.  As a result, it determined that "the proposed action, including the implementation of the Framework, is not likely to jeopardize the continued existence of North Atlantic right whales."  Id.  Additionally, in the ITS accompanying the BiOp, NMFS states that it is "authorizing zero lethal take of these whales because the lethal incidental take of ESA-listed whales has not been authorized under section 101(a)(5) of the MMPA."  Id. at ECF p. 165.  The ITS also includes an "exemption for non-lethal take of North Atlantic [right whales]" of up to 9.14% of the species' population.  Id. at ECF pp. 165–66.  If either the lethal or non-lethal take threshold is exceeded, then consultations must be reinitiated under section 7 of the ESA.  Id. at ECF p. 165.

NMFS does acknowledge, however, that "further efforts are necessary to reduce interactions between authorized federal fisheries and large whales in order to achieve the

MMPA's goal of insignificant levels of incidental mortality and serious injury of marine mammals approaching a zero mortality and serious injury rate" and that it will continue to work towards the "zero mortality goal" through the Framework.  Id.  The ITS, which clearly reflects the expenditure of considerable effort by NMFS, also includes reasonable and prudent measures, monitoring protocols, and other features aimed at minimizing incidental take.  Id. at ECF pp. 167–173.

### 3.  *2021 Final Rule*

In September 2021, NMFS released the Final Rule amending the Atlantic Large Whale Take Reduction Plan.  See 86 Fed. Reg. 51,970.  The changes in this rule represent the first phase of the Framework discussed above.  See JA3 at ECF p. 88.

 The ALWTRP was issued in 1997 in fulfillment of NMFS's obligations under section 118 of the MMPA.  Id. at ECF p. 185.  It is the product of consultations by the Take Reduction Team (TRT), which consists of "representatives from the fishing industry, state and Federal resource management agencies, the scientific community, and conservation organizations," including Plaintiffs, and was first convened in 1996.  See Fed. Dfts. Cross-MSJ at 9.  The ALWTRP has been amended over time to meet the conservation needs of right whales, including most recently in the 2021 Final Rule, which arose from a reinitiation of consultation by the TRT members in 2017.  Id. (discussing need to reconvene TRT in wake of "unusual mortality event" for right whales).  The 2021 Final Rule creates two new seasonal restricted areas for fishing and expands others.  See 86 Fed. Reg. 52,019–23.  The Rule also includes new requirements on trap/pot gear to reduce the potential harm from entanglements, including by preventing buoy lines from floating on the surface, reducing the number of lines that can be placed per trawl, and

requiring the insertion of weak links that will break more easily if a whale becomes entangled. Id. at 52,017–19.  These changes went into effect last month.

This new Rule comes into play against the backdrop of the importance of lobster fishing to the economies of several states along the Atlantic seaboard.  In particular, in coastal Maine, "the lobster supply chain has an economic impact . . . of $1 billion annually" and benefits numerous fishermen and their families.  See Maine Cross-MSJ at 11; see also ECF No. 206 (Massachusetts Lobstermen's Association's Opposition (MALA Opp.)) at 9–11 (discussing economic and labor effects of trap/pot fishing on coastal Massachusetts communities).

C.  Current Suit

Despite all of the efforts incorporated in the new 2021 BiOp and the Final Rule amending the ALWTRP, Plaintiffs remain dissatisfied.  They thus filed an Amended Complaint in September 2021.  See ECF No. 171 (Am. Compl.).  In total, Plaintiffs now raise six claims: they believe that the final two counts from their original 2018 Complaint remain live, and they present four new causes of action in the Amended Complaint.  For the sake of consistency with the parties, the original numbering of these claims is maintained.  The extant counts are thus: III) the BiOp violates the ESA by allowing for the unpermitted take of North Atlantic right whales; IV) NMFS's actions violate the MMPA and APA because the required "negligible impact" finding has not been made under section 101(a)(5)(E) of the MMPA; V) the BiOp is unlawful under the APA and ESA because it fails to consider the full effects of the agency action by focusing on too limited a geographic area and too large a time span; VI) NMFS has failed to issue a lawful incidental-take statement for the right whales in contravention of the APA and ESA; VII) the Final Rule violates the APA and MMPA as it does not "reduce right whale mortality and serious injury to below PBR within six months," as required under 16 U.S.C. § 1387(f); and VIII) the

Court should compel NMFS to address its "ongoing failure to reduce right whale mortality and serious injury in the lobster fishery to below PBR within the timeline mandated by the MMPA," as failure to do so is an unreasonable delay under the APA.  See Compl., ¶¶ 130–39 (Counts III–IV); Am. Compl., ¶¶ 130–56 (Counts V–VIII).

Finally, the parties involved remain nearly the same as in this case's earlier iterations.  In addition to the Maine Lobstermen's Association and the Massachusetts Lobstermen's Association, who were both Defendant-Intervenors initially, the State of Maine and the Maine Lobstering Union have now intervened as well.  See ECF Nos. 98 (Maine Lobstering Union's Motion to Intervene) and 172 (Maine's Motion to Intervene).

## II.    Legal Standard

Plaintiffs, Federal Defendants, the State of Maine, and the Maine Lobstermen's Association have all cross-moved for summary judgment.  The APA provides the standard of review for Plaintiffs' claims, although some are brought under the APA and MMPA, others invoke the APA and the ESA, and one names the ESA alone.  Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005) (APA provides standard of review in ESA cases); NRDC v. Evans, 279 F. Supp. 2d 1129, 1142 (N.D. Cal. 2003) ("[A]ctions challenged under the MMPA are reviewed under the APA . . . .").

"[W]hen a party seeks review of agency action under the APA [before a district court], . . . the district judge sits as an appellate tribunal."  Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (alteration in original) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  In other words, "[t]he entire case on review is a question of law."  Id. (quoting Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Such "arbitrary and capricious" review applies to Counts IV, VI, and VII in this case, which are the ones the Opinion examines. Agency action is arbitrary and capricious if, for example, the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "'The scope of review [in an APA case] is narrow and a court is not to substitute its judgment for that of the agency,' provided the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43). While the court "may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285–86 (1974) (citation omitted) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); then citing Colo. Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)). It is only these "certain minimal standards of rationality" to which a reviewing court holds an agency. Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA, 686 F.3d 803, 810 (D.C. Cir. 2012) (quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36–37 (D.C. Cir. 1976) (en banc)).

When reviewing an agency's interpretation of a law it administers, a court must apply the principles of Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837

(1984).  See Se. Ala. Med. Ctr. v. Sebelius, 572 F.3d 912, 916 (D.C. Cir. 2009).  Under Chevron, the first step is to "examine the statute de novo, 'employing traditional tools of statutory construction.'"  Nat'l Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quoting Chevron, 467 U.S. at 843 n.9); see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d 745, 754 (D.C. Cir. 2007) (court begins by "applying customary rules of statutory interpretation").  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 842–43; see also Eagle Broadcasting Group, Ltd. v. FCC, 563 F.3d 543, 552 (D.C. Cir. 2009) (if the "search for the plain meaning of the statute . . . yields a clear result, then Congress has expressed its intention as to the question, and deference is not appropriate") (internal citation and quotations omitted); Ark. Dairy Coop. Ass'n, Inc. v. U.S. Dep't of Agric., 573 F.3d 815, 829 (D.C. Cir. 2009) (no deference due where agency's construction is "contrary to clear congressional intent").

If, however, "the statute is silent or ambiguous with respect to the specific issue," Chevron, 467 U.S. at 843, the analysis proceeds to "determine the deference, if any, [the court] owe[s] the agency's interpretation of the statute."  Mount Royal Joint Venture, 477 F.3d at 754. Under this step, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  Chevron, 467 U.S. at 843–44.  Where a "legislative delegation to an agency on a particular question is implicit rather than explicit," id. at 844, a court must uphold any "'reasonable interpretation made by the administrator' of that agency."

Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 356 (D.C. Cir. 1993) (quoting Chevron, 467 U.S. at 844).

In this case, however, the Court can terminate its analysis at step one of Chevron, as the intent of Congress with respect to the relevant sections of the MMPA and ESA is clear. NMFS, moreover, never invokes Chevron deference for its interpretations.

## III.   Analysis

Despite the numerous claims and statutes at play, the Court need only reach two issues to resolve this case because those are enough to find the 2021 Final Rule and 2021 BiOp invalid. First, it addresses whether the incidental-take statement accompanying the 2021 BiOp appropriately authorized zero lethal take of the North Atlantic right whale despite not satisfying the relevant sections of the MMPA and ESA. Second, it turns to whether the 2021 Final Rule amending the Atlantic Large Whale Take Reduction Plan met certain requirements laid out in the MMPA. Although neither question is an easy cruise, the Court ultimately determines that each action cannot stand.

### A.   Lethal Take

Plaintiffs' allegations of infirmities in the lethal-take portion of the ITS accompanying the 2021 BiOp arise in two counts — one regarding the MMPA and another the ESA. First, they claim in Count IV of their original Complaint that NMFS's BiOp violates the MMPA and APA by allowing for the "unauthorized take" of right whales since the Service "authorize[d] operation of the fishery" without first making the findings required under the MMPA. See Compl., ¶¶ 130–39. Although Count IV was originally brought in the context of the 2014 BiOp, Plaintiffs have maintained that it remains live given that they believe that the 2021 BiOp also did not include a valid ITS. See ECF No. 141 (Plaintiffs' Motion to Enforce Opinions and Orders)

at 17.  Additionally, in Count VI of the Amended Complaint, Plaintiffs allege that the 2021 BiOp

has not met the conditions necessary "[t]o authorize incidental take under the ESA" for an

endangered marine mammal and that the BiOp "fails to include a lawful ITS for th[e] anticipated

lethal take of right whales."  Am. Compl., ¶¶ 140, 143.

Diving into these two counts requires an understanding of what has occurred before.  In a

prior Opinion this Court concluded that NMFS had violated the ESA by failing to issue an ITS at

all when the taking of an endangered species was anticipated.  CBD I, 2020 WL 1809465, at *8.

At that time, the Service recognized that under the ESA it was required "to find that any take

would not violate § 101(a)(5) of the MMPA" and it "had been 'unable to [so] find.'"  Id.

(alteration in original) (internal citations omitted).  Thus, "[f]aced with the choice of issuing no

BiOp (and therefore closing the lobster fishery) or issuing a BiOp without an ITS, NMFS

reasonably chose the latter."  ECF No. 82 (NMFS 2019 Cross-MSJ) at 3.  Now, NMFS faces the

same dilemma but has tried a new approach.  Rather than not issuing an ITS, it has published one

in which it authorized zero lethal take of right whales but still did not first satisfy the

requirements of section 101(a)(5).  As will be explained in depth below, this approach still leaves

NMFS out to sea for several reasons.

### 1.  *Antecedent "negligible impact" requirement*

The Court first anchors its reasoning more firmly in the statutory and regulatory

requirements that underlie its conclusion.  As described above, NMFS must "[f]ormulate a

statement concerning incidental take, if such take is reasonably certain to occur," and it has done

so.  See 50 C.F.R. § 402.14(g)(7); JA3 at ECF p. 164–65.  Before issuing an ITS for an

"endangered species or threatened species of a marine mammal," moreover, the relevant agency

must find that "the taking is authorized pursuant to" section 101(a)(5) of the MMPA, as codified

at 16 U.S.C. § 1371(a)(5).  <u>See</u> 16 U.S.C. § 1536(b)(4); <u>see also</u> 50 C.F.R. § 402.14 (biological

opinion must include incidental-take statement when incidental take is "authorized pursuant to

section 101(a)(5) of the Marine Mammal Protection Act of 1972").  The text of the ESA makes

clear that this is an antecedent requirement, stating that "[i]f . . . the Secretary concludes that"

"the taking is authorized" under the MMPA, then "the Secretary shall provide" an ITS.  <u>See</u> 16

U.S.C. § 1536(b)(4) (emphasis added).

Section 101(a)(5) of the MMPA, meanwhile, permits the Secretary of Commerce to

"allow the incidental, but not the intentional, taking [by U.S. vessels or validly permitted vessels]

. . . of marine mammals" from an endangered or threatened species only if the Secretary

determines, among other elements, that "the incidental mortality and serious injury from

commercial fisheries <u>will have a negligible impact on such species or stock</u>."  16 U.S.C.

§ 1371(a)(5)(E)(i) (emphasis added).  The need for such a finding is consistent with the MMPA's

overall aim of reducing M/SI rates for marine mammals to near zero.  <u>See, e.g.</u>, 16 U.S.C.

§ 1387(a)(1) (goal of zero M/SI rate by May 2001); 16 U.S.C. § 1371(a)(2) (aiming for

incidental M/SI rates to be "reduced to insignificant levels approaching a zero mortality and

serious injury rate").  Under the 2021 BiOp projections, however, "the incidental mortality and

serious injury from commercial fisheries" will <u>not</u> have "a negligible impact" on the right-whale

population in coming years, as NMFS projects that levels of M/SI take from trap/pot gear in

federal fisheries will in fact exceed the potential biological replacement level for right whales

until 2030.

Unable to satisfy the negligible-impact threshold, but nonetheless having been instructed

to issue an ITS, NMFS found itself in rough waters.  It decided to "authoriz[e] zero lethal take of

these whales because the lethal incidental take of ESA-listed whales has not been authorized

under section 101(a)(5) of the MMPA."  JA3 at ECF p. 165.  NMFS maintains that this "is

entirely consistent with the ESA, the MMPA, and pertinent caselaw."  ECF No. 214 (Fed. Dfts.

Reply) at 12.  Defendant-Intervenors echo this argument, explaining that "NMFS's approach . . .

reasonably balances its obligations to comply with both this Court's order" in April 2020 to issue

an ITS and the requirements of MMPA section 101(a)(5)(E), which NMFS cannot currently

meet.  See ECF No. 204-1 (Maine Lobstermen's Association's (MELA) Cross-MSJ) at 23; see

also Maine Cross-MSJ at 22–23.  Plaintiffs, however, rejoin that "NMFS cannot simply cite its

inability to comply with the MMPA as an excuse for violating the ESA by failing to issue the

required ITS for anticipated lethal take."  Pls. MSJ at 26.

        The Court agrees with the conservation groups.  The ESA does not provide for such a

workaround if taking cannot be authorized under section 101(a)(5)(E).  Prior to issuing an ITS,

NMFS was required to work with stakeholders to develop a plan under which the level of M/SI

take was not "reasonably likely to[. . .] adversely affect the species or stock through effects on

annual rates of recruitment or survival."  50 C.F.R. § 216.103.  Exactly how NMFS should have

achieved this goal is a matter of some dispute.  The Service finds itself caught between the devil

and the deep blue sea given that the low numbers of right whales mean that almost any action

will have more than a "negligible impact" on the species.  Plaintiffs, however, maintain that

"Congress gave NMFS all the authority it needed to bring right whale M/SI in the lobster fishery

to the point of negligible impact through the Plan amendments."  ECF No. 210 (Pls. Reply/Opp.)

at 15.  The Maine Lobstermen's Association, meanwhile, argues that had NMFS "objectively

evaluated" take from the American lobster fishery, rather than projecting a "hypothetical 'worst

case scenario,'" it might "very well have been able to issue an incidental take authorization under

MMPA Section 101(a)(5)(E)."  MELA Cross-MSJ at 23; see also Maine Lobstermen's

Association v. National Marine Fisheries Service, No. 21-2509, ECF No. 1-1 (Complaint),

¶¶ 54–91.  Potential fixes are an issue for another day.

   For now, it is clear that NMFS did not satisfy the antecedent "negligible impact"

requirement, and it cannot make up for its failure to do so by setting the level of lethal take

authorized at zero.  See, e.g., Wash. Toxics Coal. v. EPA, 413 F.3d 1024, 1032 (9th Cir. 2005)

("[A]n agency cannot escape its obligation to comply with the ESA merely because it is bound to

comply with another statute that has consistent, complementary objectives."); see also CBD I,

2020 WL 1809465, at *9 ("[T]he ESA and accompanying regulations . . . require that the ITS

find that any take resulting from the proposed agency action will . . . no[t] run afoul of

§ 101(a)(5) of the MMPA.").  If the action under review could not be authorized under the

MMPA, then the agency "was obligated to revise its action to ensure any anticipated take would

be lawfully authorized and appropriately minimized" to meet the antecedent requirement.  See

Pls. Reply/Opp. at 15.  This alone means that the BiOp cannot survive.

### 2. *Discrepancy between anticipated take and authorized take*

   The flaws in NMFS's attempt to work around the MMPA's "negligible impact"

requirement are further laid bare by the fact that this approach yields a discrepancy between the

number of lethal takes the ITS authorizes (zero) and the number of M/SI takes that the 2021

BiOp projects will occur, especially in the early years of the Framework.  See JA3 at ECF p. 166

(setting lethal take at zero).  Between 2022 and 2025 — during the first two phases of the

Framework — NMFS anticipates that on average 2.56 M/SI incidents involving right whales will

occur every year in trap/pot fisheries.  Id. at ECF p. 146; Fed. Dfts. Cross-MSJ at 23.  This

period includes the implementation of the 2021 Final Rule amending the ALWTRP.  The M/SI

rates will improve over time, falling to an average rate of 0.136 M/SI incidents annually by 2030.

See JA3 at ECF p. 146.  Although the Court commends NMFS for the significant reduction in M/SI incidents that this represents compared to years past, 2.56 M/SI incidents remains quite a bit more than the zero authorized under the BiOp.  Id.

Defendants wave away this discrepancy on the ground that "the ESA does not preclude NMFS from authorizing less than the estimated amount of take in an ITS" and cite cases in which the level of lethal take authorized was zero.  See Fed. Dfts. Cross-MSJ at 24 & n.10; see also ECF No. 197 (Maine Lobstermen's Union (MLU) Opp.) at 25–26.  They are correct in the abstract that an agency certainly can issue an ITS that sets the rate of lethal take at zero.  Pub. Emps. for Env't Resp. v. Beaudreau, 25 F. Supp. 3d 67, 115 n.26 (D.D.C. 2014); Town of Superior v. U.S. Fish & Wildlife Serv., 913 F. Supp. 2d 1087, 1143 (D. Colo. 2012).  When that happens, however, it is in circumstances where the agency does not anticipate that any lethal take will in fact occur.  See, e.g., Beaudreau, 25 F. Supp. 3d at 114, 115 n. 26 (explaining that NMFS must set an authorized lethal-take level even if it "determined that [incidental] take [of right whales] would not occur" and whale strike had never occurred in the area, but that "[t]o be sure, '[t]hat limit may be zero; that is, a valid [incidental take statement] may exempt no take.'" (alterations in original) (quoting Town of Superior v. U.S. Fish & Wildlife Serv., 913 F. Supp. 2d 1087, 1143 (D. Colo. 2012)); WildEarth Guardians v. U.S. Forest Serv., No. 19-203, 2020 WL 2239975, at *1, *4 (D. Idaho May 7, 2020) (setting lethal-take level at zero when there was "remote" possibility of lethal taking of grizzly bear); see also Pls. Reply/Opp. at 16–17.

Even outside the zero-lethal-take context, the level of take an ITS authorizes will usually roughly correspond to the amount of take actually anticipated.  See, e.g., Mayo v. Jarvis, 177 F. Supp. 3d 91, 142 (D.D.C. 2016), amended, 203 F. Supp. 3d 31 (D.D.C. 2016) (allowing incidental take of 3–4 bears based on projection from past data that 1.5 bears might be taken in

remaining action period); Oceana, Inc., 75 F. Supp. 3d at 493 (take limits for loggerhead turtles set by NMFS at the number of turtles estimated to be taken by dredge and trawl annually in BiOp); Defs. of Wildlife v. Dep't of Navy, 733 F.3d 1106, 1112–13 (11th Cir. 2013) (explaining that ESA amended to include an ITS that would "specify[] the amount or extent of anticipated take").  Indeed, the last time this case was before the Court, NMFS set the lethal-take "reinitiation trigger" intended to substitute for an ITS at 3.25 since the 2014 BiOp concluded that "the lobster fishery ha[d] the potential to seriously injure or kill an average of 3.25 right whales per year."  Compare ECF No. 88-6 (2020 Joint Appendix Volume 6) at ECF p. 83 (noting M/SI entanglement level), with id. at ECF p. 209 (setting reinitiation trigger).  The regulations governing incidental-take statements also suggest a correspondence between the level of authorized take and the level of anticipated take.  See 50 C.F.R. § 402.14(i)(1)(i) (ITS can use proxy to specify "the amount or extent of anticipated take" as long as ITS "sets a clear standard for determining when the level of anticipated take has been exceeded").

NMFS recognizes this contradiction but explains that because it "could not authorize the anticipated level of take," it "was not able to issue an ITS authorizing, under the ESA, that level of anticipated take," and instead its only option was "to issue a zero take ITS."  Fed. Dfts. Reply at 12.  In other words, the Service agrees that, as a result of zero lethal take being authorized, if "a single lethal take or pro-rated M/SI is assigned to the federal fisheries considered in the 2021 BiOp (including the lobster fishery), NMFS must reinitiate ESA Section 7 consultation."  Fed. Dfts. Cross-MSJ at 12; see also JA3 at ECF p. 166 n.391 (saying same).

As a matter of pure practicality, this initially appears to make some sense.  An ITS by regulation is a mechanism to ensure that consultations restart when "during the course of the action the amount or extent of incidental taking . . . is exceeded."  50 C.F.R. § 402.14(i)(4).

Additionally, "the Incidental Take Statement functions as a safe harbor provision" for incidental killing of an endangered species.  Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt., 273 F.3d 1229, 1239 (9th Cir. 2001).  If lethal take is set at zero, then there is no safe harbor.  If the goal is to protect right whales, then creating no safe harbor is clearly preferable to authorizing the actual anticipated take of two per year.

The reinitiation-of-consultation requirement, however, is more limited than NMFS's briefing suggests.  If a new consultation begins, the Service is not required to "issue a new Biological Opinion [arising from that consultation] before the agency action may continue." Env't Prot. Info. Ctr. v. Simpson Timber Co., 255 F.3d 1073, 1076 (9th Cir. 2001); see Oceana v. Bureau of Ocean Energy Mgmt., 37 F. Supp. 3d 147, 175 n. 26 (D.D.C. 2014) (this Circuit does not require new BiOp to be issued pursuant to reinitiation of consultation before project may proceed, as Ninth Circuit caselaw on this "appear[s] in dicta and the relevant quotes are dropped in the legal standard sections with no explanation or citation whatsoever"); Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., 684 F.3d 1242, 1253 (11th Cir. 2012) (cessation of action during consultation does not derive from ESA).  Given that anticipated levels of M/SI take for right whales exceed zero in the coming years, it seems likely that whales will continue to be killed during the consultations.

Yet NMFS never specifies whether and under what conditions activity in the American lobster fishery would go forward during the reinitiation-of-consultation period.  Merely requiring that consultations restart if "a single lethal take or pro-rated M/SI is assigned to the federal fisheries," Fed. Dfts. Cross-MSJ at 12, cannot loose NMFS from the net of its statutory obligations under the MMPA.  Such a plan does not ensure that the action has a "negligible impact" on right whales or even that the lethal take of right whales in federal fisheries will

actually be zero, since a killing could occur in the midst of renewed consultations.  To thus claim

to authorize zero lethal take while in fact anticipating that such take will continue to occur "runs

counter to the evidence before the agency" and is arbitrary and capricious.  State Farm, 463 U.S.

at 43.

> 3.  *Judicial estoppel*

Last, NMFS maintains that Plaintiffs are judicially estopped from arguing that the 2021

ITS unlawfully sets the incidental-lethal-take level at zero because "[i]n prior summary judgment

filings, Plaintiffs urged the Court to find that NMFS should have done in the 2014 BiOp exactly

what it did here" in so setting lethal take.  See Fed. Dfts. Cross-MSJ at 26.  NMFS further claims

that this Court in a prior Opinion relied on Plaintiffs' urging to set lethal take at zero, as did

NMFS in formulating the 2021 BiOp.  Id. at 27; see also CBD II, 480 F. Supp. 3d at 246

(discussing potential of zero-lethal-take ITS).

"[J]udicial estoppel 'is an equitable doctrine invoked by a court at its discretion,'" with

the intention of "prevent[ing] 'improper use of judicial machinery'" by letting a party adopt a

position contrary to what it has argued in a previous case.  New Hampshire v. Maine, 532 U.S.

742, 750 (2001) (quoting first Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990), then

Konstantinidis v. Chen, 626 F.2d 933, 938 (D.C. Cir. 1980)).  Courts look to "at least three

questions . . . in deciding whether to apply judicial estoppel: (1) Is a party's later position clearly

inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept

that party's earlier position, so that judicial acceptance of an inconsistent position in a later

proceeding would create the perception that either the first or the second court was misled? [and]

(3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose

an unfair detriment on the opposing party if not estopped?"  Moses v. Howard Univ. Hosp., 606

F.3d 789, 798 (D.C. Cir. 2010).  In this case the answer to each of these questions is no for the reasons that follow.  The Court thus finds that Plaintiffs are not foreclosed from opposing the zero-lethal-take ITS accompanying the 2021 BiOp.

This determination bears some elaboration.  Considering the first of the three judicial-estoppel questions, Plaintiffs' current position is not "clearly inconsistent" with the arguments that they made in their 2019 summary-judgment briefing.  At that time, the conservation groups posited that the reinitiation trigger that NMFS included in lieu of an ITS in the 2014 BiOp was not equivalent to an ITS.  In particular, they noted the discrepancy between the fact that the 2014 BiOp "stated that while no take was authorized [as it could not be under the MMPA], . . . the trigger would only be met if multiple right whales were killed or seriously injured."  ECF No. 83 (Pls. 2019 Reply/Opp.) at 16.  They argued that setting the reinitiation trigger at 3.25 right whales annually was tantamount to authorizing incidental take.  Id. at 16–17.  In contrast, had NMFS really not authorized any incidental lethal take as claimed, it "could have set the trigger at zero, such that reinitiation of consultation would have been immediately triggered if a right whale was taken."  Id. at 17 (citing to Beaudreau, 25 F. Supp. 3d at 115 n.26 for proposition that trigger could be set at zero).  Nowhere in that brief, however, did Plaintiffs argue that setting the reinitiation trigger at zero could supersede the requirement that, before issuing an ITS, NMFS find that the action would have no more than a "negligible impact" on the right-whale population.  See, e.g., Pls. 2019 Reply/Opp. at 16 (maintaining argument that NMFS's only "course of action" was "to work internally to" satisfy section 101(a)(5)(E) requirement).

Plaintiffs' current arguments do not contradict their earlier position.  Now, they put forward two points with respect to the zero-lethal-take finding: 1) NMFS still has not "authorize[d] . . . incidental take pursuant to MMPA section 101(a)(5)(E)" as it must before

issuing an ITS; and 2) the 2021 BiOp is invalid as it "anticipates that lethal take of right whales will continue to occur in the federal lobster fishery, [but] the ITS purports to authorize 'zero lethal take.'" Pls. MSJ at 24.  Plaintiffs' 2019 and 2022 positions are consistent in that both maintain the view that NMFS has implicitly authorized lethal take of right whales even as it says that it is not doing so.  The only difference is that the form that this implicit authorization takes is now different from that in the prior case where no ITS was issued at all.

This Court also did not "accept [Plaintiffs'] earlier position" in its 2020 remedies Opinion.  Moses, 606 F.3d at 798; cf. Fed. Dfts. Cross-MSJ at 27.  The Court there addressed Beaudreau, 25 F. Supp. 3d 67, as an example of a case that "the agency cite[d] . . . in which courts declined to vacate a BiOp for ITS-related shortcomings."  CBD II, 480 F. Supp. 3d at 246 (emphasis added).  Notably, the Court did not find Beaudreau persuasive because in that case there was in fact "little practical difference between having an ITS and not," as "the agency had suggested that given the unlikelihood of any take, the acceptable level of incidental take might well be zero."  Id.  The Court's statements can hardly be read as "adopting Plaintiffs' position" that a "zero take ITS would have passed muster," Fed. Dfts. Cross-MSJ at 27, since they do not endorse setting lethal take at zero in circumstances different from those in Beaudreau — such as those of the 2014 or 2021 BiOps, both of which "forecasted a considerable level of right-whale take."  CBD II, 480 F. Supp. 3d at 246.  Additionally, the Court did not consider arguments about authorizing zero lethal take at all in its April 2020 Opinion finding the 2014 BiOp unlawful because it lacked an ITS entirely.

Finally, NMFS asserts that if Plaintiffs are not estopped, it "would be prejudiced because it took Plaintiffs' views into account when drafting the 2021 BiOp."  Fed. Dfts Cross-MSJ at 27.  Although the Court cannot know everything that NMFS may have considered in drafting the

2021 BiOp, nothing in the record indicates that the Service relied on the statements in Plaintiffs'

2019 brief regarding zero-lethal-take ITSs.  Indeed, the only record cite that NMFS provides to

support this position has nothing to do with the lobster fishery.  See Fed. Dfts. Cross-MSJ at 27;

Fed. Dfts. Reply at 14 (both citing to JA3 at ECF p. 83).  Although the administrative record

reflects that NMFS was aware of various court decisions, including the deadline imposed in this

Court's August 2020 remedies Opinion, there is no reference to a court decision or comment

from Plaintiffs supporting a zero-lethal-take ITS for right whales.  See, e.g., JA3 at ECF p. 12

(noting "court-ordered" May 31, 2021, deadline imposed in August 2020 opinion); id. at ECF pp.

56 & 85 (noting various court decisions in for-the-record feedback to comments received on

draft 2021 BiOp).  Plaintiffs, moreover, submitted comments on the draft BiOp on February 19,

2021, in which they criticized the document for "fail[ing] to include a proper incidental take

statement" and observed that the draft BiOp in fact projected lethal take of right whales.  See

JA3 at ECF pp. 415, 460.  There is thus nothing in the record to suggest that NMFS relied on

Plaintiffs' or this Court's prior statements in such a way that allowing Plaintiffs' current

arguments to go forward would impose an "unfair detriment on the opposing party."  Moses, 606

F.3d at 798.  Defendants' arguments, consequently, catch no wind.

      B.  Six-Month Time Requirement

      In Count VII of their Amended Complaint, Plaintiffs also maintain that the 2021 Final

Rule amending the ALWTRP violates the MMPA and APA for a separate reason: it fails to meet

timing requirements enshrined in the former statute.  See Pls. MSJ at 29–34.  Section 118 of the

MMPA states that "[f]or any stock in which incidental mortality and serious injury from

commercial fisheries exceeds the potential biological removal level[,] . . . the plan shall include

measures the Secretary expects will reduce, within 6 months of the plan's implementation, such

mortality and serious injury to a level below the potential biological removal level." 16 U.S.C. § 1387(f)(5)(A) (emphasis added). This six-month timeframe comes after language earlier in the same section explaining thus:

> The immediate goal of a take reduction plan for a strategic stock shall be to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock under section 1386 of this title. The long-term goal of the plan shall be to reduce, within 5 years of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and existing State or regional fishery management plans.

Id. § 1387(f)(2) (emphasis added).

Plaintiffs argue that the 2021 Rule flunks the six-month requirement because the level of M/SI incidents for North Atlantic right whales currently exceeds PBR and the BiOp and the Rule project that the number of M/SI incidents in federal fisheries will average above 2.6 annually through 2025, which continues to exceed the PBR level. See JA3 at ECF p. 146 (analyzing M/SI incident rate in Phase 1, which is the current rulemaking action); 86 Fed. Reg. 51,993 (noting that right-whale PBR level is 0.8 per year); see also Pls. MSJ at 30. Indeed, the projected M/SI incident rate will not fall below the PBR level until Phase 4 of the Framework, eight years after implementation of the 2021 Final Rule. See JA3 at ECF p. 146 (M/SI incident rate falls to 0.136). Although NMFS does dispute these facts from the administrative record, it asserts two main arguments in response: 1) the six-month requirement applies only to the 1997 initial take-reduction plan, not to subsequent amendments such as those in the Final Rule; and 2) the

requirement is an aspirational goal, not a mandatory duty.  See Fed. Dfts. Cross-MSJ at 30–37.
Looking at each of these positions separately leaves the Court unconvinced.

### 1.  *Applicability to plan amendments*

The Court examines first the question of whether the six-month time requirement applies
only to the initial take-reduction plan or to subsequent amendments as well.  This question, in
turn, implicates whether Plaintiffs have challenged the correct agency action and, if not, whether
they have lost their chance to do so.

NMFS maintains that the time requirement applies only to the initial plan and that this
Court so held in a prior Opinion.  See Fed. Dfts. Cross-MSJ at 31; see also MELA Cross-MSJ at
36–37.  Defendants note that in section 118, "Congress clearly demarcated the two types of
action: first, a plan, and, subsequently, plan amendments."  Fed. Dfts. Cross-MSJ at 31; compare
16 U.S.C. § 1387(f)(7)(E) (describing how often take-reduction team should meet "to monitor
the implementation of the final take reduction plan"), with id. § 1387(f)(7)(F) ("The Secretary
shall amend the take reduction plan and implementing regulations as necessary to meet the
requirements of this section.").  They then point to the text, which states that "the plan shall
include measures" that reduce M/SI below the PBR level within six months; there is no mention
of later amendments.  See 16 U.S.C. § 1387(f)(5)(A); see also 16 U.S.C. § 1387(f)(2) (also
referring to plan, not the amendments).  If it is the case that the time requirement applies only to
the initial plan, then the only relevant action would be the original 1997 Atlantic Large Whale
Take Reduction Plan, not the various amendments, and the statute of limitations period to
challenge the 1997 Plan would have closed.

For starters, the Court is not bound by *dicta* from its August 2020 remedies Opinion.
That Opinion stated that "it is not obvious to the Court that Plaintiffs' cited statutory deadlines

apply to <u>amendments</u> to existing take-reduction plans; it is possible to read them as applying only to the <u>initial</u> plan developed by a Team after it is constituted." <u>CBD II</u>, 480 F. Supp. 3d at 248; <u>see also</u> Fed. Dfts. Cross-MSJ at 31 (noting this point).  There, the Court was addressing the slightly different issue of whether "the agency's proposed timeline [was] out of compliance with the" MMPA's deadlines for when NMFS had to publish proposed rules after receiving the Take Reduction Team's proposed plan.  <u>CBD II</u>, 480 F. Supp. 3d at 248.  While the Court acknowledges the similarity of the two issues, it did not box itself into a particular interpretation in its earlier Opinion.  It merely said that "it [was] not obvious" that the deadline applied to plan amendments as well.  <u>Id.</u>  Upon further consideration, it now concludes that application to plan amendments is in fact the better reading.

    The amendment process for a take-reduction plan directs NMFS that it "shall amend the take reduction plan and implementing regulations as necessary to meet the requirements of this section," meaning section 118.  <u>See</u> 16 U.S.C. § 1387(f)(7)(F).  This language implies that all amendments must be designed to meet section 118's requirements, including the requirement that the plan "include measures" that the agency "expects will reduce" M/SI to a level below that of PBR "within 6 months of the plan's implementation."  <u>Id.</u> § 1387(f)(5)(A); Pls. Reply/Opp. at 24.  This reading is consistent with the legislative history of section 118, which was introduced during the 1994 amendments to the MMPA.  <u>See</u> <u>Cares Cmty. Health v. Dep't of Health & Hum. Servs.</u>, 944 F.3d 950, 957 (D.C. Cir. 2019) (in construing statute, court "look[s] to the 'traditional tools of statutory interpretation — text, structure, purpose, and legislative history")  (quoting <u>In re Sealed Case</u>, 932 F.3d 915, 928 (D.C. Cir. 2019)).  The House Report accompanying the amendments explains that "[t]he goal of these [take-reduction] plans is to reduce incidental lethal takes resulting from commercial fishing operations to levels less than the

potential biological removal level" and that a "[f]ailure of a plan to meet these goals shall result

in a revision of the plan and promulgation of regulations necessary to achieve that goal."  H.R.

Rep. No. 103-439 (1994) at 37.  This stated legislative purpose aligns with the most natural

reading of Section 1387(f)(7)(F) — namely, that any later revisions of a take-reduction plan must

fulfill the time-related goals of the initial plan.  Indeed, given the emphasis on reaching zero

mortality and lowering levels of take throughout section 118 and the MMPA overall, it would

make little sense for the statute to have created a regime where if an agency fails to reduce take

under its initial plan, it is then absolved from needing to try to reach that goal within a specified

timeframe in later amendments.  See Pls. Reply/Opp. at 26.  This cannot be what Congress

intended.

   This reading is further supported by the treatment of take-reduction plans as evolving

documents to which amendments are made over time.  See, e.g., 86 Fed. Reg. 51,970 ("[t]his

final rule implements modifications to the Atlantic Large Whale Take Reduction Plan" and

describing series of modifications made through amendments); see also ECF No. 216-2 (Joint

Appendix Volume 2) at ECF p. 9 (Section 7 consultation letter on 2021 Final Rule stating, "The

proposed action is NMFS's implementation of the Plan, which requires gear regulations for U.S.

fixed gear fisheries.") (emphasis added).  NMFS itself has even acknowledged that the six-month

and five-year timeframes can apply to amendments.  In a final rule amending the implementing

regulations of the ALWTRP in 2007, the Service stated, "The MMPA provides that the

immediate goal of a take reduction plan is to reduce incidental mortality and serious injury of

marine mammals taken in the course of commercial fishing to levels less than the PBR level and

the long-term goal is to reduce such incidental mortality and serious injury to insignificant levels

approaching a zero rate.  These regulatory changes are necessary to attain these goals."  72 Fed.

Reg. 57,104, 57,122 (October 5, 2007).

The fact that the original ALWTRP also included measures "expected to achieve the

necessary take reductions within 6 months" does not undermine the conclusion that time

requirements apply to plan amendments as well.  See 62 Fed. Reg. 39,157, 39,159 (July 22,

1997); see also MELA Cross-MSJ at 34.  Both the original plan and the amendments face the

same constraints, which is why the Court also does not find it prohibitive that Plaintiffs argue

elsewhere that NMFS should have met the long-term goal of bringing right whale M/SI in

commercial fisheries to "insignificant levels approaching a zero" within five years of the original

promulgation of the ALWTRP in 1997.  See Pls. MSJ at 35.  Such a claim does not imply that

Plaintiffs think that only the original take-reduction plan is subject to a timeframe requirement;

rather, it suggests that both the original plan and subsequent amendments needed to meet the

criterion.

Last, the Court addresses Defendants' argument that Plaintiffs' six-month claim is barred

under the six-year statute of limitations for bringing an action against the United States.  See 28

U.S.C. § 2401(a); Fed. Dfts. Cross-MSJ at 32; MELA Cross-MSJ at 36.  This issue merits some

scrutiny because "[u]nlike an ordinary statute of limitations, § 2401(a) is a jurisdictional

condition attached to the government's waiver of sovereign immunity, and as such must be

strictly construed."  Peri & Sons Farms, Inc. v. Acosta, 374 F. Supp. 3d 63, 70–71 (D.D.C.

2019).  The six-year statute-of-limitations period "set by § 2401(a) begins to run when 'the right

of action first accrues.'"  Alaska Cmty. Action on Toxics v. EPA, 943 F. Supp. 2d 96, 102

(D.D.C. 2013) (quoting 28 U.S.C. § 2401(a)).  "A cause of action against an administrative

agency 'first accrues,' within the meaning of § 2401(a), as soon as (but not before) the person

challenging the agency action can institute and maintain a suit in court." Id. (quoting Spannaus v. Dep't of Justice, 824 F.2d 52, 56 (D.C. Cir. 1987)).

NMFS argues that Plaintiffs' claims are time barred because the cause of action first began to accrue in 1997 when the ALWTRP was implemented, and the six years would have then elapsed in 2003. See Fed Dfts. Cross-MSJ at 32. In so contending, Defendants rely on Alaska Community Action on Toxics, a case in which the plaintiffs challenged the agency action of publishing a new schedule listing products eligible to be used for oil discharge. See 943 F. Supp. 2d at 100–01. The underlying decision that those plaintiffs were arguing against, however, was the agency's choice not to list "waters and quantities for use" regarding such oil-dispersant products. Id. at 104. That decision had been made decades earlier in a final rule. Id. (dismissing case as barred by statute of limitations given decision made 30 years prior).

For the reasons just discussed, however, the amendments to the 2021 Final Rule were a new administrative action, and the statute-of-limitations question is thus not implicated because Plaintiffs' six-year period to bring a challenge restarted with the Final Rule's issuance. This leaves Plaintiffs well within their allotted time.

If anything, the contrast between the Final Rule amending the ALWTRP and the routine publication of the product list in Alaska Community Action on Toxics shows why the better reading of 16 U.S.C. § 1387(f)(5) encompasses the plan amendments and thus triggers a reset of the statute of limitations. There, the district court explained that the product schedule did not result from a robust process, and "[n]othing about that decision [not to list waters or use quantities] has changed in the nearly thirty years since it was made." 943 F. Supp. 2d at 104. In contrast, the 2021 Final Rule was released only after full notice-and-comment rulemaking, and "a complex process involving multiple stakeholders" and "many hours of complicated

discussions and negotiations," as NMFS has previously informed this Court.  See ECF No. 111

(Fed. Dfts. Remedy Response Brief) at 8.  That process resulted in a rule altering significant

aspects of operations in the American lobster fishery, including the types of equipment that

lobstermen can use and what areas are open for fishing.  It is not just "implement[ing] the

decisions [the agency] made 'long ago'" but making new decisions entirely.  See Peri & Sons

Farms, Inc., 374 F. Supp. 3d at 73 (quoting Alaska Cmty. Action on Toxics, 943 F. Supp. 2d at

105).

       In a final effort, NMFS argues in its Reply that Plaintiffs have waived the statute-of-

limitations point by failing to respond to Federal Defendants' argument on this score.  See Fed.

Dfts. Reply at 15.  A court can treat "specific arguments as conceded" when a "party fails to

respond to arguments in opposition papers."  Dinkel v. MedStar Health, 880 F. Supp. 2d 49, 58

(D.D.C. 2012) (internal quotation marks and citations omitted).  Here, however, Plaintiffs do

briefly address this issue as it applies to the TRP amendments.  See Pls. Reply/Opp. at 23.  More

importantly, they devote three pages of their Reply to addressing why the six-month timeline

applies to the TRP amendments as well as to the original plan.  This argument is closely

intertwined with the statute-of-limitations issue since a finding for Plaintiffs on this issue vitiates

a § 2401 claim.  Id. at 23–27.  The argument was thus not waived.

       2.  *Obligation vs. goal*

       Defendants also argue that section 118 "spoke advisedly" in creating a goal of reducing

M/SI incidents below PBR within six months but did not mandate an absolute deadline.  See Fed.

Dfts. Cross-MSJ at 32–33; MELA Cross-MSJ. at 35–36; MALA Opp. at 22–23.  In particular,

NMFS objects that if "Congress meant to set a deadline, it would have stated 'the plan shall

reduce M/SI to the potential biological removal level' by a particular date.  It did not do so."
Fed. Dfts. Cross-MSJ at 33.  Here, Plaintiffs and NMFS appear to talk past each other.

Defendants are correct that 16 U.S.C. § 1387(f)(2) states that "[t]he immediate goal of a
take reduction plan for a strategic stock shall be to reduce, within 6 months of its
implementation, the" incidental M/SI of marine mammals to below PBR, and it similarly sets a
"long-term goal" for M/SI to approach zero over five years.  Id. (emphasis added).  Another
subsection within Section 118, however, uses the word "shall" in stating that "[f]or any stock in
which incidental mortality and serious injury from commercial fisheries exceeds the potential
biological removal level[,] . . . the plan shall include measures the Secretary expects will reduce"
M/SI incidents below the PBR level within six months.  See 16 U.S.C. § 1387(f)(5)(A)
(emphasis added).  The latter section is the one that Plaintiffs rely on.  See Pls. MSJ at 29–30.
NMFS itself has stated that it is required to reduce M/SI levels for endangered species to below
the PBR rate within six months in other take-reduction plans.  See, e.g., 62 Fed. Reg. 39,173
(explaining in ALWTRP that "the MMPA requires that NMFS produce a plan to reduce serious
injuries and mortalities to below the PBR level within 6 months"); 71 Fed. Reg. 24,776, 24,790–
91 (Apr. 26, 2006) (same in bottlenose-dolphin take-reduction plan); see also Pls. Reply/Opp. at
28–29.

Comparison with subsection 118(f)(5)(B) of the MMPA further demonstrates why
subsection 118(f)(5)(A) sets more than just an aspirational goal.  The former, which does not
apply to the right whales, states that "[f]or any stock in which human-caused mortality and
serious injury exceeds the potential biological removal level, other than a stock to which
subparagraph (A) applies," NMFS must meet the same requirements as in subsection A, with the
exception that the measures need only reduce M/SI incidents "to the maximum extent

practicable" within six months.  See 16 U.S.C. § 1387(f)(5)(B); cf. MLU Opp. at 28 (focusing

only on subsection B to argue that six-month time requirement is intended to be flexible).  That

the text of subsection A contains no such qualifier implies that the six-month requirement in

subsection B — the one relevant here — in fact does create a concrete target.  See Oceana, Inc.

v. Locke, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (comparing two sections, one of which

contained "to the extent practicable" qualifier and noting that for the other subsection, "[w]hen a

statute commands an agency without qualification to carry out a particular program in a

particular way, the agency's duty is clear"); Pls. Reply/Opp. at 27.

Defendants' other counterarguments also run aground.  In particular, NMFS protests that

"[i]t would be nonsensical for Congress to have created" an obligation to act within six months

when that action has "nebulous ending points" since it is measured from the time it is

"implemented," which the MMPA leaves undefined.  See Fed. Dfts. Cross-MSJ at 33–34.  The

Court, however, agrees with Plaintiffs that Congress's failure to define implementation is no bar

here.  See Pls. Reply/Opp. at 33.  "When a term goes undefined in a statute, [courts] give the

term its ordinary meaning."  Taniguchi v. Kan Pac. Saipan, 566 U.S. 560, 566 (2012).

"Implement" is defined as "to put into practical effect; to carry out."  AMERICAN HERITAGE

DICTIONARY (3rd ed. 1992).  There is clearly some date by which NMFS considers a Plan or Plan

amendment to have been put into effect, as the agency has stated in rules that it issued, for

instance, that a "rule will reduce within 6 months of its implementation the bycatch of harbor

porpoise to below their PBR level."  63 Fed. Reg. 66,464, 66,470 (Dec. 2, 1998).

If the agency really thought that the undefined term "implementation" provided such

"nebulous ending points," then its own such statements would be meaningless.  Further, even if a

date is not set in stone against which to assess reductions in M/SI entanglements precisely six

months after implementation, the relevant date is surely not several <u>years</u> after implementation, as the BiOp suggests would occur for the measures in the 2021 Final Rule.  Nor is it the case that the implementation of the 2021 Final Rule is "not anticipated to conclude for at least ten years," as the Massachusetts Lobstermen's Association suggests.  <u>See</u> MALA Opp. at 23 (citing JA3 at ECF p. 87, which lays out dates for implementation of the Framework, not the 2021 Final Rule, the latter of which occurs in Phase 1 of the Framework).

Next, although the Court agrees that of course "M/SI may fluctuate depending on many factors" over time and could thus fall above or below the PBR level, these fluctuations do not alter the meaning of sections 118(f)(2) or 118(f)(5).  <u>Cf.</u> Fed. Dfts. Cross-MSJ at 33.  The measures that the MMPA requires are ones that "the Secretary <u>expects</u> will reduce" M/SI to below the PBR level within six months.  <u>See</u> 16 U.S.C. § 1387(f)(5)(A) (emphasis added).  If natural changes unexpectedly lead the PBR level to fall within that period, that would not render the plan or plan amendments out of compliance as long as they were expected to achieve the goal when promulgated.  Additionally, "Congress did not direct that a new 'deadline' spring to life each time a fishery's impact exceeds PBR." Fed. Dfts. Cross-MSJ at 33.  Congress simply directed that NMFS "amend the take reduction plan and implementing regulations as necessary to meet the requirements of this section."  16 U.S.C. § 1387(f)(7)(F).  If, when making those amendments, the rate of M/SI incidents is projected to exceed the PBR level, then the amendments must include measures to reduce the M/SI rate within six months.

This requirement is also a good deal more specific than the "goals" in cases that Defendant-Intervenors cite.  In those, for example, Congress declared "a national goal [of]" preventing and remedying visibility impairments from manmade air pollution.  <u>Am. Corn Growers Ass'n v. EPA</u>, 291 F.3d 1, 10 (D.C. Cir. 2002) (discussing goal in 42 U.S.C.

§ 7491(a)(1)); see also Nat'l Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 178 (D.C. Cir. 1982)

(warning that "[c]aution is always advisable in relying on a general declaration of purpose to

alter the apparent meaning of a specific provision," in context of "grand goal" in Clean Water

Act to eliminate discharge of pollutants into navigable waters by set date in dispute over whether

permits for discharge of pollutants were required for certain dams); MELA Cross-MSJ at 35

(citing cases).  If anything, the six-month timeframe in section 118 is a step towards fulfilling the

MMPA's broader goal of bringing "the incidental mortality or serious injury of marine mammals

occurring in the course of commercial fishing operations . . . to insignificant levels approaching a

zero mortality and serious injury rate within 7 years" from the date of the 1994 amendments.

See 16 U.S.C.A. § 1387(a).   This timeframe is thus more than just a hortatory aim for the

agency.

　　　　Having concluded that 1) the six-month deadline applies to plan amendments as well as

to the ALWTRP itself, 2) that NMFS had to include measures expected to reduce M/SI to below

PBR by that deadline, and 3) that NMFS did not do so, the Court finds that the 2021 Final Rule

amending the ALWTRP is invalid.

*      *      *

　　　　So how does the ship's log now read? As explained in detail above, the crux of the

problem is that the 2021 BiOp projects that in the coming years the American lobster fishery will

continue to potentially kill and seriously injure North Atlantic right whales at over three times

the sustainable rate.  This is expected to occur even after the implementation of the 2021 Final

Rule amending the ALWTRP and even though zero lethal take is authorized.  For the reasons

stated in this Opinion, the Court concludes that NMFS violated the ESA through its failure to

satisfying the required antecedent in section 101(a)(5)(E) of the MMPA before issuing an ITS.

41

The Court also finds that the 2021 Final Rule did not attempt to meet the take-reduction measures that it was obligated to under the MMPA within the required timeline. The Court therefore declares the 2021 BiOp and 2021 Final Rule invalid. The Court recognizes that this may seem a severe result for the lobster industry and NMFS. But no actor here — neither the Court nor the Service — operates free from the strict requirements imposed by the MMPA and ESA. If the agency "believes [a] statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'" Oceana, Inc., 670 F.3d at 1243 (quoting Natural Res. Def. Council v. EPA, 643 F.3d 311, 323 (D.C. Cir. 2011)).

     C.  Remedy

The Court's findings at this juncture do not dictate that it must immediately shutter the American lobster fishery; indeed, it is cognizant of what a weighty blow that would inflict. Instead, the Court will order additional briefing as to potential remedies, which may include remand with or without vacatur. CBD I, 2020 WL 1809465, at *10 (doing same); see also Fed. Dfts. Cross-MSJ at 44–45 (requesting supplemental briefing). On such a remand, moreover, the Service may find that other measures exist to reduce lethal take, or that projected take is in fact lower than originally estimated. Remand thus need not be equivalent to a shutdown. For now, however, the Court reaches no determination on this question without the benefit of further briefing.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Summary Judgment and deny Defendants' and Defendant-Intervenors' corresponding Cross-Motions for Summary Judgment. A contemporaneous Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 8, 2022