**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) | Civil Action No. 18-112 (JEB) |
| v. | ) ) | |
| GINA RAIMONDO, *et al.*, | ) ) | |
| *Federal Defendants*, | ) ) | |
| and | ) ) | |
| MAINE LOBSTERMEN'S ASSOCIATION, INC., *et al.*, | ) ) ) | |
| *Defendant-Intervenors*. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT**
**OF MOTION FOR REMEDY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

TABLE OF ACRONYMS & ABBREVIATIONS ............................................................ iv

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 3

ARGUMENT ..................................................................................................... 10

I.      The Court Should Vacate and Remand the 2021 Biological Opinion
        With Respect to the Federal Lobster Fishery and Right Whales and
        Stay Vacatur for Six Months ...................................................................... 10

        A.      The Agency's Errors Are Serious ................................................... 11

        B.      The Disruptive Economic Consequences of Vacatur Do Not Outweigh
                The Seriousness of the Agency's Legal Errors ............................. 17

II.     The Court Should Remand the Final Rule Without Vacatur ............................. 21

III.    The Court Should Order NMFS to Issue a New Rule Within Six Months .............. 22

IV.     The Court Should Issue Specific Declaratory Relief as Part of Its Remedy Order .. 24

CONCLUSION ................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal. v. Nuclear Reg. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................. 11, 17

*Am. Gas Ass'n v. Fed. Energy Reg. Comm'n*,
    912 F.2d 1496 (D.C. Cir. 1990) ..................................................................................... 23

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ...................................................................................... 23

*Anacostia Riverkeeper, Inc. v. Jackson*,
    713 F. Supp. 2d 50 (D.D.C. 2010) ................................................................................ 17

*Ariz. Cattle Growers' Ass'n v. Fish & Wildlife Serv.*,
    273 F.3d 1229 (9th Cir. 2001) ...................................................................................... 14

*Citizens to Pres. Overton Park v. Volpe*,
    401 U.S. 402 (1971) ...................................................................................................... 11

*City of Cleveland, Ohio v. Fed. Power Comm'n*,
    561 F.2d 344 (D.C. Cir 1997) ....................................................................................... 25

*Comcast Corp. v. Fed. Commc'n Comm'n*,
    579 F.3d 1 (D.C. Cir. 2009) ................................................................................... 15, 17

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ...................................................................................... 11

*Ctr. for Biological Diversity v. Fish & Wildlife Serv.*,
    342 F. Supp. 3d 968 (N.D. Cal. 2018) .......................................................................... 23

*Ctr. for Biological Diversity v. Raimondo*,
    No. 18-112-JEB, — F. Supp. 3d —, 2022 WL 2643535 (D.D.C. July 8, 2022) ............. *passim*

*Ctr. for Biological Diversity v. Ross*,
    480 F. Supp. 3d 236 (D.D.C. 2020) .......................................................................... *passim*

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) ...................................................................................... 23

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) .................................................................................................. 11

*Dist. 4 Lodge of the Int'l Ass'n of Machinists and Aerospace Workers Local
   Lodge 207 v. Raimondo,*
   18 F.4th 38 (1st Cir. 2021)................................................................................................12

*\*Dist. 4 Lodge of the Int'l Ass'n of Machinists and Aerospace Workers Local
   Lodge 207 v. Raimondo,*
   40 F.4th 36 (1st Cir. 2022)..............................................................................................22

*Envtl. Def. Fund v. Fed. Energy Regul. Comm'n,*
   2 F.4th 953 (D.C. Cir. 2021)................................................................................... 11, 17

*Esch v. Yeutter,*
   876 F.2d 976 (D.C. Cir. 1989) ...........................................................................................3

*Fed. Commc'n Comm'n v. Pottsville Broadcasting Co.,*
   309 U.S. 134 (1940) ........................................................................................................25

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ........................................................................................................19

*Forest Guardians v. Johanns,*
   450 F.3d 455 (9th Cir. 2006) ...........................................................................................24

*Friends of the Earth v. Envtl. Protection Agency,*
   446 F.3d 140 (D.C. Cir. 2006) .........................................................................................21

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.,*
   109 F. Supp. 3d 1238 (N.D. Cal. 2015)...........................................................................12

*\*Kokechik Fishermen's Ass'n v. Sec'y of Comm.,*
   839 F.2d 795 (D.C. Cir. 1988) .....................................................................................2, 16

*Cal ex. rel. Lockyer v. Dep't of Agric.,*
   575 F.3d 999 (9th Cir. 2009) ...........................................................................................14

*Nat. Res. Def. Council v. Envtl. Prot. Agency,*
   489 F.3d 1364 (D.C. Cir. 2007) .................................................................................17, 21

*Nat. Res. Def. Council v. Envtl. Protection Agency,*
   489 F.3d 1250 (D.C. Cir. 2007) .......................................................................................21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
   524 F.3d 917 (9th Cir. 2008) ...........................................................................................24

*Northwest Envtl. Advocates v. Envtl. Protection Agency,*
   No. 3:12-cv-01751-AC, 2018 WL 6524161 (D. Or. Dec. 12, 2018) ................................23

*Oceana v. Ross*,
  483 F. Supp. 3d 764 (N.D. Cal. 2020) .................................................................23

*Pac. Rivers Council v. Forest Serv.*,
  942 F. Supp. 2d 1014 (E.D. Cal. 2013) ...............................................................21

*Pub. Emps. for Envtl. Responsibility v. Fish & Wildlife Serv.*,
  189 F. Supp. 3d 1 (D.D.C. 2016) .........................................................................18

*Rodway v. Dep't of Agric.*,
  514 F.2d 809 (D.C. Cir. 1975) .............................................................................23

*\*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .........................................................................................2, 14

*Thomas v. Peterson*,
  753 F.2d 754 (9th Cir. 1985) ...............................................................................14

*Turtle Island Restoration Network v. Dep't of Comm.*,
  878 F.3d 725 (9th Cir. 2017) ...............................................................................14

*Zambrana v. Califano*,
  651 F.2d 842 (2nd Cir. 1981) ..............................................................................23

**Statutes**

5 U.S.C. § 706 ..............................................................................................................3

16 U.S.C. § 1362(20) ...................................................................................................4

16 U.S.C. § 1371(a)(2) ..............................................................................................16

16 U.S.C. § 1371(a)(5)(E) ....................................................................................12, 25

16 U.S.C. § 1371(a)(5)(E)(i) .....................................................................................15

16 U.S.C. § 1387(g) ...................................................................................................20

16 U.S.C. § 1401(a) .....................................................................................................5

16 U.S.C. § 1402(a)(4) .................................................................................................5

**Other Authorities**

50 C.F.R. § 229.32(a)(1) ............................................................................................22

50 C.F.R. §§ 402.12–402.17 ......................................................................................14

62 Fed. Reg. 39,157 (July 22, 1997) ............................................................................. 19

86 Fed. Reg. 51,970 (Sept. 17, 2021) ..................................................................... 8, 9, 22

86 Fed. Reg. 86,878 (Dec. 31, 2020) ............................................................................. 4

87 Fed. Reg. 11,590 (Mar. 3, 2022) ............................................................................. 20

## TABLE OF ACRONYMS & ABBREVIATIONS

| | |
|---|---|
| 2014 BiOp | 2014 Biological Opinion |
| 2021 BiOp | 2021 Biological Opinion |
| APA | Administrative Procedure Act |
| ESA | Endangered Species Act |
| Final Rule | Final Rule Amending Atlantic Large Whale Take Reduction Plan |
| ITS | incidental take statement |
| JA | Joint Appendix |
| MMC | Marine Mammal Commission |
| MMPA | Marine Mammal Protection Act |
| M/SI | mortality and serious injury |
| NMFS | National Marine Fisheries Service |
| Plan | Atlantic Large Whale Take Reduction Plan |
| PBR | potential biological removal level |

## INTRODUCTION

In the four and a half years since Plaintiffs originally filed this case, the status of the North Atlantic right whale has worsened dramatically. The population has dwindled to its lowest level in nearly 20 years and consists of fewer than 340 individuals. The National Marine Fisheries Service (NMFS) admits the right whale is "approaching extinction."[1] Yet the agency has repeatedly failed to sufficiently protect the species from entanglements in the American lobster/Jonah crab fishery (lobster fishery), violating the plain language of the Endangered Species Act (ESA) and Marine Mammal Protection Act (MMPA) in the process. Following the agency's issuance of a May 2021 biological opinion (2021 BiOp) in response to this Court's August 2020 order and its issuance of September 2021 regulations (Final Rule) amending and implementing the Atlantic Large Whale Take Reduction Plan (Plan), Plaintiffs were again forced to seek this Court's intervention to instruct NMFS on its statutory duties to protect the right whale. Plaintiffs now request remedies for these violations.

On July 8, 2022, this Court granted Plaintiffs' second motion for summary judgment. It held that the NMFS violated the ESA and/or MMPA in issuing the 2021 BiOp and Final Rule. Specifically, the Court held the 2021 BiOp included an unlawful incidental take statement (ITS) purporting to authorize zero lethal takes of right whales in the federal lobster fishery even though the BiOp acknowledges that the federal fishery will continue to kill several right whales each year and NMFS had unlawfully failed to authorize that take under the MMPA. The Court also held the 2021 Final Rule violates the MMPA for failing to include measures NMFS expects will

---

[1] *See* NMFS, North Atlantic Right Whale: Road to Recovery, https://www.fisheries.noaa.gov/species/north-atlantic-right-whale#road-recovery (updated Aug. 9, 2022) (Ex. 1 to the Declaration of Kristen Monsell (hereinafter "Monsell Dec.")).

reduce right whale mortality and serious injury (M/SI) to below the right whale's potential biological removal (PBR) level within six months of implementation.

These serious violations of law threaten the survival of one of the most endangered whales on the planet. NMFS's legal failures mean highly imperiled right whales will continue to be killed and seriously injured in lobster gear in both state and federal waters at unsustainable levels. NMFS's legal failures undermine Congress's intent in enacting the ESA that federal agencies "afford first priority to the declared national policy of saving endangered species," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978), and in enacting the MMPA that "[t]he interest in maintaining healthy populations of marine mammals comes first[.]" *Kokechik Fishermen's Ass'n v. Sec'y of Comm.*, 839 F.2d 795, 802 (D.C. Cir. 1988).

Notably, this Court did not write its recent merits opinion on a blank slate. Rather, this decision follows its April 2020 merits opinion holding that NMFS violated the ESA in its prior 2014 BiOp for acknowledging the lobster fishery will kill and seriously injure right whales but failing to lawfully authorize that take as required by the MMPA and ESA. The Court's August 2020 remedy decision recognized that the seriousness of that error undermined "integral parts of the [ESA's] statutory scheme." *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 246 (D.D.C. 2020) ("*CBD v. Ross*") (citation omitted). NMFS's decision to commit effectively the same legal violation yet again only reinforces the egregiousness of its error.

Given the seriousness of the agency's legal errors and its repeated legal violations, Plaintiffs request that the Court: (1) vacate and remand the 2021 BiOp, as applied to the federal lobster fishery and right whales, with a stay of vacatur for six months; (2) remand the 2021 Final Rule without vacatur; (3) order NMFS to issue a new rule amending the Plan within six months; and (4) issue specific declaratory relief to ensure NMFS does not repeat the same legal errors.

The disruptive consequences of vacating the 2021 BiOp with respect to the federal lobster fishery cannot outweigh the seriousness of the agency's legal errors that cause harm to critically endangered right whales. A six-month stay of vacatur will limit disruptive consequences while providing NMFS time to determine how "to revise its action to ensure any anticipated take [will] be lawfully authorized and appropriately minimized[.]" *Ctr. for Biological Diversity v. Raimondo*, No. 18-112-JEB, — F. Supp. 3d —, 2022 WL 2643535 at *11 (D.D.C. July 8, 2022) ("*CBD v. Raimondo*") (citation omitted). Moreover, requiring NMFS to act expeditiously to amend the Plan is warranted given the right whale's perilous status and NMFS's longstanding recognition that much greater risk reductions are necessary to comply with the MMPA. Granting Plaintiffs' requested relief will force NMFS to alter course and require it—at long last—to come into compliance with the law, thereby helping ensure the right whale's continued existence.

## FACTUAL BACKGROUND

The Court is well-versed in the plight of the right whale and the role that NMFS's continued failure to comply with the law in authorizing and managing the lobster fishery is playing in fueling the species' demise. Plaintiffs provide an overview of pertinent facts predating the Court's recent decision as well as new information regarding the right whale's plight.[2] This information underscores why it is imperative that the Court require NMFS to act as both the ESA and MMPA plainly require—obligations it has shirked for decades.

---

[2] At this remedial stage of this case, the scope of judicial review is not limited to the administrative record defined by the Administrative Procedure Act, 5 U.S.C. § 706, but may encompass competent extra-record evidence. *See, e.g.*, *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

The right whale population declined to less than 340 individual whales as of January 2020. North Atlantic Right Whale Consortium 2021 Annual Report Card at 3 (Ex. 2 to Monsell Dec.). The whale's potential biological removal (PBR)—i.e., the annual human-caused mortality level the species can withstand and still have a chance at recovery—has declined with it and now stands at 0.7. NMFS, 2021 Stock Assessment Report: North Atlantic Right Whale (May 2022) at 23 (Ex. 3 to Monsell Dec.); 16 U.S.C. § 1362(20) (defining PBR). This means that right whale M/SI in U.S. fisheries must be reduced by *90 percent* (from the level estimated before the 2021 Final Rule) to drive right whale mortality to below PBR. *See* NMFS, Atlantic Large Whale Take Reduction Team, Informational Webinar: Update on Right Whale Population and Mortality Estimates, (Nov. 2, 2021) at slides 42–43 (Ex. 4 to Monsell Dec.); *see also* Joint Appendix (JA) Vol. 1 at 91, ECF No. 216-1 (agency's recognition in issuing the Final Rule that PBR would be reduced from 0.8 to 0.7 in next stock assessment report due to continued population decline).[3]

Critically, NMFS was fully aware that much greater levels of risk reduction would be necessary to drive right whale M/SI to below PBR long before it issued the Final Rule. When NMFS first identified the lower bound of the risk reduction target at 60 percent, PBR stood at 0.9 and cryptic (i.e., unobserved) mortality assumptions of 40 percent between 2010 and 2018 were predicated on a model dating back to 2017. *See, e.g.*, 86 Fed. Reg. 86,878, 86,879 (Dec. 31, 2020); *see also* NMFS, Memorandum to File (Oct. 28, 2020) (Ex. 5 to Monsell Dec.) ("preliminary updated population estimate . . . is considerably lower than previous estimates"). By the time NMFS published its proposed rule to amend the Plan at the end of 2020, PBR had already been reduced to 0.8 the previous April, and the agency already knew it would drop

---

[3] Citations to the JA are to the ECF-generated page numbers. Citations to other filings in this case, such as briefs, are to the original pagination, not the ECF-generated page numbers.

further to 0.7. NMFS, 2019 Stock Assessment Report: North Atlantic Right Whale (Apr. 2020) at 22 (Ex. 6 to Monsell Dec.). Shortly after the proposed rule came out, a new paper on cryptic mortality published demonstrating that the agency's cryptic mortality estimates were far too low, and, in fact, 71 percent of mortalities between 2010 to 2017 were unobserved, with two-thirds of those attributable to entanglements. Pace et al. 2021 (Ex. 7 to Monsell Dec.). Thus, as of at least February 2021, the best available data made clear that a 60 percent risk reduction target had absolutely no chance of reducing M/SI to below PBR as the law plainly requires.

Yet NMFS ignored comments urging it to update the risk reduction targets and revise the draft regulation to ensure MMPA compliance. Commenting on the agency's draft biological opinion in February 2021, Plaintiffs cited the science demonstrating that, given the best available science indicating that the right whale's PBR would drop to 0.7 and the level of entanglement-related cryptic mortality the species endures, NMFS's 60 percent risk reduction target was far too low. JA Vol. 3 at 422, ECF No. 216-3. Plaintiffs reiterated these points in comments on the proposed rule to amend the Plan in March 2021, stating that this new information meant the rule needed to contain measures to reduce right whale M/SI by 90 percent. CBD et al.'s Comments on Proposed Rule (Mar. 1, 2021) at 8 (Ex. 8 to Monsell Dec.).

Right whale experts also cited the science proving that NMFS was aiming at far too low a target in their comments on the draft biological opinion and the proposed rule. The Marine Mammal Commission (MMC)—an independent federal agency established by the MMPA to advise other federal agencies on matters involving marine mammals, 16 U.S.C. §§ 1401(a), 1402(a)(4)—urged NMFS to adopt measures "to achieve an expected risk reduction sufficiently in excess of 80 percent." MMC Comments on Proposed Rule (Mar. 1, 2021) at 9–10 (Ex. 9 to Monsell Dec.); *see also* Georgia Department of Natural Resources Comments on Draft BiOp

(Feb. 2021) at 2 (Ex. 10 to Monsell Dec.) (noting "an immediate 88% reduction in M/SI is needed"); New England Aquarium Comments on Proposed Rule (Mar. 1, 2021) at 3 (Ex. 11 to Monsell Dec.) (urging agency to reduce right whale M/SI risk "by at least 80 percent."); New England Aquarium Comments on Draft Biological Opinion at 2 (Ex. 12 to Monsell Dec.) ("While 60% risk reduction may have been satisfactory when this process started in 2017, in 2021 60% risk reduction is no longer sufficient as there are now substantially (16%) fewer [North Atlantic right whales] than there were in 2017. An 80% risk reduction target initially is now more appropriate[.]").

In short, NMFS was fully aware that right whale M/SI must be reduced by significantly more than 60 percent long before it published the Final Rule. Nevertheless, it chose to aim for the lower 60 percent risk reduction target, knowing that this would have no hope of achieving the statutory mandate to reduce M/SI to below PBR within six months of implementation. Instead, it constructed the Conservation Framework to delay complying with that mandate for an additional nine years. As this Court recognized, the 2021 BiOp calculated that the federal lobster fishery alone operating under the Final Rule will continue to kill or seriously injure nearly three right whales every year, several times over PBR. *See, e.g.*, *CBD v. Raimondo*, 2022 WL 2643535 at *6, 19. Adding in anticipated lethal take from state lobster fisheries operating under the Final Rule brings that estimated total to 3.17 annual average right whale mortalities. *See* JA Vol. 3 at 323, ECF No. 216-3.

Indeed, on November 2, 2021, six weeks after publishing the Final Rule, NMFS finally publicly conceded that (based on previously available data), risk reduction in U.S. fisheries must be roughly 90 percent (from levels before the 2021 Final Rule) to drive M/SI to PBR. Specifically, NMFS calculates that U.S. fisheries risk must be reduced between 89.4 percent on

the low end (if 70 percent of mortalities are attributed to Canada) and 93.6 percent on the high

end (if only 50 percent of mortalities are attributed to Canada). NMFS, Informational Webinar

(Nov. 2, 2021) at slides 42–43 (Ex. 4 to Monsell Dec.); *see also* NMFS, Atlantic Large Whale

Take Reduction Team, Day 1: May 9, 2022 at slide 39 (Ex. 13 to Monsell Dec.) (agency

presentation reiterating that risk needs to be reduced by 90 percent).

The magnitude of the entanglements problem is demonstrably larger now. In addition to

the continued population decline, evolving scientific evidence underscores the existential threat

that fishing with vertical buoy lines poses to the species' survival in ways that NMFS has yet to

analyze. For example, one recent paper found that entanglements stunt the growth of right

whales, leaving them smaller, more vulnerable to future entanglements and other threats, and less

likely to successfully reproduce. Stewart et al. 2021 (Ex. 14 to Monsell Dec.).



---

[4] Figure 1 from Stewart et al. 2021 designed by Madeline Wukusick. According to the paper, "[t]he dashed outline in each panel represents the median model-estimated body length for a whale of the same age born in 1981 with no history of entanglements or maternal entanglements."

Another recent paper confirmed that right whales are now smaller than they were only a few decades ago and that smaller right whales produce fewer calves over their reproductive years. Stewart et al. 2022 (Ex. 15 to Monsell Dec.). This new science paints a grim picture of the numerous sublethal impacts of entanglements, particularly where NMFS acknowledges that U.S. fisheries will continue to entangle more than 15 percent of the right whale population each year even after implementation of the 2021 Final Rule. *See* JA Vol. 3 at 318, 320, 322–23, ECF No. 216-3. This is roughly 50 right whales each year based on the most recent population estimate.

This new science also demonstrates that a substantial portion of the risk reduction measures included in the 2021 Final Rule may not adequately reduce right whale mortality. Specifically, much of the risk reduction NMFS assumed in the 2021 Final Rule was based on the theoretical assumption that converting to the use of weak rope, weak insertions, and/or weak toppers will reduce right whale mortalities in static vertical buoy lines. *See* 86 Fed. Reg. 51,970, 51,973–74, 52,005 (Sept. 17, 2021). NMFS based this assumption on a Knowlton et al. 2016 paper concluding that 1700 pound-force breaking strength rope could reduce M/SI for right whales. *Id.* at 52,005. The findings in that paper, however, were based on examining documented entanglements that occurred before the most significant documented decrease in body length and stunted growth. *Compare* JA Vol. 3 at 202–203, ECF No. 216-3 (noting Knowlton et al. 2016 study examined gear collected from entanglements that occurred between 1994 and 2010) *with* Stewart et al. 2021 (examining right whale size since the 1980s and noting significantly smaller size for whales born starting in 2011) (Ex. 14 to Monsell Dec.) *and* Stewart et al. 2022 (right whales are now smaller) (Ex. 15 to Monsell Dec.).

Shorter right whales, with commensurately less mass, cannot be assumed to be able to exert the same forces as longer, heavier right whales, casting doubt on NMFS's conclusion that

"right whales can break free of rope with breaking strengths below 1700 lb[.]" 86 Fed. Reg. at 52,005. Moreover, another recent paper found that weak rope cannot be effectively used in deep, offshore waters because the trawl gear (i.e., sets of lobster traps connected by groundline) used there is too heavy. Willse et al. 2022 (Ex. 16 to Monsell Dec.). NMFS recently issued a report stating that, while federal waters represent 20 percent of fixed-gear fishing effort, these waters represent 70 percent of the entanglement risk for risk whales. NMFS, Draft Ropeless Roadmap A Strategy to Develop On-Demand Fishing (July 2022) at 15 (Ex. 17 to Monsell Dec.). "This suggests that, in general, vessels operating in federal waters represent a disproportionate amount of entanglement risk[.]" *Id.*[5] Thus, the remaining risk to right whales from gear used in the federal offshore lobster fishery may be even greater than NMFS assumed it was when it issued the 2021 Final Rule, underscoring the need for effective judicial remedies that require the agency to come into compliance with its ESA and MMPA obligations without additional undue delay.

Scientists now believe there are fewer than 70 breeding females in the population and that low birth rates coupled with whale deaths "means that there could be no females left in the next 10 to 20 years." Pls.' Status Report at 2, ECF No. 128. Nor do the last two years of improved calving numbers provide grounds for optimism. Even though 20 right whale calves were born in the 2020–21 calving season and 15 were born in the 2021–22 calving season, NMFS has stated that "given the estimated rate of human-caused mortality and serious injury, we need approximately 50 or more calves per year for many years to stop the decline and allow for recovery." NMFS, North Atlantic Right Whale Calving Season 2022,

---

[5] NMFS is scheduled to provide an update on the risk reduction of Phase 1 (the 2021 Final Rule) to the Atlantic Large Whale Take Reduction Team on August 18, 2022. *See* NMFS, Atlantic Large Whale Take Reduction Team: Upcoming Meetings, https://www.fisheries.noaa.gov/new-england-mid-atlantic/marine-mammal-protection/atlantic-large-whale-take-reduction-team#upcoming-meetings (updated Aug. 9, 2022).

https://www.fisheries.noaa.gov/national/endangered-species-conservation/north-atlantic-right-whale-calving-season-2022 (updated July 26, 2022) (Ex. 18 to Monsell Dec.). The right whale has already waited years for NMFS to reverse the trend towards extinction and put it on the road to recovery. It simply does not have any more years to wait.

## ARGUMENT

The right whale's dire status is due in no small part to the agency's decades-long failure to comply with the mandates of the MMPA and ESA. Since NMFS first promulgated the Plan in 1997, it has never complied with its MMPA obligation under section 118 to bring right whale M/SI in the lobster fishery to below PBR, to say nothing of insignificant levels approaching zero. Nor has NMFS ever lawfully authorized incidental take in the lobster fishery under the MMPA and ESA. Time and again NMFS has dragged its feet in amending and implementing the Plan. *See, e.g.*, Pls.' Opp'n to Mot. to Stay at 7–8, ECF No. 71. It has refused to finalize proposed regulations until compelled to do so by litigation. *Id.* at 8. It has failed to implement proactive, protective measures the right whale's status demands and the law requires, repeatedly acceding to industry in the face of resistance. *Id.* at 8–9. NMFS has been equally cavalier with its ESA obligations, tacitly allowing unauthorized right whale non-lethal and lethal incidental take in both state and federal fisheries for decades. *See, e.g.*, Pls.' Mot. to Enforce at 12–13, ECF No. 141. And while those legal violations have always been egregious, they are even more so now given that the species is, in NMFS's words, approaching extinction.

This conservation crisis necessitates explicit directives from this Court requiring NMFS to comply with the law at long last, and to do so expeditiously. Plaintiffs detail below why this Court should vacate and remand the 2021 BiOp with respect to the federal lobster fishery and right whales, staying vacatur for six months; remand the Final Rule without vacatur; order

10

NMFS to issue a new rule within six months; and issue explicit declaratory relief to ensure that there is no way for the agency to misinterpret the scope of its obligations on remand.

## I.       The Court Should Vacate and Remand the 2021 Biological Opinion with Respect to the Federal Lobster Fishery and Right Whales and Stay Vacatur for Six Months

"Vacatur is the normal remedy when [courts] are faced with unsustainable agency action." *Envtl. Def. Fund v. Fed. Energy Regul. Comm'n*, 2 F.4th 953, 976 (D.C. Cir. 2021) (cleaned up); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020) (because an agency decision violated the Administrative Procedure Act (APA), it "must be vacated"); *Citizens to Pres. Overton Park  v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action *must be set aside* if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.") (emphasis added) (quoting 5 U.S.C. § 706(2)(A)–(D)). The Court should order the normal statutory remedy under the APA here and vacate the 2021 BiOp with respect to the federal lobster fishery and the right whale. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating and remanding a biological opinion issued under the ESA).

Although the D.C. Circuit has recognized an exception to the default statutory remedy of vacatur, under which a court may remand without vacatur in limited circumstances, *see Allied-Signal. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), there is no reason to depart from the presumptive remedy here. Courts use two factors to determine if remand without vacatur is warranted: (1) the seriousness of the agency's error and (2) "the disruptive consequences of an interim change that may itself be changed." *Id*. The burden is on NMFS and Defendant-Intervenors to show anything less than vacatur is warranted. *CBD v. Ross*, 480 F. Supp. 3d at 245. They cannot do so here.

11

First, the agency's legal violations of the plain-language requirements of the MMPA and ESA are serious, going to the core purposes of both statutes. Because of the severity of these errors, NMFS's only recourse is to issue new decisions; it cannot justify its decisions based on the existing record. *Cf. Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1244 (N.D. Cal. 2015) (courts remand without vacatur only when errors are "mere technical or procedural formalities that the [agencies] can easily cure"). Indeed, NMFS will need to substantially amend the regulations governing operation of the lobster fishery "to ensure any anticipated take would be lawfully authorized and appropriately minimized." *CBD v. Raimondo*, 2022 WL 2643535 at *11 (citation omitted). Should it anticipate that incidental lethal take in the federal lobster fishery will continue to occur even after implementation of such amendments, moreover, it must first undertake a rulemaking to authorize such take under the MMPA, 16 U.S.C. § 1371(a)(5)(E), before it may authorize such take under the ESA, 16 U.S.C. § 1536(b)(4)(C).

Second, while there will be economic consequences to the federal fishery from vacatur, these disruptive consequences cannot outweigh the seriousness of the agency's legal errors, which threaten the right whale's very survival. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists and Aerospace Workers Local Lodge 207 v. Raimondo*, 18 F.4th 38, 41 (1st Cir. 2021) (recognizing that the right whale population is so low that "even one additional death a year increases the odds that the right whale will go extinct."). Congress has already "placed its thumb on the scale for the whales," *id.* at 40, and the Court should not strike a different balance here. Moreover, staying vacatur for six months will provide the agency with time to figure out how to come into compliance with the law in authorizing and managing the federal lobster fishery while

it develops a new biological opinion under the ESA and incidental take authorization under the MMPA, if necessary.

> A.    The Agency's Errors Are Serious

The agency's legal violations in issuing the 2021 BiOp are serious. The Court held that the ITS for right whales violates the law in two ways. First, the Court held that NMFS unlawfully issued an ITS for take of right whales without first authorizing such take under section 101(a)(5) of the MMPA. *See CBD v. Raimondo*, 2022 WL 2643535 at *10–11; *see also id.* at *10 ("The text of the ESA makes clear that [MMPA incidental take authorization] is an antecedent requirement" to ESA incidental take authorization for an endangered marine mammal). In doing so, the Court rejected the agency's argument that it could make up for its failure to "satisfy the antecedent 'negligible impact' requirement" of the MMPA "by setting the level of lethal take authorized [under the ESA] at zero," agreeing with Plaintiffs that the agency cannot use its failure to comply with the MMPA as an excuse to also violate the ESA. *Id.* at *11. Rather, "if the action under review could not be authorized under the MMPA, then the agency 'was obligated to revise its action to ensure any anticipated take would be lawfully authorized and appropriately minimized' to meet the antecedent requirement." *Id.* (citation omitted).

Second, the Court also held that NMFS's ITS was unlawful due to the discrepancy between the level of lethal take NMFS anticipated in the 2021 BiOp (2.56 per year in the federal fishery, more than three times PBR) and the level of lethal take authorized (zero). *See id.* The Court again rejected the agency's position that the requirement to reinitiate consultation in the event a right whale is confirmed to be killed by the federal fishery could save the faulty ITS because there are no measures in place to ensure that the federal lobster fishery would not kill

another right whale during reinitiated consultation. *Id.* at *12. As with its 2014 BiOp, these violations of law are serious. *See CBD v. Ross*, 480 F. Supp. 3d at 245–46.

These legal violations undermine the conservation purposes of the ESA. As the Supreme Court has recognized, section 7 reflects Congress's intent to require federal agencies to "afford first priority to the declared national policy of saving endangered species," even above their primary missions. *Tenn. Valley Auth.*, 437 U.S. at 185. Section 7 of the ESA is the very "heart" of the ESA for federal agencies, *Cal ex. rel. Lockyer v. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). Its consultation requirement is how agencies carry out the ESA's substantive mandate to protect endangered species from jeopardy. *See* 50 C.F.R. §§ 402.12–402.17.

As courts have explained, "the strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985). This includes the requirement to issue lawful ITSs. *See Ariz. Cattle Growers' Ass'n v. Fish & Wildlife Serv.*, 273 F.3d 1229, 1251 (9th Cir. 2001) ("The terms of an [ITS] do not operate in a vacuum. To the contrary, they are integral parts of the statutory scheme[.]"). Without an ITS that appropriately authorizes and sufficiently mitigates lethal right whale take by the federal lobster fishery, NMFS cannot comply with its fundamental legal obligation to ensure its actions in authorizing and managing the lobster fishery do not jeopardize the right whale's continued existence. *See Turtle Island Restoration Network v. Dep't of Comm.*, 878 F.3d 725, 735 (9th Cir. 2017) (describing importance of jeopardy analysis).

NMFS's legal violations thus cut to the foundation of the ESA. *See Tenn. Valley Auth.*, 437 U.S. at 184–85. This is particularly true considering that the Court also held NMFS's 2014 BiOp unlawful for failing to properly authorize and mitigate lethal take of right whales by the

lobster fishery, that NMFS failed to cure these legal violations on remand, and that the right

whale's already-dire status has only continued to worsen in the two years since the Court's first

remedy order *See Comcast Corp. v. Fed. Commc'n Comm'n*, 579 F.3d 1, 9 (D.C. Cir. 2009)

(agency decision is "particularly egregious" where it failed to resolve problems identified by the

court); *see supra* at 4–6, 7–9 (discussing harm to right whales).

　　　NMFS's legal violations also undermine the purposes of the MMPA. As this Court

explained, issuing an incidental take authorization under section 101(a)(5)(E) of the MMPA is a

necessary antecedent to authorizing such take under the ESA. *CBD v. Raimondo*, 2022 WL

2643535 at *1, 10–11. To authorize the incidental take of right whales by the lobster fishery

under the MMPA, NMFS must find, *inter alia*, that "the incidental mortality and serious injury

from commercial fisheries will have a negligible impact on [the] species[.]" 16 U.S.C. §

1371(a)(5)(E)(i). As the Court recognized, "[t]he need for such a finding is consistent with the

MMPA's overall aim of reducing [mortality and serious injury] rates for marine mammals to

near zero." *CBD v. Raimondo*, 2022 WL 2643535 at *10. Here, NMFS has once again failed to

expressly authorize such incidental take, including by making the requisite negligible impact

finding.

　　　To the contrary, NMFS again concluded that, even after full implementation of the Final

Rule, the federal lobster fishery will still kill or seriously injure an average of 2.56 right whales

every year. *See* JA Vol. 3 at 323, 325, ECF No. 216-3. This anticipated annual take is still

several times more than PBR and well above insignificant levels approaching zero. *See CBD v.

Raimondo*, 2022 WL 2643535 at *10 (noting that the 2021 BiOp indicates the fishery "will not

have 'a negligible impact' on the right-whale population in coming years, as NMFS projects that

levels of [mortality and serious injury] take from trap/pot gear in federal fisheries will in fact

exceed the potential biological replacement level for right whales until 2030."); JA Vol. 1 at 91,

ECF No. 216-1 (noting PBR was 0.8 at time Final Rule was released in September 2017).

Indeed, NMFS has stated outside the context of this litigation that the species' "[s]urvival . . .

depends on no more than one whale death per year." NMFS, 10 Things You Should Know About

North Atlantic Right Whales, https://www.fisheries.noaa.gov/feature-story/10-things-you-

should-know-about-north-atlantic-right-whales (Oct. 17, 2019) (Ex. 19 to Monsell Dec.).

Nevertheless, NMFS continues to authorize the lobster fishery in the same manner that

the agency acknowledged in the 2021 BiOp will cause high, unsustainable levels of take for

years to come. Despite repeatedly assuring this Court of its diligence in engaging in a rulemaking

and reinitiated consultation to address the right whale's plummeting numbers, NMFS directly

violated the MMPA's command to authorize incidental take with an accompanying negligible

impact finding prior to authorizing take under the ESA, thus frustrating  the "primary goal" of

the MMPA that marine mammals be "protected" from harm and that the statute must "be

administered for the benefit of the protected species rather than for the benefit of  commercial

exploitation." *Kokechik*, 839 F.2d at 800 (citation omitted). Indeed, marine mammal mortality in

commercial fishing operations was one of the primary threats Congress sought to address in

originally enacting the MMPA, reflected in both the setting of an "immediate goal that the

incidental kill[ing] . . . of marine mammals permitted in the course of commercial fishing

operations be reduced to insignificant levels approaching . . . zero mortality," 16 U.S.C. §

1371(a)(2), and the command that NMFS "assist in the recovery or prevent the depletion" of

marine mammals that "interact[] with commercial fisheries. *Id.* § 1387(f)(1).

The agency cannot possibly provide additional explanation to justify its violations of the

plain language of the ESA and MMPA in failing to properly authorize the federal lobster fishery

to kill and seriously injure right whales or else changing its action to ensure such lethal takes do not occur. Like last time around, the agency has already provided an explanation for why it chose the course it took. But this Court found that explanation lacking and the agency's approach contrary to the plain meaning of the law. *CBD v. Raimondo*, 2022 WL 2643535 at *11 (rejecting NMFS's explanation, noting that "[t]he ESA does not provide for [the agency's] workaround if taking cannot be authorized under section 101(a)(5)(E)" of the MMPA); *see also CBD v. Ross*, 480 F. Supp. 3d at 245 (noting that the Court rejected the agency's argument as to why it did not include an ITS in its 2014 BiOp "and it is therefore certain that the agency cannot cure its errors on remand because the actions taken were not statutorily authorized." (cleaned up)).

On remand, NMFS must modify its action and ensure that any anticipated take resulting from its authorization of the federal lobster fishery will be adequately minimized and lawfully authorized under both the ESA and MMPA. In doing so, it "must [again] develop an entirely new [biological opinion] to correct its error," rendering remand without vacatur inappropriate. *See Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 52 (D.D.C. 2010).

B.      The Disruptive Economic Consequences of Vacatur Do Not Outweigh the Seriousness of the Agency's Legal Errors

Under *Allied-Signal*, "remand without vacatur is not required when there are *any* disruptive consequences, but rather when those consequences are unacceptable in light of the seriousness of the error." *Friends of the Earth v. Haaland*, No. 21-2317-RC, — F.Supp.3d —, 2022 WL 254526 at *28 (D.D.C. Jan. 27, 2022); *see also Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009) ("the second *Allied–Signal* factor is weighty only insofar as the agency may be able to rehabilitate its rationale"); *Envtl. Def. Fund*, 2 F.4th at 976 (vacating approval of pipeline already operating). That is particularly true here where the harm from vacatur would be economic, not environmental. *See Nat. Res. Def. Council v. Envtl. Prot. Agency*, 489 F.3d 1364,

17

1374 (D.C. Cir. 2007) ("Vacatur would be disruptive if it set back achievement of the environmental protection required" by statute.); *see also Pub. Emps. for Envtl. Responsibility v. Fish & Wildlife Serv*., 189 F. Supp. 3d 1, 3 (D.D.C. 2016) ("[I]t is not clear that economic concerns [from vacatur] are as relevant in an environmental case like this one.").

Indeed, not vacating the 2021 BiOp and allowing lobster fishing to continue in the same manner and to the same extent as it currently does under the Final Rule during the pendency of remand would result in significant environmental harm by causing continued serious injury and death of critically endangered right whales, pushing the species even closer to the brink of extinction. *See supra* at 10.

NMFS had every opportunity to comply with the law by enacting stricter, more comprehensive mitigation measures in the Final Rule and thereby enable it to make the requisite findings required by both the MMPA and ESA to lawfully authorize the fishery. Indeed, over the course of this entire litigation, NMFS has repeatedly assured this Court that it was working diligently to protect the species and comply with the law.

But despite knowing what the science required with respect to risk reduction, NMFS chose not to implement more protective measures. For example, based on the best available science it could have implemented several proposed closures to lobster fishing with vertical buoy lines, including a seasonal closure of Lobster Management Area 3 above 40.3 degrees between October-December, a year-round closure of statistical area 529 (an area south of Martha's Vineyard and Nantucket), or a seasonal closure of all of Lobster Management Area 1. JA Vol. 1 at 131. NMFS could have also spatially expanded the Plan's current Massachusetts Restricted Area to the New Hampshire border; and it could have required the use of one buoy line in Lobster Management Area 3 year-round. *Id.* at 130–31.NMFS chose not to promulgate these

measures claiming they were "[t]oo large" or "unpopular with stakeholders" (i.e., the lobster industry). *Id.*; *see also id.* at 130–35 (describing various alternatives NMFS considered but rejected in developing the Final Rule). Indeed, this conundrum is on NMFS as it has avoided enacting more comprehensive protective measures for decades because of opposition from industry. *See* 62 Fed. Reg. 39,157, 39,159 (July 22, 1997) (NMFS's recognition that "extensive closures of large areas of the ocean to lobster and gillnet  fishermen . . . would guarantee reduction of entanglements causing serious injury and mortalities but only at a high cost to many fishermen").

But neither the MMPA nor the ESA permits NMFS to dismiss conservation measures because they are unpopular with industry. *See Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) ("Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law.") (cleaned up). As this Court already recognized, while meeting its legal obligations may be difficult, the agency does not "operate[] free from the strict requirements imposed by the MMPA and ESA." *CBD v. Raimondo*, 2022 WL 2643535 at *19.

While Plaintiffs acknowledge that there would be disruptive economic consequences from vacating the 2021 BiOp with respect to the right whale and the federal lobster fishery, those consequences cannot outweigh the significance of NMFS's legal errors. Defendants may attempt to overstate these consequences by asserting that vacatur will shut down the entire lobster fishery in both state and federal waters. But this Court's ruling is based on the unlawful ITS for the federal lobster fishery alone; the Court did not rule on Plaintiffs' arguments that the ITS also unlawfully failed to authorize anticipated take of right whales in state waters that are regulated

19

by the Plan. *See* Pls.' Summ. J. Mem. at 29, ECF No. 188-1. NMFS has stated that vacating the 2021 BiOp means it could no longer authorize operation of the fishery in federal waters. *See, e.g.*, NMFS Summ. J. Mem. at 44, ECF No. 202-2. Therefore, while vacatur would disrupt the lobster fishery in federal waters, it would not directly affect the lobster fishery in state waters as permitted under state fisheries law from Maine to Rhode Island. Vacating the BiOp with respect to the federal lobster fishery will therefore target the area where NMFS acknowledges most of the risk of right whale mortality and serious injury remains—federal waters. JA Vol. 3 at 323, ECF No. 216-3 (2021 BiOp concluding that, after implementation of the Final Rule, ongoing operation of the lobster fishery in federal waters will cause an average of 2.56 right whale deaths each year while ongoing operation of the lobster fishery in state waters will cause an average of 0.61 right whale deaths each year).

Moreover, NMFS has ample statutory authority to immediately implement additional measures that could result in less than a full shutdown of federal waters. This includes, for example, issuing an emergency rule under section 118(g) of the MMPA. 16 U.S.C. § 1387(g); *see also supra* at 20–21 (describing measures NMFS considered but rejected in issuing Final Rule because of industry opposition). Indeed, the agency recently invoked its emergency authority to implement a short, one-month closure of federal waters off Massachusetts to lobster fishing with vertical buoy lines for April 2022 only. 87 Fed. Reg. 11,590 (Mar. 3, 2022). It did so after realizing that expanding the Massachusetts Restricted Area inadvertently left "a critical gap in protection where right whale distribution information identifies a high risk of overlap between right whales and buoy lines." *Id.* at 11,593. And it recently issued a report recognizing that "the urgent conservation crisis facing the endangered North Atlantic right whale" increases "the need for larger and longer seasonal restricted areas" to protect the species from entanglements. NMFS,

20

Draft Ropeless Roadmap at 1. In sum, NMFS has many ways it could exercise its authorities to protect right whales from being injured and killed in federal lobster gear. But what it cannot do is what it has done since 1997—continue to violate the law by minimizing disruptive consequences for the lobster industry at the expense of the right whale.

A short stay will provide NMFS time in which to determine how it will modify its authorization of the federal lobster fishery to come into compliance with the law. Staying vacatur for six months is within the Court's discretion. *See, e.g.*, *Friends of the Earth v. Envtl. Protection Agency*, 446 F.3d 140, 148 (D.C. Cir. 2006) (vacating EPA's unlawful approval of a water pollution control limit and recognizing the district court's authority to stay the order of vacatur); *CBD v. Ross*, 480 F. Supp. 3d at 246. It will also provide NMFS incentive to act expeditiously. *See Nat. Res. Def. Council v. Envtl. Protection Agency*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (Randolph, J., concurring in part) ("The existence of a stay with time limits, rather than an open-ended remand without vacating, will give the agency an incentive to act in a reasonable time, given the other constraints on its resources. When we simply remand the agency has no such incentive."); *CBD v. Ross*, 480 F. Supp. 3d at 246. However, given the highly imperiled status of the species, and NMFS's repeated and long-standing failure to comply with the ESA or MMPA in authorizing and managing the fishery, a stay longer than six months is not warranted.

## II.    The Could Should Remand the Final Rule Without Vacatur

The Court should remand the Final Rule without vacatur. Vacatur is "disruptive if it set[s] back achievement of the environmental protection required." *Nat. Res. Def. Council*, 489 F.3d at 1374; *see also Pac. Rivers Council v. Forest Serv.*, 942 F. Supp. 2d 1014, 1022 (E.D. Cal. 2013) (declining to vacate where court found "harmful environmental consequences" would

occur if it vacated the "environmentally superior" forest plan amendments and put the old plans back in place during remand).

Here, the Final Rule—while not nearly protective enough—does contain new measures that improve the situation for right whales, including new seasonal restricted areas to vertical buoy lines off the coasts of Maine and Massachusetts. 86 Fed. Reg. at 51,972–73; *codified at* 50 C.F.R. § 229.32(c)(4)(ii), (6)(ii); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists and Aerospace Workers Local Lodge 207 v. Raimondo*, 40 F.4th 36, 38 (1st Cir. 2022) (recognizing that NMFS implemented the new seasonal restricted area in federal waters off Maine "to guard against the possibility that the large proliferation of lobster trap lines customarily placed in the [area] during [the time the restricted area is in place] would cause the death of one or more of the few, severely endangered North Atlantic right whales.").

And these new measures not only help protect right whales but also other imperiled whale species at risk of entanglement in lobster gear in both state and federal waters such as humpback, fin, and minke whales. *See* 50 C.F.R. § 229.32(a)(1) (the Plan seeks "to reduce incidental mortality and serious injury of fin, humpback, and right whales in specific Category I and II commercial fisheries from Maine through Florida" and "is also intended to benefit minke whales"). Vacating the Final Rule would remove these important measures. The Final Rule should therefore remain in place while NMFS develops a new rule to amend the Plan with measures it expects will reduce right whale M/SI in the U.S. lobster fishery in both state and federal waters to below PBR within six months of implementation.

## III.    The Court Should Order NMFS to Issue a New Rule Within Six Months

The Court should order NMFS to issue a new final rule amending the Plan that complies with the MMPA's requirement to contain measures the agency expects to reduce right whale

M/SI in the lobster fishery to below PBR within six months of implementation. The Court should order the agency to issue this new final rule within six months from the remedy order. This expedited schedule is necessary to ensure NMFS complies with the Court's decision in a timely fashion, and the right whale receives the protections to which it is legally entitled and that it so desperately needs to survive.

In issuing this relief, the Court will not be commanding the agency *how* to act, only that it must act by a date certain. This is well within this Court's power. *See, e.g.*, *Rodway v. Dep't of Agric.*, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding agency rule and ordering the agency "to complete the new rule-making process within 120 days of the issuance of th[e] opinion"); *Am. Gas Ass'n v. Fed. Energy Reg. Comm'n*, 912 F.2d 1496, 1518 (D.C. Cir. 1990) (remanding inadequately supported agency rule and requiring "that the [agency] address the matter in a final rule within 90 days"); *Ctr. for Biological Diversity v. Fish & Wildlife Serv*., 342 F. Supp. 3d 968, 980 (N.D. Cal. 2018) (holding agency decision denying ESA protections for Pacific fisher unlawful and ordering agency to prepare a new rule by March 22, 2019, 182 days from the date of the court's order); *Northwest Envtl. Advocates v. Envtl. Protection Agency*, No. 3:12-cv-01751-AC, 2018 WL 6524161 at *7 (D. Or. Dec. 12, 2018) (reaffirming prior order requiring the agency to issue new rule under the Clean Water Act by April 2019, two years after the court's order); *Oceana v. Ross*, 483 F. Supp. 3d 764, 788 (N.D. Cal. 2020) (remanding rule to agency and ordering it to issue a new rule within 120 days); *see also In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering agency action within 45 days); *Cutler v. Hayes*, 818 F.2d 879, 895 n.137 (D.C. Cir. 1987) (listing cases where courts "intervened to compel an agency unreasonably delaying to speed up its activities" and imposed 30 and 60 day deadlines); *Zambrana v. Califano*, 651 F.2d 842, 844 (2nd Cir. 1981) ("[t]he remanding court is

vested with equity powers" and "[i]t may when appropriate set a time limit for action by the administrative tribunal, and this is often done").

A court-ordered deadline for a new final rule is necessary due to the agency's long and consistent history of delaying actions to protect right whales from entanglements and "the urgency of the listed species' situation." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008) (holding a court has discretionary authority to impose deadlines on remand proceedings and district court properly did so especially considering agency's history of issuing flawed biological opinions and the highly endangered status of the species at issue); *see also, e.g.*, Pls.' First Opening Br. on Remedy, ECF No. 105 at 13–15 (describing agency's history of delaying actions to protect right whales); *supra* at 4–5 (describing right whale's increasingly imperiled status); *supra* at 5–6 (noting how long NMFS has been aware of need to further reduce risk).

## IV.   The Court Should Issue Specific Declaratory Relief as Part of its Remedy Order

In addition to the remedies above, Plaintiffs request that the Court also include specific declaratory relief as part of its remedy order. Issuing declaratory relief as part of its remedy order is particularly appropriate and important for two reasons. First, NMFS has a long history of failing to properly authorize or minimize right whale take in the lobster fishery under both the ESA and MMPA. A declaration of the specific ways that NMFS violated these laws in issuing the 2021 BiOp and Final Rule will help prevent future violations. *See Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006) ("[A] declaratory judgment could help to remedy the effects of the agency's statutory violations and to ensure that similar violations would not occur in the future.").

Second, it appears that NMFS needs such specific instructions given that, in defending against Plaintiffs' Motion to Enforce the Court's 2020 opinions and orders on summary judgment and remedy, NMFS disingenuously claimed that these were "limited" orders that required nothing more of the agency than submitting status reports and that the Court "at most . . . *suggested*" the new biological opinion must contain an ITS. *See* ECF No. 148 at 21, 23 (emphasis added). NMFS cannot keep treating the plain language of the ESA and MMPA and this Court's decisions as mere suggestions, or this litigation may never end. *Cf. Fed. Commc'n Comm'n v. Pottsville Broadcasting Co.*, 309 U.S. 134, 145 (1940) ("On review the court may thus correct errors of law and on remand the [agency] is bound to act upon the correction."); *see also City of Cleveland, Ohio v. Fed. Power Comm'n*, 561 F.2d 344, 346 (D.C. Cir 1997) (agency is "without power to do anything which is contrary to either the letter or spirit of the" Court's Opinions and Orders) (citation omitted).

Therefore, Plaintiffs request that the Court, issue an order (1) declaring that NMFS violated the ESA and APA for issuing an ITS in the 2021 BiOp for zero lethal right whale take in the federal fishery without first authorizing incidental take under the MMPA, 16 U.S.C. § 1371(a)(5)(E); (2) declaring that NMFS violated the ESA and APA by anticipating but not authorizing lethal take in the federal lobster fishery in the 2021 BiOp ITS; (3) declaring that NMFS violated the MMPA and APA in issuing a final rule amending the Plan that failed to contain the measures the agency expected would reduce right whale M/SI in the U.S. lobster fishery in both state and federal waters to below PBR within six months of implementation; (4) vacating and remanding the 2021 BiOp with respect to the right whale and the federal lobster fishery with vacatur stayed for six months and ordering NMFS to produce a new biological opinion that includes fully complies with the requirements of the MMPA and ESA in authorizing

any anticipated lethal take of right whales in the federal lobster fishery; and (5) remanding without vacating the Final Rule and ordering NMFS to issue a new rule within six months of the order that contains the measures NMFS expects will reduce right whale M/SI in the U.S. lobster fishery to below PBR within six months of the rule's implementation.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter an order granting their requested relief.

Respectfully submitted this 12th day of August, 2022,

/s/ Kristen Monsell
Kristen Monsell, DC Bar No. CA00060
Center for Biological Diversity
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org

/s/ Jane P. Davenport
Jane P. Davenport, DC Bar No. 474585
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036
(202) 722-3274
jdavenport@defenders.org

Attorneys for Plaintiffs Center for
Biological Diversity and
Defenders of Wildlife

/s/ Erica A. Fuller
Erica A. Fuller, DC Bar No. MA0001
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
(617) 850-1754
efuller@clf.org

Attorney for Plaintiff Conservation Law
Foundation