TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

J. BRETT GROSKO
*Senior Trial Attorney* (Md. Bar)
TAYLOR MAYHALL
*Trial Attorney*
Wildlife and Marine Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
TEL:   (202) 305-0342 (Grosko)
         (202) 598-3796 (Mayhall)
FAX:   (202) 305-0275

*Counsel for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case Nos. 1:18-cv-112-JEB |
| GINA RAIMONDO, in her official capacity as Secretary of Commerce, JANET COIT, in her official capacity as Assistant Administrator of NOAA Fisheries, and the NATIONAL MARINE FISHERIES SERVICE, | ) ) ) ) ) ) ) | |
| *Federal Defendants*, and | ) ) | |
| THE STATE OF MAINE, et al., | ) ) | |
| *Intervenor-Defendants*. | ) ) | |

## FEDERAL DEFENDANTS' REMEDY RESPONSE BRIEF

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................................................. 1

STANDARD OF REVIEW ............................................................................... 5

LEGAL BACKGROUND .................................................................................. 6

   I.   Endangered Species Act Section 7 ......................................................... 6

   II.  The MMPA and the Atlantic Large Whale Take Reduction Team Process ........... 8

FACTUAL BACKGROUND ............................................................................. 9

   I.   NMFS's Implementation of the Conservation Framework .................................... 9

   II.  NMFS's Campaign to Develop, Refine, and Disseminate On-Demand Fishing
       Technology to the American Lobster Fishery, and the Ropeless Roadmap .......... 12

   III. NMFS's September 9, 2022 Notice of Intent to Amend the TRP ......................... 13

ARGUMENT ................................................................................................... 14

   I.   THE COURT SHOULD REMAND THE 2021 TRP AMENDMENT RULE
       WITH A DEADLINE OF DECEMBER 9, 2024 TO PUBLISH AND FINALIZE
       ITS NEXT TRP AMENDMENT RULE. ............................................................ 14

   II.  THE COURT SHOULD REMAND THE ITS WITHOUT VACATUR ............. 18

      A.   Only the Incidental Take Statement is at Issue, Not the Biological
          Opinion. ................................................................................................. 20

      B.   The Single Deficiency that the Court Identified Concerning the Incidental
          Take Statement is not Serious. ................................................................. 21

      C.   The "Disruptive Consequences" Prong of *Allied Signal* Also Supports
          Remand Without Vacatur. ........................................................................ 25

      D.   The Court Should Limit Any Remedy to Fisheries Expected to Impact Right
          Whales. ................................................................................................. 28

CONCLUSION ............................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**                                                                  **PAGE**

*Am. Ass'n of Retired Persons v. Equal Employment Opporunity Comm'n,*
   267 F. Supp. 3d 14, 38-19 (D.D.C. 2017) ..................................................... 6

*Allied-Signal v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ............................................................... *passim*

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................ 19

*Chamber of Commerce of the U.S. v. SEC,*
   443 F.3d 890 (D.C. Cir. 2006) ................................................................ 20

*Columbia Snake River Irrigators Ass'n v. Evans,*
   No. 03-cv-1341, 2004 WL 1240594 (D. Or. June 3, 2004) .......................... 20

*Dist. 4 Lodge v. Raimondo,*
   No. 21-01874 (1st Cir. Nov. 16, 2021) ...................................................... 15

*Ethyl Corp. v. EPA,*
   541 F.2d 1 (D.C. Cir. 1976) .................................................................... 22

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
   423 U.S. 326 (1976) ................................................................................ 19

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ................................................................................ 19

*Grand Canyon Trust v. U.S. Bureau of Reclamation,*
   623 F. Supp. 2d 1015 (D. Ariz. 2009) ................................................ 19, 20

*Illinois Commercial Fishing Ass'n v. Salazar,*
   867 F. Supp. 2d 108 (D.D.C. 2012) .......................................................... 22

*INS v. Ventura,*
   537 U.S. 12 (2002) .................................................................................. 19

*Mayo v. Jarvis,*
   177 F. Supp. 3d 91 (D.D.C. 2016) ............................................................ 23

*Maine Lobstermen's Ass'n v. NMFS,*
   No. 21-cv-2509 (D.D.C) .................................................................... 15, 23

ii

*N.C. Fisheries Ass'n v. Gutierrez*,
　550 F.3d 16 (D.C. Cir. 2008) ........................................................................ 19

*North Dakota v. EPA*,
　550 F.3d 1176 (D.C. Cir. 2008) ...................................................................... 6

*Nat. Res. Def. Council, Inc. v. Train*,
　510 F.2d 692 (D.C. Cir. 1974) ...................................................................... 17

*Nat'l Parks Conservation Ass'n v. Semonite*,
　422 F. Supp. 3d 92 (D.D.C. 2019) ..........................................................5-6, 28

*Nat'l Wildlife Fed'n v. NMFS*,
　254 F. Supp. 2d 1196 (D. Or. 2003) .............................................................. 20

*Pub. Emps. for Envtl. Responsibility v. Beaudreau*,
　25 F. Supp. 3d 67 (D.D.C. 2014) .................................................................... 6

*SEC v. Chenery*,
　332 U.S. 194 (1947) ...................................................................................... 19

*Shands v. Jacksonville Med. Ctr.*,
　139 F. Supp. 3d 240 (D.D.C. 2015) ................................................................ 6

*Sierra Club v. Pruitt*,
　280 F. Supp. 3d 1 (D.D.C. 2017) .................................................................. 17

*Int'l Union, United Mine Workers v. Federal Mine Safety & Health Admin.*,
　920 F.2d 960 (D.C. Cir. 1990) ...................................................................... 20

*United Steel v. Mine Safety & Health Admin.*,
　925 F.3d 1279 (D.C. Cir. 2019) ...................................................................... 5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
　435 U.S. 519 (1978) ...................................................................................... 19

*Wash. Toxics Coal. v. EPA*,
　413 F.3d 1024 (9th Cir. 2005) ...................................................................... 22

*Wildearth Guardians v. U.S. Forest Serv.*,
　No. 19-203, 2020 WL 2239975 .................................................................... 23

## STATUTES

5 U.S.C. § 702 .............................................................................................. 18
5 U.S.C. § 706(2) ........................................................................................... 5
16 U.S.C. § 1362(20) ...................................................................................... 8

16 U.S.C. § 1371(a)(5) ........................................................................................... 7
16 U.S.C. § 1387(f)(6)(C) ....................................................................................... 8
16 U.S.C. § 1387(f)(8)(A)(ii) ................................................................................ 16
16 U.S.C. § 1536(a)(2) ............................................................................................ 6
16 U.S.C. § 1536(a)(3)(A) ..................................................................................... 21
16 U.S.C. § 1536(a)(4) ........................................................................................... 21
16 U.S.C. § 1536(b) ............................................................................................... 22

## FEDERAL REGULATIONS

40 C.F.R. § 1506.12 ............................................................................................... 17
50 C.F.R. § 402.14 ................................................................................................. 22
50 C.F.R. § 402.14(a) .............................................................................................. 7
50 C.F.R. § 402.14(h) ............................................................................................ 21
50 C.F.R. § 402.14(i) ...................................................................................... *passim*
62 Fed. Reg. 39,157 (July 22, 1997) ..................................................................... 8
65 Fed. Reg. 80,368 (Dec. 21, 2000) .................................................................... 8
67 Fed. Reg. 15,493 (Apr. 2, 2002) ...................................................................... 8
72 Fed. Reg. 34,632 (June 25, 2007) ................................................................. 8-9
73 Fed. Reg. 19,171 (Apr. 9, 2008) ...................................................................... 9
73 Fed. Reg. 58,942 (Oct. 8, 2008) ....................................................................... 9
87 Fed. Reg. 11,978 (March 3, 2022) .................................................................. 16
79 Fed. Reg. 30,586 (June 27, 2014) ..................................................................... 9
79 Fed. Reg. 73,848 (Dec. 12, 2014) ..................................................................... 9
80 Fed. Reg. 30,367 (May 28, 2015) ..................................................................... 9
83 Fed. Reg. 49,046 (Sept. 28, 2018) .................................................................... 8
86 Fed. Reg. 51,970 (Sept. 17, 2021) .................................................................... 9
87 Fed. Reg. 46,971 (Aug. 1, 2022) ...................................................................... 9
87 Fed. Reg. 55,405 (Sept. 9, 2022) .................................................................... 14

**INTRODUCTION**

For fifty years, the National Marine Fisheries Service ("NMFS") has protected the

North Atlantic right whale (*Eubalaena glacialis*) pursuant to the Endangered Species Act

("ESA") and Marine Mammal Protection Act ("MMPA"). Working closely with states

and stakeholders, NMFS has substantially reduced the risk of vessel strikes and vertical

fishing line entanglements, and the species has more than tripled its numbers from a

population of roughly 150 in 1971 to 481 individuals in 2011.

But a warming ocean has eroded that progress and made the job of conserving and

recovering the North Atlantic right whale significantly harder. In 2017 NMFS learned

that a steep decline had begun in 2010. Climate change and associated alterations in prey

abundance and distribution are exacerbating that decline by geographically shifting the

overlap between right whales and fisheries and by reducing the population's resilience to

other stressors. Fewer than 350 right whales remain today.

NMFS increased its efforts as soon as it became aware of the species' decline in

2017, reinitiating consultation under the ESA in late 2017, and convening the MMPA

Atlantic Large Whale Take Reduction Team ("TRT"). Using rigorous scientific analysis,

NMFS issued a new biological opinion in 2021 ("2021 BiOp") concerning the effects,

*inter alia*, of the federal American lobster fishery and other fixed gear fisheries on right

whales. After marathon sessions with states and stakeholders, NMFS received

recommendations for measures to reduce the risk of entanglement in fishing gear from

the Northeast lobster and Jonah crab fishery. NMFS implemented these measures in state

and federal waters through a rulemaking–the 2021 Atlantic Large Whale Take Reduction

Plan ("TRP") Amendment Rule ("2021 TRP Amendment Rule")–that promised to

1

significantly reduce entanglement risk. NMFS found that, taking into account the reductions from the 2021 TRP Amendment Rule and the effects of planned future rulemakings, entanglement-related mortality and significant injury ("M/SI") would drop 44 percent to 2.69 in 2021, and then fall again by over 60 percent, to 1.04 in 2025, and an additional 80 percent to 0.136 M/SI per year in 2030. NMFS committed to those future rulemakings in the North Atlantic Right Whale Right Whale Conservation Framework for Federal Fisheries in the Greater Atlantic Region ("Conservation Framework")–which was part of the proposed action–in the 2021 BiOp at issue in this case. NMFS found that the operation of the American lobster fishery through 2030 was not likely to jeopardize the species' continued existence, provided those future rulemakings took place.

In its July 8, 2022 opinion, this Court did not disturb NMFS's no jeopardy conclusion. It did, however, narrowly hold that the incidental take statement ("ITS") included with its 2021 BiOp, which authorized zero M/SI take, was arbitrary and capricious for failing to align with lethal take expected to occur in federal fisheries. The Court stated that the level of take an ITS authorizes should "roughly correspond to the amount of take actually anticipated." Dkt. 219 at 24. Separately, the Court commended NMFS for the significant risk reduction that the 2021 TRP Amendment Rule achieved, but ultimately found that that rule was unlawful because NMFS did not include measures that would reduce right whale M/SI to below the species' potential biological removal ("PBR") level before March 17, 2022.

Addressing the deficiencies identified by the Court will require analysis of the best available science, which is constantly changing, engagement with the public, members of which are deeply invested in both the future of the North Atlantic right

whale and the future of the American lobster fishery, engagement with the TRT, which plays a crucial role in developing workable take reduction measures, and major advances to fishing gear technology. Given the weighty task ahead, the Court should remand the 2021 TRP Amendment Rule, without vacatur,[1] with an instruction to finalize a new TRP amendment rule by December 9, 2024. In light of recent population and risk reduction figures, NMFS announced in a September 8, 2022 *Federal Register* notice that it is in the process of expediting the implementation of the Conservation Framework. It intends to issue its next rule–designed to reach the right whale's PBR of 0.7 M/SI–by December 9, 2024. With this action, NMFS is expediting the risk reduction schedule contemplated in the Conservation Framework. Moreover, the risk reduction will occur across both state and federal fisheries, resulting in a substantively more ambitious undertaking than originally anticipated in the Conservation Framework.

The Court should reject Plaintiffs' proposed six-month window for a new TRP amendment rule. Among a host of other problems, Plaintiffs do not take into account the public processes and legal procedural requirements that NMFS's forthcoming rule must satisfy. In light of the amount of work that is required for such a rulemaking, the importance of public input in the process of developing operationally feasible measures, and the time previous TRP amendment rules have taken, 26 months is eminently reasonable. But perhaps more importantly, 26 months is necessary to develop and implement an effective rule that adequately protects right whales. Public input from the scientific community and environmental, industry, and state stakeholders is a necessary

---

[1] Federal Defendants agree with Plaintiffs that in light of the conservation benefit that the measures in the 2021 TRP Amendment Rule provide for right whales, vacatur of the rule would not be an appropriate remedy. *See* Pls. Remedy Brief (Dkt. 226-1) at 21-22.

component for developing such an important, complex, and far-reaching rule that will achieve PBR without unnecessary or unintended consequences.

As for the 2021 ITS, the appropriate remedy is remand, as it relates to the North Atlantic right whale, without vacatur, for issuance of a new ITS. Plaintiffs' proposal to vacate the entire 2021 BiOp, with vacatur stayed for six months (i.e., with vacatur commencing in early 2023), is unwarranted. Here, the Court ruled narrowly that NMFS had issued a zero lethal take ITS that did not account for 2.69 right whale M/SI per year. In other words, only the ITS was found to be flawed. Importantly, the 2021 BiOp's no jeopardy conclusion remains undisturbed. And NMFS contemplated that the M/SI figure would continue dropping to 1.04 in 2025 and 0.136 in 2030. Thus, the amount of lethal take authorized, zero, will roughly correspond to the amount of lethal take anticipated (0.136 M/SI) within a relatively short timeframe. Moreover, under the 2021 BiOp's own terms, any exceedance of the zero take ITS triggers reinitiation of consultation. NMFS's error was therefore not "serious."

Vacating the entire 2021 BiOp in early 2023, as Plaintiffs propose, could also cause significant institutionally, economically, and ecologically disruptive consequences. The federal lobster industry, which in 2018 generated 491 million dollars in landings in Maine alone, could be closed if NMFS does not have an operable biological opinion in place to satisfy its ESA Section 7 legal requirements. In light of the ongoing public health crisis and its economic impact, including higher than average fuel costs due to supply chain constraints, shuttering the federal fishery from 2023 through 2030 is untenable.

Plaintiffs' proposal that NMFS craft a new BiOp within six months of the Court's decision ignores reality. The Court has held that to issue a lawful BiOp, NMFS must first

be able to make a negligible impact determination ("NID") for federal fixed-gear

fisheries pursuant to the MMPA, which would allow the agency to issue an ITS pursuant

to the ESA. Plaintiffs have conspicuously avoided discussing what achieving the NID

would actually entail. But to be clear, the current NID level is 0.095 M/SI per year–far

lower than PBR. In other words, NMFS would have to find that no more than one M/SI

will occur in the federal fisheries *every 11 years* to reach NID. Without broadly shutting

down federal and state fixed gear fisheries, the only way to make a NID is broad-scale

deployment of "on-demand" (i.e., ropeless) fishing in federal and state waters for all, or

nearly all, fixed gear fisheries–not merely the lobster fisheries. That kind of technology is

not currently viable for widespread use. It will not likely be widely available and adopted

before 2030. However, targeted deployment of on-demand fishing could be implemented

on a more limited, commercial scale earlier. Thus, vacatur of the 2021 BiOp in 2023–

with no feasible means of achieving the NID standard in an operating fishery–would

likely require the closure of the federal lobster fishery for eight years to meet the NID

standard. As this Court has already recognized, the outcome of its actions concerning

remedy could be "severe." For all these reasons, as further explained below, the Court

should not vacate the ITS in the 2021 BiOp and should instead remand without vacatur,

and order NMFS to finalize a new TRP amendment rule by December 9, 2024.

## STANDARD OF REVIEW

Vacatur is not the only remedy option available to the Court. Dkt. 125 at 9

(quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir.

2019) (citing 5 U.S.C. § 706(2)). Instead, as equity requires, the reviewing court has

discretion to leave the agency action in place. *See, e.g., Nat'l Parks Conservation Ass'n v.*

*Semonite*, 422 F. Supp. 3d 92, 98–99 (D.D.C. 2019); *Pub. Emps. for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 115 (D.D.C. 2014).

In *Allied-Signal v. U.S. Nuclear Regulatory Commission*, the D.C. Circuit laid out the operative test for whether to vacate an agency action found to be deficient during remand. 988 F.2d 146 (D.C. Cir. 1993). First, a court must consider "the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly)." *Id*. at 150 (citation omitted). Second, it analyzes "the disruptive consequences of an interim change that may itself be changed." *Id*. at 150–51 (citation omitted). "Neither factor is dispositive, as 'there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.' " *Nat'l Parks*, 422 F. Supp. 3d at 99 (quoting *Shands v. Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015) (citing *North Dakota v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) (per curiam)). Instead, "'resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives.'" *Nat'l Parks*, 422 F. Supp. 3d at 99 (quoting *Shands*, 139 F. Supp. 3d at 270) (remanding without vacatur when the first factor favored vacatur but the second did not), and *AARP v. EEOC*, 267 F. Supp. 3d 14, 38-19 (D.D.C. 2017) (same)).

## LEGAL BACKGROUND

### I.     Endangered Species Act Section 7

ESA Section 7 directs all action agencies (here, NMFS-Sustainable Fisheries Division ("NMFS-SFD")) to ensure that their actions are not likely to jeopardize threatened and endangered species. 16 U.S.C. § 1536(a)(2). To carry out this mandate, when a proposed Federal action may affect an ESA-listed species, ESA Section 7 and its

implementing regulations require that the action agency consult with the ESA consulting agency (here, NMFS-Protected Resources Division). 50 C.F.R. § 402.14(a). The Section 7 consultation process may culminate in a biological opinion, which explains the scientific basis for NMFS-Protected Resources Division's conclusions. Such biological opinions must include the consulting agency's opinion as to whether the action is likely to jeopardize the species' continued existence or result in destruction or adverse modification of critical habitat. *Id.* In those cases where the consulting agency concludes that an action and the resultant incidental take of listed species will not violate Section 7(a)(2)–i.e., a "no jeopardy" biological opinion–and, in the case of marine mammals, where the taking is authorized pursuant to Section 101(a)(5) of the MMPA, the consulting agency will provide with the biological opinion a statement concerning incidental take, known as an incidental take statement. *Id.* § 402.14(i).

An ITS must specify (a) the impact of such taking on the species; (b) those reasonable and prudent measures ("RPMs") that are necessary or appropriate to minimize that impact; (c) in the case of marine mammals, measures necessary to ensure compliance with the MMPA's Section 101(a)(5), 16 U.S.C. § 1371(a)(5), requirements; (d) terms and conditions that will allow the action agency to implement the RPMs and measures necessary for compliance with the MMPA; and (e) procedures to be used to handle or dispose of any individuals of a species actually taken. 50 C.F.R. § 402.14(i)(1)(i)-(v). An ITS can use a proxy to specify "the amount or extent of anticipated take" as long as it "sets a clear standard for determining when the level of anticipated take has been exceeded." Dkt. 219 at 25 (the Court's summary judgment decision, citing to 50 C.F.R. §

402.14(i)(1)(i)). If, during the course of the action, the amount or extent of incidental

taking is exceeded, the action agency must reinitiate consultation. *Id.* § 402.14(i)(4).

## II.      The MMPA and the Atlantic Large Whale Take Reduction Team Process

In 1996, NMFS established the TRT, consisting of expert representatives from the

fishing industry, state and Federal resource management agencies, the scientific

community, and conservation organizations.[2] The TRT develops and recommends

measures to reduce the impact of Category I and II commercial fisheries on large whales

in the Atlantic to achieve the PBR level.[3] 83 Fed. Reg. 49,046 (Sept. 28, 2018). The TRT

does so to assist NMFS in developing a TRP. *Id.*

The TRP, which was first issued in 1997, is designed to reduce M/SI of large

whales in commercial fisheries along the Atlantic coast, including the American lobster

fishery. *Id*. Since 1997, the TRP has been amended several times to reduce the impacts of

fishing gear on large whales in U.S. waters through measures that include area closures,

gear configuration requirements, and gear marking. Dkt. 81-1 at 19-20; NMFS, *Taking of*

*Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale*

*Take Reduction Plan Regulations*, 62 Fed. Reg. 39,157 (July 22, 1997) (ALWTRP Final

Plan); 65 Fed. Reg. 80,368 (Dec. 21, 2000) (gear modifications interim final rule); 67

Fed. Reg. 15,493 (Apr. 2, 2002) (gear modifications final rule); 72 Fed. Reg. 34,632

(June 25, 2007) (Southeast regional modifications final rule); 73 Fed. Reg. 19,171 (Apr.

---

[2] *See* 16 U.S.C. § 1387(f)(6)(C) ("Members of take reduction teams shall have expertise regarding the conservation or biology of the marine mammal species which the [TRP] will address, or the fishing practices which result in the incidental mortality and serious injury of such species.").
[3] PBR is defined in the MMPA as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).

9, 2008) (broad-based gear modifications); 73 Fed. Reg. 58,942 (Oct. 8, 2008) (Dynamic

Area Management Program Temporary Reinstatement); 79 Fed. Reg. 30,586 (June 27,

2014) (vertical line rule); 79 Fed. Reg. 73,848 (Dec. 12, 2014) (change to Massachusetts

restricted area); 80 Fed. Reg. 30,367 (May 28, 2015) (change to vertical line rule).

## FACTUAL BACKGROUND

**I.       NMFS's Implementation of the Conservation Framework**

The most recent TRP Amendment Rule, published on September 17, 2021,

implemented modifications intended to reduce M/SI caused by entanglement in the

Northeast American lobster and Jonah crab trap/pot fishery by up to 60 percent. 86 Fed.

Reg. 51,970 (Sept. 17, 2021). This rulemaking is sometimes referred to as the "Phase 1"

risk reduction modifications. *Id*.

In 2021, the TRT convened to address large whale M/SI caused by entanglements

in the U.S. East Coast gillnet, Atlantic mixed species trap/pot, and mid-Atlantic lobster

and Jonah crab trap/pot fisheries ("Phase 2" fisheries). *Id*. Scoping on measures to reduce

the impacts of these fisheries occurred from August 10, 2021, through October 21, 2021.

*Id*. The TRT reconvened in May 2022 to begin development of recommendations for

modifications to the TRP regulations related to these Phase 2 fisheries. *Id*.; *see also*

NMFS, https://www.fisheries.noaa.gov/alwtrp (last visited Sept. 19, 2022) (further

information about the TRP and the 2021-2022 TRT meetings).[4]

---

[4] NMFS has also recently taken steps to further reduce the risk of vessel strikes. NMFS, *Amendments to the North Atlantic Right Whale Vessel Strike Reduction Rule*, 87 Fed. Reg. 46,921 (Aug. 1, 2022) (proposing changes to right whale vessel speed regulations to further reduce likelihood of M/SI from vessel collisions, which are leading cause of right whales' decline and primary factor in ongoing unusual mortality event).

In light of new information about the population's decline, NMFS has decided to accelerate the Conservation Framework's timeline by combining Phases 2 and 3, with a target of reaching PBR for state and federal fisheries. Phase 3 would have originally implemented rulemaking to further reduce M/SI by an additional 60 percent in just federal fixed-gear fisheries, reducing M/SI from entanglement, on average annually, to 1.04. BiOp_1088. The new approach is more ambitious because it seeks to reduce M/SI from both state and federal waters to 0.7 (i.e., PBR) within six months of the rule's implementation.

Thus, NMFS intends to issue a new TRP Amendment Rule by December 9, 2024, which will be designed to meet the right whale PBR of 0.7 M/SI, by May 31, 2025. Declaration of Michael Pentony ("Pentony Decl.") (Exh. A) ¶¶ 2-12. This timeline is accelerated from the roadmap laid out in the Conservation Framework, which provided for completion of Phase 3 in 2025. Achieving PBR will require NMFS to implement a broad suite of measures in both federal and state waters that are informed by the most recent scientific information and the realities of the affected fisheries. *Id.* ¶¶ 6, 9. Any suite of measures capable of achieving PBR will likely include the following: (1) continuation of the existing measures in the 2021 TRP Amendment Rule; (2) targeted large-scale closures, where, in some cases, gear is required to be removed from the water and brought to shore for extended periods rather than being redeployed in other waters where fishing is permitted; (3) broad vertical line reductions (achieved through reductions in trap allocations, on-demand or "ropeless" fishing technology, or through other means); and (4) expanded use of weak rope or weak insertions. *Id.*

Twenty-six months would allow for TRT involvement, although not as extensively as past TRP rulemakings, which is critical to develop an effective rule. *Id*. Dkt. 111-1 ¶ 12 (Decl. of Jennifer Anderson). NMFS has scheduled TRT meetings for September 19, September 22, and September 30, 2022, and beyond, with the intent of having the TRT discuss and consider–using its expertise in TRP fisheries and right whale conservation–the measures that are best suited to reaching PBR. *Id*. NMFS intends to expedite the TRT process such that TRT deliberations are complete by the end of December 2022. *Id*. Next, NMFS will consider the consensus or alternatives developed during TRT deliberations, to begin work on a draft environmental impact statement and proposed rule. *Id*. Given NMFS's experience with National Environmental Policy Act ("NEPA") compliance for similarly complex and controversial actions, and the need to expedite the process, NMFS anticipates finalizing the draft environmental impact statement and proposed rule by November 2023 and the final environmental impact statement and final rule by December 9, 2024. *Id*.

The proposed timeline also takes into account the time needed to seek peer review for several critical analytical approaches that will underpin the new rule including: (1) the updated and refined Decision Support Tool; (2) potential reconsideration of apportionment of M/SI between the U.S. and Canada; and (3) potential reconsideration of apportionment of M/SI between vessel strikes and fisheries. *Id*. ¶ 10. Additionally, this timeline will allow NMFS to utilize a new and updated right whale population model. *Id*. NMFS expects this model to be available by early 2023. *Id*. NMFS will also seek input on the proposed rule from the Atlantic States Marine Fisheries Commission and Fishery Management Councils. *Id*.

II.    **NMFS's Campaign to Develop, Refine, and Disseminate On-Demand Fishing Technology to the American Lobster Fishery, and the Ropeless Roadmap**

Achieving the goals of the ESA and MMPA will require broad-scale deployment of on-demand fishing technology. NMFS has worked aggressively to aid development of this technology, but it needs more time. On June 29, 2022, NMFS released its 20-page draft Ropeless Roadmap for public input. NMFS, *Ropeless Roadmap, available at* https://media.fisheries.noaa.gov/2022-07/RopelessRoadmapDRAFT-NEFSC.pdf. ("Ropeless Roadmap") (last visited Sept. 19, 2022); *see also* Overview of On-Demand Fishing: a Collaboration, at 8 (NMFS, June 28-30, 2022) (Exh. B) ("Overview") (types of on-demand gear mechanisms); *see also* Overview at 15 (mechanical problems associated with on demand technology). The Ropeless Roadmap describes the current state of on-demand fishing and outlines a path for development and increasing adoption of this technology in U.S. East Coast commercial fisheries. Ropeless Roadmap at 2. It discusses this developing technology and forecasts its future path based on the status of gear development, ongoing regulatory changes, and the need to decrease whale entanglements and associated M/SI under the ESA and MMPA. *Id.* As the need for larger and longer seasonal restricted areas increases to protect right whale, on-demand fishing represents the best solution to separate rope and right whales in high-risk areas. *Id.* It is, moreover, likely the only solution that would permit high-intensity fishing effort in areas with relatively high right whale densities. Declaration of Henry Milliken ("Milliken Decl.") (Exh. C) ¶¶ 2-20; Pentony Decl. ¶ 12.

Broader adoption of on-demand fishing gear will require compliance with numerous federal and state laws and regulations, and fishery management plans, and will

follow a four-step process. Ropeless Roadmap at 9-11. The first step is technology development and testing, which is ongoing in 2022. *Id.* at 11. Technology testing has two goals: (1) continue to operationalize gear designed to be deployed and recovered without the continuous presence of a buoy line in the water column; and (2) report and track the gear's position through a geolocation software data system to prevent unintentional gear conflicts. *Id.* The second step, which began this year, building off of efforts started in 2019, entails resolving gear conflicts. *Id.* at 12. The third step is to expand experimental fishing, which will begin next year. *Id.* at 13. The fourth and final step entails fishery regulatory management plan changes, which will also begin next year. *Id.* at 14.

Vessels operating in federal waters represent a disproportionate amount of entanglement risk and might be candidates for early adoption of on-demand gear in appropriate, high-risk locations. *Id.* While development of on-demand fishing gear will require both time and investment, once operational it could provide many opportunities including:

- Reducing the risk of entanglement of whales, sea turtles, and other marine animals in vertical lines.
- Providing a spatially-resilient management solution as both large marine vertebrates and fisheries shift movement patterns in response to climate change.
- Supporting market demand for sustainable seafood products, including green seafood labeling, sustainability certification, NGO endorsement, and increased marketing opportunities.
- Reducing gear conflicts by allowing gear to be visualized at night and in inclement weather.
- Reducing ghost-gear as displaced gear can be relocated using acoustics.
- Providing sophisticated, innovative options for lobster management with geolocation technology.

*Id.* at 19-20.

//

13

### III.     NMFS's September 9, 2022 Notice of Intent to Amend the TRP

On September 9, 2022, NMFS notified the public that it intends to modify the

TRP again to further protect right whales. NMFS, *Notice of Intent to Prepare an*

*Environmental Impact Statement on Modifications to the Atlantic Large Whale Take*

*Reduction Plan to Reduce Mortality and Serious Injury of Large Whales in Commercial*

*Trap/Pot and Gillnet Fisheries Along the U.S. East Coast*, 87 Fed. Reg. 55,406 (Sept. 9,

2022). NMFS communicated that "additional risk reduction is needed in all East Coast

gillnet and trap/pot fisheries regulated under the [TRP] to meet the requirements of the"

MMPA. *Id*. Given new information since the TRT began work on the 2021 TRP

Amendment Rule, the risk reduction estimated to be necessary to reduce M/SI in U.S.

commercial fisheries to below PBR "has increased from 60 to 80 percent in 2019 to at

least" 90 percent. *Id*. at 55,405. NMFS will develop and analyze regulatory measures that

would modify existing TRP requirements to reduce the risk of M/SI of large whales in

U.S. fisheries caused by ongoing large whale incidental entanglements. *Id*.

## ARGUMENT

### I.     THE COURT SHOULD REMAND THE 2021 TRP AMENDMENT RULE WITH A DEADLINE OF DECEMBER 9, 2024 TO PUBLISH AND FINALIZE ITS NEXT TRP AMENDMENT RULE.

The Court should give NMFS the necessary amount of time–through December 9,

2024–to issue its next TRP Amendment Rule. That rule will be designed to meet the right

whale PBR of 0.7 M/SI, by May 31, 2025.[5] Pentony Decl. ¶¶ 2-8. Achieving PBR will

require another herculean effort by the agency and the TRT. NMFS will have to hold

---

[5] Federal Defendants are not addressing the issue of whether the 2021 TRP Amendment
Rule should be vacated because the Plaintiffs have requested that the 2021 TRP
Amendment Rule be remanded without vacatur. Dkt. 226-1 at 21-22, 226-3 at 3.

TRT meetings to discuss measures necessary to reach PBR, and then will consider the recommendations developed during these TRT deliberations to begin developing a draft environmental impact statement and proposed rule. *Id.* NMFS should also allow for public comment on the proposed rule under NEPA and the Administrative Procedure Act ("APA"), and refine and seek peer review on the Decision Support Tool, right whale population model, and potentially, risk apportionment between the United States and Canada and between vessel strikes and fisheries, where appropriate. *Id.* ¶ 10; *Maine Lobstermen's Ass'n v. NMFS*, No. 21-cv-2509 (D.D.C.), Dkt. 76 at 11 (Court noting as "circumstances change and new data become available, the agency can and must continually update its assessments."). Under the circumstances, and given the complicated economic and ecological nature of NMFS's upcoming rulemaking, 26 months for the next phase is reasonable. Dkt. 219 at 2-3 (the Court, recognizing that this case involves a "highly complex statutory and regulatory environment . . ."); *id.* at 12 (the Court, noting that "[g]iven climate change . . . the [right whale's] habitat has shifted northward . . . following the movement of their main food sources – zooplankton and copepods – to cooler waters."); *Dist. 4 Lodge v. Raimondo*, No. 21-01874 (1st Cir. Nov. 16, 2021 (Dkt. 00117811467, at 11) (discussing uncertainty inherent in any attempt to quantify take via entanglement in vast ocean); *cf.* Dkt. 76 at 16 ("attempting to trace the location of mortal entanglements is quintessentially murky water" and "the agency here face[s] the difficult gap-filling task of assigning M/SI of unknown provenance to a likely source."). Twenty-six months is also necessary to develop and implement a rule that adequately protects right whales and effectively restricts fishing across numerous fixed-gear fisheries. TRT expertise and public input from various stakeholders is a critical

component for developing such an important, complex, and far-reaching rule that will

achieve PBR without unnecessary collateral consequences.

Deference to NMFS's judgment is especially appropriate here, "[i]n light of the

agency's . . . willingness to act urgently where urgent measures are called for . . . ." Dkt.

125 at 15. As Plaintiffs have noted, "the agency recently invoked its emergency authority

to implement a short, one-month closure of federal waters off Massachusetts to lobster

fishing with vertical buoy lines for April 2022 only." Dkt. 226-1 at 20 (quoting NMFS,

*Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic*

*Large Whale Take Reduction Plan Regulations; Correction*, 87 Fed. Reg. 11,978 (Mar. 3,

2022)).[6] As such, there is "no pressing need to preempt completion of [the next] TRP

rulemaking process," "which, by Congressional design, should involve attempts to reach

'consensus' with stakeholders and a robust opportunity 'for public review and

comment.'" Dkt. 125 at 15 (citing 16 U.S.C. § 1387(f)(8)(A)(ii), (B)(i)).

The Court should reject Plaintiffs' suggestion that NMFS needs no more than six

months from the date of the Court's remedy order to finalize the next TRP amendment

rule. Dkt. 226-1 at 21; *see also id.* at 3. Plaintiffs' argument that "six months will provide

the agency with time to figure out how to come into compliance with the law in

authorizing and managing the federal lobster fishery" is entirely speculative and, indeed,

appears to have been plucked out of thin air. Dkt. 226-2 at 12-13. A simple comparison

with previous TRP amendments suffices to demonstrate the fallacy of Plaintiffs'

proposal. For example, the 2021 TRP Amendment Rule (Phase 1 of the Conservation

---

[6] NMFS implemented a temporary emergency rule to prohibit trap/pot fishery buoy lines
between Federal and State waters within the TRP's Massachusetts Restricted Area during
April 2022 to reduce the incidental M/SI in commercial lobster and Jonah crab trap/pot
fisheries. 87 Fed. Reg. 11,978.

Framework) took approximately 53 months to complete. Pentony Decl. ¶ 6; *see also* Dkt. 111-1 (Decl. of Jennifer Anderson, NMFS) ¶ 12. In context, NMFS's 26-month proposal is "reasonable" and "rests on 'a good faith effort [by the agency] to manage [its] . . . obligations' under the MMPA." Dkt. 125 at 17-18 (quoting *Sierra Club v. Pruitt*, 280 F. Supp. 3d 1, 3 (D.D.C. 2017)). Far from dragging its feet, as Plaintiffs may contend on reply, NMFS is moving swiftly in pursuing challenging risk reduction goals. *Cf. Nat. Res. Def. Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1974) (the district court's task is to "separate justifications grounded in the purposes of the [a]ct from the footdragging efforts of a delinquent agency")).

Plaintiffs' six-month proposal also fails to consider the fact that proposed measures may implicate existing fishery regulations, or necessitate modifications of such fishery regulations, which would require coordination and consultation with the Atlantic States Marine Fisheries Commission and the Mid-Atlantic and New England Fishery Management Councils to ensure effective implementation. It would also force NMFS to waive public comment entirely, or at a bare minimum severely restrict comment on the draft rule. The public interest in these matters is reflected by the over 171,000 written comments submitted to NMFS on the 2021 TRP Amendment Proposed Rule. *See* Dkt. 149 at 13-14. Imposing a six-month deadline would destabilize and undercut the TRT process, the expert input of which is invaluable.

Moreover, a six-month timeline would require NMFS to seek "alternative arrangements from the Council on Environmental Quality for an expedited NEPA process. *See* 40 C.F.R. § 1506.12. Simply stated, six months could result in a rushed

agency rulemaking process and would likely yield a less effective rule with potentially greater collateral consequences for right whales and regulated parties.

Plaintiffs miss the mark when they contend that NMFS knew that more than a 60 percent risk reduction was necessary but still opted "not to implement more protective measures" in the 2021 TRP Amendment Rule. Dkt. 226-1 at 18. That is not accurate. Rather than abandoning the progress and momentum achieved in the TRT process from 2018 TO 2020, the agency chose to move ahead with the measures that the TRT (which included two of the Plaintiffs) had agreed upon in 2020. At the same time, NMFS acknowledged that more needed to be done, and in the Conservation Framework established a roadmap for how it would accomplish that additional work. Given the rapid pace that new scientific information is being developed, and the urgent conservation needs of the species, it would have been irresponsible to delay the conservation benefits of the 2021 TRP Amendment Rule to go back to the drawing board, as Plaintiffs suggest.

Reaching PBR will almost certainly require a complex rulemaking that restricts fishing for numerous fixed-gear fisheries across the Atlantic seaboard. Even a complete closure of the federal lobster fishery, without additional measures in state waters and other federal fixed gear fisheries, would likely not reach PBR. Pentony Decl. ¶ 4. The Court should therefore permit NMFS through December 9, 2024 to complete its forthcoming TRP Amendment Rule, the minimum time necessary for such a complex and important rulemaking.

## II.     THE COURT SHOULD REMAND THE ITS WITHOUT VACATUR.

Because Plaintiffs' challenge to the ITS was brought pursuant to the judicial review provision of the APA, 5 U.S.C. § 702, the legally appropriate remedy is governed

by administrative law principles. *See Bennett v. Spear*, 520 U.S. 154, 174-79 (1997). It is well-established that, in APA cases, the reviewing court "is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (*per curiam*) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). "Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id*. An administrative agency ordered to reconsider or explain a prior decision retains the discretion to determine how it "may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as it develops." *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp*., 423 U.S. 326, 333 (1976) (per curiam). As the Supreme Court noted in *Federal Power Commission*, in the absence of substantial justification for doing otherwise, a reviewing court may not dictate to the agency "the methods, procedures, and time dimension of the needed inquiry." *Id*. Such a procedure "clearly runs the risk 'of propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency.'" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 544-45 (1978) (quoting *SEC v. Chenery*, 332 U.S. 194, 196 (1947)).

In this case, where the Court has ruled that the NMFS-Protected Resources Division, as the consulting agency, included an incidental take statement in the 2021 BiOp that did not account for the estimated amount of M/SI, the Court should remand the ITS to NMFS for further consideration without vacating it. *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) (leaving regulation in place on remand); *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 623 F. Supp. 2d 1015, 1041-43 (D.

Ariz. 2009) (after finding Fish and Wildlife Service BiOp arbitrary, court remanded BiOp for reconsideration). NMFS should be afforded the discretion to complete a new ITS, in conjunction with the TRP amendment process, and determine how best to proceed in meeting its obligations under the ESA. Thus, under the APA and the principles of administrative law, the proper remedy is for the Court to remand the ITS that it has found to be "arbitrary and capricious" back to NMFS for further consideration.

The D.C. Circuit has allowed agency actions under the *Allied-Signal* test to remain in place pending completion of a remand, even where those actions have been found to be "arbitrary and capricious." *United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966 (D.C. Cir. 1990) (citation omitted). Courts repeatedly have applied this rule to avoid the vacatur of an agency action where such vacatur would cause serious disruption of an affected industry. *See, e.g., Chamber of Comm. of the U.S. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006). And courts have allowed agency actions taken under the ESA–including incidental take statements and biological opinions–to remain in place during remand. *Grand Canyon Tr.*, 623 F. Supp. 2d at 1043; *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196, 1215 (D. Or. 2003) (remanding biological opinion without vacatur, "in order to give [NMFS] the opportunity to consult [on defects the court had identified in the biological opinion]"); *Columbia Snake River Irrigators Ass'n v. Evans*, No. CV 03–1341–RE, 2004 WL 1240594, at *1 (D. Or. June 3, 2004) (expressly stating that the court "did not order the [biological opinion in *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196] vacated, but remanded it").

//

//

A.      Only the Incidental Take Statement is at Issue, Not the 2021 BiOp.

First, the only fault that the Court found with the 2021 BiOp was in the ITS. The

scope of any remedy should be limited to addressing the deficiencies identified by the

Court and thus should extend to the ITS only and not the other portions of the 2021 BiOp.

The ESA and its implementing regulations make clear that an ITS is distinct from a

biological opinion and has an independent basis. ESA Section 7(a)(3) states that after

consultation the consulting agency "shall provide . . . a written statement setting forth

[its] opinion, and a summary of the information on which the opinion is based, detailing

how the agency action affects the species or its critical habitat." 16 U.S.C. §

1536(a)(3)(A). ESA Section 7(a)(4) then separately sets out the circumstances where the

consulting agency shall provide the action agency and any applicant with an incidental

take statement. *Id*. § 1536(a)(4). Similarly, the ESA regulations have separate provisions

for issuing a biological opinion and an ITS. *Compare* 50 C.F.R. § 402.14(h) ("The

biological opinion shall include …") with 50 C.F.R. § 402.14(i) (setting out the

circumstances where "the Service will provide with the biological opinion a statement

concerning incidental take"). Here, the Court found only that NMFS's ITS included with

the 2021 BiOp was arbitrary and capricious. It declined to reach Plaintiffs' other ESA

claims, including those challenging the 2021 BiOp. Therefore, the Court should reject

Plaintiffs' request to vacate the 2021 BiOp as overbroad. At most the Court should

consider vacatur with respect to the ITS.

B.      The Single Deficiency that the Court Identified Concerning the ITS is not
        Serious.

Turning to the first prong of *Allied-Signal*, the deficiency identified by the Court

is not serious. *Allied-Signal*, 988 F.2d at 150-51. In its July 8, 2022, summary judgment

decision, while the Court concluded that the ITS fell short, it left the 2021 BiOp intact. Dkt. 219. For example, Plaintiffs argued strenuously that NMFS artificially limited the action area to federal waters from 3 to 200 nautical miles and should have included the effects of lobster fishing in state waters from 0 to 3 nautical miles in its consultation, Dkt. 188-1 at 17-22, 29. The Court declined to rule on Plaintiffs' claims concerning the core conclusion of the 2021 BiOp–that continued operation of the lobster fishery through 2030 would not jeopardize the North Atlantic right whale. Dkt. 219 at 13.[7] The fact that the Court did not disturb NMFS's no jeopardy determination weighs strongly against vacating the 2021 BiOp. *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005) ("non-jeopardizing" agency actions may be allowed "to continue during the consultation process."); *cf.* Dkt. 125 at 14-15 (Court, in previous remedy order, deferring to NMFS as to appropriate timing of next TRP amendment rule, quoting *Ill. Comm. Fishing Ass'n v. Salazar*, 867 F. Supp. 2d 108, 113–14 (D.D.C. 2012) ("[T]he Court 'must look at the [agency's] decision not as the chemist, biologist, or statistician that [it is] qualified neither by training nor experience to be," but instead must limit itself to "holding agencies to certain minimal standards of rationality.") (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)). NMFS's judgment is entitled to deference. *Id*.

NMFS's error was also not a "serious violation of law," as Plaintiffs maintain, because the 2021 BiOp's ITS did not significantly diverge from, and indeed approximated, the expected level of take over time. Dkt. 226-1 at 2, 12-13. The 2021 BiOp included an ITS with a zero lethal take reinitiation trigger when NMFS expected

---

[7] The ESA requires the consulting agency to include in a BiOp its conclusion as to whether the action is likely to jeopardize the species' continued existence or result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

2.69 M/SI to occur initially per year in the federal fishery. But NMFS expected that

number to drop precipitously a short time thereafter through implementation of the

Conservation Framework. *Maine Lobstermen's Association v. NMFS*, No. 21-cv-2509

(D.D.C.), Dkt. 76 at 26 (Court, rejecting environmental Plaintiffs' argument, finding the

Conservation Framework, "form[ed] a necessary part of the agency's action"); J.A. Vol.

2 at 540 (BiOp 2017) and *id.* at 541 (BiOp 2018). NMFS made clear that it expected

M/SI from federal fisheries to dip to 1.04 in 2025 and 0.136 in 2030. J.A. Vol. 2 at 677–

78 (BiOp 2154–55).

    Thus, while NMFS expected M/SI to remain above PBR, it anticipated that the

difference between the amount of lethal take authorized–zero–and anticipated would be

approximately *one* M/SI per year by 2025. The Federal Defendants then expected M/SI

from federal fisheries to dip to a number *approaching zero*, 0.136 M/SI. The delta

between the amount of lethal take authorized–zero–and the number of expected take–

2.69, 1.04, and 0.136–was not significant as it approached 2030. *Cf. Mayo v. Jarvis*, 177

F. Supp. 3d 91, 142 (allowing incidental take of 3–4 bears based on projection that 1.5

bears might be taken in remaining period), *amended on other grounds*, 203 F. Supp. 3d

31 (D.D.C. 2016), *vacated on other grounds sub nom., Mayo v. Reynolds*, 875 F.3d 11

(D.C. Cir. 2017); *Wildearth Guardians v. U.S. Forest Serv.*, No. 19-203, 2020 WL

2239975, at *1, *4 (D. Idaho May 7, 2020) (setting lethal-take level at zero when there

was "remote" possibility of lethal taking of grizzly bear); *cf.* Dkt. 219 at 25 (the Court,

citing 50 C.F.R. § 402.14(i)(1)(i), noting ITSs can use a proxy to specify "the amount or

extent of anticipated take" as long as the ITS "sets a clear standard for determining when

the level of anticipated take has been exceeded"). Far from undermining the "core

purposes" of the ESA, as Plaintiffs suggest, NMFS's zero-take ITS and Conservation Framework *supported* the goals of the ESA and MMPA. Dkt. 226-1 at 14, 15; Dkt. 219 at 26 (the Court, commending NMFS's zero take ITS because "creating no safe harbor is clearly preferable to authorizing the actual anticipated take of two per year."); *id*. at 24 (Court praising NMFS "for the significant reduction in M/SI incidents that this represents compared to years past . . . .").

Moreover, NMFS implements the functional equivalent of the reasonable and prudent measures aspect of the incidental take statement, 50 C.F.R. § 402.14(i), through the MMPA TRP rulemaking process. NMFS and the TRT designed the TRP regulations specifically to protect right whales from adverse effects of fisheries. And as to the requirement that the incidental take statement include procedures to be used for the handling of any individuals of a species actually taken, *id.* § 402.14(i)(1)(v), NMFS's Marine Mammal Authorization Program Certificate for 2020 already requires for all fishing vessels that "any marine mammal incidentally taken must be immediately returned to the sea unless directed otherwise by NMFS or a NMFS-authorized observer."[8] MMAP Certificate, Dkt. 111-8. In its regulatory context, the existence of safeguards implemented through the MMPA supports a finding that NMFS's error was not serious.

Plaintiffs' argument that NMFS's error was "serious" is undercut by their inability to substantiate their claim that leaving the 2021 BiOp in place will cause "high, unsustainable levels of take for years to come." Dkt. 226-1 at 16. Plaintiffs renewed their arguments from the previous phase of this case that NMFS had violated ESA Section 9

---

[8] The NMFS-Sustainable Fisheries Division has used this same mechanism in its BiOps for decades as a framework for intensively monitoring, documenting, and studying North Atlantic right whales.

by allowing take to occur, Dkt. 188-1 at 4; Dkt. 66-1 at 40-41, but the Court again declined to address those arguments. Dkt. 219 at 19. Nor have they "moved for preliminary relief at any point during this [four]-year-plus litigation." Dkt. 125 at 15. As the Court has previously held, Plaintiffs' "choices are consistent with NMFS's expert determination that" the additional time NMFS required to implement and expedite the next rulemaking processes under the TRP will not lead to the extirpation of the right whale. *Id*. at 16.

Plaintiffs are also wrong to suggest that the error the Court identified in the 2014 ITS and 2021 ITS are the same. Dkt. 226-1 at 2. Unlike the 2014 BiOp, which included no ITS for right whales but set the reinitiation trigger at 3.25, the 2021 BiOp included an ITS of zero for right whales and obliged NMFS-Sustainable Fisheries Division to reinitiate consultation if even one significant injury or mortality in federal waters were to occur. And unlike the 2014 BiOp, the 2021 BiOp took into account multiple measures aimed at minimizing the impact of take. *Compare* Dkt. 125 at 11 (noting 2014 BiOp not even based on "functional equivalent" of such measures, because such measures had not been finalized through incomplete TRP process), *with* Dkt. 219 at 14-15.

In short, the fact that the deficiency that the Court identified in the 2021 ITS is not "serious" weighs in favor of remand without vacatur.

C.    The "Disruptive Consequences" Prong of *Allied Signal* Also Supports
      Remand Without Vacatur.

As to the second prong of *Allied Signal*, vacating the 2021 BiOp six months after the Court issues its remedy order and mandating a replacement that satisfies the NID standard could produce significant negative economic consequences for the lobster industry, an industry that has already been (and is still being) affected by COVID-19, and

those relying on it throughout various supply chains. Here, NMFS has concluded that the fisheries considered in the 2021 BiOp would not jeopardize the continued existence of the right whale, and the Court has not invalidated this finding. However, due to the interplay between the ESA's incidental take provisions and the MMPA's NID standard, the Court's ruling here would require NMFS to make a finding that the federal fisheries will not cause more than 0.095 right whale M/SI per year—or approximately one M/SI every 11 years. Pentony Decl. ¶ 11. Plaintiffs' suggestion that NMFS should be required to produce a new, superseding biological opinion within six months of the Court's remedy order ignores how difficult it will be for NMFS to reach a NID under the MMPA. Dkt. 214 at 22-23. It is wholly untethered to reality. Dkt. 219 at 22 (the Court, noting "the Service finds itself caught between the devil and the deep blue sea given that the low numbers of right whales mean that almost any action will have more than a 'negligible impact' on the species."); Pentony Decl. ¶ 12.

Under current technological conditions, meeting this standard likely would not allow for a fixed gear fishery to operate, and would likely require massive shutdowns[9] of the federal fisheries. *Id*. With the development and implementation of ropeless fishing technology, however, meeting this standard could occur while allowing fisheries to operate. *Id*. NMFS estimates that on-demand fishing can be broadly available for wide-scale commercial use by 2030. *Id*.; Milliken Decl. ¶ 20; NMFS, Ropeless Roadmap at 11-15; BiOp_1088 (Cons. Framework). Smaller-scale commercial and more targeted use of on-demand fishing may be available earlier than 2030, Milliken Decl. ¶ 20, but

---

[9] While vacatur of the 2021 BiOp would not, in and of itself, trigger the closure of any fisheries, the lack of a biological opinion would likely foreclose NMFS from reissuing federal permits in fixed gear fisheries at issue here.

smaller-scale, on-demand fishing is not enough to allow NMFS to make a NID that would allow for a functioning fixed gear fishery. Until this technology is ready for widespread implementation, meeting the NID standard would likely be tantamount to a shutdown of the federal fixed gear fishery as it exists today. Indeed, the Court has recognized "the importance of lobster fishing to the economies of several states along the Atlantic seaboard." Dkt. 219 at 15. "In particular, in coastal Maine, 'the lobster supply chain has an economic impact . . . of $1 billion annually' and benefits numerous fishermen and their families." *Id.* Shuttering the federal lobster fishery would inflict a "weighty blow," especially in New England. *Id*. at 42.

In addition to the social and economic impacts, there would likely be other negative impacts that would flow from accomplishing the NID standard in the federal lobster fishery without ropeless technology. Widespread shutdowns of the federal lobster fishery could cause lobster fishers with both state and federal permits to move their traps and vertical lines from federal to state waters. This would result in a concentration of vertical lines in state waters, substantially offsetting gains in risk reduction from shuttering federal fisheries. Pentony Decl. ¶ 4. It bears repeating that shuttering the federal lobster fishery, without more measures in state waters and in other federal fixed gear fisheries, is not likely sufficient to meet PBR, a standard that under the MMPA applies to state and federal fisheries. *Id*. Moreover, vacatur of the 2021 BiOp would also negate the reliance value of the Conservation Framework and undercut the TRT process (of which all Plaintiffs are a part) as NMFS continues to implement them. Dkt. 125 at 4 (Court noting that TRT is "a group convened by NMFS with the central purpose (as the

name suggests) of decreasing the very takes Plaintiffs are concerned with."). TRT

expertise is also invaluable for developing effective measures to protect right whales.

  Thus, both prongs of *Allied Signal* militate against vacating the 2021 BiOp. The

only appropriate remedy is to leave the 2021 BiOp in place while NMFS continues to

collaborate with the lobster fishing industry, states, and other stakeholders to develop and

mainstream the use of on-demand fishing. Only after on-demand technology is made

affordable, available, and operationalized, will NMFS be able to make a NID for

operational federal fixed gear fisheries. Milliken Decl. ¶ 20; Pentony Decl. ¶¶ 11-

12. Without this technological advancement of on-demand fishing, the means for

reaching a NID are likely limited to  wide-scale shutdowns of numerous fisheries

including lobster. Vacating the 2021 BiOp in 2023, as Plaintiffs' suggest, would go well

beyond the legal violations found, and could cause extensive environmental,

institutional, and economic disruptions.[10] Any negative effects of allowing the federal

lobster fishery to continue to operate through 2030 while NMFS implements on-

demand technology "do not outweigh the aforementioned harms that will occur if vacatur

is ordered." *Nat'l Parks Cons. Ass'n*, 422 F. Supp. 3d at 102 (D.D.C. 2019).

  D. The Court Should Limit Any Remedy to Fisheries Expected to Impact
    Right Whales.

  Regardless of how the Court rules, the Court should recognize that the 2021 BiOp

addressed a variety of fisheries that are not expected to adversely affect right whales. The

ITS deficiency that the Court identified related solely to fixed-gear fisheries that may

---

[10] To the extent the Court disagrees, and finds that vacatur is warranted, the Court should stay any such vacatur through December 31, 2030 to allow NMFS and the lobster fishing industry to improve and operationalize ropeless lobster fishing.

entangle right whales and cause M/SI. Dkt. 219. The Court should avoid a remedy that implicates fisheries that are not expected to cause entanglements of right whales, and leave the remainder of the 2021 BiOp unaffected by its ruling.

## CONCLUSION

For the foregoing reasons, the Court should remand the 2021 TRP Amendment Rule without vacatur and instruct NMFS to issue a new TRP amendment rule by December 9, 2024, that NMFS anticipates will achieve PBR within six months of its implementation. The Court should also remand, and not vacate, the lethal take portion of the ITS in the 2021 BiOp to NMFS.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

/s/ J. Brett Grosko
J. BRETT GROSKO
Senior Trial Attorney (Md. Bar)
TAYLOR MAYHALL
Trial Attorney
Wildlife and Marine Resources Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC 20044-7611
TEL: (202) 305-0342
FAX: (202) 305-0275

Counsel for Federal Defendants

Of Counsel

John Almeida, Attorney-Advisor
Mark Capone, Attorney-Advisor
NOAA Office of General Counsel
Gloucester, Massachusetts

29

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2022, I caused the foregoing document

upon counsel of record, as indicated below, through the Court's electronic service system

(ECF/CM):

*/s/ J. Brett Grosko*
Attorney for Federal Defendants